1 | COLEMAN & BALOGH LLP
   | BENJAMIN L. COLEMAN
2 | California State Bar No. 187609
   | 1350 Columbia Street, Suite 600
3 | San Diego, California 92101
   | Telephone No. (619) 794-0420
4 | Facsimile No. (619) 652-9964

5 | COLEMAN & BALOGH LLP
   | ETHAN A. BALOGH
6 | California State Bar No. 172224
   | 255 Kansas Street, Suite 340
7 | San Francisco, California 94103
   | Telephone No. (415) 565-9600
8 | Facsimile No. (415) 565-9601

9 | Attorneys for Petitioner Eliot Scott Grizzle

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | ELIOT SCOTT GRIZZLE,                    )        Case No. C 07-4845 SI
                                            )
13 |            Petitioner,                  )
                                            )
14 | v.                                      )
                                            )        **STATEMENT OF FACTS AND**
15 | ROBERT HOREL,                           )        **MEMORANDUM OF POINTS**
                                            )        **AND AUTHORITIES IN SUPPORT**
16 |            Respondent.                  )        **OF PETITION FOR WRIT OF**
                                            )        **HABEAS CORPUS**
17 | _____)

18 |                    **PRELIMINARY STATEMENT**

19 |        Petitioner, Eliot Scott Grizzle, respectfully submits the following Statement of Facts and

20 | Memorandum of Points and Authorities in Support of his Petition for a Writ of Habeas Corpus.

21 |                    **PROCEDURAL HISTORY**

22 |        On December 24, 1997, Mr. Grizzle and Gary Littrell, inmates at Pelican Bay State Prison,

23 | were jointly charged in Del Norte County, California in a two-count information with murder and conspiracy

24 | to murder Aaron Marsh.  The conspiracy count alleged four overt acts: (1) Mr. Grizzle dissolved prescription

25 | drugs in inmate-manufactured alcohol to make Marsh drunk, vulnerable, and unable to defendant himself; (2)

26 | Mr. Grizzle caused inmate Michael Contreras to deliver the alcohol to Marsh in a bag covered by a manila

27 | folder; (3) Littrell got Marsh drunk and physically disabled with the drugs and alcohol; and (4) Littrell

28 | strangled Marsh with a garrote rope while Marsh was too drunk to defend himself.  *See* Ex. A.

1    The trials of Mr. Grizzle and Littrell were severed. *See, e.g.*, Ex. B at 1; Ex. K at 2. Former
2    Deputy District Attorney James Fallman tried both cases for the prosecution. *See, e.g.*, Ex. B at 1,109; Ex.
3    E. Mr. Grizzle was originally represented by appointed attorney Paul Gallegos. *See, e.g.*, Ex. I at 65; Ex. N.
4    By the time of trial, however, he was represented by appointed attorney Russell J. Clanton. *See, e.g.*, Ex. E.

5    Littrell proceeded to trial first, in the summer of 1998. A jury acquitted him on the conspiracy
6    count and convicted him of second degree murder on the substantive count. Due to potential jury misconduct,
7    Littrell's case was ultimately settled for a reduced sentence. *See, e.g.*, Ex. B; Ex. K at 2.

8    Mr. Grizzle's trial took place in February of 1999. *See, e.g.*, Ex. E. Shortly before the trial,
9    he unsuccessfully moved to dismiss the information on the grounds of collateral estoppel, relying upon the
10   acquittal on the conspiracy count in Littrell's trial. *See* Ex. K at 42-43. Unlike the jury in Littrell's trial, a jury
11   returned guilty verdicts against Mr. Grizzle as to both the conspiracy and substantive counts on February 19,
12   1999. *See, e.g.*, Ex. K at 1. In June 1999, Mr. Grizzle's motions for new trial were denied, and he was
13   sentenced to 37 years to life. *See, e.g.*, Ex. K at 1.

14   Mr. Grizzle appealed to the Court of Appeal, First Appellate District. The court of appeal
15   affirmed in an unpublished opinion issued on March 2, 2001 and denied Mr. Grizzle's petition for rehearing
16   on April 2, 2001. The Supreme Court of California denied Mr. Grizzle's petition for review on June 13, 2001.
17   *See* Ex. K.

18   On September 11, 2002, Mr. Grizzle filed a petition for a writ of habeas corpus in Del Norte
19   County Superior Court. On October 8, 2002, the superior court issued an order granting 30 days to file an
20   amended petition. While the state habeas corpus proceedings were commencing, the United States Attorney's
21   Office for the Central District of California filed a wide-ranging racketeering indictment against Mr. Grizzle
22   and dozens of other defendants. For the most part, the allegations against Mr. Grizzle contained in the federal
23   indictment consisted of the Marsh homicide. Mr. Grizzle was taken into federal custody and moved from
24   Pelican Bay. In addition, Mr. Grizzle's legal materials were seized by federal authorities. The federal
25   prosecutors also announced that they were considering seeking the death penalty against Mr. Grizzle.
26   Consequently, the superior court granted extensions of time to file an amended petition while the federal case
27   was pending. After over three years of pretrial proceedings, federal prosecutors dismissed the charges against
28   Mr. Grizzle, and he was transported back to Pelican Bay. *See* Ex. O at 3.

1    Undersigned counsel, who had been appointed to represent Mr. Grizzle in the federal

2    racketeering case, then filed an amended petition on his behalf in the superior court.  On June 18, 2007, the

3    superior court denied Mr. Grizzle's petition.  Mr. Grizzle then filed a petition for a writ of habeas corpus with

4    the California Court of Appeal, which was denied on September 6, 2007.  The Supreme Court of California

5    denied his petition for review on November 14, 2007.  *See* Ex. O.

6                                          **STATEMENT OF FACTS**

7    The following statement is only meant to summarize the facts presented at trial.  Mr. Grizzle

8    will certainly provide the Court with any specific testimony or other portions of the record to support this

9    summary or any other facts, should the Court so require.  Moreover, the facts specifically relating to the claims

10   for relief are set forth in detail in their respective sections of this memorandum.

11   On July 25, 1997, Littrell killed Marsh while the two lived in the same cell in a segregated

12   housing unit ("SHU") at Pelican Bay.  *See* Ex. K at 1.  That fact is undisputed.  The dispute at trial centered

13   around whether Mr. Grizzle had anything to do with Marsh's death.

14   The defense's theory, supported by the testimony of Littrell and other witnesses, was that Mr.

15   Grizzle had nothing to do with the homicide.  Instead, Marsh and Littrell had been fighting during the time

16   that they celled together.  On the day of the homicide, Marsh became drunk and belligerent after having

17   consumed homemade alcohol known as "pruno."  He then picked a fight with Littrell, a fight which resulted

18   in his death.

19   The prosecution's theory was that Mr. Grizzle, Littrell, and Marsh were all members of the

20   Aryan Brotherhood prison gang.  Leaders of the gang had ordered that Marsh was to be killed, and Mr. Grizzle

21   and Littrell carried out that order.  Specifically, the prosecution contended that Mr. Grizzle, who lived in a

22   separate cell but in the same pod as Marsh and Littrell, concocted the pruno, laced it with prescription

23   medication, and had it sent to the cell of Marsh and Littrell.  Marsh then drank the concoction, which left him

24   in a weakened state thereby allowing Littrell to overcome and kill him.  *See, e.g.*, Ex. G.

25   The prosecution did not have a strong case, as reflected by the jury verdicts in Littrell's trial,

26   which acquitted Littrell of conspiracy and only convicted him of second degree murder.  Indeed, the judge who

27   presided over both trials commented that the case against Mr. Grizzle was primarily based on witnesses with

28   "slimy" motives and was obviously even weaker than the case against Littrell.  *See* Ex. C at 65-66; Ex. D at

22-24.  The only way the prosecution could tie Mr. Grizzle to Marsh's death was through a series of convicted felons who turned state's evidence.  In total, the prosecution called five such witnesses.  While there was much evidence undercutting their testimony, this summary will simply outline what the prosecution sought to prove through their testimony.

Brian "Deadeye" Healy testified that he was a member of the Aryan Brotherhood and had recently dropped out to cooperate with the prosecution.  He testified that a few months before Marsh was killed, he conveyed the leadership's order to kill Marsh to Mr. Grizzle.  He also testified that, shortly after Marsh was killed, Mr. Grizzle told him that Marsh had been taken care of.  *See* Ex. F.

Douglas Ridinger testified that Mr. Grizzle had asked him if he would "whack" Marsh.  Ridinger testified that he originally agreed to do it, hoping that it would allow him to become a member of the Aryan Brotherhood, but then decided not to go through with the request when he realized that "whack" meant that he had to kill Marsh, as opposed to just stabbing him.  *See* Ex. D at 23-24; Ex. K at 2, 4-5.

Michael Contreras testified that he was a tier tender in the pod where Mr. Grizzle, Littrell, and Marsh lived.  He testified that he saw Mr. Grizzle in his cell while he was lacing pruno with prescription medication and that he then carried the concoction in an envelope from Mr. Grizzle's cell to the cell of Littrell and Marsh.  *See* Ex. D at 23; Ex. K at 2, 5-6.

Vernon Rubidoux testified that, after Marsh was killed, he had a conversation with Mr. Grizzle and Littrell while all three were waiting to see their attorneys.  During the conversation, both Mr. Grizzle and Littrell made incriminating statements.  *See* Ex. K at 2, 7-8.

Finally, last, and certainly not least for the purposes of this petition, was the testimony of Frederick Clark.  According to Clark, Mr. Grizzle paid him $500 to testify falsely at Littrell's trial.  Mr. Grizzle then offered to pay Clark additional money if he could provide the address of Healy's young daughter, who the Aryan Brotherhood had planned to kill as retaliation for Healy's cooperation with law enforcement. *See* Ex. E.

1

**STANDARD OF REVIEW**

2    The Attorney General will likely lean on the standard of review set forth in the Anti-Terrorism

3    and Effective Death Penalty Act of 1996 ("AEDPA").  The AEDPA standard of review provision states:

4        An application for a writ of habeas corpus on behalf of a person in custody
         pursuant to the judgment of a State court shall not be granted with respect
5        to any claim that was adjudicated on the merits in State court proceedings
         unless the adjudication of the claim –

6

7        (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
         Court of the United States; or

8

9        (2) resulted in a decision that was based on an unreasonable determination of
         the facts in light of the evidence presented in the State court proceeding.

10    28 U.S.C. § 2254(d).  At least six members of the Ninth Circuit believe that the AEDPA standard of review

11    is unconstitutional.  *See Crater v. Galaza*, _ F.3d _, No. 05-17027, 2007 WL 4259530 (9th Cir. Dec. 6, 2007)

12    (Reinhardt, J., dissenting from denial of rehearing *en banc*); *Irons v. Carey*, 505 F.3d 846, 854-59 (9th Cir.

13    2007) (Noonan, J., concurring).  Mr. Grizzle urges the Court to follow the lead of these six judges.

14    In any event, even if  the AEDPA standard of review is constitutional, the Ninth Circuit has

15    held that its precedent, or any other federal circuit court precedent, has persuasive value in determining

16    "whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and . . . what

17    law is 'clearly established."  *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000); *see also Robinson v.

18    Ignacio*, 360 F.3d 1044, 1057 (9th Cir. 2004) ("When faced with a novel situation we may turn to our own

19    precedent, as well as decisions of other federal courts, in order to determine whether the state decision violates

20    the general principles enunciated by the Supreme Court and is thus contrary to clearly established federal

21    law.").  Other circuits agree with the Ninth Circuit on this point.  *See Williams v. Bowersox*, 340 F.3d 667, 671

22    (8th Cir. 2003) ("[T]he objective reasonableness of a state court's application of Supreme Court precedent may

23    be established by showing other circuits having similarly applied the precedent."); *Ouber v. Guarino*, 293 F.3d

24    19, 26 (1st Cir. 2002) ("[T]o the extent that inferior federal courts have decided similar cases, reference to

25    those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the

26    contested issue.") (internal quotation marks and citation omitted); *Matteo v. Superintendent, SCI Albion*, 171

27    F.3d 877, 890 (3d Cir. 1999) (*en banc*) ("[W]e do not believe federal habeas courts are precluded from

28    considering the decisions of the inferior federal courts when evaluating whether the state court's application

1  of the law was reasonable.").  In short, as set forth below, Mr. Grizzle has multiple claims that entitle him to

2  relief even under the AEDPA standard of review.[1]

3  **ARGUMENT**

4  **I.**

5  **MR. GRIZZLE'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH**
   **AMENDMENTS WERE VIOLATED WHEN THE TRIAL COURT FAILED**
6  **TO DECLARE A MISTRIAL DUE TO THE TAINT OF THE JURY.**

7  **A.  Factual Background**

8  At the end of the second day of trial, Juror 5 reported to the court a contact concerning the trial.

9  The juror worked at Pelican Bay teaching classes for inmates, and on the previous day, while at work during

10 the noon recess, was told by an inmate, "Well, I hear you are Juror No. 5."  When asked, "Where did you hear

11 that?" The inmate replied, "Oh, word gets around."  There was no further conversation, and the juror could

12 not figure out how the inmate had found out.  The court inquired whether this would affect Juror 5's decision,

13 and he said it would not.  On further questioning by defense counsel, the juror revealed that, while getting a

14 cup of coffee, he had discussed this development with Juror 12.  Juror 5 was "sure" ("I didn't make a secret

15 out of it") that three or four other jurors had overheard their discussion.  Ex. K at 25.

16 After Juror 5 left, the court and parties discussed what to do, and defense counsel, citing

17 concerns that jurors were "tainted" and would now be intimidated by the prospect of the Aryan Brotherhood

18 targeting them, ultimately requested a mistrial.  The trial court denied the motion, reasoning that nothing had

19 gone to the "merits of the case" but invited questioning of the other jurors the next morning.  The next

20 morning, Juror 5 approached the court with second thoughts.  Having thought about it overnight, he requested

21 to be excused.  Defense counsel inquired further and learned that Juror 5 had mentioned the incident generally

22 to the other jurors and that one juror had said something about getting a call years ago from a state institution

23 and having her phone number changed.  Ex. K at 25-26.

24 The court then apprised each juror individually that Juror 5 had been excused and asked what

25 each knew about the circumstances.  Each juror stated that he or she had heard, from Juror 5 or others, that

26 _____

27 [1]  Mr. Grizzle has slightly changed the order of the claims as presented in the petition.
   Specifically, Mr. Grizzle has briefed "Claim Five" (alleging jury taint) as the first issue in this memorandum.
28 In addition, Mr. Grizzle has elected not to proceed on the ineffective assistance of counsel claim asserted in
   "Claim Six" of the petition, except as it relates to the procedural default issue surrounding the jury taint issue.

1  Juror 5 worked or taught at the prison and had learned that some inmate knew he was a juror.  One juror
2  surmised that Juror 5 could be "a little uneasy" about the situation.  Two other jurors felt concern for Juror
3  5's "safety" and of him being "in danger."  An alternate juror was seated in the place of Juror 5, and the trial
4  continued.  Defense counsel did not renew his motion for a mistrial.  Ex. K at 26.

5  **B. Procedural Default Should Not Apply**

6  As to this claim, the last "reasoned" decision of the state courts was rendered by the California
7  Court of Appeal on direct review, as the Supreme Court of California summarily denied Mr. Grizzle's petition
8  for review.  As a result, this Court "looks through" the summary decision of the California Supreme Court and
9  evaluates the decision of the court of appeal.  *See, e.g., Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007)
10 (*en banc*).

11  The California Court of Appeal stated that Mr. Grizzle waived the instant claim because
12  defense counsel failed to renew his objection and motion for mistrial; the court of appeal, however, then
13  proceeded to address the merits of the claim.  Ex. K at 27.  Under these circumstances, because the California
14  Supreme Court issued a summary denial, this claim is not procedurally defaulted.  *See, e.g., Barker v. Estelle*,
15  913 F.2d 1433, 1436 n.3 (9th Cir. 1990); *Huffman v. Ricketts*, 750 F.2d 798, 800-01 (9th Cir. 1984).  In short,
16  for this reason alone, procedural default does not apply.

17  Furthermore, "[u]nder the doctrine of procedural default, a petitioner who had defaulted on
18  his claims in state court is barred from raising them in federal court so long as the default is 'pursuant to an
19  independent and adequate state procedural rule.'"  *Jackson v. Roe*, 425 F.3d 654, 656 n.2 (9th Cir. 2005)
20  (citation omitted) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).  If an independent and adequate
21  state procedural default rule applies, federal habeas corpus review is denied unless a petitioner can show either
22  cause for the default and prejudice, or that the failure to consider the claims will result in a miscarriage of
23  justice.  *See, e.g., Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).  Mr. Grizzle contends that the
24  procedural default rule relied upon by the court of appeal was not "adequate" or "independent," and therefore
25  his jury taint claim is not barred for this additional reason.

26  The state bears the burden of demonstrating the adequacy of the state procedural default rule.
27  *See Bennett*, 322 F.3d at 584-86.

28

> To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate to support a state decision, to be considered adequate, the discretion must entail 'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.' State rules that are too inconsistently or arbitrarily applied to bar federal review 'generally fall into two categories: (1) rules that have been selectively applied to bar the claims of certain litigants and (2) rules that are so unsettled due to ambiguous or changing state authority that applying them to bar a litigant's claim is unfair.'

*Bennett*, 322 F.3d at 583 (citations omitted). In this instance, the waiver rule applied by the California Court of Appeal was not well-established and has been inconsistently applied, further demonstrating that procedural default does not apply. Specifically, the Ninth Circuit has held that the California waiver rule has only been consistently applied when a defendant has failed to make *any* objection at trial; the rule has not been consistently applied when an objection has been made and the question is whether the objection was sufficient. *See Melendez v. Pliler*, 288 F.3d 1120, 1125-26 (9th Cir. 2002) (citing several California cases where imprecise objections were liberally construed). Thus, in this case, where an objection and motion for mistrial were made, the procedural default doctrine does not apply.

Finally, the waiver rule applied in California is far from clear when the issue concerns the fairness or impartiality of the jury. Indeed, the case relied upon by the California Court of Appeal, *People v. Fudge*, 7 Cal. 4th 1075, 1100-01 (1994), *see* Ex. K at 27, suggests that a claim that a jury is tainted is a fundamental flaw in the trial process that cannot be waived. For this additional reason, the waiver rule has been inconsistently applied, and therefore procedural default does not apply.[2]

### C. The Petition Should Be Granted Under *Caliendo*

As for the merits, the California Court of Appeal reviewed the trial court's ruling on the mistrial motion for an "abuse of discretion" and concluded that "there is no showing" that any of the jurors were tainted. Ex. K at 27-28. This is not the standard. The question of jury taint is a constitutional question that is subject to independent review, and, more importantly, a court must presume prejudice. *See Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 692 (9th Cir. 2004). In short, the Ninth Circuit's decision in *Caliendo* is directly on point and dictates that the instant petition should be granted.

---

[2] If this Court determines that procedural default does apply, then Mr. Grizzle maintains that trial counsel rendered ineffective assistance of counsel by failing to renew his objection, which constitutes cause for the default. If this Court determines that this claim is meritorious, then there is also prejudice.

1    In *Caliendo*, a "detective who provided testimony that was crucial to the prosecution's case

2 had a twenty-minute conversation, factually unrelated to the trial, with three jurors in the hallway during a

3 break in deliberations." *Id.* at 692. The trial "judge questioned all the jurors one by one as to whether the

4 conversation would influence their judgment or cause them to view [the detective's] testimony any differently.

5 All the jurors testified that the conversation would not affect their deliberations." *Id.* at 694. The trial court

6 then denied a motion for a mistrial, reasoning that it would accept the jurors' representations that the contact

7 would not influence their verdict. *Id.* at 694. Likewise, the California Court of Appeal rejected Caliendo's

8 jury taint claim, reasoning: "The record as a whole disclosed no reasonable probability of actual harm to

9 appellant. . . . No topic discussed by [the detective] and Jurors 4 or 5 had any tendency to reflect upon or

10 bolster [the detective's] credibility, and every juror said that he or she would not be influenced by the

11 conversation between [the detective] and members of the jury." *Id.* at 697.

12    The Ninth Circuit granted the petition for a writ of habeas corpus, reasoning that a consistent

13 line of Supreme Court precedent over the last century has held that a presumption of prejudice must be applied

14 in these circumstances. *Id.* at 695-99 (citing *Turner v. Louisiana*, 379 U.S. 466 (1965); *Remmer v. United*

15 *States*, 347 U.S. 227 (1954); *Mattox v. United States*, 146 U.S. 140 (1892)); *see also Parker v. Gladden*, 385

16 U.S. 363 (1966). The Ninth Circuit concluded that the state courts "did not identify or apply the clearly

17 established *Mattox* rule." *Caliendo*, 365 F.3d at 697. Furthermore, the Ninth Circuit did not simply send the

18 case back to the state courts to apply the presumption. Instead, the Ninth Circuit ordered that Caliendo be

19 released or given a new trial, noting that the presumption could not be rebutted given the closeness of the case.

20 *Id.* at 698-99. In doing so, the Ninth Circuit noted that Caliendo had a previous trial in which the jury

21 deadlocked. *Id.* at 699.

22    This case is clearly governed by *Caliendo*. As in *Caliendo*, the California courts did not apply,

23 or even identify, the *Mattox* rule. Instead, the California Court of Appeal affirmed because there was "no

24 showing" that the jurors were tainted. Of course, the state courts should have presumed prejudice and instead

25 required the prosecution to make a clear showing that there was no prejudice. Furthermore, as in *Caliendo*,

26 the prosecution could not possibly make such a showing. The jury taint involved the question of distorting

27 the judicial process through threats, and a central theme of the prosecution's case, as reflected in the testimony

28 of Clark and others, was that Mr. Grizzle and his gang had the ability to influence testimony by threats and

1   other means.  Furthermore, this was a closes case, as reflected by the previous trial of Littrell, the actual killer,

2   who was acquitted on the conspiracy charge and only convicted of second degree murder.  In sum, the petition

3   should be granted based on *Caliendo* and the Supreme Court authority cited therein.

4                                                             **II.**

5                   **THE PROSECUTION KNOWINGLY, OR AT LEAST RECKLESSLY AND**
                    **NEGLIGENTLY, PRESENTED PERJURED TESTIMONY AND FAILED TO**
6                   **CONDUCT INVESTIGATION TO ENSURE THAT IT WAS NOT PRESENTING**
                    **PERJURED TESTIMONY IN VIOLATION OF MR. GRIZZLE'S FIFTH, SIXTH,**
7                                 **AND FOURTEENTH AMENDMENT RIGHTS.**

8                   **A.  Factual Background**

9               The prosecution secured Mr. Grizzle's convictions through the use of perjured testimony.  In

10  a strange twist, the prosecution used two witnesses, Clark and Healy, who both claimed to have committed

11  perjury in the past.  Clark claimed to have committed perjury at Littrell's trial, and Healy admitted that he had

12  committed perjury at his own murder trial.  Healy, in particular, was evidently quite good at committing

13  perjury, as he was able to beat a first degree murder charge.  *See, e.g.*, Ex. E at 765; Ex. F at 880, 931-32; Ex.

14  N.

15              Unfortunately for Mr. Grizzle, such perjury was not simply a thing of the past and instead

16  infected the fairness of his trial.  Indeed, the transcripts of the trial definitively establish that, at the very least,

17  one of the two committed perjury.  *Compare* Ex. E at 766; *with* Ex. F at 895-96; *see* Ex. N.  In actuality, it is

18  evident that they both committed perjury.  What is worse, the prosecution knew of this perjury, or, at the very

19  least, was reckless and negligent in its eagerness to secure convictions based on this perjured testimony.

20              Indeed, despite the fact that the prosecution was put on notice before trial that it would likely

21  be using perjured testimony, it failed to conduct an investigation and instead remained willfully ignorant of

22  the facts.  In a stunning admission at the time of the trial, Fallman flatly stated on the record that he had not

23  conducted an investigation into the likely perjury that he would be using.  *See* Ex. C at 34-35.  Even after the

24  trial testimony of Clark and Healy definitively established that at least one of them was committing perjury,

25  the prosecution still refused to inform the trial court of the perjury or to conduct an investigation.  To the

26  contrary, Fallman heavily relied on the perjury throughout the trial, especially during closing arguments.  *See*

27  Ex. G.  After the trial, facts known to the prosecution have definitively revealed that Clark is a pathological

28  perjurer and that his testimony and the arguments made by the prosecutor based on his testimony were false.

1  Yet, the prosecution continues to fail to inform the Court or investigate its use of the perjury.  The facts
2  underlying this claim are somewhat involved but are not complicated.  They are as follows:

3           *1. Clark Testifies For Littrell*

4           Clark, an African-American inmate, testified for the defense in Littrell's trial.  In essence, he
5  testified that he knew Healy well, having initially met him at Corcoran State Prison in the early 1990's.  After
6  Marsh was killed, at around the end of 1997 and the beginning of 1998, he lived in the same pod as Healy.
7  Clark even provided the identification of the specific pod and the cells that they lived in.  *See* Ex. B at 110-12.

8           Clark testified that the two talked while they were housed in the same pod.  Initially, Healy
9  asked if Clark could help him make money selling drugs.  As they continued to talk, Healy explained that
10 although he was serving a life sentence, he did not plan on staying in prison for the rest of his life.  As a result,
11 he decided to concoct a story against Mr. Grizzle and Littrell by pumping a defense investigator for
12 information.  He then cut a deal to testify for the prosecution, which would enable him to be moved to a less
13 secure facility and give him the ability to make an escape attempt.  *See* Ex. B at 112-17.

14          *2. Clark Does A 180*

15          On January 5, 1999, several months after Littrell's trial and about a month before Mr. Grizzle's
16 trial, Clark met with James Rogers, an official with the Office of Internal Affairs.  Rogers conducted a tape-
17 recorded interview with Clark.  Clark met with Rogers to discuss his allegations that prison officials were
18 engaging in misconduct.  During the interview, Clark stated that he had committed perjury at Littrell's trial.
19 *See* Ex. J.

20          Clark specifically stated that Gallegos, Mr. Grizzle's original attorney, requested that Mr.
21 Grizzle approach Clark about providing perjured testimony to discredit Healy.  Clark stated that his sister, who
22 he would not identify, received $500 for his testimony, and he assumed that the payment came from Gallegos.
23 *See* Ex. J.  Clark's statement, on its face, is patently absurd.  Gallegos is currently the District Attorney for
24 Humboldt County, California, not the type of person one would expect to be soliciting perjury.

25          *3. Fallman Is Put On Notice That Clark Is Likely Lying But Does Not Investigate*

26          Rogers wrote a memorandum to Fallman, dated January 13, 1999, summarizing his interview
27 of Clark and suggesting that Clark should not be believed.  In addition to his apparent admission of perjury,
28 Rogers noted that Clark had made other allegations in the past that "have already been proved baseless."  In

1  the past, Clark had refused to take a polygraph examination, admitting to the polygraph examiner that he had

2  been untruthful in his prior statements.  Furthermore, Clark stated that he would discuss his allegations against

3  Mr. Grizzle further, "but only if given immunity for his perjury."  *See* Ex. J.  In addition to his memorandum,

4  Rogers told Fallman and Daniel Smith, the lead investigative agent on Mr. Grizzle's case, that he had severe

5  doubts about Clark's credibility.  *See* Ex. I at 100-01.

6          On January 19, 1999, Fallman, Smith, and at least one other officer conducted a videotaped

7  interview with Clark.  *See* Ex. N.  The videotaped portion of the interview lasts just under one hour.  The

8  video clearly demonstrates that the prosecution knowingly, or at least negligently and recklessly, used perjured

9  testimony to convict Mr. Grizzle.

10          At the beginning of the interview, Fallman explained to Clark that he would receive immunity

11  for the supposed perjury that he committed at Littrell's trial.  Fallman also reminded Clark that this was

12  important, for although Clark was a "short-timer" scheduled to be released within the year, another conviction

13  would have constituted a third strike for Clark, subjecting him to life imprisonment.  Fallman also informed

14  Clark that it was his understanding that there was at least one outstanding referral for prosecution that had been

15  made to his office concerning Clark.  Fallman said that he had not seen the referral yet and could not promise

16  anything.  Once on the prosecution team, however, the likelihood that Clark would be subjected to a three-

17  strikes prosecution was slim, and Clark, an experienced and manipulative convict, undoubtedly knew this.

18  *See* Ex. N.

19          At the beginning of the interview, after acknowledging that he had to be truthful, Clark

20  proceeded to describe his relationship with Healy.  Once again, Clark stated that he had known Healy for years

21  and that they were celled in the same pod together.  Clark again stated that he spoke with Healy on a daily

22  basis in the pod and provided specifics about their housing locations.  Clark actually stated that, at Littrell's

23  trial, the only subject matter that he testified truthfully about was his relationship with Healy.  Clark even

24  stated that the two had discussed Healy's family.  Clark specifically stated that Healy had told him that he had

25  family in Ohio.  *See* Ex. N.

26          Clark then related his tale regarding the request for perjury made by Mr. Grizzle and Gallegos.

27  In addition to his allegations concerning the perjury at Littrell's trial, Clark also stated that Mr. Grizzle had

28  offered to pay him if he could find out where Healy's young daughter lived.  Clark maintained that it was

1  known in the prison that he had an unspecified relative, presumably with some law enforcement ties, who
2  could access personal information.  Clark maintained that Mr. Grizzle wanted the girl's address so that the
3  Aryan Brotherhood could have her killed to retaliate against Healy's cooperation with law enforcement.  *See*
4  Ex. N.

5          Despite the serious questions raised about Clark's credibility, the prosecution did nothing to
6  ascertain the accuracy of his story.  For example, the prosecution never attempted to interview Gallegos about
7  the allegations.  Moreover, the supposed unnamed "sister" presumably could have corroborated Clark's story
8  that she was paid $500 for the false testimony at Littrell's trial, but no follow up on this subject was
9  undertaken.  Similarly, the prosecution failed to ascertain who the supposed relative was with the law
10 enforcement contacts.  The videotape is remarkable in its display of the utter failure of Fallman and the
11 officers to probe the accuracy of Clark's fanciful statements.  They did not even ask Clark for the names of
12 the mystery relatives.  All that was done was that Fallman asked Clark, who was in segregated housing at
13 Pelican Bay thereby making it difficult to communicate with the outside world, to see if he could get in contact
14 with his supposed family members to check if they would back up his story.  Of course, that is what
15 government-paid investigators are supposed to do, and it could have been accomplished with a simple
16 telephone call.  *See* Ex. N.

17         At a hearing held on February 4, 1999, less than a week before the trial, Clanton stated that he
18 wanted discovery of "all reports relating to the investigation of Mr. Clark's sister as it relates to the report filed
19 by James Rogers.  I am told absolutely by Mr. Fallman and Officer Willis that there are no attempts at
20 investigation in that particular area and I'm going to take them on their word at that."  Ex. C at 34.  In
21 response, Fallman stated: "Well, what – what's been said is we've asked Clark to see if the person will be
22 willing to come forwards [sic] and cooperate, but there's so little time left before trial that we don't have the
23 wherewithal to send people where this person may be and invest in that in case that ends up being a wild goose
24 chase.  So we're not affirmatively doing that, but if he comes back and says that his sister will testify, we
25 would accept that if it happens and that's what we've told him."  Ex. C at 34-35.

26         In essence, Fallman specifically stated on the record that he was taking a course of action that
27 is forbidden under the Constitution.  Fallman stated that he would finesse the problem by pressing ahead
28 without a diligent and good faith attempt to resolve the question of the truthfulness of Clark's testimony.

1  Fallman even acknowledged that Clark may have been sending the prosecution on a "wild goose chase." Put

2  simply, Fallman avoided his obligation by refusing to search for the truth and remaining willfully ignorant of

3  the facts.

4              In the middle of the trial, after Clark had testified, Rogers concluded his investigation of Clark.

5  He submitted his findings to both the Del Norte County District Attorney's Office and the California Attorney

6  General's Office with a request to charge Clark with filing a false citizen complaint against a peace officer.

7  *See* Ex. J.  It is not clear whether this was the referral that Fallman mentioned to Clark when he began the

8  videotaped interview or whether this was yet another potential three-strike case.  In any event, the prosecution

9  did not inform the trial court or the defense about Rogers' findings until after the trial.  *See* Ex. I at 98-99; Ex.

10  J.  Of course, despite Rogers' request, Clark, who at that point was part of the prosecution team, was not

11  prosecuted.  As will be demonstrated below, the reckless decision not to do so ultimately cost a pastor his life.

12  Had Clark been prosecuted for his third strike, this pastor would likely be alive today.

13              *4.  Clark And Healy Commit Perjury At The Trial*

14              If this were not bad enough, Clark and Healy provided testimony at the trial that definitively

15  established that at least one of them committed perjury.  In reality, it is clear that both committed perjury.

16  Despite this fact, the prosecution failed to advise the trial court of the perjury and failed to do anything to

17  investigate the matter.

18              As has been set forth above, Fallman had a problem with Clark's testimony.  He had nothing

19  to corroborate Clark's account, as he had done no investigation despite the overwhelming indicia of perjury.

20  Fallman, however, seized on one aspect of Clark's story and made it a central theme of his case.  Fallman

21  argued that Clark knew the name of Healy's daughter, and Clark only could have obtained the name from Mr.

22  Grizzle.  As a result, Fallman contended that this fact demonstrated that Clark was telling the truth, and he

23  strenuously argued this point during summations.  *See* Ex. G at 1252-53, 1327, 1339-40.

24              In order for this point to have any validity, however, Fallman had to establish that Clark did

25  not get the name of the daughter from Healy himself.  As a result, during direct examination, Fallman asked

26  Healy if he ever discussed his daughter with Clark.  Healy testified that he had not.  Fallman went further,

27  however, and had Healy testify that he had never had any discussions whatsoever with Clark.  In fact, Healy

28  testified that he had never "even seen that guy."  Ex. F at 895-96.

1    There was only one problem; Clark had testified differently earlier in the trial. During direct
2    examination, Fallman asked Clark whether Mr. Grizzle asked him to lie about Healy at Littrell's trial. In the
3    midst of Clark's answers, he also testified that he had known Healy "for a long time" at least "since the early
4    '90s." Ex. E at 766. Of course, Clark had also repeatedly told Fallman and the investigators in his videotaped
5    interview that he had known Healy for years, that the two lived in the same pod and spoke on a daily basis,
6    that Healy told him about his family in Ohio, and that his relationship with Healy was the only truthful aspect
7    of his previous testimony at Littrell's trial. *See* Ex. N. Thus, at least one committed perjury. Either Healy
8    lied when he testified that he had never even seen Clark, or Clark lied when he testified that he and Healy had
9    known each other for years and had a tight relationship. The prosecutor never brought this perjury to the
10   attention of the trial court and never did anything to investigate which of its witnesses was lying.

11   Of course, housing records and prison logs could have easily answered the question of which
12   one was lying. Clark had previously testified at Littrell's trial that he and Healy lived in the same pod towards
13   the end of 1997 or the beginning of 1998, where they spoke on a daily basis, and Clark confirmed the accuracy
14   of these facts in his videotaped interview with Fallman. Clark had even named the specific pod and cells. *See*
15   Ex. B at 110-12; Ex. N. Yet, the prosecution did not even take the basic step of investigating the prison
16   records to determine which of its witnesses was committing perjury. Even more troubling, the prosecution
17   successfully obstructed Mr. Grizzle's efforts to obtain this information. *See* Ex. H at 29-36.

18   The reality is that both Clark and Healy committed perjury at Mr. Grizzle's trial. Virtually all
19   of Clark's testimony was perjury. He concocted the story about Mr. Grizzle paying for his false testimony at
20   Littrell's trial. Perhaps even more appalling, Clark fabricated the story about Healy's daughter, testifying that
21   he came forward because he could not stand the thought of seeing an innocent, young girl killed, comparing
22   it to a "Poly Klass situation." *See* Ex. E at 768-69. Clark testified as if his intentions were to protect a
23   helpless victim, and Fallman heavily argued during closings that Clark had reformed, comparing him to the
24   likes of various biblical figures, such as Barabbas, Saul, Matthew, Zacchaeus, King David, King
25   Nebuchadnezzar, and Mary Magdalene. Ex. G at 1251-52, 1259-68. As will be demonstrated in the next
26   section, Clark's testimony was patently false, and Fallman's argument was misleading. Clark was not a
27   reformed protector of young girls. Instead, he had been convicted of raping an underage girl in the past, and,
28   just months after his testimony, he savagely killed a helpless pastor. *See* Ex. B at 118; Ex. L.

1    The one point that Clark testified truthfully about was his relationship with Healy.  On this

2 point, it was Healy who committed perjury.  Healy did so because he knew that Fallman needed it.  The

3 bottom line, however, is that the prosecution was on notice that Clark may be committing perjury.  Indeed,

4 at least one government investigator had warned the prosecution team that Clark's testimony was not credible.

5 Yet, the prosecution did nothing to investigate the veracity of his allegations.  Instead, it stuck its head in the

6 sand and pressed forward because the prosecutor liked the testimony.  Even when it became evident that either

7 Clark or Healy had lied at the trial, the prosecution did not bring the perjury to the attention of the trial court

8 or do anything to investigate.  Amazingly, the prosecution heavily relied on the perjury to obtain a conviction.

9    *5.  Clark Murders A 68-Year Old Pastor By Stabbing Him 24 Times*

10    As mentioned earlier, at least one government official was wise enough to recognize that Clark

11 was incredible and should be prosecuted for false allegations.  If the prosecution had followed his request,

12 Clark would have been convicted of a third strike and would not have been released.  Predictably, the

13 prosecution declined to charge Clark, as he had given the perjury that was needed to secure Mr. Grizzle's

14 conviction.  This gross exercise of prosecutorial decision-making led to the death of an innocent victim.

15 Indeed, although Clark had testified at the trial that he could not live with the killing of a helpless young girl,

16 he committed a grizzly murder of a pastor within four months of his release from Pelican Bay.

17    Clark was paroled in June 1999, approximately four months after testifying for the prosecution

18 against Mr. Grizzle.  Just four months later, on October 20, 1999, he stabbed Edward Sherriff, a 68-year old

19 pastor, to death.  Although several of the wounds took substantial force to inflict and would have quickly

20 caused death, Clark, who according to Fallman resembles King David and Mary Magdalene,  apparently felt

21 that he needed to stab the helpless victim 24 times.  *See* Ex. L at 2-3.

22    Clark confessed to the murder after his arrest and during his testimony at trial.  Although Clark

23 predictably testified that he committed the murder to protect young boys from the pastor's sexual desires

24 (sound familiar), the evidence was overwhelmingly clear that he committed the murder for money.  Clark

25 brutally stabbed Sherriff in Sherriff's own bedroom and then began to ransack his home, looking for anything

26 valuable.  Officers found speakers, a videocassette recorder, and other valuable items stacked in the middle

27 of the pastor's living room.  Clark had to leave the stacked items because neighbors began to investigate.

28 Clark fled the scene by stealing Sherriff's car.  *See* Ex. L at 3-5.

1    Clark was seen counting money shortly after the murder.  He also gave a young woman two

2   jewelry boxes and their contents and asked her to get rid of them.  Despite Clark's "Poly Klass" testimony at

3   Mr. Grizzle's trial, he "threatened to hurt her if she told her mother and ordered her to tell anyone who asked

4   that he had been home all night."  Ex. L at 4.  Clark also had another individual call the police from a pay

5   phone with the location of Sherriff's stolen vehicle and with the name of a false suspect, continuing his pattern

6   of false accusations.  Clark then wiped the phone with a rag.  *See* Ex. L at 4.

7    Just when one would think it could not get any worse, there is still more.  Clark manipulated

8   his public defender, starting a romantic relationship with her.  Jail officials believed that the girlfriend/attorney

9   was bringing Clark contraband and also providing him with information on other criminal defendants housed

10   at the jail to enhance his status and his own civil lawsuits, which alleged abuse against prison officials.  Clark

11   then used this information "to intimidate and threaten other inmates into acting as witnesses to false claims

12   of abuse."  Ex. L at 7.  Specifically, Clark was alleging that jail officials forcibly sodomized him with a baton.

13   *See* Ex. L at 6.

14    *6. Fallman Concedes That The Perjured Testimony Must Have Affected The Verdict*

15    Although the prosecution engaged in woeful misconduct in failing to investigate the perjury

16   of Clark and Healy at the time of trial, one would think that the subsequent developments concerning Clark

17   would have sparked some inquiry.  Unfortunately, such is not the case.  Unbelievably, Fallman actually

18   attempted to come to Clark's rescue by testifying for him at his sentencing proceedings.  *See* Ex. M.

19    During this testimony, Fallman admitted that Clark's testimony was critical in obtaining

20   convictions against Mr. Grizzle.  Fallman explained that "largely because of Clark's testimony that there was

21   a different result" from the Littrell trial. Ex. M at 13.  Fallman further explained: "Case number one, not guilty

22   on the conspiracy to commit murder, and only a second degree murder on the actual strangler, where – who

23   was in the cell with the victim.  Whereas on case number two, the large difference in the case was Clark's

24   testimony.  I got a first degree murder."  Ex. M at 14-15.  Fallman's assessment of the impact of Clark's

25   testimony corresponded with his closing argument at Mr. Grizzle's trial, where he argued to the jury that it

26   should return a different verdict than the Littrell jury because of Clark's testimony.  Ex. G at 1326-27.

27    Perhaps amazed by the fact that Fallman could still be blindly crediting Clark's testimony, the

28   prosecutor handling the Clark case asked Fallman whether there was any way he could corroborate Clark's

1  testimony at Mr. Grizzle's trial.  As one would expect, all Fallman could do was rely on his trial theory, and

2  he simply responded that Clark knew the age of Healy's child.  The prosecutor pressed Fallman, explaining

3  that if Clark had a source who could obtain information, then he could have obtained the information on

4  Healy's daughter from the source.  Fallman's response was simply: "Well, I suppose, but he had very specific

5  information."  Ex. M at 16-17.  Fallman also admitted that nothing has ever happened to Healy's family.  Ex.

6  M at 22.

7          Fallman's assessment of the materiality of Clark's testimony corresponded with the court of

8  appeals' assessment.  Indeed, the court of appeals relied on Clark's testimony in finding sufficient evidence

9  and in rejecting Mr. Grizzle's collateral estoppel argument.  *See* Ex. K at 15, 45.  Of course, as recognized by

10  the trial court,  the case against Mr. Grizzle was primarily based on witnesses with "slimy" motives and was

11  even weaker than the case against Littrell, who was acquitted of conspiracy.  *See* Ex. C at 65-66; Ex. D at 22-

12  24.  Given the weak prosecution case, the perjury was clearly prejudicial.

13          Finally, as explained above, not only did Clark commit perjury, but Healy also committed

14  perjury when he testified that he did not know Clark and had never even seen him.  Healy's testimony played

15  a major role in the prosecution's case.  For this additional reason, the jury's verdict was tainted by prosecution

16  perjury.

17          **B.  Legal Analysis**

18          The superior court issued a "reasoned" decision denying Mr. Grizzle's perjury claim.  The

19  California Court of Appeal and the Supreme Court of California summarily denied Mr. Grizzle's petition.

20  *See* Ex. O.  As a result, this Court "looks through" the summary decisions of the California appellate courts

21  and evaluates the decision of the superior court.  *See, e.g.*, *Medley*, 506 F.3d at 862.

22          *1.  The Law Governing The Use Of Perjured Testimony*

23          Claims that the prosecution used perjured testimony are often referred to as *Mooney-Napue*

24  claims based on the two landmark Supreme Court cases addressing the issue.  In *Mooney v. Holohan*, 294 U.S.

25  103, 112 (1935), the Supreme Court held that a conviction obtained through the use of testimony known to

26  be perjured violates the Due Process Clause of the Fourteenth Amendment.  Twenty-five years later, in *Napue*

27  *v. Illinois*, 360 U.S. 264, 269-70 (1959), the Supreme Court clarified that a due process violation occurs if a

28  prosecutor fails to correct perjured testimony, even if he did not solicit it.  The Supreme Court also clarified

1  in *Napue* that the use of perjured testimony triggers a due process violation even if the testimony does not go

2  directly to a defendant's guilt and instead only bears on a witness's credibility: "A lie is a lie, no matter what

3  its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to

4  correct what he knows to be false and elicit the truth.  That the district attorney's silence was not the result of

5  guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could

6  in any real sense be termed fair." *Napue*, 360 U.S. at 269-70 (citation omitted).

7          The Supreme Court has also clarified that a *Mooney-Napue* violation does not only arise when

8  the prosecution knowingly uses perjured testimony.  Instead, such a violation arises when "the prosecution

9  knew, *or should have known*, of the perjury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis

10  added).  Thus, courts have consistently held that a *Mooney-Napue* violation occurs when the use of perjured

11  testimony by the prosecution was knowing, reckless, or even negligent. *See, e.g.*, *United States v. Tierney*,

12  947 F.2d 854, 860-61 (8th Cir. 1991).

13          Recognizing that reckless or negligent use of perjured testimony can trigger a *Mooney-Napue*

14  violation, the Ninth Circuit has recently explained the duties that the prosecution must undertake when

15  confronted with the potential perjury of one of its witnesses. *See Morris v. Ylst*, 447 F.3d 735, 743-44 (9th Cir.

16  2006).  In *Morris*, the Ninth Circuit described the issue before it as follows: "Often it is clear that false

17  evidence was presented.  Here, however, there is only an allegation or suspicion that a witness lied, but no

18  follow-up investigation or explanation by the state.  As a result, we must decide whether the prosecution had

19  a duty to investigate an allegation or suspicion of perjury, separate from its duty to disclose perjury that has

20  definitely taken place." *Id.* at 743-44 (citation omitted).

21          The Ninth Circuit provided a definitive answer to that question: "When a prosecutor suspects

22  perjury, the prosecutor must at least investigate.  The duty to act 'is not discharged by attempting to finesse

23  the problem by pressing ahead without a diligent and good faith attempt to resolve it.  A prosecutor cannot

24  avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts.'  This

25  principle is supported by *Mooney*, *Napue*, and their progeny." *Id.* at 744 (quoting *Northern Mariana Islands*

26  *v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001)).  The Ninth Circuit further explained that the truth-seeking

27  function of a trial "cannot be fulfilled when the state, knowing that a witness may have perjured herself,

28  proceeds without conducting an investigation to ensure that a new trial is not warranted.  The duty to

1  investigate flows from 'the constitutional obligation of the State and its representatives to collect potentially
2  exculpatory evidence, to prevent fraud upon the court, and to elicit the truth.'" *Id.* at 744 (quoting *Bowie*, 243
3  F.3d at 1117).

4          If a defendant can demonstrate that the prosecution knowingly, intentionally, or recklessly used
5  perjured testimony, or, as in *Morris*, recklessly or negligently used potential perjury and failed to investigate,
6  then the defendant has established the first part of a *Mooney-Napue* claim.  In order to obtain relief, however,
7  a defendant must also make a second showing – that the use of perjury or the failure to investigate potential
8  perjury resulted in prejudice.  *See Morris*, 447 F.3d at 745.  "The test for prejudice for a *Mooney-Napue* claim
9  is the same as that for materiality in a *Brady* [*v. Maryland*, 373 U.S. 83 (1963)]claim.  That is, [the court] must
10 decide whether, despite the use of perjured testimony, Petitioner received a 'trial resulting in a verdict worthy
11 of confidence.'" *Id.* at 745 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  Stated differently, prejudice
12 is shown "if there is any reasonable likelihood that the false testimony could have affected the judgment of
13 the jury." *Agurs*, 427 U.S. at 103; *see, e.g.*, *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*).

14         In *Kyles*, the Supreme Court emphasized four points regarding this standard of prejudice.  First,
15 a showing of prejudice does *not* require that a defendant demonstrate by a preponderance of the evidence that
16 the result of the trial would have been different.  *See Kyles*, 514 U.S. at 434.  Second, the prejudice inquiry
17 "is not a sufficiency of evidence test.  A defendant need not demonstrate that after discounting the inculpatory
18 evidence [in light of the revelation of perjury] there would not have been enough left to convict." *Id.* at 434-
19 35.  Instead, a defendant merely needs to show that the revelation of the perjury "put[s] the whole case in such
20 a different light as to undermine confidence in the verdict." *Id.* at 435.  Third, once a reviewing court "has
21 found a constitutional error there is no need for further harmless-error review." *Id.* at 435.  Fourth, a reviewing
22 court should look at the perjury "collectively, not item by item." *Id.* at 436.

23         Finally, the standard governing the knowing, reckless, or negligent use of perjured testimony
24 "generally requires that the conviction be set aside." *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002).
25 On the other hand, if the perjury was presented in "good faith" (in other words, the prosecution did not act
26 knowingly, intentionally, or recklessly), then the standard is whether there is a "reasonable probability" that
27 without the perjury the result of the proceeding would have been different.  *See Killian*, 282 F.3d at 1208;
28 *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994).

### 2. Application Of The First Mooney-Napue Prong

The prosecution failed in at least three respects under the first *Mooney-Napue* prong.  First, the prosecution jumped into bed with two witnesses who claimed to have committed perjury in the past.  Thus, any reasonable prosecutor would have been suspicious from the outset.  Indeed, with respect to Clark, the indicia of dishonesty were overwhelming from the very beginning.  The first investigator to speak with Clark specifically advised the prosecutor and the lead investigative agent that Clark should not be believed.  While Mr. Grizzle would certainly contend that Clark's background and claim that he had previously committed perjury were alone enough to trigger a duty to investigate under *Morris*, certainly a duty to investigate was triggered when the first officer to speak with Clark specifically suggested that Clark was not credible.  The prosecution, however, did nothing to investigate.  Instead, the prosecution simply accepted Clark's fanciful allegations without making any effort to determine whether what he was saying had any basis in reality.

Furthermore, there were potential avenues of investigation that the prosecution could have pursued to ascertain the veracity of Clark's allegations.  The prosecution could have confronted Gallegos with Clark's allegations, or it could have tried to confirm the allegations with Clark's mystery "relatives."  The prosecution, however, never conducted any follow-up with Gallegos and never even obtained the names or contact information for the supposed "relatives."  Indeed, Fallman even admitted shortly before the trial that Clark may have been sending the prosecution on a "wild goose chase," but he unbelievably decided not to investigate.  In essence, Fallman decided to "finesse" the problem.  This failure to investigate Clark's allegations constitutes the first error under *Morris*.  *See United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) (government insufficiently investigated potential perjury of cooperating witness even when it extensively questioned witness and contacted friends who corroborated him).  In short, "given the importance of [Clark]'s testimony to the case, the prosecutors may have consciously avoided recognizing the obvious – that is, that [Clark] was not telling the truth."  *Id.* at 457.

The second error occurred when the prosecution was confronted with flatly conflicting testimony from two of its untrustworthy witnesses.  Clark testified, consistent with his interview, that he and Healy knew each other for a long time.  Healy, on the other hand, testified that he had never even seen Clark.  As a result, one of the prosecution's witnesses was committing perjury.  Of course, at this point, the prosecution had a duty to inform the trial court of the perjury, but it failed to do so.  Moreover, under *Morris*,

1  the prosecution had a duty to investigate which of its two witnesses was lying. Once again, the prosecution

2  had ample information by which it could have conducted an investigation. Clark had provided details

3  regarding his relationship with Healy, including when and where they first met and specific information about

4  the pods and cells that they lived in. The prosecution could have checked prison records to determine whether

5  they had been celled near each other, and it could have questioned prison guards about whether the two

6  communicated with each other. The prosecution did none of this. Instead, the prosecution failed to call the

7  perjury to the attention of the trial court, failed to investigate who was telling the truth, and heavily relied on

8  Healy's testimony that the two did not know each other even though the facts overwhelmingly suggest that

9  Clark was telling the truth on this one point.

10           The third error occurred when the prosecution failed to conduct any investigation after it

11  learned of Clark's unthinkable actions within months of his release from prison. Clark's testimony, which

12  again was never investigated by the prosecution in the first place, was that Mr. Grizzle and Gallegos paid him

13  to commit perjury at Littrell's trial, and Mr. Grizzle then asked him to help in the Aryan Brotherhood's attempt

14  to kill Healy's daughter. Clark further testified that he came forward because he just could not bear the

15  thought of an innocent girl being killed. The prosecution then argued in closings that the jury should believe

16  Clark because he had reformed, much the way several biblical figures had reformed. Clark's actions

17  demonstrate that this was all a farce. Within four months of his release from prison, Clark brutally murdered

18  a pastor. He confessed to the killing but concocted a similar, false story that he did so to protect young boys

19  from the sexual desires of the victim. Indeed, the objective evidence revealed that he actually killed the pastor

20  while burglarizing his home. After the murder, he attempted to frame another individual and threatened a

21  young woman to cover up his crime. While he was detained pending trial, he manipulated his lawyer into

22  giving him sensitive information about other inmates' cases which he could then use to threaten them into

23  giving false testimony on his behalf. Clark also made ludicrous false accusations against a variety of prison

24  officials.

25           It strains credulity to think that the prosecution did not immediately become aware of Clark's

26  actions. Indeed, the prosecution's complicity in allowing the release of Clark must have been a source of

27  horror and embarrassment for the District Attorney's Office. In any event, there can be no doubt that the

28  prosecution eventually became aware of Clark's actions because Fallman testified at his sentencing

1  proceedings.  At this point, one would think that the prosecution would have investigated whether Clark

2  committed perjury at Mr. Grizzle's trial.  Indeed, Clark's subsequent actions mirrored what he did at the trial

3  and suggested a similar pattern of perjury.  Clark testified at Mr. Grizzle's trial that he came forward to protect

4  a young and innocent girl, and therefore the prosecution urged the jury to believe that Clark had reformed.

5  Yet, Clark then brutally killed an innocent pastor and falsely claimed that he did so to protect children.  Clark

6  then threatened to hurt a young woman in order to get her to provide him with an alibi, attempted to frame

7  other individuals to maintain his own freedom, and continued to throw out ridiculous false accusations about

8  others.  He also manipulated a lawyer into giving him sensitive information so that he could concoct false

9  testimony.  Actually, if this did not awaken the prosecution, it surely should have recognized its duty to

10 investigate when the Clark prosecutor asked Fallman during his testimony whether he could corroborate any

11 of Clark's testimony at Mr. Grizzle's trial.  Fallman was caught flat-footed and simply responded that he knew

12 about Healy's daughter, an explanation that is wanting when considering Clark's repeated testimony that he

13 knew Healy well and had discussed Healy's family with him.  Of course, the prosecution has still failed to

14 conduct any investigation or advise the court of the perjury committed at Mr. Grizzle's trial.

15                         *3. Application Of The Second Mooney-Napue Prong*

16         While the above discussion demonstrates that the first prong of the *Mooney-Napue* test has

17 clearly been satisfied, the second prong is just as easily demonstrated.  As an initial matter, this is an unusual

18 case because the Court is actually presented with two trials that reached two different results.  Consequently,

19 it has clear proof that the perjury could have affected the judgment of the jury.  Indeed, Fallman flatly admitted

20 at Clark's sentencing that his testimony was the difference between the result in Littrell's trial and the result

21 in Mr. Grizzle's trial.  The court of appeals also relied on Clark's testimony in finding sufficient evidence and

22 in rejecting Mr. Grizzle's collateral estoppel argument based on Littrell's acquittal.  Moreover, Clark's perjury

23 was highly inflammatory, as it alleged that Mr. Grizzle was involved in a plot to kill an innocent, young girl.

24 This type of inflammatory evidence easily could have affected the jury's decision-making.

25         The Court must also assess the perjured testimony cumulatively.  In addition to Clark's perjury,

26 Healy committed perjury when he testified that he never had even seen Clark.  Healy presented important

27 testimony for the prosecution, essentially laying out the roadmap for the Aryan Brotherhood evidence and

28 providing specific incriminating testimony against Mr. Grizzle.  Healy's perjury calls into question all of his

1  testimony, as there is a "fundamental inference that if [the cooperator] lied about X, Y and Z, it is quite likely

2  that he lied about Q, R and S." *Killian*, 282 F.3d at 1209 (finding new trial required for perjury even under

3  the higher standard for the "good faith" use of perjury); *see also Lopez-Umanzor v. Gonzales*, 405 F.3d 1049,

4  1059 (9th Cir. 2005) (discussing the principle of "falsus in uno, falsus in omnibus").  In addition, during

5  closing arguments, Fallman heavily relied on the combination of Clark's perjured testimony and Healy's false

6  claim that he did not know Clark.  In short, the cumulative effect of Healy's and Clark's perjury certainly

7  undermines the confidence in the jury's verdict.

8  It is also important to emphasize that this was not a strong prosecution case.  Indeed, the trial

9  court recognized that the case against Mr. Grizzle was entirely built on the testimony of convicted felons with

10  slimy motives, horrible pasts, and enormous credibility problems.  When prosecution perjury is added to the

11  mix, there can be little confidence in the jury's verdict.  Finally, even if the Court somehow finds that the

12  prosecution only innocently used perjured testimony, it should still find prejudice even under the heightened

13  standard for all of the same reasons mentioned above.

14  *4. The Flaws In The Superior Court's Analysis*

15  Rather than following the straightforward analysis set forth above, the superior court rejected

16  Mr. Grizzle's *Mooney-Napue* claim based on seriously flawed reasoning.  *See* Ex. O.  The superior court

17  incorrectly applied clearly governing law, failed to address the essence of the claim raised by Mr. Grizzle, and

18  ultimately ignored a wealth of undisputed facts that were central to Mr. Grizzle's claim.

19  As to the incorrect application of clearly governing law, the superior court held that Mr. Grizzle

20  had to establish, "by a preponderance of the evidence" that there was "actual" perjury at his trial and that the

21  prosecution "knew" about the perjury.  Ex. X at 4, 6.  This statement of the law is simply wrong.  As set forth

22  above, the Ninth Circuit decisions in *Morris* and *Bowie* have clearly established, based on Supreme Court

23  precedent, that the prosecution has an independent duty to investigate *suspected* perjury.  Indeed, in both cases,

24  the defendant did not have proof that the witnesses actually committed perjury.  Instead, in both cases, the

25  prosecutions failed to follow up on suggestions that their witnesses *might* have committed perjury.  The

26  superior court simply ignored that the prosecution in this case failed to investigate a wealth of information

27  generating a strong suspicion that Clark's *entire* testimony, including the allegations that Mr. Grizzle and

28  Gallegos suborned perjury and that Mr. Grizzle plotted to kill Healy's daughter, was false.  As the Ninth

1 │ Circuit held in *Bowie*, the failure to investigate such a suspicion of perjury requires a new trial, even if actual

2 │ perjury has not been proven:

3 │
> The Attorney General argues that without actual proof of perjury in the record as it now stands, it is premature to order a new trial. The Attorney General asks
4 │ us to remand this matter to the trial court for a full evidentiary hearing to determine whether any of its witnesses actually lied . . . . As support for this position, the
5 │ Attorney General notes that in the controlling cases, the record justified the conclusion that perjury did in fact infect the trial and result in a denial of due
6 │ process. The Attorney General's argument misses the mark in this case.

7 │
> First, we cannot help but note the irony in an argument that asks years after a trial for an opportunity to do what the Constitution required of the proponent
8 │ of the argument *before* the trial began to ensure that it would be fair. It is the Attorney General who is directly responsible for what he now says is unclear
9 │ from the record and for the deficiencies in the trial that took place. Given the manifest reason to question the veracity of the prosecution's witnesses, the
10 │ Constitution required a prompt pretrial investigation of the integrity of the government's evidence before the witnesses were called to the stand. This
11 │ requirement is not satisfied by a tardy evidentiary hearing after the fact. Although the prosecution had leverage before the trial to get to the truth with
12 │ its witnesses, it is not unlikely now that the Fifth Amendment will shield them from the inquiry the prosecution wishes to launch. By committing the witness
13 │ under oath to a certain story, an admission now of untruthfulness might well unveil a crime.

14 │
15 │
> Second, when Reyes's counsel attempted to introduce handwriting evidence to establish that Reyes did not write the letter, the Attorney General's
representative objected and blocked evidence on a crucial part of the issue it
16 │ now says it wants to examine.

17 │
> Third, the record as it now stands establishes bad faith with regard to this issue on the part of the Attorney General's Office prior to and during the
18 │ trial, i.e., a knowing violation of its ethical obligations.

19 │
> In conclusion, the clear defects in Bowie's trial were the direct result of the prosecutor's pretrial constitutional failure to guard against improbity in the
20 │ trial process, a failure which rendered the trial itself patently unfair in due process terms. The prosecution saw fit without prophylaxis to call to the
21 │ stand witnesses whom it had clear reason to believe might have conspired to lie under oath. The manner in which the trial unfolded leaves us with the
22 │ definite conviction that the process itself lacked fundamental fairness and delivered a palpably unreliable result. In this connection, the principles
23 │ which compel our decision here are not designed to punish society for the misdeeds of a prosecutor, but to vindicate the accused's constitutional right
24 │ to a fair trial, a fundamental right for which the prosecution shares responsibility with the courts.

25 │
*Bowie*, 243 F.3d at 1123 (emphasis in original, citations omitted). This reasoning in *Bowie* neatly fits this
26 │ case. The prosecution knew about the problems with Clark's testimony before trial (indeed Rogers told the

27 │ prosecution before trial that Clark was not believable) but did nothing to investigate. Clark and Healy then

28 │

1  provided conflicting testimony during trial, but the prosecution did nothing and actually obstructed Mr.

2  Grizzle's efforts to obtain their housing records.  Even after the trial, law enforcement officials uncovered

3  evidence that Clark's modus operandi is to fabricate testimony, but the prosecution has still done nothing.  As

4  in *Bowie*, the prosecution's failure to investigate before the trial requires a new trial now, even if the evidence

5  does not establish that Clark's entire testimony was actual perjury.

6          Because the superior court incorrectly narrowed the legal standard to actual perjury at the time

7  of trial, it only considered the actual perjury committed by either Clark or Healy during the trial regarding their

8  relationship.  While Mr. Grizzle certainly agrees that one of the two committed actual perjury on this point,

9  the due process violation in this case had already occurred long before this actual perjury was presented at trial.

10  Indeed, the due process violation first occurred *before* the trial, when Fallman ignored the warnings given to

11  him by his agent that Clark was not telling the truth, failed to investigate Clark's dubious allegations, and

12  instead "finessed" the problem by pressing ahead with Clark's testimony.

13          Because the superior court seriously erred in reasoning that the constitutional violation was

14  limited to the conflicting testimony between Clark and Healy at trial, it similarly erred in explaining that the

15  jury had the opportunity to evaluate their conflicting testimony in order to determine which one was telling

16  the truth.  In *Bowie*, for example, the prosecution was in possession of a letter that indicated that its witnesses,

17  who were cooperating convicts like Clark and Healy, may have been fabricating a story to pin a murder on the

18  defendant.  The prosecution did no follow up investigation on the letter.  Even though the letter was admitted

19  into evidence at trial, thereby allowing the jury to weigh the credibility of the prosecution witnesses, the Ninth

20  Circuit still reversed based on the prosecution's failure to investigate the letter and ascertain whether its

21  witnesses were telling the truth.  The Ninth Circuit explained:

22          The issue is not just whether the use of the letter during the trial somehow deprived
         Bowie of due process of law, but whether the government's inexcusable lack of
23          attention to and investigation of the letter deprived Bowie of liberty without due
         process of law, notwithstanding Bowie's forced use of it at trial on his own behalf . . . .

24

25          What may have served Bowie's purposes in trial is different and distinct from the duty
         of the prosecution to protect the trial process against fraud.  Viewed in this light, what
26          Bowie did in court with the letter is irrelevant.  He had certain constitutional rights that
         he could waive or forfeit, but he could not waive the freestanding ethical and
         constitutional obligation of the prosecutor as a representative of the government to protect
27          the integrity of the court and the criminal justice system, as established in *Mooney* and
         *Berger*. . . .  Here, the government shirked this duty.  In this respect, the error on which
28          we reverse Bowie's conviction was not simply a trial error, but a fatal due process error

1    committed by the Office of the Attorney General . . . .

2 *Bowie*, 243 F.3d at 1122-23 (citations omitted).

3    Finally, the superior court's prejudice analysis was also flawed because it improperly narrowed

4 the inquiry to the actual perjury committed by Clark or Healy regarding their relationship.  The superior court

5 also incorrectly found that there was "extensive evidence" from "numerous witnesses" that established that

6 Mr. Grizzle was guilty.  In addition to Healy and Clark, there were but three other witnesses, and they were

7 all convicted felons who were testifying to reduce their sentences.  Amazingly, the superior court ignored the

8 different result in the Littrell trial and ignored the prosecutor's very own admission that Clark's testimony was

9 the difference in the case.

10    **C.  Conclusion**

11    In evaluating this claim, Mr. Grizzle respectfully asks the Court to keep in mind the concluding

12 remarks of Judge Trott in *Bowie*:

13    Never has it been more true than it is now that a criminal charged with a serious
    crime understands that a fast and easy way out of trouble with the law is not only

14    to have the best lawyer money can buy or the court can appoint, but to cut a deal at
    someone else's expense and to purchase leniency from the government by offering

15    testimony in return for immunity, or in return for reduced incarceration. . . .

16    [B]ecause of the perverse and mercurial nature of the devils with whom the
    criminal justice system has chosen to deal, each contract for testimony is fraught

17    with the real peril that the proffered testimony will not be truthful, but simply
    factually contrived to "get" a target of sufficient interest to induce concessions

18    from the government. . . .

19    Such false testimony and false evidence corrupts the criminal justice system and
    makes a mockery out of its constitutional goals and objectives.  Thus, although

20    the truthful testimony of accomplice witnesses will continue to be of great value
    to the law, rewarded criminals also represent a great threat to the mission of the

21    criminal justice system.  It is just as constitutionally unacceptable for the
    government to put a guilty person in prison on the basis of false evidence as it is

22    to have an innocent person suffer the same fate. . .

23    Nowhere in the Constitution or in the Declaration of Independence, nor for that
    matter in the Federalist or in any other writing of the Founding Fathers, can one

24    find a single utterance that could justify a decision by any oath-beholden servant
    of the law to look the other way when confronted by the real possibility of being

25    complicit in the wrongful use of false evidence to secure a conviction in court.

26 *Bowie*, 243 F.3d at 1123-24.

27

28

1

**III.**

2
**MR. GRIZZLE'S TRIAL LAWYER RENDERED INEFFECTIVE
ASSISTANCE OF COUNSEL BY FAILING TO PREPARE AND
3 FAILING TO INVESTIGATE THE PERJURY, AND THEREFORE
HE NEVER BROUGHT IT TO THE ATTENTION OF THE JURY
4 OR THE TRIAL COURT.**

5    **A. Factual Background**

6      On January 19, 1999, Fallman and his investigators conducted the videotaped interview of

7 Clark. *See* Ex. N. At a pretrial hearing held on February 4, 1999, Fallman stated on the record that he had

8 conducted the videotaped interview of Clark and turned the video over to Clanton. *See* Ex. C at 23-24. In

9 response to Fallman's assertion that he produced the videotape to Clanton, the record reveals that Clanton

10 nodded, presumably confirming that he had received the videotape. *See* Ex. C at 24. Indeed, Clanton never

11 indicated at the hearing that he had not received the videotape. Later in the hearing, Fallman again indicated

12 that he had produced the videotape to Clanton, and Clanton did not dispute his assertion. *See* Ex. C at 30-31.

13      Towards the end of the hearing, Clanton actually admitted that he had received the videotape,

14 as he requested "[a]ny tape-recorded or video statements by Mr. Clark since July 25th, 1997, and any and all

15 audio or video statements by any other inmate concerning Mr. Clark since July 25th, '97. I'm informed by

16 counsel and Officer Willis that my tape of Mr. Clark to their knowledge is the sum total of any electronic

17 statements. I'm not certain whether the file the Court has alludes to the existence of any other audiotapes or

18 videotapes." Ex. C at 34. In other words, Clanton admitted that he had received the videotape of the Clark

19 interview, as he was requesting any *other* electronic statements.

20      At a post-trial hearing held on June 16, 1999, the trial court heard arguments and evidence on

21 Clanton's motion for a new trial. *See* Ex. I. Among other things, Clanton argued that Clark had testified about

22 Mr. Grizzle's supposed efforts to kill Healy's daughter, and Clanton maintained that he had not heard of that

23 allegation before the trial testimony. *See* Ex. I at 58. However, as mentioned previously, the allegation about

24 Healy's daughter was discussed in the videotaped interview, *see* Ex. N, demonstrating that Clanton had not

25 reviewed the videotape before Clark testified.

26      Later in the hearing, Clanton maintained that he had never received the videotape, going so

27 far as to state: "I will under penalty of perjury declare on the record that I never received a copy of this tape."

28 Ex. I at 93. The prosecution, however, was able to establish through a witness and its discovery log that the

1   videotape was produced to Clanton on January 21, 1999.  *See* Ex. I at 79-83.  Of course, Clanton had also

2   acknowledged at the February 4, 1999 pretrial hearing that he had received the tape.  Nevertheless, Clanton

3   maintained that he had never seen the tape, nor did he even know of its existence until months after the trial.

4   *See* Ex. I at 94, 130.  Indeed, Clanton stated that, even as of the time of the post-trial hearing, he had still not

5   reviewed the videotape or made any effort to do so.  *See* Ex. I at 128-30.

6           Put simply, Clanton's failure to view the videotape was utter incompetence.  As an initial

7   matter, it is clear that he was given the videotape before the trial.  The testimony and the discovery log reveal

8   that the tape was turned over on January 21, 1999, and Clanton admitted that he had received the videotape

9   at the February 4, 1999 hearing.  There is simply no professionally reasonable explanation for Clanton's failure

10  to view the videotape.

11          Assuming that Clanton was not making misrepresentations to the trial court, the only possible

12  explanation is that he simply lost the videotape.  This, however, is not a very good explanation for failing to

13  *view* the videotape.  He clearly knew of the videotape's existence before the trial, as it was extensively

14  discussed at the February 4, 1999 hearing.  If he lost the videotape, he certainly should have requested another

15  copy.  The second alternative is that Clanton made misrepresentations to the trial court in an effort to cover

16  up his own incompetence.  In other words, Clanton realized that he was incompetent for failing to view the

17  videotape and then sought to cover it up by claiming that he had never been informed of its existence.

18          Under either scenario, Clanton rendered ineffective assistance of counsel.  Moreover, there was

19  no excuse for Clanton's failure to view the videotape by the time of the June 16, 1999 hearing on the motion

20  for a new trial.  At the hearing, Clanton admitted that, at least by that time, he was aware of the existence of

21  the videotape.  Yet, he stated that he had still not taken the time to view it.  In sum, while the prosecution

22  flouted its obligation to bring the perjury of Clark and Healy to the attention of the trial court, Mr. Grizzle's

23  trial lawyer rendered ineffective assistance of counsel by failing to prepare and investigate, and therefore he

24  too never brought the perjury to the attention of the jury or the trial court.  While the perjury of Clark and

25  Healy was self-evident from their testimony, as one of them had to have been perjuring himself regarding their

26  relationship, it would have been crystal clear to Clanton had he reviewed the videotape of Clark's interview

27  with Fallman and the investigators.  Clanton, however, never even performed this most basic task.  Had he

28  taken this minimal step, he would have been able to uncover and undermine the perjury of Clark and Healy.

1

### B.  Procedural Default Should Not Apply

2          The superior court issued a "reasoned" decision denying Mr. Grizzle's ineffective assistance

3 of counsel claim, but the California appellate courts issued summary decisions.  *See* Ex. O.  As a result, this

4 Court "looks through" the summary decisions of the California appellate courts and evaluates the decision of

5 the superior court.  *See, e.g.*, *Medley*, 506 F.3d at 862.

6          The superior court *sua sponte* suggested that Mr. Grizzle's ineffective assistance of counsel

7 claim may not have been timely, reasoning that it could have been raised on direct appeal, but then proceeded

8 to address the merits of his claim.  The California appellate courts then issued summary denials.  For this

9 reason alone, Mr. Grizzle's claim is not procedurally defaulted.  *See, e.g.*, *Barker*, 913 F.2d at 1436 n.3;

10 *Huffman*, 750 F.2d at 800-01.  Furthermore, Mr. Grizzle contends that the superior court "did not make a clear

11 statement that its decision was based on a bona fide, adequate, and independent ground."  *Park v. California*,

12 202 F.3d 1146, 1149 (9th Cir. 2000) (citing *Harris v. Reed*, 489 U.S. 255 (1989)).  Indeed, the superior court

13 merely made its suggestion and then proceeded to the merits.  As a result, federal habeas corpus review should

14 not be precluded under the procedural default doctrine.

15          The superior court relied on *People v. Tello*, 15 Cal. 4th 264 (1997), but that case clearly states

16 that "[b]ecause claims of ineffective assistance are often more appropriately litigated in a habeas corpus

17 proceeding, the rules generally prohibiting raising an issue on habeas corpus that was, or could have been,

18 raised on appeal would not bar an ineffective assistance claim on habeas corpus."  *Id.* at 267 (citations

19 omitted).  Thus, to the extent that the superior court's ruling can be considered one based on procedural

20 default, it should clearly be rejected, as the purported procedural default rule suggested by the superior court

21 was certainly not "adequate."  In this instance, the very authority relied upon by the superior court, *Tello*,

22 demonstrates that there is no consistent rule as to when an ineffective assistance claim *must* be brought on

23 direct appeal.  Indeed, *Tello* specifically states that failure to raise an ineffective assistance claim on direct

24 appeal cannot bar such a claim on habeas corpus.  Finally, the inconsistent and unnoticed invocation of

25 procedural default by the superior court deprived Mr. Grizzle of the opportunity to raise a claim of ineffective

26 assistance of appellate counsel, which would constitute cause and prejudice for any default.

27

28

1          **C.  Clanton Engaged In Deficient Performance**

2          Under the Sixth and Fourteenth Amendments, a criminal defendant is entitled to the effective

3   assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Under the now-familiar *Strickland*

4   test, a defendant must first show that his attorney engaged in deficient performance and secondly demonstrate

5   that the inadequate performance was prejudicial.

6          With respect to the first prong, the superior court agreed that Clanton engaged in deficient

7   performance, and therefore little further discussion is required.  Indeed, it is clear that Clanton engaged in

8   deficient performance by failing to watch the videotape of Clark's interview and failing to investigate Clark's

9   fanciful allegations.  Clanton's failure to view the videotape is similar to the deficient performance rendered

10  by the trial attorney in *Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995), who failed to review a letter that

11  was produced by the prosecution in discovery and failed to conduct follow-up investigation.   There, the

12  Seventh Circuit explained:

13              [Counsel] breached his duty to investigate by failing to *familiarize* himself with
                the letter. Indeed, he did not even realize it was in his possession.  As the district
14              court correctly noted: "Counsel's duty to investigate would necessarily have
                included a review of the discovery materials provided by the State. [Counsel's]
15              surprise at the letter being introduced at trial, and the embarrassing moment when
                the state's attorney quickly located it in [counsel's] file, indicates [counsel] did
16              not do so."

17  *Id.* at 680 (emphasis in original).  The Seventh Circuit further stated: "We cannot imagine a plausible excuse

18  for a decision not to read discovery materials voluntarily provided by the State.  'Such a complete lack of trial

19  preparation puts at risk the reliability of the adversarial testing process.' . . . Because of his ignorance, counsel

20  was both unable and unprepared to make any strategic decisions regarding the letter – including either

21  objecting to its admission as hearsay or, faced with an adverse ruling, using the letter to impeach Angela's

22  credibility.  We can imagine no scenario excusing his failure.  An attorney rather clearly has a duty to

23  familiarize himself with the discovery materials provided by the state.  Because counsel failed in this regard

24  here, his behavior was not objectively reasonable under *Strickland*."  *Id.* at 680 (citations omitted).

25          Clanton's performance was quite similar to the deficient performance of the trial attorney in

26  *Williams*.  Clanton admitted that he had not viewed the videotape of the Clark interview.  After trial, he

27  claimed that he did not even know of its existence, even though he readily admitted that he had received a

28  copy of the videotape before trial.  Even when Clanton admitted at the time of the post-trial hearing that he

1   was now aware of the videotape, he still had not bothered to view it.  There was simply no excuse for

2   Clanton's failure to view the videotape, which was voluntarily produced by the prosecution.

3                    **D.  The Deficient Performance Was Prejudicial**

4              Although the superior court found that Clanton's performance was deficient, it found that the

5   deficient performance was not prejudicial.  In this regard, the superior court fundamentally erred.  Unlike the

6   superior court, this Court should follow *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006), a case where the

7   Ninth Circuit granted habeas relief based on an ineffective assistance of counsel claim under eerily similar

8   circumstances.

9              In *Reynoso*, the defendant, like Mr. Grizzle, was convicted of murder based on the testimony

10  of four witnesses who had serious credibility problems.  *Id.* at 1103.  Two of the witnesses were

11  "eyewitnesses," while the other two claimed to have heard admissions made by Reynoso.  The two witnesses

12  who claimed to have heard admissions by Reynoso were jailhouse snitches who claimed that Reynoso made

13  incriminating statements and gestures to them, and one of these witnesses recanted his story at trial.  *Id.* at

14  1103-04.  One of the inmate witnesses claimed to have "experienced a religious conversion" which prompted

15  his testimony.  *Id.* at 1103.  Of the two eyewitnesses, neither were inmates; one eyewitness claimed that he

16  saw Reynoso at the murder scene, and the other testified that he saw Reynoso arrive at the murder scene and

17  then run away after the murder.  *Id.* at 1105.  In Mr. Grizzle's case, there were three inmate witnesses who

18  claimed that Mr. Grizzle made incriminating statements or gestures (Clark, Healy, and Rubidoux), one of

19  whom (Clark) flip-flopped on his testimony.  Ironically, both Clark and Healy claimed something similar to

20  a "religious conversion" which prompted their testimony.  There were also two supposed "eyewitnesses" in

21  Mr. Grizzle's case, Contreras, who allegedly delivered the pruno, and Ridinger, who claimed to have almost

22  participated in the crime.  The witnesses in Mr. Grizzle's case may have had even more credibility problems

23  than the ones in *Reynoso*, as they were all inmate witnesses who only agreed to testify in exchange for

24  immunity and reduced sentences.

25             The claim of ineffective assistance in *Reynoso* was that, although trial counsel attacked the

26  credibility of all four witnesses, she failed to investigate and cross-examine two of the witnesses about a

27  financial reward that was offered for helping solve the murder.  The Ninth Circuit first found that the trial

28  counsel did engage in deficient performance.  Although it was not entirely clear whether the trial counsel knew

1 that the witnesses had knowledge of the reward, the Ninth Circuit concluded that her performance was

2 deficient, explaining that her failure to investigate and develop this avenue for impeachment was inadequate.

3 *See Reynoso*, 462 F.3d at 1112-15.  The Ninth Circuit then proceeded to the prejudice prong and explained

4 that the prosecution's case was weak, as it was based on inmate witnesses and other witnesses who had

5 credibility problems.  *Id.* at 1116-17.  The Ninth Circuit further reasoned that the prosecutor emphasized

6 during closing arguments that the defense failed to successfully impeach the state's witnesses.  *Id.* at 1117.

7          Once again, the similarities between *Reynoso* and this case are eery.  As in *Reynoso*, Clanton's

8 incompetent failure to watch the videotape and investigate Clark's allegations was prejudicial.  Clanton clearly

9 should have recognized the perjury committed by Clark and Healy from their trial testimony and was

10 incompetent in failing to do so.  However, even if he had missed the obvious perjury during the trial, he

11 certainly would have recognized it had he watched the videotape.  As mentioned previously, throughout the

12 videotape, Clark discussed his relationship with Healy, including that they lived in the same pod, that they

13 talked on a daily basis, and that Healy had even mentioned that he had family in Ohio.  After watching the

14 video, any competent attorney would recognize that either Clark was lying when he maintained that he had

15 a close relationship with Healy, or Healy was lying when he said that he had never even seen Clark.  He could

16 have then brought the perjury to the attention of the court and the jury during the trial.  Instead, the perjury was

17 completely overlooked and never argued to the court or the jury.

18          Moreover, Clanton's failure to watch the videotape was prejudicial as he never conducted any

19 investigation to undermine Clark's fanciful allegations.  Had he watched the videotape, he would have

20 recognized the specific allegations against Gallegos.  Clanton knew Gallegos, the current District Attorney

21 of Humboldt County, and he would have recognized that the allegations that Gallegos solicited and paid for

22 perjury were totally false.  Clanton could have called Gallegos as a witness to refute Clark's allegations.  Also,

23 had Clanton viewed the videotape, he would not have been caught off guard by Clark's "Polly Klass"

24 testimony about the plot to kill Healy's daughter.  Clanton could have destroyed Fallman's argument that

25 Clark's testimony on this point was truthful because he only could have known about Healy's daughter

26 through Mr. Grizzle.  The videotape revealed that Clark knew about Healy's daughter through Healy himself.

27 Finally, had Clanton at least taken the time to view the videotape by the June 16, 1999 hearing on the motion

28 for a new trial, he could have pointed the perjury out to the trial court in an effort to obtain a new trial.

1    In sum, Clanton rendered ineffective assistance of counsel, and his deficient performance was

2 prejudicial.  Clanton did not prepare for Clark's testimony and did not investigate, although he had ample

3 avenues to pursue.  Indeed, Clanton did not even review basic discovery material so that he could prepare for

4 and investigate Clark's testimony.  This case is governed by *Reynoso*.  Indeed, the Ninth Circuit has "found

5 prejudice even when the prosecution's case has been stronger than in the instant case."  *Reynoso*, 462 F.3d at

6 1118 n.14.

7                                                            **IV.**

8        **THE PROSECUTION VIOLATED MR. GRIZZLE'S RIGHTS UNDER THE FIFTH,**
         **SIXTH, AND FOURTEENTH AMENDMENTS WHEN IT FAILED TO TURN OVER**
9        **EXCULPATORY EVIDENCE, A PRISON LOG, WHICH UNDERMINED THE**
         **TESTIMONY OF HEALY, ONE OF THE PROSECUTION'S COOPERATING**
10                                  **INMATE WITNESSES.**

11            **A.  Factual Background**

12            Healy testified that, the day after the murder, Mr. Grizzle made incriminatory admissions to

13 him in the area of the holding cells at Pelican Bay.  Healy testified that the encounter occurred when, having

14 just finished a non-attorney visit and awaiting transport from a holding cell, he saw Mr. Grizzle arrive for a

15 visit and be placed into a cell more or less across from him.  At trial, prison logs were introduced to show that

16 Healy's visit was from 11:00 a.m. to 1:00 p.m. and that Mr. Grizzle's visit was from 1:00 p.m. to 3:00 p.m.

17 Thus, there was a brief chance for an encounter at the end of Healy's visit and the beginning of Mr. Grizzle's

18 visit.  After the trial, however, the prosecution produced a log which demonstrated that Healy left his visit at

19 1:00 p.m. and that Mr. Grizzle did not arrive for his own visit until 1:30 p.m., creating a half-hour gap and

20 establishing that the two could not have had the encounter claimed by Healy.  *See* Ex. K at 34.

21            **B.  The State Court Totally Misconstrued *Brady***

22            The last "reasoned" decision of the state courts on this issue is the decision of the California

23 Court of Appeal on direct review.  Thus, that is the decision subject to review.  *See, e.g.*, *Medley*, 506 F.3d

24 at 862.  The state appellate court apparently recognized that the missing log was exculpatory (indeed, it

25 seriously undercut Healy's testimony) but found that it would not "render a different result probable on

26 retrial."  The state appellate court applied the wrong standard, as it fundamentally misunderstood the relevant

27 due process principles.

28

1        As an initial matter, the state court appeared to suggest that a due process violation only occurs

2  if the prosecution intentionally suppressed the exculpatory evidence.  This is totally wrong.  Under the Due

3  Process Clause, the government must turn over exculpatory evidence, including impeachment material, in its

4  possession.  *See Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).  Under

5  *Brady*, "it is the character of the evidence, not the character of the prosecutor, that determines whether

6  nondisclosure constitutes constitutional error."  *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989).

7  As the Ninth Circuit has recently stated, "the evidence must have been suppressed by the government, either

8  willfully *or inadvertently*."  *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (*en banc*)

9  (emphasis added).  In other words, the good faith or bad faith of the prosecutor is irrelevant.  *See Banks v.*

10  *Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

11        Furthermore, even assuming the prosecutor in this case did not know about the missing log

12  before trial, the state cannot seriously dispute that the exculpatory information, which was possessed by the

13  California Department of Corrections, was in the possession of the state for *Brady* purposes.  *See, e.g.*, *Kyles*,

14  514 U.S. at 438; *Giglio*, 405 U.S. at 154; *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (*en banc*);

15  *see also United States v. Santiago*, 46 F.3d 885, 893-94 (9th Cir. 1995).  In short, the asserted lack of evil intent

16  by the trial prosecutor does not in any way impact the instant *Brady* claim.

17        Because the state court incorrectly believed that only intentional suppression of exculpatory

18  evidence triggered a due process inquiry, it did not apply the correct materiality standard.  Instead, it appeared

19  to apply the more onerous standard under California statutory law for a new trial based on newly discovered

20  evidence, reasoning that Mr. Grizzle had to show that it was more "probable" than not that he would receive

21  a different result on retrial.  As stated previously, the correct standard is whether the defendant received a "trial

22  resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.  Stated differently, the standard is

23  whether there is a reasonable possibility that, had the exculpatory evidence been disclosed, the result of the

24  proceeding would have been different.  *Id*. at 433-34.  Importantly, a showing of prejudice does *not* require

25  that a defendant demonstrate by a preponderance of the evidence that the result of the trial would have been

26  different. *Id.* at 434.  Instead, a defendant merely needs to show that the non-disclosure of the evidence "put[s]

27  the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 435.

28

1   Mr. Grizzle can clearly satisfy this standard.  The evidence against Mr. Grizzle was primarily
2   based on jailhouse informants and therefore was not overwhelming, which is when a conviction should be
3   vacated on *Brady* grounds.  *See Kyles*, 514 U.S. at 441-54; *Jernigan*, 492 F.3d at 1053-57; *Boss v. Pierce*, 263
4   F.3d 734, 745 (7th Cir. 2001); *United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994).  Furthermore, the
5   suppressed evidence impeached a critical cooperating witness for the state, which is another factor indicating
6   materiality.  *See Carriger*, 132 F.3d at 480 (finding materiality where testimony of "prosecution's star witness"
7   was "critical"); *United States v. Steinberg*, 99 F.3d 1486, 1491-92 (9th Cir. 1996).  The suppressed evidence
8   also indicated that Healy may have lied and therefore constitutes a significant *Brady* violation.  *See Benn v.
9   Lambert*, 283 F.3d 1040, 1056-57 (9th Cir. 2002) (*Brady* information demonstrating that a witness lied is
10  particularly significant); *United States v. Bernal-Obeso*, 989 F.2d 331, 336 (9th Cir. 1993) (reversing for *Brady*
11  violation and explaining that evidence of "a lie might be equivalent to the proverbial smoking gun").

12   The state court reasoned that this critical impeachment material on Healy was "cumulative,"
13  as Healy's credibility was attacked in other ways.  The Ninth Circuit, however, has repeatedly rejected
14  arguments that the failure to produce important impeachment material about a critical cooperating witness is
15  merely "cumulative" because the witness's credibility was attacked in other ways.  *See Benn*, 283 F.3d at
16  1054-55 (reversing for *Brady* violation and rejecting argument "that the suppressed material was cumulative
17  and its suppression harmless because [informant] was sufficiently impeached"); *Carriger*, 132 F.3d at 481-82
18  (reversing for *Brady* violation even where the district court found that "the jury had already heard 'a wealth
19  of negative information about [the informant's] veracity'"); *Steinberg*, 99 F.3d at 1491-92 (reversing for *Brady*
20  violation even though informant's "credibility was explored at trial").  This Court should "reject the
21  government's argument that the [missing log] contained merely cumulative evidence.  In truth, it contained
22  evidence contradictory to the government's position." *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1463
23  (9th Cir. 1993).  In short, "the government cannot satisfy its *Brady* obligation to disclose exculpatory evidence
24  by making some evidence available and claiming the rest would be cumulative." *Carriger*, 132 F.3d at 481.

25   Finally, the state court reasoned that the log may not have definitively demonstrated that Healy
26  lied, as prison officials explained that the logs are not always precise.  While this is certainly an argument that
27  the prosecution can make at a retrial, it does not undercut the exculpatory value of the suppressed evidence.
28  In any event, it is likely that this argument will not go very far, as jurors would be skeptical of a prosecutor

1 arguing that the prison's logs are not precise, particularly when the prosecution relied on other prison records
2 throughout its case.

3                                                 **V.**

4       **MR. GRIZZLE'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH**
         **AMENDMENTS WERE VIOLATED WHEN HE WAS TRIED IN SHACKLES**
5          **AND CONDITIONS OF EXTRAORDINARY SECURITY.**

6           **A.  Factual Background**

7            Mr. Grizzle was tried in restraints, seated chained at the waist and ankles to a heavy security
8 chair that was "scooted" under counsel table, his left hand linked by handcuffs to the waist chain.  Only his
9 right hand was free above the table for writing and the like.  To prevent the restraints from being visible to the
10 jurors, the trial court ordered a cloth screen placed around the front of the counsel table, and a cloak was
11 draped across the back of the security chair to disguise it.  At pretrial proceedings, Mr. Grizzle also had a
12 "black box" over his handcuffs that prevented access to the keyholes, but this was not used in proceedings
13 before the jury.  *See* Ex. K at 8-13.

14            Mr. Grizzle did not engage in disruptive behavior during pretrial or trial proceedings.  His
15 codefendant, Littrell, who was the actual killer and proceeded to trial first, was allowed to have both hands
16 free and only his ankles bound to the security chair.  Like Mr. Grizzle, Littrell also did not engage in any
17 disruptive behavior in court.  Nevertheless, the additional restraints were imposed on Mr. Grizzle based on
18 two witnesses from Pelican Bay who recounted Mr. Grizzle's prison record and various allegations about
19 prison gangs at a pretrial hearing.  In particular, the witnesses testified that Mr. Grizzle had accumulated
20 numerous "points" for various prison violations and also had convictions for prior crimes of violence.  The
21 witnesses also stated that Mr. Grizzle was associated with the Aryan Brotherhood prison gang, which was a
22 gang known to attack informants and plan escapes.  The trial court stated that it was aware that there was an
23 attempt to breach security during Littrell's trial, asserting that someone had been caught "making a diagram
24 of the layout of the courthouse."  *See* Ex. K at 8-13.

25           **B.  The State Court Failed To Properly Apply Established Shackling Precedent**

26            As to the shackling claim, the last "reasoned" decision of the state courts was rendered by the
27 California Court of Appeal on direct review, as the Supreme Court of California summarily denied Mr.
28 Grizzle's petition for review.  As a result, this Court "looks through" the summary decision of the California

1  Supreme Court and evaluates the decision of the court of appeal.  *See, e.g.*, *Medley*, 506 F.3d at 862.

2      The law is clear that, when there is a request to shackle the defendant, a court must employ the

3  least restrictive alternatives.  *See United States v. Howard*, 480 F.3d 1005, 1012 (9th Cir. 2007); *Duckett v.*

4  *Godinez*, 67 F.3d 734, 748 (9th Cir. 1995); *Spain v. Rushen*, 883 F.2d 712, 721 (9th Cir. 1989); *see also Deck*

5  *v. Missouri*, 544 U.S. 622 (2005); *Illinois v. Allen*, 397 U.S. 337 (1970).  In addressing this claim, the

6  California Court of Appeal observed: "Grizzle says the court failed to explore less restrictive alternatives, but

7  the record shows that his counsel argued vigorously for alternatives.  This is not a case of summary denial

8  without a hearing or adequate record.  The court implicitly explored alternatives and, except for eliminating

9  the 'black box,' rejected them."  Ex. K at 11-12 (citations omitted).  The problem with this analysis is that the

10  court of appeals never addressed the ultimate question: was the trial court's rejection of less restrictive

11  alternatives correct?  The fact that the trial court may have considered the alternatives and rejected them does

12  not mean that the trial court was correct in doing so.  Simply put, given the lesser restraints imposed on

13  Littrell, and given that Mr. Grizzle had engaged in no disruptive behavior, shackling three of his four limbs

14  was not the least restrictive alternative.   Accordingly, his constitutional rights were violated.

15                          **CONCLUSION**

16      For the foregoing reasons, the Court should grant Mr. Grizzle's petition for a writ of habeas

17  corpus.

18                              Respectfully submitted,

19

20                              s/ Benjamin L. Coleman, Ethan A. Balogh
   Dated: January 15, 2008        COLEMAN & BALOGH LLP
21                              BENJAMIN L. COLEMAN
                                ETHAN A. BALOGH
22
23                              Attorneys for Mr. Grizzle

24
25
26
27
28

1

## <u>TABLES OF CONTENTS</u>

2   PRELIMINARY STATEMENT                                                 1

3   PROCEDURAL HISTORY                                                    1

4   STATEMENT OF FACTS                                                    3

5   STANDARD OF REVIEW                                                    5

6   ARGUMENT                                                              6

7   I.  MR. GRIZZLE'S RIGHTS UNDER THE FIFTH, SIXTH, AND
    FOURTEENTH AMENDMENTS WERE VIOLATED WHEN
8   THE TRIAL COURT FAILED TO DECLARE A MISTRIAL DUE
    TO THE TAINT OF THE JURY.                                             6
9
            A.  Factual Background                                        6
10
            B.  Procedural Default Should Not Apply                       7
11
            C.  The Petition Should Be Granted Under *Caliendo*           8
12
    II.  THE PROSECUTION KNOWINGLY, OR AT LEAST RECKLESSLY
13  AND NEGLIGENTLY, PRESENTED PERJURED TESTIMONY AND
    FAILED TO CONDUCT INVESTIGATION TO ENSURE THAT IT WAS
14  NOT PRESENTING PERJURED TESTIMONY IN VIOLATION OF MR.
    GRIZZLE'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT
15  RIGHTS.                                                               10

16          A.  Factual Background                                        10

17          B.  Legal Analysis                                            18

18          C.  Conclusion                                                27

19  III.  MR. GRIZZLE'S TRIAL LAWYER RENDERED INEFFECTIVE
    ASSISTANCE OF COUNSEL BY FAILING TO PREPARE AND
20  FAILING TO INVESTIGATE THE PERJURY, AND THEREFORE HE
    NEVER BROUGHT IT TO THE ATTENTION OF THE JURY OR THE
21  TRIAL COURT.                                                          28

22          A.  Factual Background                                        28

23          B.  Procedural Default Should Not Apply                       30

24          C.  Clanton Engaged In Deficient Performance                  31

25          D.  The Deficient Performance Was Prejudicial                 32

26

27

28

IV.  THE PROSECUTION VIOLATED MR. GRIZZLE'S RIGHTS
UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS
WHEN IT FAILED TO TURN OVER EXCULPATORY EVIDENCE,
A PRISON LOG, WHICH UNDERMINED THE TESTIMONY OF
HEALY, ONE OF THE PROSECUTION'S COOPERATING INMATE
WITNESSES.                                                                              34

        A.  Factual Background                                          34

        B.  The State Court Totally Misconstrued *Brady*        34

V.  MR. GRIZZLE'S RIGHTS UNDER THE FIFTH, SIXTH, AND
FOURTEENTH AMENDMENTS WERE VIOLATED WHEN HE WAS
TRIED IN SHACKLES AND CONDITIONS OF EXTRAORDINARY
CONFINEMENT.                                                                        37

        A.  Factual Background                                          37

        B.  The State Court Failed To Properly Apply Established
           Shackling Precedent                                          37

CONCLUSION                                                                          38

**TABLE OF AUTHORITIES**

**CASES**

*Banks v. Dretke*,
540 U.S. 668 (2004) — 35

*Barker v. Estelle*,
913 F.2d 1433 (9th Cir. 1990) — 7,30

*Benn v. Lambert*,
283 F.3d 1040 (9th Cir. 2002) — 36

*Bennett v. Mueller*,
322 F.3d 573 (9th Cir. 2003) — passim

*Boss v. Pierce*,
263 F.3d 734 (7th Cir. 2001) — 36

*Brady v. Maryland*,
373 U.S. 83 (1963) — passim

*Caliendo v. Warden of California Men's Colony*,
365 F.3d 691 (9th Cir. 2004) — passim

*Carriger v. Stewart*,
132 F.3d 463 (9th Cir. 1997) (*en banc*) — 35,36

*Coleman v. Thompson*,
501 U.S. 722 (1991) — 7

*Crater v. Galaza*,
2007 WL 4259539 (9th Cir. 2007) — 5

*Deck v. Missouri*,
544 U.S. 622 (2005) — 38

*Duckett v. Godinez*,
67 F.3d 734 (9th Cir. 1995) — 38

*Duhaime v. Ducharme*,
200 F.3d 597 (9th Cir. 2000) — 5

*Giglio v. United States*,
405 U.S. 150 (1972) — 35

*Harris v. Reed*,
489 U.S. 255 (1989) — 30

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) (*en banc*) — 20

*Huffman v. Ricketts*,
750 F.2d 798 (9th Cir. 1984) — 7,30

*Illinois v. Allen,*
 397 U.S. 337 (1970)        38

*Irons v. Carey,*
 505 F.3d 846 (9th Cir. 2007)     5

*Jackson v. Roe,*
 425 F.3d 654 (9th Cir. 2005)     7

*Killian v. Poole,*
 282 F.3d 1204 (9th Cir. 2002)    20, 21,24

*Kyles v. Whitley,*
 514 U.S. 419 (1995)      passim

*Lopez-Umanzor v. Gonzales,*
 405 F.3d 1049 (9th Cir. 2005)    24

*Matteo v. Superintendent, SCI Albion,*
 171 F.3d 877 (3d Cir. 1999) (en banc)  5

*Mattox v. United States,*
 146 U.S. 140 (1892)      9

*Medley v. Runnels,*
 506 F.3d 857 (9th Cir. 2007) (*en banc*)  passim

*Melendez v. Pliler,*
 288 F.3d 1120 (9th Cir. 2002)    8

*Mooney v. Holohan,*
 294 U.S. 103 (1935)      18,19

*Morris v. Ylst,*
 447 F.3d 735 (9th Cir. 2006)    passim

*Napue v. Illinois,*
 360 U.S. 264 (1959)      19

*Northern Mariana Islands v. Bowie,*
 243 F.3d 1109 (9th Cir. 2001)    passim

*Ouber v. Guarino,*
 293 F.3d 19 (1st Cir. 2002)     5

*Park v. California,*
 202 F.3d 1146 (9th Cir. 2000)    30

*Parker v. Gladden,*
 385 U.S. 363 (1966)      9

*People v. Fudge,*
 7 Cal. 4th 1075 (1994)      8

1   *People v. Tello,*
          15 Cal. 4th 264 (1997)                                    30
2

3   *Remmer v. United States,*
          347 U.S. 227 (1954)                                          9

4   *Reynoso v. Giurbino,*
          462 F.3d 1099 (9th Cir. 2006)                       32,33,34
5

6   *Robinson v. Ignacio,*
          360 F.3d 1044 (9th Cir. 2004)                             5

7   *Spain v. Rushen,*
          883 F.2d 712 (9th Cir. 1989)                             38
8

9   *Strickland v. Washington,*
          466 U.S. 668 (1984)                                        31

10  *Strickler v. Greene,*
          527 U.S. 263 (1999)                                        35
11

12  *Turner v. Louisiana,*
          379 U.S. 466 (1965)                                         9

13  *United States v. Agurs,*
          427 U.S. 97 (1976)                                       19,20
14

15  *United States v. Bernal-Obeso,*
          989 F.2d 331 (9th Cir. 1993)                            36

16  *United States v. Brumel-Alvarez,*
          991 F.2d 1452 (9th Cir. 1993)                           36
17

18  *United States v. Endicott,*
          869 F.2d 452 (9th Cir. 1989)                            35

19  *United States v. Howard,*
          480 F.3d 1005 (9th Cir. 2007)                           38
20

21  *United States v. Jernigan,*
          492 F.3d 1050 (9th Cir. 2007) (*en banc*)            35,36

22  *United States v. Kelly,*
          35 F.3d 929 (4th Cir. 1994)                             36
23

24  *United States v. Santiago,*
          46 F.3d 885 (9th Cir. 1995)                             35

25  *United States v. Steinberg,*
          99 F.3d 1486 (9th Cir. 1996)                            36
26

27  *United States v. Tierney,*
          947 F.2d 854 (8th Cir. 1991)                            19

28

*United States v. Wallach,*
   935 F.2d 445 (2d Cir. 1991)                                          21

*United States v. Young,*
   17 F.3d 1201 (9th Cir. 1994)                                         21

*Williams v. Bowersox,*
   340 F.3d 667 (8th Cir. 2003)                                          5

*Williams v. Washington,*
   59 F.3d 673 (7th Cir. 1995)                                          31

**STATUTES**

28 U.S.C. § 2254                                                         5

Memo of P.A. C 07-4845 SI

**PROOF OF SERVICE**

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 1350 Columbia Street, Suite 600, San Diego, California, 92101;

3) That on January 15, 2008, I served a copy of the attached Memorandum of Points and Authorities on counsel for respondent by e-mailing a copy to Jill.Thayer@doj.ca.gov.  A hard copy is also being forwarded via U.S. Mail to Jill M. Thayer, Deputy Attorney General, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on January 15, 2008, at San Diego, California.

*s/Benjamin L. Coleman*
BENJAMIN L. COLEMAN