1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF DEL NORTE

**FILED**

NOV 2 5 1998

SUPERIOR COURT OF CALIFORNIA
COUNTY OF DEL NORTE

PEOPLE OF THE STATE
OF CALIFORNIA,

            Plaintiff,

    vs.                 No. 97-269-X

GARY JOE LITTRELL (C-45888),

           Defendant.
_____/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HONORABLE: Robert W. Weir
DATE:      Wednesday, July 22 1998
PLACE:     Crescent City, California

William Romero, C.S.R. #1647
Official Reporter
Courthouse - Room 159
Crescent City, CA 95531



1    thrashing and very difficult to be around, and they are

2    probably not very dangerous.  So it's a hard line to draw.

3        MR. FALLMAN:    Thank you, Doctor.  No further questions.

4        MR. SANDERS:    Thank you very much, Doctor.  No further

5    questions.

6        THE COURT:    All right, you may step down.

7        Next witness.

8        MR. SANDERS:    We probably need to take just a wee break.

9        THE COURT:    A short break.  Remember the admonition.

10    (Recess taken at 2:45 p.m. until 2:55 p.m.)

11                        ---oOo---

12        THE COURT:    We have the jury, the attorney and the

13    defendant.

14        THE COURT:    Raise your right hand.

15                    FREDERICK CLARK,

16    called as a witness by the Defense, having been sworn, was

17    examined and testified as follows:

18        THE CLERK:    State your name for the record, please, and

19    spell your last name.

20        THE WITNESS:    Frederick Clark, C-l-a-r-k.

21                    DIRECT-EXAMINATION

22    BY MR. SANDERS:

23    Q.    Mr. Clark, you're an inmate at Pelican Bay State Prison?

24    A.    Yes.

25    Q.    What type of felonies have you been convicted of in the

26    past?

27    A.    I have been convicted of assault with a deadly weapon,

28    burglary, robbery, false imprisonment.

1    Q.    Any drug-type offenses?

2    A.    Not felonies, you know.  But as far as institutional

3    offenses, yes.

4    Q.    Were you ever housed with an individual by the name of --

5    or housed in the same pod with an individual by the name of

6    Brian Healy?

7    A.    Yes.

8    Q.    About how long ago was that, that you were housed with

9    him, to the best of your recollection?

10    A.    Approximately about -- about the beginning of January or

11    late last year, November, December in there.

12    Q.    And did you ever have an opportunity to talk to Mr. Healy

13    when you were housed?

14    A.    Sure.

15    Q.    Where was it in the institution that you and Mr. Healy

16    were housed?

17    A.    The SHU, C Facility SHU.

18    Q.    C Facility?

19    A.    Yes.

20    Q.    Which one of the pods were you in?

21    A.    We were in 1 Block on C Facility in F Pod.

22    Q.    Do you remember your cell number?

23    A.    Yes, 124.

24    Q.    Do you remember what cell number Mr. Healy had?

25    A.    221.

26    Q.    Did you ever talk to Mr. Healy about any plans he had as

27    far as getting out of the institution?

28    A.    Yes.

1    MR. FALLMAN:   Well, I object to leading questions, Your

2    Honor.

3    THE COURT:   Overruled.

4    Q.    (By Mr. Sanders)   Would you tell us about that

5    discussion?

6    A.    I know him as Deadeye, that's what I refer to him as.

7    You know, he talked to me about, you know, he won a lawsuit,

8    you know, and he said that he had some money, you know, and

9    that he wanted me to help him double his funds.  He knows that

10    in the past up until about 1995 that I used to sell drugs in

11    the penitentiary and, you know, so it was his intentions to --

12    for me to help him through some contacts on the street, you

13    know, increase his money because, you know, he says that he was

14    going to get to another institution.  At that time, you know,

15    he said that he was going to make his attempt to escape.

16    Q.    Okay.  Now, Mr. Healy's a white inmate, correct?

17    A.    Yes.

18    Q.    And you are a black inmate, correct?

19    A.    Yeah.

20    Q.    And Mr. Healy has been associated, at least in this

21    trial, with a gang by the name of Aryan Brotherhood?

22    A.    Uh-huh.

23    Q.    Are you familiar with that?

24    A.    Yes.

25    Q.    Why would he be talking to you to ask for help?

26    A.    Well, you know, I didn't just meet him, you know.  I met

27    him like in 1991 or '92 in Corcoran Prison, you know, that's

28    where I met him at originally.  And, again, he knows I used to

1   sell drugs to white guys in the penitentiary.  Black guys, it

2   doesn't really matter, I am not intimidated with any type of

3   prison gang or of any type of politics going in the prison, I

4   don't really care.  As long as you spend money, I don't care

5   who you are at that time in the prison.  So he knows this, you

6   know, and so I don't have any alliance to the Aryan

7   Brotherhood, so he felt that he could talk to me, you know what

8   I mean.

9   Q.     Did he ever indicate to you that he was looking at some

10   serious time relating to a charge that he was involved with?

11   A.     Yeah.  It was pretty much common knowledge, you know,

12   that he was involved in an institutional murder.  And, you

13   know, he explained to me that he wasn't going to do life in

14   isolation as a result of that, you know, that murder charge,

15   you know.

16   Q.     Did he indicate what he was doing to try to get out of

17   that long sentence in an isolation cell?

18   A.     Yeah.  He -- you know, he told me that he had contacted

19   the District Attorney's office, wrote them some letters.  He

20   wrote, he told me that someone named I believe her first name

21   is Jill but her last name is Willis, was going to help him get

22   to another institution for cutting a deal with the District

23   Attorney's office for coming up with a story that he had came

24   up with about some of the inmates.

25   Q.     Did he ever talk to you specifically about your

26   background as far as institutions are concerned?

27   A.     Yeah.  You know, I mean, I was incarcerated prior to

28   coming to this state in Idaho and so, you know, he was real

1  interested about that, you know.  I had explained to him that
2  they sent prisoners -- you know, there was prisoners that were
3  in that institution when I was over there that were sent over
4  there from California, you know, in that institution and things
5  like that.  And, you know, he asked me about a lot of things
6  about that prison, you know, the security of it, how the
7  program of was, things like that.
8  Q.    And from your conversation with him about that out-of-
9  state institution, was it your impression that he was
10 contemplating getting to another institution out of state?
11 A.    Yeah.  You know, my impression by his conversation was
12 that he was trying to get anywhere other than Pelican Bay,
13 because his intentions were to again escape out of prison,
14 that's what he told me.
15 Q.    Okay.  Did he explain to you at all what he thought he
16 was going to try to do as far as escape was concerned?
17 A.    He told me about a case that he had read in the law
18 library, a murder case, one prisoner having killed another
19 prisoner, that his name was Tom Silversteen, one prisoner
20 having killed another prisoner, and as a result of that the
21 informant that was used by the prosecuting attorney had cut a
22 deal, he went to another institution, and he escaped out of the
23 penitentiary.  And that was the case that he used, that's what
24 he explained to me, that's where he got his theory.  So, you
25 know, his idea was that, you know, if somebody else did it, he
26 could do it.
27 Q.    From your contacts with Mr. Healy, did you gain an
28 impression concerning whether he was a smart guy or not,

1    intelligent guy?

2    A.    Yeah, yeah, he is.

3    Q.    Would you put him on a scale of one to ten of the inmates

4    that are at the institution, one being very dumb and ten being

5    extremely bright, where would you put Mr. Healy?

6         MR. FALLMAN:    I would object to that as impossibly

7    unscientific.

8         THE COURT:    Overruled.  You may answer.

9         THE WITNESS:    He's -- he's the top notch, the type --

10   he's very smart, I would say that he's a ten.

11   Q.    (By Mr. Sanders)   And what was he going to use this

12   money for?  You can't -- let me back up a second.  You can't

13   have cash in the institution, is that right?

14   A.    Right.

15   Q.    What was he going to use this money for that he was going

16   to try to double through you?

17   A.    It was my understanding that he was going to use it to

18   help in his escape attempt.  You know, money talks.

19   Q.    Did that plan ever go through as far as you assisting him

20   with doubling his money?

21   A.    No.  He stayed where I was living at that particular time

22   in the institution, he stayed there for a couple of weeks, and

23   then one day they just came and got him and took him out of

24   there, so he's gone.

25   Q.    Did you ever attempt to provide information to the

26   District Attorney's office concerning what you have just told

27   us?

28   A.    Yeah.

1    Q.    And how did you go about trying to do that?

2    A.    A couple of different ways.  I wrote two letters to the

3    District Attorney's office, and I contacted one of the

4    sergeants in the SHU and explained to her, you know, that I

5    wanted to talk to the District Attorney, you know, and let him

6    know the information that I had.

7    Q.    What response, if any, did you get from your efforts?

8    A.    The two letters went unresponded to.  And when I talked

9    to the sergeant in the SHU, it was kind of like an ongoing

10   thing, they took me over to the program office in the SHU, you

11   know, her office, and I told her at the time, you know, the

12   information that I had, which is basically what I told you.

13   And I told her that I wanted her to -- or I asked her, rather,

14   if she would contact the District Attorney's office so I could

15   tell him.  And she left, she came back, she explained to me

16   that the District Attorney's office had conveyed to her that

17   they wouldn't talk to me if I didn't have any information that

18   was -- that would help them, you know, because they're in the

19   business of -- you know, if I don't have any information that

20   would help them, then they don't want to talk to me.

21        If I had any information that would -- the reason that

22   they wouldn't talk to me is because if I didn't have any

23   information that would help them, they would be obligated by

24   law to turn it over to the defense so and so.  Therefore he

25   wouldn't talk to me -- they wouldn't talk to me, rather.  At

26   that time she asked me would I talk to the gang coordinator,

27   Mrs. -- her name is Lieutenant Cogwell, I believe.  And I told

28   her no, I wouldn't talk to nobody from the institution, only

1   the prosecutor's office, the District Attorney's office.

2   Q.    Have you received some -- have you had any problems since

3   you've come forward with this statement?

4   A.    No question.

5   Q.    What kind of problems have you had?

6   A.    Well, I asked -- I had some problems, you know, from some

7   black inmates, you know.  I mean, because this is really by

8   prison politics, you know what I mean, this has to do with

9   white guys, nothing to do with us, you know, coming forward,

10  telling them.  Really like in one sense, putting me in jeopardy

11  there, you know what I mean.  You know, I've had some -- I've

12  had correctional officers, you know what I mean, tell me that I

13  didn't have any business being involved in this, you know what

14  I mean, this has to do with institutional murder, that didn't

15  have anything to do with me.

16       In addition to that, you know what I mean, there's no

17  question about it, you know, that, you know, Deadeye will be

18  upset, you know, knowing what it is I am saying.  And with him

19  having -- you know, already convicted of two institution

20  murders, it ain't like him coming up to me for a chitchat, you

21  know what I mean.

22  Q.    Is everything here you are telling us the truth?

23  A.    Yeah.

24  Q.    Did Mr. Healy ever indicate to you in your conversations

25  with him how he obtained information in this case?

26  A.    Yeah, he did.

27  Q.    What did he tell you?

28  A.    He explained to me that he talked to the investigators of

117

1    the defendants in the case, you know, he had talked to the

2    investigator, he had talked to the attorneys.  And, basically,

3    he said they talk too much, you know.  Because it's my

4    understanding that everything that he conveyed to them

5    concerning talking about the D.A. concerning the -- you know,

6    the details of the case, he learned from, in specific, one of

7    the investigators sitting in the back.

8           MR. SANDERS:   Okay.  Thank you, very much.

9           THE COURT:   Cross-examine.

10         MR. FALLMAN:   Thank you, Your Honor.

11                  CROSS-EXAMINATION

12    BY MR. FALLMAN:

13    Q.    Which investigator are you talking about?

14    A.    I don't know his name.  He came to see me.  But one of

15    the guys sitting in the back.

16    Q.    Am I standing behind the person you are talking about?

17    A.    Yes.

18    Q.    Mr. Kuhns?

19    A.    I guess that's his name, yes.  He came and talked to me,

20    he told me what his name was.

21    Q.    What did Mr. Kuhns come and talk to you about?

22    A.    He came and asked me about this, right, how -- the

23    relative information that I had pertaining to this case.

24    Q.    Did you ever talk to the gentleman over there in the

25    glasses in the gray, it looks like a gray coat and white shirt

26    without a tie?

27    A.    I don't think so.

28    Q.    All right.  Have you told us all your felony convictions?

1    A.    All of my felonies going back to when, when I was a kid?

2    Q.    Yes.

3    A.    No, I don't think so.

4    Q.    Any grown-up felonies that you have, tell us adult

5    felonies.

6    A.    Adult felonies.  I have robbery, I have a burglary I

7    believe back in early '80's, I have assault with a deadly

8    weapon, I have false imprisonment cases, I have --

9    Q.    More than one?

10    A.    I think two.  I have a robbery case, I said that.  I have

11    a case in 1980, something unlawful sex with a female that was

12    seventeen when I was twenty-two or twenty-three.  And I think

13    that's it.

14    Q.    Okay.  Do you happen to know the man here with the

15    sergeant's stripes that I'm standing next to?

16    A.    Sure do.

17    Q.    That is Sergeant Miller, isn't it?

18    A.    Sure is.

19    Q.    How long did you live in an area where Sergeant Miller

20    worked?

21    A.    Depending on what area you are talking about.

22    Q.    The psychiatric unit.

23    A.    I lived there probably about eight good months.

24    Q.    And Sergeant Miller was around you a lot during that

25    time, wasn't he?

26    A.    Yeah.  He worked there.

27    Q.    So he might have a good idea about things related to you

28    and your conduct and your life, might he not?

A.      Yeah, very much so.

Q.      And what other places have you lived where Sergeant
Miller worked?

A.      That's it.

Q.      Now, what is it that leads you to believe that Deadeye
has two murders?

A.      Well, he himself told me that he came to the penitentiary
in '90 or '91 for second degree murder.  And the Arthur Ruffo
case, that's two, that's two right there.

Q.      What officers told you not to be involved or not to get
involved in giving information?

A.      Officer Newman.

Q.      Officer Newman?

A.      Yes, first initial R.

Q.      Male or female, Officer Newman?

A.      Male.  That's it.

Q.      I thought you told us officers told you?

A.      Officer.

Q.      Now, if I got this right, you said some female sergeant
in SHU talked to you, who was that sergeant?

A.      Cynthia Sekula.

Q.      And she's a black lady, isn't she?

A.      Yes, she is.

Q.      What did Sergeant Sekula and you talk about?

A.      Well, I told her basically what I told this court, you
know what I mean, about the information that I had concerning
the conversation that I had about Deadeye, and that I wanted
her to contact the District Attorney's office.

120

1    Q.    Did you keep any copies of these alleged letters you sent
2    to the District Attorney's office?
3    A.    No, I didn't.  But I'm sure there's a log book of all the
4    mail that goes out, you know, in the institution, where the
5    mail goes to when it's institution mail.
6    Q.    Did you happen to address them to any particular person?
7    A.    Yes.
8    Q.    Who did you address them to?
9    A.    To James Fowling (sic).
10   Q.    Have you ever seen that person before?  Would you know
11   him if you saw him?
12   A.    On T.V.
13   Q.    You have seen that person on T.V.  What did they look
14   like?
15   A.    Well, kind of looked like you a little bit.
16   Q.    What T.V. station is this?
17   A.    Well, channel on our T.V., it would say Channel 6 but on
18   the regular T.V. it will be Channel 9.
19   Q.    What program is it?
20   A.    The news, man.
21   Q.    You saw Fallman on T.V.?
22   A.    Fallman.
23   Q.    Whoever it is.
24   A.    Local news.
25   Q.    You saw that person on T.V.?
26   A.    Well, the District Attorney.
27   Q.    You think that person is the District Attorney?
28   A.    Yeah, prosecuting attorney, District Attorney.

121

Q.     But you're not sure, you might have seen Mr. Cornell on
T.V.?

A.     Well, maybe it was.

Q.     Okay.  Now, are you aware that fifteen hundred dollars of
the three thousand dollars settlement of Mr. Deadeye's was
given to his mother immediately?

A.     No, I'm not aware of that at all.

Q.     That wasn't mentioned to you?

A.     No.

Q.     Now, what cell did you say you were in and what cell did
you say Deadeye was in?

A.     I was in 124 and he was in 221.

Q.     Did you guys have to talk through the vents since he was
upstairs and you were down?

A.     No.

Q.     How did you talk?

A.     I was the porter, the tier tender, so I came out every
day.

Q.     How many people were celled with him in that cell?

A.     He was by hisself.

Q.     What about you?

A.     I was by myself.

Q.     Why were you in that cellblock?

A.     Because that's a housing unit, you know, what I mean,
that's where people live.

Q.     Isn't that a protected housing unit?

A.     No, that's 12 Block.

Q.     Why were you housed in that unit, if there's a reason

122

1    that you are aware of?

2    A.    That's a housing block, that's where they house people

3    at.

4    Q.    That is not any special housing, you are just there, it

5    could be anywhere else?

6    A.    Yeah.   It's a regular block, protective custody over

7    there on 12 Block, C-12.

8    Q.    You weren't in protective custody?

9    A.    That is C-1.

10   Q.    So you weren't in protective custody?

11   A.    Right.

12   Q.    You said you are not affiliated with any gang?

13   A.    Right.

14   Q.    So why were you in SHU at all?

15   A.    Well, for stabbing of an inmate, you know, probably about

16   1995.

17   Q.    So you are in there for violence?

18   A.    Yeah, pretty much.

19   Q.    And how many years have you spent in prison?

20   A.    Altogether?

21   Q.    Yes.

22   A.    Well, approximately fourteen years.

23   Q.    And that's not just one prison, that's several?

24   A.    Basically the same choice.   Several different

25   penitentiaries, the same choice.

26   Q.    You are aware of what time it is when it concerns white

27   prison gangs, right?

28   A.    I don't know what that means.

1        MR. SANDERS:  Objection.

2    Q.    (By Mr. Fallman)  As a black person, do you have a fear

3  of white supremacist prison gangs for your own safety?

4    A.    They are outnumbered probably about ten to one.  So, no,

5  I don't.

6    Q.    You aren't afraid of Nazi-type prison gang members?

7    A.    Again, they are outnumbered like ten to one, so it

8  doesn't matter.

9    Q.    You have absolutely no fear of the Aryan Brotherhood?

10    A.    The Aryan Brotherhood doesn't chase black people around

11  the main line.

12    Q.    From your years in prison, do you have an opinion as to

13  whether or not Aryan Brotherhood members like black people?

14    A.    Well, I mean, you know, do they like associate with us?

15    Q.    Don't they normally associate only with the Mexican

16  Mafia?

17    A.    No, that's not true.

18    Q.    Isn't it generally true?

19    A.    No, it's not generally true, either, you know, because we

20  are housed next door to each other, so we wind up having a lot

21  of interaction.

22    Q.    All right.  It's not your opinion that the Aryan

23  Brotherhood membership looks down on black people?

24    A.    I don't know what their philosophy is about, what they

25  think about black people.  I don't care what they think about

26  black people, you know what I mean.  There ain't no Aryan

27  Nation member or Aryan Brotherhood member that I know of that I

28  could say that he's better than me when he's in the same

124

1   position I am.

2   Q.    But haven't you ever heard it said that the Aryan

3   Brotherhood stands for white supremacy?

4   A.    Yeah.  I think David Duke said that.

5   Q.    Have you ever seen them wearing "WP" tattoos, "White

6   Power"?

7   A.    No.  That is strictly forbidden in prison.

8   Q.    If they already had it on them on the street, they would

9   have it in prison.

10  A.    A patch?

11  Q.    A tattoo.

12  A.    I don't go looking at dudes' bodies too much in

13  penitentiary.

14  Q.    Okay.  So you don't think it at all strange that somebody

15  related to the Aryan Brotherhood -- well, first of all, you

16  believe that Healy is related to the Aryan Brotherhood, don't

17  you?

18  A.    I don't know that.

19  Q.    Did he say anything about it to you?

20  A.    No, not as far as, you know, that "I'm associated with

21  the Aryan Brotherhood," you know.  And so, you know, I mean,

22  again, I'm not in the politics so I don't care what his

23  affiliations.  If he is, he is.  If he isn't, I don't care.

24  Q.    As a tier tender, you go in front of his cell different

25  times of the day in your associated duties, routine duties?

26  A.    Yeah.

27  Q.    Sometimes he would have his T-shirt off?

28  A.    That's a possibility.

125

Q.    Did you ever see Nazi eagles on his chest and SS things on his body?

A.    There is Lexan on the door, it's difficult to look in the doors, you know.

Q.    Lexan is Plexiglas, clear, you can see through it, right?

A.    Yeah, right. But if you look in the cells, I'm sure if you look in Pelican Bay SHU, if you look in the cells, on the outside it's difficult to see on the inside.

Q.    It's your testimony that Officer -- Sergeant Sekula and Officer Newman tried to talk you into not cooperating with an investigation, is that your testimony?

A.    Excuse me, would you say that again.

Q.    Yes, sir. I am sorry. Is it correct under oath that you're telling us that Sergeant Sekula tried to talk you out of --

A.    No.

Q.    -- giving information to an official investigation?

A.    No, Sergeant Sekula didn't do that.

Q.    Is it your testimony that Mr. Newman did, Officer Newman did?

A.    Yes.

Q.    Now, isn't it true that in the psychiatric unit -- well, first of all, is the psychiatric unit called P.S.U.?

A.    Yes.

Q.    Now, we've heard the initials "P.S.U." from an earlier inmate at Corcoran. You have been at Corcoran, right?

A.    Yes.

Q.    Now "P.S.U." at Corcoran doesn't mean psychiatric unit at

126

1    Corcoran, does it?

2    A.    I have never been to P.S.U. at Corcoran.

3    MR. SANDERS:    I am going to object to that as misstating

4    the evidence.    I think it's probably P.H.U.

5    MR. FALLMAN:    He is probably right.

6    THE WITNESS:    Yeah, he is.

7    Q.    (By Mr. Fallman)    I am confused.    P.S.U. in Pelican Bay

8    State Prison is the psychiatric unit, isn't that true?

9    A.    Pelican Bay State Prison is a psychiatric unit?

10    Q.    Yes.

11    A.    No, Pelican Bay State Prison is a prison.

12    Q.    No, no.    At Pelican Bay State Prison the P.S.U. unit --

13    my question is confusing -- the P.S.U. unit is the psychiatric

14    unit?

15    A.    Yes, it is.

16    Q.    And that's where you got to know Sergeant Miller?

17    A.    Well, yeah, that's where I seen him at.

18    Q.    Okay.

19    A.    In the hospital and the SHU and other places.

20    Q.    Isn't it true that at P.S.U. you would do just about

21    anything to get attention, including lying?

22    A.    Oh, me?

23    Q.    Yes, you.

24    A.    Well, you know, I don't think Miller is going to come up

25    here and say that so, you know, again, I don't know what your

26    question is specifically.

27    Q.    Well, were you a great attention-seeker in the

28    psychiatric unit?

127

1    A.      Actually, I fought for eight months trying to get out of

2    that unit.

3    Q.      Were you a great attention-seeker during the eight months

4    while you were not able to get out of the unit?

5    A.      No.  I fought for eight months, hollered long and hard,

6    to get out of there, you know what I mean.  I'm sure Sergeant

7    Miller could attest to that.

8    Q.      You were always a truthful person there?

9    A.      Very truthful.  I told them I didn't need P.S.U., I

10   wanted to go back to the SHU where I belong.

11   Q.      You are aware from something that you've said to Mr.

12   Kuhns that Mr. Healy debriefed, is that correct?

13   A.      Who?

14   Q.      I am sorry, Deadeye.

15   A.      No.  Who did I say that to?

16   Q.      Did you ever tell Mr. Kuhns, the investigator --

17   A.      Okay.

18   Q.      -- that Mr. Healy debriefed?

19   A.      I mean, did I tell him that?

20   Q.      Yeah.

21   A.      Yeah.  I explained to him that this is what Deadeye told

22   me.

23   Q.      Didn't you say quote, that you think that Healy's, or

24   that Deadeye's, debriefing was bullshit?  Forgive my French.

25   A.      Yeah, I think that what he said, to debrief was

26   bullshit.  At first I didn't believe it, you know.  I've been

27   knowing this guy for awhile, you know, so you know what I mean,

28   it ain't like I just -- you know, when he told me that, I

128

1    thought that he had just flipped.  He ain't the caliber or type
2    of individual that you usually associate with debrief.
3    Q.    A person that debriefs in the prison is a rat, aren't
4    they, they get a rat jacket or a snitch jacket, right?
5    A.    Well, sometimes, not all the time.
6    Q.    Well, isn't it true that you were mad at Healy, you
7    thought his debriefing was quote "B.S." because he had flipped
8    and debriefed and broken the code and become a rat?
9    A.    What code is that?
10    Q.    Well, the code not to cooperate with the Man, with the
11    officers.
12    A.    Well, you know, again, he didn't -- you know, if he had
13    debriefed, he didn't debrief on anybody black, again, so I
14    don't care, you know what I mean.  It's one of those things to
15    where if it's -- if he did something to somebody that's not of
16    my race, you know what I mean, in the institution, you know
17    what I mean, then, you know, I don't care what he did, you know
18    what I mean.
19    Q.    Well, isn't it true that in the institution there's an
20    unwritten code among all inmates that if somebody snitches,
21    they are in the hat with everybody, anybody can hit them?
22    A.    That means almost everybody on the main line would be
23    hit, then, because almost everybody there does some snitching.
24    Q.    You weren't in any way upset at Healy for his debriefing?
25    A.    Healy -- as long as Healy spent money, I don't care what
26    he does, you know what I mean.
27    Q.    Did Healy ever pay you any money?
28    A.    No, he didn't.

1    Q.    When is the last time you sold drugs in prison?

2    A.    I quit in 1995 when I got busted.

3    Q.    Who is the last person you sold drugs to?

4    A.    I don't even remember.  But I know the last time that I

5    had drugs in my possession I got busted.

6    Q.    Well, you got busted for possessing drugs, not selling

7    them?

8    A.    No, I got busted for trafficking narcotics.

9    Q.    So you did sell them to somebody?

10    A.    No.  They said I sold them to somebody.  I'm not saying

11    that, they said that.

12    Q.    You have said to Mr. Kuhns that you sold drugs in prison,

13    didn't you?

14    A.    Yes, I have.  You said the last time.

15    Q.    How many times have you sold drugs in prison?

16    A.    Man, a lot.

17    Q.    More than one prison?

18    A.    Yeah.

19    Q.    You didn't send any letters to the court, did you,

20    alerting them that you might be a witness, along with letters

21    you say you sent to the D.A.?

22    A.    No, I didn't.

23    Q.    Didn't you think you might be able to get somebody's

24    attention by just sending a letter to the court?

25    A.    To who?

26    Q.    To the judge, to the clerk of the court.

27    A.    I don't know the judge's name.

28    Q.    To the superior court in general, the clerk?

1    A.      If we go to the institution, into the pod, you know, or

2    into the law library or anyplace, you know what I mean, they

3    have -- the District Attorney's office is listed on pieces of

4    paper, you know.  They don't have, you know, the court or

5    specific judge, that I know of, of a court, you know what I

6    mean.  So I want to be specific, you know, I want my attention

7    to get out of SHU.

8    Q.      During nine months you were trying to get out of SHU you

9    were filing writs with the court and everyone you could to get

10   out of SHU?

11   A.      To get out of SHU?

12   Q.      I don't mean SHU, I mean the psychiatric unit.

13   A.      No, I can't file any writs to get out of P.S.U.  As far

14   as a 602, I filed a 602.

15   Q.      You didn't file anything with the courts?

16   A.      To get out of P.S.U.?

17   Q.      You didn't?

18   A.      No, of course not.

19   Q.      If I send this officer this afternoon this afternoon to

20   your cumulative file, your C file, is he going to find any

21   paperwork to any superior court in this state?

22        MR. SANDERS:    Objection.

23        THE COURT:    To get out of P.S.U., or for anything?

24        MR. FALLMAN:    For anything, to see if he knows how to

25   get access to the court.

26        THE WITNESS:    No, you are not going to find anything.

27              ---o0o---

28

REDIRECT-EXAMINATION

BY MR. SANDERS:

Q.    You indicated to Mr. Fallman in your cross-examination
that a person doesn't always get a rat jacket for debriefing;
do you remember saying that?

A.    Yes.

Q.    When you heard from Mr. Healy that he debriefed, is that
something that -- did you think at first that he was joking
with you?

A.    Yeah, I did, yeah.

Q.    Do you know whether Mr. Healy truly debriefed or whether
this was some ruse by whatever gang he might have been
associated with to get him out of SHU?

A.    I don't know, I can't positively say that the man
debriefed because I wasn't there, you know what I mean.  I know
what he explained to me, you know, which was, you know, again,
where he got his idea, you know, about escaping and where he
got his information to give to the District Attorney's office
and how he contacted the District Attorney's office and gang
coordinators in the institution.

MR. SANDERS:    Thank you.  Nothing further

RECROSS-EXAMINATION

BY MR. FALLMAN:

Q.    If you were so interested in getting this information
out, why wouldn't you at least take the officer's suggestion
that you talk to their gang coordinator?

A.    Because in the past, you know, and I stressed, I
emphasized in the past, you know, Pelican Bay has -- the

132

1   administration of Pelican Bay has, you know, demonstrated a

2   propensity for, you know, misleading people, you know, they'll

3   -- in other words, if you cooperated with them now, it's all

4   good, but as soon as they get done with you, they'll pretty

5   much throw you to the wolves, you know what I mean.

6   Q.    Let me ask you this, since you're not affiliated with any

7   gangs, as you've told the jury, why would you be afraid to talk

8   to the gang coordinator?

9   A.    Again, I just told you, because they have a way of

10  twisting things, they have a way of putting on to paper what

11  they want people to see, what they don't want them to see won't

12  appear on paper.  So, in other words, I felt that directly

13  contacting the District Attorney's office, whoever I talked to

14  at that particular time, you know, they were protecting the

15  integrity of the conversation, you know, it would be accurate,

16  whatever I said will be accurate.

17  Q.    Did you send your letters to the District Attorney's

18  office registered or certified in any way?

19  A.    No.  I didn't feel I needed to because, you know, again,

20  you know, when mail leaves the institution, it's sealed, it's

21  signed and, you know, it's noted in the log book, you know,

22  that legal mail left and, you know, where it's addressed to.

23  Q.    Do you guys address your own envelopes, or does the

24  prison address them for you to make sure they are properly

25  addressed?

26  A.    We address them but they stamp them.

27        MR. FALLMAN:   Thank you, sir.  No further questions.

28                         ---o0o---

133

REDIRECT-EXAMINATION

BY MR. SANDERS:

Q.    Are you aware of situations where there have been staff

that would jeopardize an inmate's status?

MR. FALLMAN:   Well, wait a minute.  I would ask for a

hearing at sidebar, that's going to get into a lot of 352

issues.

THE COURT:   Overruled.  You can answer.

Q.    (By Mr. Sanders)  Are you aware of that type of

situation occurring?

A.    Yeah, yeah.

Q.    Is that a fear that you had in dealing with law

enforcement there at the institution?

A.    Yeah.  Again, like I says, you know -- you know, it

wouldn't be -- I have seen it done to where, you know, the

administration or gang coordinators, you know, they -- they

have a tendency of patting inmates on the butt, so to speak,

when they're getting what they want.  But as soon as they're

done, you know, they'll let it be known that -- it keeps the

violence going in the institution.

Q.    In other words, that there are staff that essentially

will filter information back to other inmates?

A.    No question.

MR. SANDERS:   Thank you.  Nothing further

RECROSS-EXAMINATION

BY MR. FALLMAN:

Q.    Are you saying that since you have this rape on your

record, that you're afraid that staff might retaliate against

134

1    you and send that information back because you're testifying

2    here?

3    A.    I don't ever recall saying that I had a rape on my

4    jacket, you know what I mean, you did.

5    Q.    Didn't you just tell the jury when you were twenty-two or

6    twenty-three you were convicted of a felony for unlawful sexual

7    intercourse with a minor seventeen years old?

8    A.    Yeah, consensual sex.  It's a lot different than rape.

9    Q.    That's a felony?

10   A.    It's a lot different than jumping out of a tree on

11   somebody.

12   Q.    Are you afraid of that information getting back to other

13   inmates from officer sources?

14   A.    If I was, I wouldn't be here, you know what I mean.  If I

15   was afraid of that information coming out, it's going to be

16   part of public record, so if I was afraid of that information,

17   you know what I mean, I wouldn't even be here, you know what I

18   mean.  My whole point is this, at some point every man has to

19   change their life, you know what I mean, including me, you know

20   what I mean.

21         So by me contacting your office in the first place, you

22   know what I mean, it was an attempt, you know what I mean.  I

23   am going home, I don't care what happens in this entire

24   situation, you know what I mean, I am getting ready to go

25   home.  My point is this, at some point people got to change,

26   I'm one of them that has got to change.  This is something I

27   talked to Sergeant Miller about before, prior to me going to

28   the street, I got to complaining, man, you know what I mean.

1   Part of changing my life is being straight up, that's why I

2   made an attempt to contact you, you know what I mean.

3        I lived with Brian a long time ago, you know what I am

4   saying, in Corcoran as well as Pelican Bay and, you know, I

5   felt it wasn't right.  You know, if I know that the dude is

6   bullshitting, if I know that the guy is bullcrapping, you know

7   what I mean, I felt that I needed to contact somebody about it.

8   Q.    Well, from living with Brian in other places, did you

9   have a fear that he, as an A.B. member, might cause assaults on

10  you because of your rape conviction if he became aware of it?

11       MR. SANDERS:    Again, it assumes facts not in evidence.

12       THE COURT:    He says it's not a rape conviction, no

13  testimony that it is, so you are going to have to rephrase the

14  question.

15  Q.    (By Mr. Fallman)    From your sexual assault conviction --

16  well --

17       MR. SANDERS:    Again, I am going to object to the

18  characterization.

19       THE COURT:    He didn't call it a sexual assault, he said

20  consensual.

21  Q.    (By Mr. Fallman)    -- statutory rape conviction, because

22  the minor is incapable of giving consent --

23  A.    Okay.

24  Q.    -- from your statutory rape conviction, were you afraid

25  that inmates might get that information, and were you also

26  aware that the Aryan Brotherhood hits people that have any kind

27  of rapes on their jacket?

28  A.    I didn't, no.

136

1        MR. SANDERS:   Again, it assumes -- there has been no

2   evidence that any kind of consensual-type conduct was involved

3   with the A.B.'s, I think that is just misleading this witness.

4        MR. FALLMAN:   Well, Your Honor, an inmate may not know

5   the nice, subtle difference between rape and statutory rape.

6   And Counsel opened the door on this with his implication that

7   officers would leak this kind of information.

8        MR. SANDERS:   I didn't say leak this type of

9   information.

10       THE COURT:   Yes, sustained.   There's no testimony there

11   would be a hit on a person who engaged in consensual sex.

12       MR. FALLMAN:   No further questions.

13       THE COURT:   Nobody has testified to that.

14                REDIRECT-EXAMINATION

15   BY MR. SANDERS:

16  Q.    One more question.  When are you due out?

17  A.    Next year, about the beginning of next year, the middle

18   of next year.

19        MR. SANDERS:   Thank you.  Nothing further.

20       THE COURT:   Anything else?

21       MR. FALLMAN:   No, sir.

22       THE COURT:   All right, you may step down.

23       MR. SANDERS:   Can we approach the bench, Your Honor?

24       THE COURT:   All right.  Would this be a good time for a

25   brief recess, anyway?

26       MR. SANDERS:   I think I might want to just talk to the

27   Court, if I could, for a moment.

28       THE COURT:   We need to take a break anyway to reshuffle