1          SUPERIOR COURT OF THE STATE OF CALIFORNIA FILED

2                    COUNTY OF DEL NORTE              MAR 3 0 1999

3             HONORABLE ROBERT W. WEIR, JUDGE   SUPERIOR COURT OF CALIFORNIA
                                                 COUNTY OF DEL NORTE

4                         *  *  *

5

6    THE PEOPLE OF THE STATE OF    )
     CALIFORNIA,                   )
7                                  )
              Plaintiff,           )
8                                  )
         -vs-                      )        Case No. 97-268-X
9                                  )
     ELLIOT SCOTT GRIZZLE,         )
10                                 )
              Defendant.           )
11   _____)

12

13

14

15

16

17          Reporter's transcript of proceedings on TRIAL BY

18   JURY, in the above-entitled action, before Hon. ROBERT W.

19   WEIR, Judge, at the Del Norte County Courthouse, Crescent

20   City, California, on February 11, 1999, reported by

21   William C. Beard, RPR, CSR No. 10460

22

23

24

25                          COPY

26

27                      Volume IIII

28

1

## A P P E A R A N C E S

2

3    FOR THE PEOPLE:                          FOR THE DEFENDANT:

4    MICHAEL D. RIESE                         RUSSEL J. CLANTON
     District Attorney                        Attorney at Law
5    County Courthouse                        725 8th Street, Suite D
     Crescent City, CA 95531                  Arcata, CA 95521

6
     By:  Jim Fallman, Chief Deputy D.A.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    A      Yes.

2              MR. FALLMAN:  Thank you, Doctor.

3              MR. CLANTON:  I have no further questions,

4    your Honor.

5              THE COURT:  May your witness be excused?

6              MR. CLANTON:  Yes.

7              THE COURT:  Thank you.  You are excused.

8              Next witness.

9              MR. FALLMAN:  I'm sorry.  Your Honor, the next

10   witness would be Mr. Clark, Gregory Clark.

11             THE COURT:  All right.

12             MR. FALLMAN:  Your Honor, may we approach while

13   we're waiting?

14             THE COURT:  On the record?

15             MR. FALLMAN:  On the record.  And I'd ask Officer

16   Dan Smith, Special Agent Dan Smith to approach the bench

17   with us.

18             (Sidebar conference.)

19             MR. FALLMAN:  Your Honor, just before lunch

20   Mr. -- we asked that Mr. Frederick Scott be brought here

21   as our next -- or Frederick Clark be brought here as our

22   next witness.  He got here and we went back to talk to

23   him, Special Agent Smith and I and John McKinney and

24   Kelly Keefer from our office, and this new discovery

25   which we have just handed to counsel I've only had it

26   myself since we started the testimony of Mr. Lawrence.

27             THE COURT:  What new discovery?

28             MR. FALLMAN:  It was stuff found -- what happened

1    is Mr. Clark told us there was some evidence back in his

2    cell, and I sent Special Agent Smith and

3    Sergeant McKinney out.  This is what they seized, copies

4    of it, and I'm saying this because I had no idea that

5    this stuff existed until just now, so I've just given it

6    to the defense.

7        THE COURT:  So what are you asking me to do?

8        MR. FALLMAN:  I just wanted to put that on the

9    record that's why this discovery is coming in or came

10   to -- was being handed to the defense at this time.  He

11   may want to look at it before we examine.

12       THE COURT:  I'd rather not delay unless you get

13   some other witness you want to call instead.

14       MR. FALLMAN:  I really don't, but just -- I just

15   wanted to --

16       THE COURT:  So why don't we get started and if

17   you want to take a break before you cross-examine, that

18   will be about the right time.

19       MR. CLANTON:  I need to make a record, your

20   Honor, if the Court wants to go forward with this

21   witness, because I don't feel it's proper to go forward

22   with this witness.  Although it's only one page, one

23   paragraph says volumes, and I don't think it's fair.

24       THE COURT:  What is it?  What's the big deal?

25       MR. SMITH:  Here's a copy.

26       THE COURT:  All right.  It's a note which says --

27   it's in handwriting, written by -- it says:  "You might

28   want to tell Jim Fallman that now that I've seen an

1     effort on his behalf to do what he says, I'll have a

2     little more corroborating info into his case against

3     Grizzle.  And some handwritten information by Grizzle et

4     al.  That he may need to know before Monday.  Clark.

5         But it requires additional immunities from

6     prosecution."

7         Well, I don't see there's any difference between

8     this and if it came up in the middle of his

9     cross-examination.  Why do we need to delay the trial

10     because of this?

11         MR. CLANTON:  Well, one, I don't know that

12     this -- what this individual's going to say about the

13     type of information he's talking about here.

14         THE COURT:  Neither do I.  Why don't we ask him

15     and find out?

16         MR. CLANTON:  Because I would prefer, if I'm

17     going in a cross-examination scenario, to have done the

18     proper investigation about these types of -- in response

19     to the information he claims to be able to elicit.

20     Otherwise, I'm going to be standing there flat-footed

21     without any response to this activity.

22         THE COURT:  What is this stuff supposed to be?

23         MR. FALLMAN:  I haven't read it myself.  It's

24     stuff he said that was in his cell that might add to his

25     testimony.

26         THE COURT:  Well, I don't know if I want to delay

27     this trial because some convict says something in his

28     cell.  Why don't we get started and we'll find out what

1    he says and then if we need a break, I'll take it.

2        MR. CLANTON:  I think it's appropriate time.  I

3    may be asking for sanctions under this type of

4    situation.

5        THE COURT:  Well, when time comes, we'll deal

6    with that.  Let's proceed.

7        (Open court resumed.)

8        MR. CLANTON:  Could I have just a moment to talk

9    to Mr. Grizzle, your Honor?

10        THE CLERK:  Sir, if you could raise your right

11    hand, please.

12                    FREDERICK CLARK

13    after having been duly sworn, testified as follows:

14        THE CLERK:  Would you state your name, please.

15        THE WITNESS:  Frederick Clark.

16        THE CLERK:  Thank you.

17        MR. FALLMAN:  Afternoon, Mr. Clark.

18        THE WITNESS:  Afternoon.

19                  DIRECT EXAMINATION

20    BY MR. FALLMAN:

21    Q    Sir, you --

22        MR. CLANTON:  Excuse me, Mr. Fallman, I requested

23    a moment to speak to Mr. Grizzle before he starts.

24        MR. FALLMAN:  Oh, I'm sorry.

25        MR. CLANTON:  Thank you.

26        Your Honor, I think that we need to approach on

27    the record one more time.

28        THE COURT:  All right.

1          (Sidebar conference.)

2          MR. CLANTON:  Your Honor, my concern is when you

3     look at this last line, it would appear that the

4     district attorney had this discovery prior to this date,

5     because Mr. Clark indicates in the last line that he may

6     need to know before Monday.  Now, I understand that to

7     be Monday, the date of the start of the trial.  This is

8     Thursday.

9          Now, I feel that if, in fact, the district

10    attorney or CDC has had this information here, we're in

11    a position here where I can't effectively cross-examine

12    this individual because I do not know everything that is

13    in these reports that I've got, which are several pages,

14    that are letters in here.  This -- this --

15         THE COURT:  Well, I thought this -- was this one

16    page that was handed to you or a whole bunch of more

17    stuff?

18         MR. CLANTON:  We were given this as well.  A

19    number of reports.

20         THE COURT:  You were given this, what, now?

21         MR. CLANTON:  There is a number of reports.

22    There are letters --

23         THE COURT:  When did you get that?  Just now?

24         MR. CLANTON:  Yes.  And it would appear that the

25    District Attorney had this since Monday.

26         This defendant has written he may need to know

27    more before Monday.  Now I suspect Monday was the trial

28    date.

THE COURT: Well, when he wrote it and the D.A. got it, it may be the same date or different dates. I have a representation the D.A. just got it.

MR. FALLMAN: Mr. Smith can tell you that he got this from the guy's cell over lunch. I didn't have any of this until just about five minutes before I handed you your copy.

MR. CLANTON: Well, in any event, I would like the Court just to look at the volume of information.

THE COURT: All right. Let's see what you got here.

Okay. From what I've read is a pack of papers, a package of papers that have been handed to me by Mr. Clanton. I've looked at them briefly.

They essentially contain allegations by Inmate Clark, the witness, that at some point -- and as should be noted for the record, Mr. Clark is a black man -- he indicates that, at some time earlier some correctional officer asked him why he was getting involved in testifying for skinheads, and Mr. Clark telling the officer that it was none of his business and apparently some angry exchange about that. That essentially, repeated in a number of ways, is what this is about. And Clark having that he was -- that the officer was trying to discourage him from testifying.

But I do not see that that justifies stopping this trial to investigate. You can simply ask him whether that happened and whether it had any effect on

1   his testimony, and if he says no, or if he says yes,

2   whatever it may be, follow up with questions from there.

3        I do not see that that requires stopping this or

4   sending anybody out to investigate it further.  It

5   either happened or it didn't and Clark can tell us what

6   effect, if any, it may have had on his testimony.  So

7   are we ready to proceed then?

8        MR. FALLMAN:  Yes.

9        MR. CLANTON:  I need make a further record here,

10  your Honor, with all due respect to the Court.  I am I'm

11  not asking this proceeding to be stopped.  I'm just

12  asking that this one witness be put on at another time

13  so I have the opportunity not only just to read this

14  myself, but to discuss it with my client and discuss

15  what it means.

16       My client is extremely agitated by the advent of

17  this additional discovery and he's extremely agitated by

18  the fact I really don't have the opportunity to sit down

19  with him and discuss it at this point.

20       He's on trial for his life, basically, and I've

21  gotten a package of discovery with an inmate who is

22  prepared to testify against him, and I have a sheet of

23  material here that I have not been able to review.  My

24  cross-examination is going to be impaired because of

25  that, and my client relationship is going to suffer as

26  well.

27       THE COURT:  Well, it sounds to me, if he's all

28  agitated about it, it sounds like much ado about

1    nothing.  I guess anybody would wonder why a black

2    person would testify for skinheads, but that mystery to

3    one side, it does not strike me that this requires

4    delaying the testimony of the witness.

5         I think the more sensible conclusion is simply to

6    keep the witness available to be recrossed if anything

7    comes up on this later, which I doubt it will, but it

8    appears to me to be making a mountain out of a mole

9    hill.

10        I don't know why Clark is so surprised that

11   anybody would ask or be curious why he's testifying for

12   skinheads, either.  That just strikes me as being rather

13   peculiar, actually.

14        MR. CLANTON:  Well if I may, your Honor, in fact,

15   he's not testifying for skinheads.  He is now, in fact,

16   a prosecution witness and is going to be recanting his

17   testimony that he gave at Littrell's trial.  The tables

18   have turned 180 degrees here.

19        THE COURT:  Well, he did at some time, so I don't

20   know, but it strikes me that this stuff, that some

21   officer may have had the audacity to ask him:  Why are

22   you doing this? doesn't really shed any light on this

23   case.  And finding out why the officer asked that

24   wouldn't shed any light on it either, so it doesn't

25   strike me as being reasons for a delay of the trial.

26        MR. CLANTON:  Well, again, I would just like to

27   know for the record.  I'm not asking for a delay of the

28   trial, simply a delay of the witness appearing.

1    Mr. Fallman, I know, has other witnesses he could put on

2    while we have the opportunity to review this.

3    THE COURT:  Well, I just don't have that much

4    curiosity nor would anybody, any reasonable person, as

5    to why the officer would be puzzled that Clark would

6    have testified for the Nazis.  That's what -- the

7    officer may have been puzzled about that.  Yes, he may

8    have asked Clark about that, but so what.

9    MR. CLANTON:  Well, with all due respect to the

10   Court, the issue is a little more complex than that

11   because Mr. Clark at one time was a defense witness.

12   Some events have transpired.  He is now listed as a

13   prosecution witness, being called for that.  We were

14   just given discovery on that just prior to the trial and

15   now at the very cusp of his testimony, we're given

16   additional discovery.

17   THE COURT:  Well, because all this complaint

18   about the officer asking that question comes from Clark

19   in the first place, just ask Clark.  There's no need to

20   delay things for this.  So your request is denied.

21   MR. CLANTON:  Okay.

22   (Open court resumed.)

23   THE COURT:  You may examine.

24   MR. FALLMAN:  Thank you, your Honor.

25                    DIRECT EXAMINATION

26   BY MR. FALLMAN:

27   Q    Mr. Clark, is it your feeling one way or another

28   you need special protection for some reason?

```
1    A      Yes.

2    Q      And are you attempting to get protection in the

3    state witness protection program?

4    A      Yes.

5    Q      Have you been offered immunity by the district

6    attorney's office for anything that you're going to say

7    related to this case but not for perjury, if you perjure

8    yourself?

9    A      That's correct.

10   Q      All right.  Did you testify in another trial last

11   year in this court?

12   A      Yes.

13   Q      What case was that in?

14   A      A homicide case of Gary Littrell.

15   Q      Okay.  And which side called you to the stand in

16   that case; the prosecution or the defense?

17   A      The defense.

18   Q      And did you testify for the defense under oath?

19   A      Yes.

20   Q      Did you testify truthfully?

21   A      No.

22   Q      Did someone -- could you tell us the reason that

23   you lied under oath at that trial?

24   A      Well, because -- well, the -- I lied in that

25   trial because it was necessary to discredit one of the

26   witnesses that was coming to testify for the prosecuting

27   attorney in that case.

28   Q      Who was the witness that you were told to try to
```

```
 1   discredit?

 2   A       A guy named Brian Healy.  I knew him as Deadeye,

 3   so that's what I know him as.

 4   Q       Were the things that you said about Deadeye Healy

 5   true?

 6   A       No.

 7   Q       Who put you up to lying about Deadeye?

 8   A       Mr. Grizzle asked me to.

 9   Q       All right.  Mr. Grizzle asked you to come to

10   Littrell's trial and lie about Prosecution Witness

11   Healy?

12   A       Yeah, well, to discredit him.

13   Q       All right.  And what, if anything, did

14   Mr. Grizzle say about Deadeye to you?

15   A       Well, a lot of things.  You know, that he had --

16   he had debriefed to the prison gang coordinators or IGI

17   that's there in the institutions.  And initially I

18   didn't believe it.  You know, I know -- I know that for

19   a long time, you know, I know him since the early '90s,

20   Deadeye, and I didn't believe it originally, you know.

21           And he showed me some court transcripts and some

22   other papers that clearly, you know, made me change my

23   mind that he did debrief against the Aryan Nation or the

24   Aryan Brotherhood, excuse me.  And as a result of that,

25   he needed to be discredited.

26   Q       So who showed you transcripts of Mr. Healy's

27   testimony?

28   A       Mr. Grizzle.
```

1    Q      All right.  And where did this take place?

2    A      In the institution's -- in our unit that we were

3    living in at the time.

4    Q      Pelican Bay?

5    A      Yes.

6    Q      All right.  And what, if anything, did

7    Mr. Grizzle -- did Mr. Grizzle know anything about the

8    family of Mr. Healy out on the street?

9    A      Yes.  His daughters -- you know, that's really,

10   you know, that's the only reason I'm involved in all of

11   this is because Deadeye's daughter, you know, or what

12   was told to me, you know, I was asked, you know, could I

13   find Deadeye's daughters.  You know, it's kind of known

14   throughout some circles in the institution, it's kind of

15   known through some circles in the institution, you know,

16   that, you know, I'm capable of maybe locating some

17   individuals on the street.  And, you know, I was asked

18   to locate his daughter, you know.

19          And to be perfectly honest with you, you know

20   what I'm saying, whatever it is that I've ever

21   participated in in my life, I've never participated in

22   doing anything malicious to somebody's kid.

23   Q      So somebody wanted information about Deadeye's

24   daughter who lives somewhere out in the street, after

25   Deadeye had testified in some transcripts?

26          MR. CLANTON:  I'm going to object.  It's leading

27   the witness, your Honor.

28          THE COURT:  Overruled.  You may answer.

```
 1              THE WITNESS:  That's correct.
 2     BY MR. FALLMAN:
 3     Q       All right.  And did -- and was Mr. Grizzle the
 4     person that wanted that information about where the
 5     daughter was?
 6     A       Yes.
 7     Q       Did Mr. Grizzle happen to give you a name of any
 8     relatives of Deadeye Healy?
 9     A       Yes.
10     Q       What did he say?
11     A       That he gave me the name and approximate age of
12     her.  Her name was Shannon McCole I believe, and she was
13     approximately eight or nine years old, and that she was,
14     I believe, with her foster parent.
15     Q       Did Mr. Grizzle tell you why he wanted to find
16     out where eight-year-old Shannon McCole was?
17     A       Well, the -- they wanted to -- the A.B., you
18     know, maybe not him specifically, but the A.B. was going
19     to retaliate against Deadeye and -- by, you know, taking
20     her out.
21     Q       Taking her out, meaning killing that little girl?
22     A       Yes.
23     Q       And is that why you -- first of all, did you --
24     did I find you or did you find me?
25     A       I actually found you, or found not you but
26     someone at the institutions.
27     Q       And if I understood your testimony, you decided
28     to come forward and tell what you knew about this
```

1    situation because of the little girl?

2    A    Yeah, you know, I mean, again, you know, there

3    are a lot of things that, you know, I've did in my life,

4    but, you know, the reoccurring thoughts of, you know,

5    what happened to, you know, Polly Klass, it's not a

6    situation where, you know, that I want to be in at all.

7        I'm getting ready to go home and I don't have

8    anything to gain by being in the know, but, you know,

9    just that thought keeps eating at me, you know what I

10   mean?  And I don't want to see that situation happen

11   again, the situation I was in.

12   Q    Mr. Clark, you mentioned the word Aryan

13   Brotherhood a couple of times in some of your answers.

14   I'm not trying to do anything that sounds prejudice or

15   anything, I mean, but just so the record shows, because

16   the Court of Appeals might be looking at this case

17   later, you do happen to be a black man, do you not?

18   A    Yes.

19   Q    And do you happen to know anything about, since

20   you've mentioned the Aryan Brotherhood, as to whether

21   they stand for black peoples' rights or not?

22   A    Not hardly.

23   Q    Okay.  They're a white supremist group, are they

24   not?

25   A    Yeah.

26   Q    Why were you willing originally, before the

27   little girl came up, to falsely, knowingly perjure

28   yourself for the Aryan Brotherhood?

1    A        From what?

2    Q        Who offered you money to come tell a lie for

3    Mr. Littrell?

4    A        Mr. Grizzle.

5    Q        Okay.  And how much were you offered?

6    A        Approximately 500 just to come in to discredit

7    Deadeye.

8    Q        What are some of the things that you said at the

9    last trial that were lies about Deadeye?

10    A        Well, that he -- explained to me what it was that

11    he was going to come in here and basically testify about

12    or where he got his testimony from, how it is that he

13    went about debriefing in the institution, how it is that

14    he went about debriefing or gathering information that

15    he would submit in court.

16    Q        What were you told about Littrell's plans to come

17    in here to court?  What did they tell you was going to

18    happen?

19             MR. CLANTON:  I would object to relevance

20    throughout this point, your Honor.

21             THE COURT:  Overruled.

22             MR. CLANTON:  I would --

23             THE WITNESS:  Well --

24             MR. CLANTON:  I would object on 352 grounds, your

25    Honor.  The discussion that Mr. Fallman's having with

26    this witness at this point involves another procedure.

27             THE COURT:  Well, narrow the question down to

28    what he was told by Mr. Grizzle.

BY MR. FALLMAN:

Q    What, in this regard, did Mr. Grizzle say to you about what Littrell's trial was going to be like or what they planned to do?

A    Well, you know, I was brought in for two reasons. One to discredit Deadeye. Secondly, is because I'm black. You know what I mean? There's no question about it that, you know, this was a -- that was a case that was based upon the fact that this was a -- the Aryan Brotherhood, which is just an exclusive white organization. And I was brought here to broadside the prosecuting attorney on that case, to discredit -- and to discredit Deadeye.

     If Littrell's case could get dropped from first degree to second degree murder, then Grizzle, being a co-defendant, would walk. There's no such thing as conspiracy to commit a second degree murder.

Q    That is originally what happened, isn't it?

A    Yes.

Q    And so you did broadside the prosecution a little bit in that case, didn't you?

A    Yeah, a little bit.

Q    All right.

A    Yes.

Q    Part of your agreement to testify you did negotiate with me, did you not?

A    Excuse me?

Q    You did negotiate with me and ask for some

1    things, did you not?

2    A      Yes.

3    Q      And you do want the Attorney General or the

4    D.A.'s office to go through the Department of

5    Corrections and the California Attorney General and try

6    to get you safe housing somewhere else and witness

7    protection if possible; is that correct?

8    A      Yes.

9    Q      Why do you feel you need that?  Although I know

10   the answer's obvious.

11   A      Yeah, I mean there ain't no question about it

12   that -- I've taken steps to like move my family out of

13   California and to -- because, you know, it's obvious I'm

14   going to be retaliated against as a result of coming

15   here today.  And, you know, my life is in jeopardy as a

16   result of this.  But, again, you know, there's a kid

17   involved.  You know what I mean?  It's a bad situation.

18   Q      Back at a time -- well, at lunch did somebody

19   come to the holding cell here in this building to talk

20   to you?

21   A      Yes.

22   Q      Who came into that holding cell?

23   A      You, yourself and the -- Mr. Smith there, and the

24   lady sitting behind you.

25   Q      Kelly Keefer?

26   A      Yeah, and someone else.

27   Q      John McKinney?

28   A      Yes.

1   Q       Okay.   What did you tell us at lunch?

2   A       That I had -- I have forgotten a couple of

3   things.   I have -- I had contacted -- a couple of weeks

4   ago, I had contacted someone in the institution, you

5   know, to provide a letter, or a -- some papers to them,

6   you know, that I've -- they said they would contact you,

7   you know, contact the prosecutors attorney's office and

8   have you guys come and pick them up, to have you guys

9   come and pick them up, and it never happened, so that's

10  basically what it is that I was talking about.

11  Q       Did you send -- did you tell us to go somewhere

12  for some reason at the lunch hour?

13  A       Yes, I told you -- told the Mr. McKinney --

14  that's his name?

15  Q       Yeah, Sergeant McKinney.

16  A       Yeah, Sergeant McKinney, I told him to go to my

17  cell because I had had papers in my cell at that

18  particular time.

19  Q       Among those papers -- first of all, we wouldn't

20  use any of them except just the last two.   I'd ask that

21  these -- it's marked, two yellow pages at the top.   It

22  says Exhibit D on Page 1, and at the end of it it says,

23  "Signed, Elliott Scott Grizzle, Declarant."   On Page 2,

24  your Honor.   And it's dated -- the second page is

25  dated -- I don't see a date anywhere on it.

26          THE COURT:   All right.   The second page is a

27  continuation of the first?

28          MR. FALLMAN:   Yes, your Honor.

1          THE COURT:  All right.  Let's just staple them

2     together and we'll just call it a single exhibit.

3     What's next in order?

4          MR. CLANTON:  Your Honor, we're going to be

5     objecting to any uses of these documents under 1054 with

6     the appropriate sanctions.

7          THE COURT:  The objection is overruled.

8          THE CLERK:  Be Peoples' 60.

9          THE COURT:  Exhibit 60 for identification.

10    Two-page note, handwritten.

11          (Exhibit 60 marked for identification.)

12          MR. FALLMAN:  Oh, I misspoke.  They pointed out

13    to me that the document does say July 21st on it, your

14    Honor.  Those are the dates.  1998.  And now I see that.

15    Q     Sir, is that one of the documents you sent these

16    police officers out to get out of your cell?

17    A     Yes, that's correct.

18    Q     Okay.  Where was that in your cell?  Where did

19    you tell them to go to find it?

20    A     It was located in a book on one of the beds in my

21    cell.

22    Q     Okay.  And who wrote that?

23    A     Mr. Grizzle.

24    Q     Who gave that to you?

25    A     Mr. Grizzle.

26    Q     And was that written back at a time when

27    Mr. Grizzle apparently still thought that you were going

28    along with the false statements about Healy?

1    A       Correct.

2    Q       And that's all in Mr. Grizzle's handwriting, to

3    your recollection and knowledge?

4    A       Correct.

5    Q       People would move in number 60, your Honor.

6            MR. CLANTON:  We're going to object, your Honor,

7    under 1054.

8            THE COURT:  Approach the bench, Counsel.

9            (Sidebar conference.)

10           THE COURT:  All right.  My recollection was that

11   at the last bench conference, I was handed a packet of

12   paper pertaining to Clark's complaint about some officer

13   asking:  Why are you testifying for the skinheads?

14           Now we're talking about a document allegedly

15   written by Grizzle.  This is something different now

16   from what we were talking about last time?

17           MR. FALLMAN:  This is the last two pages of what

18   you were -- this is an exhibit in support of Clark's

19   complaint.

20           THE COURT:  All right.  I see.  All right.

21   Nevertheless, I'm going to overrule the objection.

22           Any other record you want to make on it other

23   than what we've done already?

24           MR. CLANTON:  No, I would just reiterate that I

25   think this is a sandbag job by the People.  This

26   discovery, I think they were aware of this, and to

27   deliver it literally when this witness takes the stand

28   is a violation under 1054.

1    THE COURT:  What factual basis do you have for

2    establishing that they knew of it before today?

3    MR. CLANTON:  Because of the statement of

4    Mr. Clark's latest message to them that they should know

5    this by Monday, and it's obviously his intent to have

6    this information to them, the information they do have,

7    and it can be easily inferred that his message, the way

8    he phrased it there, was made at a time that he was

9    delivering this information and anticipating the trial

10   date and waiting, making sure it was very important the

11   people have the information, or at least CDC have that

12   information prior to the trial date, that inference can

13   be directly drawn from that statement.

14   THE COURT:  All right.  And what is your

15   statement as to when you first learned of this?

16   MR. FALLMAN:  Your Honor, we all went back in the

17   holding cell.

18   THE COURT:  Today?

19   MR. FALLMAN:  Today at lunch.  And when we

20   learned that this even existed, I sent two officers out

21   there and they brought it back, and at 1:00 I had it,

22   and at five after one he had it, and I hadn't even had a

23   chance until -- I read it while you were reading your

24   copy up here at the bench.

25   THE COURT:  Well, the prosecutor is an officer of

26   the court just as a defense attorney is.  I'm going to

27   have to rely upon his statement, unless you have more to

28   show that it's not true.  Simply drawing the inference

1   Clark may have authored something prior to Monday

2   doesn't mean the D.A. had it sooner than today.

3        MR. CLANTON:  Well, I'm completely in a

4   defenseless position with regards to that because I just

5   have the document.  I've not been able to look into any

6   of the statements by Mr. Clark or any -- or be able to

7   investigate his motives for all of this information that

8   is amounting to a broadside on the defense right in the

9   middle of trial.

10        THE COURT:  Well, if what you will be seeking

11   would be impeachment of Clark, it really is, other than

12   the fact that he is a self-admitted perjurer, wouldn't

13   add much anyway.

14        MR. CLANTON:  If I may, with all due respect to

15   the Court, your Honor, this business about an

16   eight-year-old girl and that is his motive for coming

17   here, is an extremely inflammatory type of accusation.

18   I think probably one of the most inflammatory that

19   somebody could make, that my client is somehow engaged

20   in the committing of a child murder.  That's basically

21   what this testimony is, inflammatory to the maximum, and

22   I think that it would be -- I think it would be proper

23   discretion of the Court to provide us the opportunity to

24   provide a response to that other than put this before

25   the jury and that's that and the defense have to

26   scramble, that's basically what we're doing right now,

27   and I think it's fundamentally unfair to Mr. Grizzle to

28   be put in that position.

1         THE COURT:  Well, I don't know that Mr. Clark's

2    credibility is particularly high about that of -- of

3    anything, including the story about any eight-year-old

4    girl.  The idea he is suddenly doing this out of public

5    spirit gives me the reaction of:  Yeah, right.  But --

6         MR. CLANTON:  If I may, your Honor.

7         THE COURT:  I suspect that the jury will deal

8    with it the same way.  His credibility is so badly

9    shaken by his admission that he's created perjury in a

10    case related to this one that, again, I don't see that

11    it requires -- that the prosecutor learning about this

12    and your learning about this today justifies suppression

13    of the evidence.  So the motion is denied.

14         MR. CLANTON:  If I may respond just briefly for

15    the record.

16         I appreciate and respect the Court's decision.

17    However, I think the Court views Mr. Clark from a

18    perspective having dealt with inmates over a long period

19    of time and having a pretty good idea of their

20    credibility, and I think the Court has a veteran's

21    perspective on that.  But with all due respect, I don't

22    think this jury shares that same perspective.  They're

23    people off the street.  They've not dealt with inmates

24    over a long period of time.  They have precious few ways

25    to gauge the credibility the way the Court does.  And I

26    think they look at it from a completely different

27    perspective.

28         The specter of Polly Klass being drawn into this

1    and a child murder, I don't think this jury takes very

2    lightly.  I think that their emotions are inflamed by

3    those kinds of comments and they're going to be wanting

4    to believe that.  And I think it's only correct and

5    fair, given this is a jury trial, Mr. Grizzle, give him

6    the opportunity to rebut these assertions.

7         THE COURT:  Well, the jurors are mature adults

8    and I really doubt that they are inflamed.  I suspect

9    that they, like any reasonable person, would look at

10   Mr. Clark askance once he admits that he has lied under

11   oath, and would naturally wonder, is he doing it again?

12   So -- particularly when he gives his motive as being

13   public spirit -- so we'll leave it for them to sort it

14   out.  I think they're capable.  Proceed.

15        MR. CLANTON:  Just one more comment just if I

16   may, your Honor.  I think that part of the prejudice

17   associated with this scenario is the fact that I have to

18   stop and interpose the objections and we have to have

19   these bench conferences, I think that has the

20   communication to the jury that I -- we're somehow caught

21   defenseless in this situation, and I think that incurs

22   prejudice to Mr. Grizzle, the fact that we have to stop

23   in the middle of this and -- at my urging, and have

24   these conversations.  I think that communicates to the

25   jury that perhaps we're somehow concerned, which in fact

26   we are, and I think that communicates, directly,

27   prejudice to our case.

28        THE COURT:  Well, I guess it's always a tactical

1    choice whether to ask for a bench conference to raise an
2    objection, but I don't know, other than not making
3    objections, I don't know how I can help you with that.
4    I suppose we could hold a hearing out of the jury's
5    presence or something, but at this point we've got --
6    we've discussed it and made a ruling and I don't know
7    that there's any need anymore to hold a hearing on it.
8            MR. CLANTON:  That is fine.  I felt a need to
9    make a record, your Honor.
10           THE COURT:  All right.  Proceed.
11           I believe you are offering Exhibit 60; is that
12    correct?
13           MR. FALLMAN:  Yes, your Honor.
14           THE COURT:  Okay.  Exhibit 60 is received.
15           (People's No. 60 received into evidence.)
16           MR. FALLMAN:  Thank you.
17           (Sidebar concluded.)
18    BY MR. FALLMAN:
19    Q    I have one more question for you and it's not to
20    embarrass you, but I need to ask you this.  We ask it to
21    all witnesses that are inmates.  I need to know what
22    felonies you've been convicted of.
23    A    I've been convicted of assault with a deadly
24    weapon.  A burglary.  I've been convicted of having sex
25    with an under-age female.  And those are the crimes that
26    I'm in prison for right now.
27           MR. FALLMAN:  Thank you.
28           THE COURT:  Cross-examine?

1          <u>CROSS-EXAMINATION</u>

2     BY MR. CLANTON:

3     Q      Good afternoon, Mr. Clark.

4     A      Good afternoon.

5     Q      Mr. Clark, on January 5th, did you contact a

6     James Rogers?

7     A      James Rogers.

8     Q      Sure.

9     A      No.  I believe that he might have came to see me

10    at the institution, but I've never written to James

11    Rogers.

12    Q      You know who he is?

13    A      Yeah, I believe he's from I.A., Internal Affairs.

14    Q      Okay.  And you met with him on January 5th of

15    this year, did you not?

16    A      Yeah, if that's the date.

17    Q      Okay.  And gave a statement to him, didn't you?

18    A      Yes.

19    Q      And it was a taped statement?

20    A      Yes.

21    Q      And in that statement you indicated that you had

22    perjured yourself at Mr. Littrell's trial; is that

23    correct?

24    A      Yes.

25    Q      And that Mr. Grizzle had initiated your

26    participation in that perjury; is that correct?

27    A      Yes.

28    Q      And you told him that you received, indirectly,

1    $500 as payment for your testimony, right?

2    A    That's correct.

3    Q    Nowhere in that recitation did you mention any

4    eight-year-old or nine-year-old girl, did you?

5    A    Well --

6    Q    Yes or no, Mr. Clark?

7    A    I believe I did.

8    Q    I'm going to show you a summary of your taped

9    statement.   Would you like to review that?

10   A    Sure.

11   Q    May I approach, your Honor?

12        THE COURT:   Yes.

13   BY MR. CLANTON:

14   Q    Could you look at that, please.

15   A    Yes.

16   Q    Did you review it?

17   A    Okay.

18   Q    Anywhere in there any mention of any eight or

19   nine-year-old girl?

20   A    No.

21   Q    Thank you.

22        Now, Mr. Clark, you filled out a, I believe it

23   looks likes a 602, that would be an inmate parolee

24   appeal form.   And you filled that out and signed it on

25   July 21st, 1998.   Do you remember that?

26   A    Yes.

27   Q    And do you recall what that 602 was all about?

28   A    Yes.

1    Q       Do you want to tell this jury?

2    A       I believe it was about an officer named Newman.

3    I believe it was about being threatened for taking an

4    active participation in the trial of Mr. Littrell.

5    Q       Can you tell us what happened between you and

6    Officer Newman?

7    A       Yeah, nothing, really.

8    Q       Well, what was -- what did you do -- put in your

9    602 that transpired between and you Officer Newman?

10   A       It was really written for a couple of reasons.

11   Q       Excuse me, Mr. Clark, I'd like you to be

12   responsive to the question.

13           What did you put in your 602 regarding what

14   transpired between you and Officer Newman?

15   A       That Officer Newman had threatened me for taking

16   a participation in a former trial, the prior trial,

17   prior to this one.

18   Q       Precisely what did Officer Newman tell you?

19   A       That he pointed his rifle at me.

20   Q       And what did he say when he pointed his rifle at

21   you?

22   A       Why were you getting involved in these skinheads

23   business?

24   Q       That he threatened you, right?

25   A       Yes.

26   Q       What did he threaten you with besides his gun?

27   A       115s, stopping me from paroling.

28   Q       There you go.  What about your parole?

1    A        What about it?

2    Q        What did he threaten you with with regards to

3    your parole?

4    A        That I wouldn't get out of the institution.

5    Q        What did he say, I'm asking you?

6    A        Well, I mean, it's been a long time since I

7    looked at the paper.

8    Q        Would you like to look at it?

9    A        Sure.

10   Q        May I approach?

11            THE COURT:  Yes.

12            THE WITNESS:  That I would not be reaching my

13   parole date if I took an active participation in that

14   trial.

15   BY MR. CLANTON:

16   Q        Okay.  And by "that trial," which trial do you

17   mean?

18   A        Littrell, Gary Littrell.

19   Q        But you went ahead and you testified in that

20   trial, didn't you?

21   A        Yes.

22   Q        Okay.  And at that trial, what did you testify

23   to?  What did you say?

24   A        I said, I mean, a lot of things.

25   Q        Well, what do you recall saying?

26   A        Well, that -- that Deadeye had told me a lot of

27   things about how it is that he came to debrief, how it

28   is that, you know, he was coming here to this trial to

1    testify against Gary.  And why it is that he wanted to

2    testify against Gary.

3    Q    Well, did you testify that Mr. Healy had come

4    into some money?

5    A    Yes.

6    Q    And why was that important?

7    A    Well, because that's what I was told.

8    Q    What did Mr. Healy tell you that he came into

9    money for?

10   A    Well, Healy didn't tell me that.

11   Q    What did you testify about it?

12   A    I testified that, exactly what it is that I was

13   asked to testify about.

14   Q    Let's get this in detail, Mr. Clark.

15   A    Sure.

16   Q    What did you tell the jury, Mr. Littrell, about

17   Mr. Healy and some money that he had?

18   A    That he had won a lawsuit, approximately $3,000.

19   Q    And why did he tell you that, for your testimony?

20        MR. FALLMAN:  That's an ambiguous question.

21        THE COURT:  Rephrase it.

22        MR. CLANTON:  I'll rephrase.

23   Q    You gave testimony at the Littrell trial about

24   Mr. Healy having received a settlement in a lawsuit,

25   correct?

26   A    Uh-huh.

27   Q    Did you testify about what Mr. Healy intended to

28   do with that money?

```
1    A       What is -- what did he intend to do with it?
2    Q       Yes.
3    A       Yes, I aided and abetted in his escape; this is
4    what he's going to testify to.
5    Q       And how is that going to happen by your
6    testimony?
7    A       Well, Mr. Grizzle and I could concoct a story
8    which by -- I would come in here and testify that
9    Deadeye was going to give me some money to sell some
10   drugs and thereby make a profit and give him the money
11   back that would help him in aiding and abetting his
12   escape.
13   Q       Well, isn't it true, Mr. Clark, that you
14   testified that Mr. Healy approached you; isn't that
15   correct?  Initially, that's what you testified to?
16   A       You mean he came to my cell or I came to his
17   cell?
18   Q       That Mr. Healy approached you wherever at the
19   institution that Mr. Healy discussed with you his
20   settlement from a lawsuit.  You testified to that,
21   correct?
22   A       Yes.
23   Q       And isn't it true that you testified at
24   Mr. Littrell's trial that Mr. Healy asked you to use
25   your knowledge of drug sales in prison to try and
26   increase the amount of his settlement?  Isn't that true?
27   Isn't that what you testified to?
28   A       Correct.
```

```
1    Q       And isn't it true that he told you that he had
2    debriefed and was expecting to go to an institution or a
3    location with less security than the SHU?  Did you
4    testify like that?
5    A       Yeah, I did.
6    Q       And didn't you testify that Mr. Healy indicated
7    that it was his intention to hit a fence?
8    A       Yes, that's what I testified to.
9    Q       And what does hit a fence mean to you, Mr. Clark?
10   A       It means to escape, that's what it means.
11   Q       And, in fact, Mr. Healy had debriefed, hadn't he?
12   A       Well, according to the papers that I was shown.
13   Q       So you knew that he'd debriefed?
14   A       Again, according to the papers that I was shown.
15   Q       So you came and you testified?
16   A       Correct.
17   Q       You took an oath?
18   A       Correct.
19   Q       Just like you did today?
20   A       Correct.
21   Q       And now your testimony is that you lied?
22   A       That's correct.
23   Q       Well, were you concerned at all after your
24   testimony, Mr. Clark, that in fact, you might not make
25   your parole like Officer Newman told you?
26   A       No.
27   Q       Well, did you ever write a letter to the district
28   attorney telling them that it appeared you weren't going
```

1    to get out-of-state parole, therefore, you weren't going

2    to come here and testify?  Did you do that?

3    A    Did I write them a letter, tell them that I

4    wasn't going to testify?

5    Q    Yes.

6    A    No, I believe that I wrote to them and told them

7    that the -- that there was somebody that said I wasn't

8    going to be -- a counselor or somebody said I wasn't

9    going to be allowed to testify, and therefore if the

10   deal that he and I -- or the deal that I was asking him

11   for, which was that I needed protection, you know what I

12   mean, if I was going to come in here that's what I need,

13   and if they couldn't give me that protection, then I

14   wasn't going to step forward.

15   Q    Well, isn't it true, Mr. Clark, that you

16   didn't -- you just didn't want to assure your parole,

17   but you wanted to do something that was prohibited and

18   that was -- excuse me, Mr. Clark, and that something was

19   to obtain out-of-state parole?

20   A    No, my parole was guaranteed, you know what I

21   mean.  They can't stop a parole, the prosecution, you

22   attorneys, you can't stop it.  CDC's not going to stop

23   my parole.  I'm going to be paroled by law and they

24   don't discretion in there because -- because I'm at the

25   end of my sentence.

26       I asked for protection, I didn't ask to be

27   paroled, or they had the ability to deny my parole at

28   this time.  The only way that my parole could be denied

1    is if I'm set up for another crime.

2    Q       Okay, Mr. Clark, let's take that as fact.

3    A       Okay.

4    Q       But typically, aren't you paroled back to the

5    county of your commitment?

6    A       Sure.

7    Q       That's where you don't want to go, isn't it?

8    A       Well, I mean not by coming in here and

9    testifying, I don't.  After I testify, I don't want to

10   go back there.

11   Q       Mr. Clark, you don't want to go back to the

12   county of your commitment, do you?

13           MR. FALLMAN:  Asked and answered.

14           MR. CLANTON:  No, it wasn't.  He -- answer that

15   question.

16           THE COURT:  You can answer it.

17           THE WITNESS:  Yeah, if after -- today, no, I

18   don't.

19   BY MR. CLANTON:

20   Q       Well, on January 24th, did you want to parole

21   back to your county of commitment?

22   A       Yeah, I would have paroled back there if I wasn't

23   going to come here and testify.

24           MR. CLANTON:  I would like to have this marked as

25   defense exhibit next in order.

26           THE CLERK:  That would be NN.

27           THE COURT:  Double N?

28           THE CLERK:  Yes.

1              (Defense Exhibit NN marked for identification.)

2              MR. FALLMAN:  Counsel, I wouldn't object, but I'd

3      like to reread it real quick.

4              MR. CLANTON:  Okay.

5      Q       I'd like you to look at this exhibit marked for

6      identification as Defense Exhibit NN.  Is that a letter

7      you wrote, Mr. Clark?

8      A       Yes.

9      Q       Would you read that please if you need to, in

10     order to refresh your memory.  First of all, do you know

11     what's in that letter?

12     A       Yeah, I wrote it.

13     Q       Okay.  Do you recall it?  You don't need to read

14     it?

15     A       Well, I wrote it, but I'd like to reread it.

16     Q       Take your time.

17             (Brief pause.)

18     A       Okay.

19     Q       You indicate in this letter dated January 24th,

20     1999, strike that.

21             Who was this letter directed to?

22     A       Someone -- whoever's it was that was running the

23     particular unit that I was housed in at that time.

24     Q       Okay.  In this letter, do you tell the person

25     you're directing that to that you don't want to go to

26     your county of commitment on parole?

27     A       Correct.

28     Q       And do you tell them that you're not going to

1  provide any assistance, and I quote here, "substantial

2  assistance in Mr. Grizzle's case unless you get

3  out-of-state parole"?

4  A      That's correct.

5  Q      Okay.  Mr. Clark, after your testimony in the

6  Littrell case, did you suffer any harassment or

7  intimidation by staff at Pelican Bay State Prison?

8  A      As the direct result of testifying?

9  Q      Yes.

10  A      No.

11  Q      Was your cell searched within a week after you

12  got back?

13  A      Sure.

14  Q      Things taken from your cell?

15  A      No.

16  Q      But your cell was searched wasn't it?

17  A      Yes.

18  Q      Why did that happen, in your opinion?

19  A      Routine.

20          MR. FALLMAN:  That calls for --

21          THE WITNESS:  That's CDC policy and procedure.

22  They do that all the time.  Search it almost every

23  month.  At least once or twice a month.

24  BY MR. CLANTON:

25  Q      Especially after a trial where you testified for

26  the defense, correct?

27          MR. FALLMAN:  Objection.  Argumentative and

28  speculative.

1    THE COURT:  Overruled.  Overruled.  You may

2    answer.

3    THE WITNESS:  I can't say it's because of the

4    trial.

5    BY MR. CLANTON:

6    Q    Did you suspect that?

7    MR. FALLMAN:  Objection as to relevance.  It's

8    suspicions.

9    THE COURT:  Overruled.  He may answer.

10    THE WITNESS:  Initially, I did.

11    BY MR. CLANTON:

12    Q    Well, you'd already been, by your own admission

13    in the 602, you'd been threatened at gunpoint by staff,

14    right?

15    A    Correct.

16    Q    So it probably didn't take much of a quantum leap

17    of imagination to think that was repercussion for that

18    trial.

19    MR. FALLMAN:  Your Honor, that question is a

20    quantum leap, I object to that.

21    THE COURT:  Overruled.

22    THE WITNESS:  But the threatening didn't happen

23    after, the cell search did.  You know what I mean?  And

24    as a result of me coming back from the trial the next

25    day and my cell having been searched, sure you come to a

26    conclusion.

27    BY MR. CLANTON:

28    Q    Now you're saying that your 602 was a lie, too?

```
 1    A       Yeah, it was.

 2            MR. CLANTON:  I'd ask that this be marked as the

 3    next defense exhibit in order.

 4            THE CLERK:  It would be double O.

 5            THE COURT:  Exhibit double O.

 6            (Defense Exhibit OO marked for identification.)

 7            THE COURT:  Were you offering exhibit double N?

 8            MR. CLANTON:  Yes, I was your Honor.

 9            THE COURT:  Any objection to that?

10            MR. FALLMAN:  Nope.

11            THE COURT:  Double N is received.

12            (Defense Exhibit NN received in evidence.)

13    BY MR. CLANTON:

14    Q       I'm going to have you look at that, that 602.

15            Did you sign and file it?

16    A       Yes, I signed it.

17    Q       And what do you say in there?  You say that you

18    were --

19    A       This is only part of it.

20    Q       That's the official document portion, correct?

21    A       This is only part of it.

22    Q       I understand, but that's the first portion,

23    that's the actual form itself, isn't it, the 602 form?

24    A       Yes.

25    Q       Okay.  And we discussed that earlier in

26    cross-examination, did we not, that contains the

27    scenario in which you write in detail about how you were

28    threatened at gunpoint by Officer Newman; contains that?
```

1    A      No, this doesn't.

2    Q      Well, read it closer, Mr. Clark.

3    A      Well, I did and this doesn't say anything about

4    the gun.  The other part does.  That's why I'm saying

5    this is only part of it.

6    Q      Well, let me ask you this, Mr. Clark:  You talked

7    about an incident with Officer Newman with other

8    inmates, did you not?

9    A      Yeah, with Grizzle, other prisoners.

10   Q      Anybody else?

11   A      Yeah.

12   Q      How many other inmates did you discuss that with?

13   A      Well, approximately six.

14   Q      And they, in turn -- you, in turn, put together a

15   list of inmates that you'd spoken with who knew about

16   that; isn't that true?

17   A      I put together a list of it?

18   Q      Yes.

19   A      No.

20   Q      Well, did you solicit declarations from other

21   inmates regarding that incident?

22   A      No, I didn't.

23          MR. CLANTON:  May I have this marked as next

24   defense exhibit in order?

25          THE CLERK:  Double P.

26          THE COURT:  Double P.

27          (Defense Exhibit PP marked for identification.)

28   BY MR. CLANTON:

1     Q     If I can get you to review that Mr. Clark,

2     please.

3     A     Okay.

4     Q     You need to review that?

5     A     I know what's in it.

6     Q     Okay.  Tell us what's in that.

7     A     There's about six affidavits by individuals on

8     behalf of my 602.

9     Q     The 602 in which you're relating an assertion of

10    intimidation by an officer?

11    A     Correct.

12    Q     So you did talk to other inmates and they did

13    provide declaration?

14    A     No, I didn't.

15    Q     Where did you get those declarations, Mr. Clark?

16    A     I got it from Mr. Grizzle.

17    Q     And you, in fact, had -- do you know if you --

18    you talked -- told inmate -- you told -- you talked to

19    other inmates and you put those together with your 602,

20    isn't that correct?

21    A     No, that's not what I said.  That's not what

22    happened.

23    Q     You filed that 602 with those declarations

24    appended to it, didn't you?

25    A     Correct.

26    Q     Okay.  Thank you.

27          MR. CLANTON:  Now I'd like to have this marked as

28    the next defense exhibit in order.

```
1        THE CLERK:  Double Q.

2        (Defense Exhibit QQ marked for identification.)

3        MR. FALLMAN:  Your Honor, his first exhibit in

4   this series, I don't remember the number, I think it's

5   the original 602 form he was talking about, is missing

6   Page 2, and for completeness --

7        THE COURT:  The documents he wrote to the one

8   officer, double O, are the first page of the 602, and

9   the double P is the affidavit to the 602.

10       MR. FALLMAN:  Double O we're asking counsel to

11  agree that it be amended as to the second page so the

12  complete document is in there rather than part of it.

13       THE COURT:  We'll re-mark double O then so that

14  it has the full document.

15       THE CLERK:  It's already on here.

16       THE COURT:  All right.  The clerk tells me it's

17  already there.

18       MR. FALLMAN:  Oh, all right.

19       MR. CLANTON:  Thank you.

20  Q    I'm going to show you what's been marked

21  defendant's exhibit for identification QQ, Mr. Clark.

22  Can I have that back, Mr. Clark, please?

23       I'd like you to review that document, Mr. Clark.

24  A    Yes.

25  Q    Did you write that document?

26  A    Yes.

27  Q    When did you write that document?

28  A    Maybe a week ago or maybe a little bit more.
```

1    Q        Who did you intend to give that document to?

2    A        My floor staff.

3    Q        And did you do that?

4    A        Yes.

5    Q        What date did you do that?

6    A        I don't know what specific date.  It isn't

7    written down.

8    Q        Can you approximate the date that you gave that

9    to floor staff?

10   A        Maybe about a week ago.

11   Q        Do you remember the name of the floor staff you

12   gave that to?

13   A        Yes, his name was Daley.

14   Q        Daley?

15   A        Yes.

16   Q        And did you give Mr. or Officer Daley any

17   instructions when you gave him that?

18   A        No, it's pretty much self explanatory.

19   Q        Did you expect him to deliver that to somebody?

20   A        Yes.

21   Q        Who did you expect that document to be delivered

22   to?

23   A        To someone named Willis at the institution.

24   Q        And did Officer Daley tell you, in fact, he would

25   deliver that to Officer Willis?

26   A        No, but he did come back and tell me that he had

27   done that later on that day.

28   Q        So Officer Daley, later in the day, told you that

1  that had been delivered to Officer Willis?

2  A      Correct.

3  Q      Do you know who Officer Willis is?

4  A      Yeah.

5  Q      Who is she?

6  A      She's a person who works at the institution, a

7  C.O.

8  Q      Why did you want that document to go to

9  Officer Willis?

10 A      It's pretty much self explanatory, you know what

11 I mean, for them to pass it along to Mr. Fallman.

12 Q      Mr. Fallman here is district attorney, correct?

13 A      Correct.

14 Q      Now what does that document say, Mr. Clark?

15 A      It said I might want to tell Jim Fallman that now

16 that I have seen an effort on his behalf to do what he

17 says, I have a little bit more cooperating into the case

18 against Grizzle and have handwritten information by

19 Grizzle, et al, that he may need to know before Monday.

20 Q      Now Mr. Clark, what are you saying that

21 Mr. Fallman has done for you, in that document?

22 A      Well, if he intends to provide the security that

23 I asked for, you know what I mean, then, you know, then

24 I would go ahead.  But I explained to Mr. Fallman and to

25 the SSU officer, as well as everybody, he has came to

26 me -- me from the beginning, that I wasn't going to come

27 in here and testify at all if they couldn't provide my

28 security.  The safety -- my safety comes before coming

1    in here and participating in this trial, you can rest

2    assured of that.

3    Q        Does that mean out-of-state parole, Mr. Clark?

4    A        They can't guarantee any out-of-state parole, and

5    they explained to this me.

6    Q        But that's what you're saying in your letter that

7    that's what you want from them or you're not going to

8    give them substantial assistance.  That's what this

9    letter says, isn't it?

10   A        No, no.  They can't promise out-of-state parole,

11   you know what I mean?  They explained that to me.  They

12   said:  We'll do what we can but we cannot promise you.

13   Q        What did you receive -- from the time you wrote

14   this letter to the time you wrote that document, what

15   did you receive from Mr. Fallman that --

16   A        Until I wrote to -- in between that document and

17   that one?

18   Q        Yes.

19   A        I didn't receive anything.

20   Q        What are you referring to in that document then,

21   that you have received from Mr. Fallman?

22   A        I received confirmation that he was going to

23   attempt to secure me out-of-state parole, if necessary.

24   Q        There you go.  That's what you were bargaining

25   for from the very beginning, wasn't it, Mr. Clark?

26   A        That's something I could probably get without

27   coming in here to this trial, believe me.

28   Q        This document says you're not going to provide

1    what you call substantial assistance, in quotation

2    marks, unless you get out-of-state parole. So you were

3    bargaining for that, weren't you?

4         MR. FALLMAN: Your Honor, that's the wrong

5    document.

6         MR. CLANTON: Would you like to review it,

7    Mr. Fallman?

8         THE COURT: Which document are you referring to?

9         MR. CLANTON: To Defendant's Exhibit NN, a letter

10   written on January 21st.

11        THE COURT: It's a double N, and you know which

12   one he's talking about?

13        THE WITNESS: That's the last letter that I

14   wrote.

15        MR. CLANTON: Would you like to review it?

16        THE COURT: Show him what it is so we're all on

17   the same page.

18        THE WITNESS: Okay.

19        THE COURT: All right. Now your question.

20   BY MR. CLANTON:

21   Q    My question to you: In that letter, you are

22   telling -- you're saying that you're not going to give

23   substantial assistance, whatever that means --

24   A    Correct.

25   Q    -- unless you get out-of-state parole, right?

26   A    Correct.

27   Q    And what you're telling us here today is that you

28   wrote, if I may have the other document that you had,

1    that you wrote this document?

2            THE COURT:  That is what?

3            MR. CLANTON:  That's Defense Exhibit QQ.

4    Q       That you wrote this document approximately a week

5    ago?

6    A       Correct.

7    Q       Saying that you're prepared to give that

8    assistance now, and basically thanks to Mr. Fallman.

9    And you're telling us now that that thanks was for his

10   assistance in granting you what you wanted in that

11   document there where you're asking for out-of-state

12   parole; isn't that correct?

13   A       No, that's not what I'm telling you at all.

14   Q       What are you telling, Mr. Clark?

15   A       In fact, he doesn't have the jurisdiction to

16   grant me anything as far as out-of-state parole is

17   concerned.  He doesn't have the jurisdiction.  I know

18   that.  I knew that from the beginning.  I asked if I

19   can't be protected.  This is -- this is at a point if

20   they can't protect me, you know what I'm saying, then I

21   wasn't coming here and testifying, you know what I'm

22   saying?

23           He said that, you know, I mean that they would

24   approach CDC, you know what I mean, and the Department

25   of Corrections and attempt to secure me out-of-state

26   parole.  He can't guarantee that and it hasn't been

27   granted still today.  I'm still attempt -- I still have

28   to go back to Sacramento when I parole.

1    Q       That's because you haven't finished testifying,

2    right, Mr. Clark?

3    A       When I leave here today, I still have to go back

4    to Sacramento.

5    Q       But you wrote this about a week ago --

6    A       I wrote it.

7    Q       -- saying thanks?  Right.  This is a thank-you

8    note?

9    A       Correct.

10   Q       And it's because you're expecting that assistance

11   from Mr. Fallman, aren't you, to get you out-of-state

12   parole?

13   A       No, I'm expecting him to do what he said he was

14   going to do, which was to approach CDC.

15   Q       Well, Mr. Clark, you claimed earlier to have sold

16   your testimony in the Littrell trial for five hundred.

17   A       Correct.

18   Q       Are you selling your testimony here today for

19   out-of-state parole?

20   A       I haven't been given any out-of-state parole and

21   it's not guaranteed I'm going to get it.  That's what

22   I'm telling you.  And even without coming in here and

23   testifying, I could still ascertain out-of-state parole

24   by going through the proper channels.

25   Q       Then what are you bothering with Mr. Fallman for?

26   A       Because it expedites the matter, you know what

27   I'm saying?  For me coming in here -- again, at the risk

28   of repeating myself again, I'm going to tell you I came

1  in here because somebody's kid is at stake.  I could

2  give a damn about Littrell or give a damn about any of

3  those other Klu Klux Klans.  I don't care about that.  I

4  care about the fact that I don't want to have to go to

5  bed thinking about Polly Klass or Richard Allen Davis or

6  their little girl, you know what I'm saying?  And if I

7  can prevent that, that's what I'm going to do.

8      Now I don't care about this other stuff.  I'm a

9  pretty big boy as far as being able to take care of

10  myself in a one-on-one situation with my -- one of these

11  Klu Klux Klans, but the fact of the matter is there's a

12  little girl that is probably going to get chopped up and

13  buried in somebody's shallow grave as a result of

14  Deadeye coming in here and testifying, that's it.

15      If he can provide me with assistance on

16  maintaining my security once I get to the streets, then

17  that's fine.  If he can't, then as I explained to the

18  Governor, as I explained to the Department of

19  Corrections, I'm going to protect myself, you know what

20  I mean?  If that's what I've got to do, if that means

21  that Aryan Brotherhood has to go into the grave before I

22  go into that, then that's what's going to happen.

23  Q      These documents add up to the fact you're

24  thinking about Frederick Clark?

25  A      Well, you know, I mean, if that's the way you

26  wanted it to be, then that's the way it's going to be.

27  You can spin it any way you want to.

28  Q      You're not asking for anything in any of these

1    documents except something for yourself, aren't you,

2    Mr. Clark?

3    A      I can get out of the state parole without his

4    assistance.

5           MR. CLANTON:  I have no further questions, your

6    Honor.

7           THE COURT:  Mr. Fallman?

8           MR. CLANTON:  I move all of these exhibits into

9    evidence, your Honor.

10          THE COURT:  No objection to those exhibits?

11          MR. FALLMAN:  No.

12          THE COURT:  Exhibits double O, double P, and

13   double Q, are all received in evidence.

14          (Defense Exhibits OO, PP, and QQ

15          received into evidence.)

16          THE COURT:  Redirect?

17          MR. FALLMAN:  I'm sorry, your Honor.

18          THE COURT:  Go ahead.

19                    REDIRECT EXAMINATION

20   BY MR. FALLMAN:

21   Q      You understand, just so it's clear for the

22   record, that I do want you to have out-of-state parole

23   if that's what it takes to protect your life.

24   A      Yes.

25          MR. FALLMAN:  No further questions.

26          THE COURT:  Anything further?

27          MR. CLANTON:  If I can have a moment, your Honor.

28          I have nothing further of this witness.

1    THE COURT:  May the witness be excused?

2    MR. FALLMAN:  Yes, your Honor.

3    THE COURT:  All right.  Mr. Clanton, do you wish

4    him excused or reserved for possible questioning?

5    MR. CLANTON:  Yes, I would like him kept on hold,

6    your Honor.

7    THE COURT:  So you can step down, but we do need

8    to keep Mr. Clark available for possible further

9    testimony.

10    MR. CLANTON:  And if we could approach briefly,

11    your Honor.

12    THE COURT:  What I'm going to do is, ladies and

13    gentlemen, I'll give you a recess of ten minutes.

14    Remember the admonition.  Do not discuss the case or

15    form any conclusion about it.

16    All right.  Jurors have left the courtroom.

17    Since they have left, we can just do this in the clear.

18    MR. CLANTON:  Well, your Honor, with the

19    testimony of Mr. Clark indicating he, in fact, delivered

20    the document in question to an Officer Daley with the

21    expressed direction that that go to Officer Willis, I

22    think that there should be sanctions.  In fact, I

23    haven't been permitted the opportunity to investigate

24    that, so I am making these statements without that

25    investigation, granted, but I think that insomuch as

26    I've been having to take the testimony of this

27    individual and accept it as discovery, to conduct

28    cross-examination without the benefit of any

1    investigation, I think at this point, given the

2    testimony that, in fact, he did deliver a document to

3    Officer Daley with the express direction that it be

4    taken to Officer Willis and that confirmation of that

5    having been received by Officer Willis later in the

6    afternoon, who is, in fact, the litigation officer for

7    the prison, and the fact that I just received that

8    today, I think that under 1054 the appropriate sanctions

9    should be undertaken and that this testimony from

10   Mr. Clark -- well, I think the Court should just take

11   the appropriate sanctions.

12        MR. FALLMAN:  Your Honor, I'd like to be heard on

13   that if I may.

14        THE COURT:  All right.

15        MR. FALLMAN:  Number one, I don't know -- I'm

16   absolutely sure that he did give that to Mr. Daley.

17        THE COURT:  I guess we can -- we don't need the

18   witness any longer.  All right, you can go ahead with

19   Mr. Clark.

20        Go on.

21        MR. FALLMAN:  I'm sure that Mr. Clark gave that

22   thing to Mr. Daley.  Whatever happened between Mr. Daley

23   and today in the last week, I have no idea.  I saw that

24   thing right after Dan Smith handed it to me.  Dan Smith

25   is here.

26        The offer of proof would be that at lunch, Kelly

27   Keefer, Dan Smith, Sergeant McKinney and I went back in

28   this holding cell, talked to Mr. Clark.  He told us that

1    he had additional corroborating written evidence in a

2    book in his cell on the top bunk.  I hope I have that

3    right.  If I got it wrong, Dan Smith will tell you what

4    he heard.

5         Based on that, I asked both of them to go out

6    there and seize whatever it was to corroborate what he

7    was saying, see if there was something in his bunk,

8    bring it here, court make a copy for me, make a copy for

9    the defense and bring the original in this evidence bag

10   seized on the -- it says it was seized at 1330 hours,

11   whenever that is, and I've already proven that I'm not

12   good at military time, but I saw my copy of this, no

13   matter what happened to the copy that he gave to

14   Mr. Daley, five minutes before I handed it to

15   Mr. Clanton, and I didn't get to read it until

16   Mr. Clanton handed his copy to you up there at the

17   bench.  You were reading his copy and I was reading my

18   own for the first time.

19        That's the offer of proof.  That's what I think

20   Dan Smith and/or Kelly Keefer and/or Sergeant McKinney,

21   all of us would say.

22        THE COURT:  Well, we don't know whether the

23   document ever got to Officer Willis, or if it did, we

24   don't know how long it sat in her in-basket, but even if

25   we knew, the code requires that suppression of evidence

26   can only be used as a sanction if there is no other

27   alternative.

28        There are -- in the first place, there is nothing

1    to indicate that the D.A. held them any longer than he
2    says he held it.  And even if he did, there's no reason
3    why suppression of the evidence would be what we would
4    choose to do with that, anyway.  We're only allowed to
5    do that if there's no other way to deal with the matter
6    under the code, under the very section you're relying
7    upon.  I can only suppress evidence and keep the jury
8    from hearing it if there is no other way to resolve the
9    matter.
10        So the other point I would make is that Clark
11   himself is an impeachment witness.  He came into that
12   case in the first place because he -- not because he
13   knew anything about the case but because he came in
14   saying that somebody else who claims he does know
15   something about the case, that is Healy, is a liar, so
16   he's a witness brought in to impeach Healy.
17        He now does a turnabout, and so in effect we are
18   trying -- this information is really another layer
19   further away from the facts of what happened in this
20   case, impeachment of an impeachment witness.  And
21   whether the impeachment of the impeachment witness got
22   into the hands of the D.A. a day early or a day later
23   and hence in the hands of the defense does not strike me
24   as being a monumental matter in this case one way or
25   another.  Particularly considering that Clark himself
26   has -- is already deeply impeached by the fact he has
27   admitted he has lied both under oath and not under oath
28   in the form of a 602, there is no doubt that this jury

1    has plenty of reasons to disbelieve him and to not trust

2    him.  So there is really -- I think we're making a

3    mountain out of a mole hill, this issue of who got what

4    paper in their hand at what time here.

5        If you can make some further showing, we'll

6    consider whatever you can show me, but the motion to

7    suppress the testimony of Clark, if that's what you're

8    going for at this time, is denied.

9        MR. CLANTON:  That was, in fact, the sanction I

10   was considering, your Honor.

11       I would just like to make one point for the

12   record, that we did have significant discussion about

13   Mr. Clark when we first learned of his decision, be that

14   what it may, to become a prosecution witness.  I

15   immediately informed the Court of that development and

16   made a -- put together a list of those items which I

17   felt were going to be appropriate in order to

18   effectively cross-examine him, were he, in fact, to

19   become a prosecution witness.  That did develop and we

20   were left with really basically nothing to cross-examine

21   him with with regards to this information.

22       We're put into a position where we had to attempt

23   to impeach him from the hip with these few documents

24   that we were given, and I think it did put us at a

25   significant disadvantage, put Mr. Grizzle at a

26   significant disadvantage, and I think we did everything

27   we could to alert the Court of our concerns regarding

28   Mr. Clark and the potential existing for his testimony,

1    and given his testimony is that, in fact, this document

2    was in the channels I think just makes a prima facia

3    showing of something afoot.  I'm not sure what.  And I'm

4    not accusing Mr. Fallman, I'm not accusing Mr. Smith,

5    I'm not accusing Officer Willis of anything untoward.

6    I'm just indicating to the Court that because we're not

7    able to do any investigation because of the Court's

8    ruling about having to go forward immediately upon

9    receipt of these documents, that we're unable to even

10   substantiate that claim.  That's the position we're in.

11          THE COURT:  Well, you cross-examined him quite

12   effectively, I thought.  I didn't see you stepping in

13   any big trap, and I've taken the further step of

14   reserving him for later cross-examination some later

15   time in the trial after you have all had, I am assuming,

16   several more days to delve into this matter, which is

17   what you want in the first place, to delay his

18   testimony, so I don't see any harm.  So what are you

19   asking me to do now?

20          MR. CLANTON:  Well, I've made my request to the

21   Court.  The Court's denied it.  I'm just making a record

22   at this point.

23          THE COURT:  You have no further questions or

24   nothing more?

25          MR. CLANTON:  No.

26          THE COURT:  All right.  We'll take a ten-minute

27   break and reconvene at that time.

28          (Recess taken from 3:10 p.m. - 3:22 p.m.)