1    Q    Is that the non-attorney visiting·log for SHU?

2    A    For what?

3    Q    For the SHU?

4    A    I don't know if it's a non -- it doesn't -- say one

5  way or the other, but it shows numerous names there, though.

6    Q    Do you see a -- do you see a date there, "July 26,

7  1997"?

8    A    Yes, I do.

9    Q    And do you see a time in there for you to have a

10  visit?  And Mr. Grizzle to have a visit?

11    A    "Nine to eleven."

12    Q    Okay.  And who is that 9:00 to 11:00?

13    A    Or no, excuse me, it's not "9:00 to 11:00."  It's

14  "11:00 to 1:30."  I think that's "1:30."

15         "Thirteen hundred" -- no, "eleven" -- "eleven to

16  thirteen hundred."

17    Q    Okay.  Now, who is that that had a visit at 1100?

18    A    That would be me.

19    Q    I'm sorry, Mr. Healy?

20    A    That's me.

21    Q    Okay.  And do you see a notation for Mr. Grizzle

22  there?  On July 26?

23    A    Yes, I do.

24    Q    And what time does it show that he has a visit?

25    A    Looks like -- I can't really read that writing.  The

26  bottom one I don't know what it is and the top one looks

27  like "12."  I'm not sure if that's what it is.

28    Q    Mr. Healy --

1    A       Or "13."  "Thirteen hundred to" -- something, I don't

2    know.  I can't --

3    Q       "Fifteen hundred"?

4    A       I can't really tell what that is.  You'd have to --

5    Q       Okay.  Okay.  Would it be "1300 to 1500"?

6    A       Yeah, it could be "1300" but I'm not saying that it

7    is.  I don't know.

8    Q       Are the --

9    A       Because if you look down at the other one, the

10   "1300," then it gets a distinctive "3."  This other one up

11   here doesn't -- I'm not sure if that's a "3."

12   Q       Okay, so you're not gonna admit to it being "1500,

13   correct?

14   A       Well, if it's --

15           MR. FALLMAN:  He can't admit to something --

16           THE WITNESS:  If it was "1500," I could tell you it

17   was "1500," I would be more than happy to tell you that.

18   Q       BY MR. CLANTON:  That's fine, Mr. Healy.  In any

19   event, do you recall which visiting booth you were in on

20   July 26th?

21   A       No, I just realize -- I know that I was in -- farther

22   towards the back, walking down the bank I was on the left

23   side.  Grizzle was a little ways down farther like

24   kitty-corner on the right side.

25   Q       Well, look at these logs again and see if there's an

26   indication, if you see an indication of a actual visiting

27   booth indication for you and Mr. Grizzle.

28           THE COURT:  Well, have these items been received into

1    evidence or have they been authenticated in some way?

2        MR. CLANTON:  I believe they have been introduced

3    into evidence, your Honor.  We were trying to find the one

4    that's been introduced into evidence and I was going to use

5    that exhibit when the clerk had it available.

6        THE COURT:  What -- when did we let those in?  I

7    don't --

8        MR. CLANTON:  I believe we stipulated to those.

9        THE COURT:  I have -- you went over before trial to

10   some things that you would --

11       MR. CLANTON:  (Nodding.)

12       THE COURT:  But I have not -- I have not received

13   anything in evidence except what I've -- what we've done

14   here in front of the jury.  That's the only thing that's in

15   evidence at this moment.

16       MR. CLANTON:  That's understood, your Honor.  My

17   understanding is the Court would have those logs.  I know

18   we've discussed those logs.

19       THE CLERK:  Do you -- do you gentlemen know a number?

20       MR. FALLMAN:  I don't remember the number.

21       THE COURT:  Well, Mr. Healy, have you ever seen these

22   logs before?

23       THE WITNESS:  No, I've never seen them in my life.

24       THE COURT:  Well, I don't think he's in a position

25   to --

26       MR. CLANTON:  That's fine, your Honor.  I think I can

27   do it through another witness.

28   Q    Mr. Healy, in any event, your testimony is you were

1    in a visiting room that was at -- kitty-corner to one in

2    which Mr. Grizzle was in?

3    A      Yes.

4    Q      That correct?

5    A      That's correct.

6    Q      And -- your testimony is you knew Mr. Grizzle prior

7    to this day; isn't that correct?

8    A      Yes.

9    Q      Okay.  Talked to him prior to this day, correct?

10   A      Yes.

11   Q      And do you recall what you said to Mr. Grizzle?  On

12   that day?  What's the first thing you said to him?

13   A      On that date?  Where -- in personal visiting?

14   Q      Sure.

15   A      Yeah, I told him, "Hey, Rascal."  He goes, "Who's

16   that?"  I said, "It's Deadeye."

17   Q      So you said, "Hi, Rascal."  What was Mr. Grizzle's

18   response?

19   A      "Who's that?"

20   Q      Why'd he say, "Who's that?"

21   A      Because he didn't see me.  He was being escorted from

22   the cops -- I was down the tier.  He was going up -- up

23   towards the back of the corridor.

24   Q      Well --

25   A      So he didn't see me when he came by.

26   Q      Well, isn't it true, Mr. Healy, that you testified on

27   direct that you shouted to Mr. Grizzle after the guard had

28   taken off Mr. Grizzle's shackles and put him in his cell?

1    A       Yes.

2    Q       Okay.  So in fact Mr. Grizzle couldn't see you; could

3    he?

4    A       When -- what time you talking about?

5    Q       When you said --

6    A       He seen me afterwards when I called him.

7    Q       Well, isn't it true, Mr. Healy, that the way these

8    cells are positioned with this perforated front that you

9    can't see at an angle into the cell?  Isn't that true?

10   A       You can or you can't?

11   Q       You tell me.  Can you or can't you?

12   A       Yes, you can.  Depending on how far down the corridor

13   you go and you can see.

14   Q       In fact, if these cells are at an angle you can't see

15   in the cell; can you?

16   A       Inside the cell?

17   Q       Sure.  You can't see who's in that cell; can you?

18   A       No, you couldn't see inside the cell but you could

19   see when they come up to the door.  To the front of the cell

20   you could see 'em then.

21   Q       Well --

22   A       If you have a diagram of the -- of -- that -- bank of

23   tier I could show it to you.

24   Q       Well, in fact, Mr. Healy, I think we're going to be

25   doing that later with another witness.

26   A       Oh, okay.

27   Q       But in fact -- so your testimony is that you can see

28   Mr. Grizzle?

1    A    Yes.

2    Q    Is that your testimony?

3    A    That is absolutely my testimony.

4    Q    Well, if he's in the cell and you holler to him, why

5    does he say to you, "Who's that?"

6    A    Because he -- that was his first response.  See, over

7    there you got to understand, people are reluctant to talk if

8    they don't know who they are so if you call somebody they're

9    not just gonna run up on their door and go, "Hey, hi, how

10   you doing," and ask who it is.

11   Q    Mr. --

12   A    And he came to the front, said, "Hi, brother," then

13   we started talking.

14   Q    Mr. Healy, you said earlier that Mr. Grizzle knew who

15   you were.

16   A    He does know who I am.

17   Q    So he can see you, he's going to know who you are,

18   right?

19   A    Yeah, but if he's not at the front of the door how

20   can he see me?

21   Q    Well, in any event --

22   A    I mean, that's obvious.

23   Q    In any event, Mr. Healy -- it's obvious to you, Mr.

24   Healy.

25        MR. FALLMAN:  Your Honor, I move to strike that.

26        THE COURT:  Sustained.  You're -- you're simply

27   commenting on the evidence.

28   Q    BY MR. CLANTON:  (Shaking head.)  So your testimony

1    is you saw Mr. Grizzle make a motion with his hands, right?

2    A    Yes.

3    Q    And your testimony is you could see him do that.

4    A    Yes, I could.

5    Q    Okay.

6    A    There's not a doubt in my mind.

7    Q    (Nodding.)  I imagine that, Mr. Healy.  Mr. Healy,

8    this was on July 26th, correct?  More or less?  To your

9    recollection?

10   A    It -- what?  What was on July 26th?  The visit?

11   Q    Yes.

12   A    Well, no, if you -- them papers right there were

13   right it was on the 27th.

14   Q    Okay.  All right.  This is on the 27th, let's say.

15   A    All right.

16   Q    That's your recollection?

17   A    Dates --

18   Q    Yes.

19   A    I'm -- I'm not good on the day.  I couldn't tell you

20   the exact day.  But if that paper says it and that's the

21   paper for the visit on the March -- yeah, or whenever we was

22   out there -- July, yeah, then that's when it was.

23   Q    Okay.  Now, let's -- say towards the end of July

24   since you can't recollect.  Now, something happened between

25   July and October 2nd of 1997; didn't it?

26   A    Something happened between July and October --

27   Q    Yes.

28   A    -- of '97?

1    Q      You in fact went to trial and were convicted; were

2    you not?

3    A      Yes, I was convicted.  Of manslaughter.

4    Q      You -- and you were convicted on October 2nd, 1997;

5    isn't that correct?

6    A      That's correct.

7    Q      Okay.  And prior to that date, you hadn't debriefed;

8    had you?

9    A      No.

10   Q      And you were convicted of voluntary manslaughter,

11   possession of spear tips; is that correct?

12   A      That's correct.

13   Q      And isn't it true that the jury -- well, not the

14   jury, but that was a three strikes case for you; isn't that

15   correct?

16   A      Yes.

17   Q      In fact, you were looking at 25 to life.  Isn't that

18   correct?

19   A      I think more than that.  I was looking at a lot,

20   yeah.

21   Q      Okay.

22   A      A life sentence, yeah, three strikes.

23   Q      The door was gonna close on you; isn't that correct?

24   A      Yes.

25   Q      Okay.  Now, you told this jury that you perjured

26   yourself at your own trial; isn't that correct?

27   A      Yes, that's correct.

28   Q      Took the stand like this one right here and raised

1    your hand?

2    A    No, I sat over there.

3    Q    Okay.  In any event, you took an oath.

4    A    I took an oath, raised my hand, yes.

5    Q    Oath to tell the truth.

6    A    Yes.

7    Q    And then you proceeded to lie.

8    A    Yes, I did.

9    Q    You lied very convincingly; didn't you?

10    A    Yeah, I guess so.  They -- found me not guilty of --

11    Q    Okay.

12    A    -- the murder.

13    Q    So the jury believed you.

14    A    Yes.

15    Q    So you did a good job.

16    A    I didn't beat it.  I didn't get found not guilty so I

17    didn't do that good of a job.

18    Q    Well, Mr. Healy, do you recall -- well, strike that.

19    You weren't compelled to testify at your own trial; were

20    you?

21    A    No, I wasn't compelled.  I have a Fifth Amendment

22    right not to take the stand.

23    Q    Right.  And so nobody was forcing you to take the

24    stand; were they?

25    A    No.

26    Q    So you volunteered to take the stand.

27    A    Yes.

28    Q    Okay.  And you weren't testifying against the Aryan

933

1    Brotherhood; were you?

2    A    Against 'em?  No, not --

3    Q    Or for --

4    A    Not the entire time.

5    Q    Or for the Aryan Brotherhood; were you?

6    A    Well, not directly, no.

7    Q    Okay, so you didn't have to defend a brother as you

8    testified on direct; is that correct?  Was for --

9    A    Defend a brother?

10   Q    Right.

11   A    What do you mean?  You mean in court testify against

12   a brother?

13   Q    Sure.

14   A    No, I was testifying for myself.

15   Q    Okay.  But you lied anyway.

16   A    I lied.

17   Q    Okay.

18   A    To hide the conspiracy.

19   Q    So would it be fair to say, Mr. Healy, that you would

20   lie to protect your own interests; wouldn't you?

21   A    Now or then?

22   Q    I'm asking you, would you lie to protect your own

23   interests?

24   A    I'll say I've lied in the past to protect my own

25   interest when I was active in the Aryan Brotherhood.  I'm

26   not lying now.

27   Q    Did you lie at your trial to protect your own

28   interests?

934

1          MR. FALLMAN:  Asked and answered.

2          THE WITNESS:  As well as the conspiracy.

3          THE COURT:  Yes.  The -- the -- the question has been

4     asked and answered.  Sustained.

5     Q     BY MR. CLANTON:  Now, isn't it true, Mr. Healy, that

6     you had escape plans during the course of your trial?

7     A     Yes, but they never got off the ground.  We was

8     trying to escape.

9     Q     The fact is you had a plan, right?

10    A     Yes, we had a plan.

11    Q     And did you carry a handcuff key with you during that

12    period of time?

13    A     Yes, I did.

14    Q     And did you have that plan to escape and carry that

15    handcuff key because you knew you were facing three strikes?

16    A     No, I could -- I didn't have to be facing three

17    strikes.  I would have escaped if I could got a chance to.

18    Q     So it's your testimony three strikes is no problem

19    for you.

20    A     No, time's never been an issue with me.  I started

21    out with four months.  I've been down ten years this time.

22    Time's never been an issue with me.

23    Q     So three strikes wasn't an issue for you.

24    A     No.

25    Q     Yes or no?

26    A     I said "no."

27    Q     Okay, why'd you ask the judge to eliminate them then?

28    A     Because after I started this new life that I'm

1    leading now which is to help the law enforcement across the

2    states, doing that now, I would like to be out one day.  As

3    an active member in the Aryan Brotherhood I didn't care

4    about nothing but the Aryan Brotherhood.  My total

5    dedication, all my life I've been dedicated to them.  Now

6    I'm dedicated to myself.

7    Q    So, Mr. Healy -- and in fact you have a parole date

8    now; don't you?

9    A    That I don't know.  Oh, yeah, I didn't get life if

10   that's what you mean, but I don't know what it is.

11   Q    But you have a parole date.

12   A    Yes, I do.

13   Q    You intend to live on the streets someday; don't you?

14   A    I don't know.  I got Hepatitis C and I got 60 to 70

15   years so I don't even know if I'm going to live that long.

16   So to say I'm going to parole, I don't know.

17   Q    Mr. Healy, you say you have 60 to 70 years.  Do you

18   know that to be true?

19   A    I don't know.  I got fifty years for the Ruffo thing.

20   I got thirty years before that to 1217.  I haven't been to

21   committee.  I don't even know my parole date.

22   Q    Do you recall testifying at your own trial you had a

23   parole date approximately 2020?

24   A    Yeah, 2017.

25   Q    Okay.

26   A    That was prior to the murder of Ruffo, yes.

27   Q    No, but -- the time that you were doing prior to

28   Ruffo was running concurrent with this new beef; isn't that

1    true?

2    A    If it does do that then yes, it's fifty years.

3    Q    In fact --

4    A    I don't know.  You're asking me to draw these

5    conclusions regarding legal issues and how the committee

6    works.  I keep on telling you I haven't even been to no kind

7    of committee.  I have not -- I don't even know what my

8    parole date is.  I do not know.  I could -- I can only

9    speculate.  I know I got fifty years.  That's all I know.

10   Q    Speculate for us, Mr. Healy, when's your parole date?

11   A    I don't know.

12   Q    Okay.  You've been --

13   A    I honestly cannot tell you.

14   Q    You've been in prison since 1984, right?

15   A    Yeah.

16   Q    Paroled out at least once?

17   A    Yes.

18   Q    How many times did you parole out?

19   A    Oh, about four, three or four times.

20   Q    Okay.  And so you're telling us with all that

21   experience, all those years, you can't project what your

22   parole date is.

23   A    Well, I don't think that would be fair to even draw

24   them conclusion on the eighties because now the laws are

25   totally different and I don't know how the laws are working

26   on terms of sentencing.  You got all new sentencing laws as

27   I'm sure you know of.

28   Q    Well --

937

1          MR. FALLMAN:  And I would join in that as an

2     objection based on the change -- the new three strikes law

3     based on the change in the law, that I would object to that

4     as an ambiguous question and calling for a legal conclusion.

5          THE COURT:  Well, his testimony is he doesn't know

6     when his release date is.  If you want to raise legal points

7     you'll have to -- you'll have to approach that through some

8     other avenue.  Proceed.

9     Q     BY MR. CLANTON:  Okay.  Well, in any event, Mr.

10    Healy, you've got a parole date.

11    A     Yes, I have a parole date.

12    Q     That would be agreeable?

13    A     Yes, I will one day probably be out if I live that

14    long, yes.

15    Q     Okay.  And you wouldn't have gotten that parole date

16    if you'd gotten three strikes, right?

17    A     No.  To tell you the truth, I probably would have

18    been better off if I got three strikes because then I would

19    be going to a board and I think a board would be more

20    willing to hear my story now and see all the good that I've

21    done.  I don't go to a board now.  Now if -- I'm just going

22    to have to do my time so I probably would have been better

23    off getting 25 to life or something.

24    Q     So -- in other words, you weren't concerned about the

25    three strikes.

26    A     When?

27    Q     At your trial.

28    A     No.  I already told you time has never been an issue

938

1    until now.

2    Q    Okay.  But you asked the judge to eliminate 'em,

3    right?

4    A    Yes, I did.

5    Q    Okay.

6    A    After I decided to debrief and turn State's evidence.

7    Q    Well, you decided to debrief after you were

8    convicted.  Isn't that correct?

9    A    Yes, that is.

10    Q    And before you were sentenced, right?

11    A    Yes.

12    Q    That -- timing have anything to do with your fear of

13    three strikes, Mr. Healy?

14    A    No, the -- what drove me to debrief was a

15    conversation that I had with Griffin, Robert Griffin in the

16    legal visiting area on the day that I was talking to the

17    investigator Kuhn (sic).  When I talked to him about Ruffo

18    and he got cocky with me over the tier about questioning and

19    that's when I decided to debrief.  I left a couple days

20    later.  Time had nothing to do with it.  I felt them dudes

21    were letting me down.  They lied to me and I came forward.

22    Q    So, Mr. Healy, the fact that you debriefed after your

23    conviction and before your sentencing had nothing to with

24    your fear of three strikes, correct?

25    A    No.

26    Q    Okay.

27    A    Time -- like I said, now the issue of time -- I would

28    love to be out again.  I think I have something to offer

1   now.  Then I didn't care because my total obligation was to

2   the Aryan Brotherhood.  I was lost in the mystique.

3   Q       Well, isn't it true, Mr. Healy, that it was on the

4   21st of November of '97 that you contacted the District

5   Attorney through their investigator, Mr. Barton?

6   A       Say that again.  I didn't understand the question.

7   Q       Isn't it true, Mr. Healy, that it was on the 21st of

8   November of 1997 when you contacted the investigator for the

9   District Attorney's Office, Mr. Barton?

10  A       I don't believe I ever contacted him. .

11  Q       Did you ever have a discussion with Mr. Barton?

12  A       Oh, yeah, I've had discussions with him but I never

13  initiated no contact with Barton, not to my recollection.

14  Q       Did you ever send him a letter?

15  A       I sent the District Attorney a letter.

16  Q       Okay, was that ever given to Mr. Barton?  Do you

17  know?

18  A       That I don't know.  I don't know what ever happened

19  to that letter.  But I'm pretty sure I addressed it to Mr.

20  Fallman, not Mr. Barton.

21  Q       So, in any event, prior to your sentencing you made a

22  decision to debrief; is that correct?

23  A       Yes.

24  Q       Okay.  And isn't it true if you got an indeterminate

25  SHU the only way you're going to leave it is one of three

26  ways.  You debrief; you die; you parole.

27  A       That's true.

28  Q       Okay, so you chose to debrief.

1    A      You try.

2    Q      And is that because you were contemplating 25 to life

3    rotting away in the SHU?

4    A      I already told you no, that's not what it was.  Let

5    me try to explain it again, it would be more clear for you.

6    I had a conversation with Griffin.  See, you got to

7    understand that Ruffo's murder was bugging me.  And I'll

8    tell you why.  Because all these brothers told me that he

9    was a rat.  And then when I started questioning them about

10   it they couldn't stand up to it.  It did not hold water.

11   That's when I started slowly drifting away from the Aryan

12   Brotherhood.  Then when I questioned Griffin and he started

13   telling me, "Don't be questioning my word," that's when I

14   decided to debrief.  It had absolutely nothing to do with

15   the time.

16   Q      Well --

17   A      If it had to do with time -- I started out with four

18   months, a four-month violation.  I could have been gone.

19   Ten years ago.  If I was that much concerned about time

20   don't you think I would have took that opportunity and split

21   then?

22   Q      So, Mr. Healy, you've indicated you started drifting

23   away from the Aryan Brotherhood.  Is it any -- any

24   coincidence the fact that that wave crested from the time

25   you were convicted and were going to be sentenced?

26   A      It might have been coincidental but there was

27   absolutely no intention there, absolutely not.  And you got

28   to understand also, just because I got fifty years, do you

1   think that's a deal?  Come on, think about fifty years, how

2   long that is.  That's not no deal.  And if I'm in there

3   bargaining for a time I surely wouldn't have said, "Okay, I

4   give you testimony and you give me fifty years."  How does

5   that sound?  That doesn't make no sense.

6   Q     Mr. Healy, you're aware of sentencing credits; aren't

7   you?

8   A     I used to be but I don't know how it works now.

9   That's a legal issue.  I don't know nothing about the law.

10  Q     So you're an individual who's been in prison more or

11  less since 1984.

12  A     Yes.

13  Q     Fifteen years.

14  A     Yes.

15  Q     And you don't know anything about sentencing credits?

16  A     The way it works now?  No.  No, I do not.

17  Q     Did you have an attorney at the time that you went

18  through your trial?

19  A     Gallegos, yeah.

20  Q     Okay.  And was he there at the time of sentencing?

21  A     He was there but I cut off communication with him

22  immediately when I decided to debrief because he's been

23  involved with -- communicating with A.B. members and he was

24  representing your client at the time.

25  Q     Well --

26  A     And I didn't want nobody thinking I was pumping

27  information from him so I didn't provide information to that

28  individual.

1    Q     Mr. Healy, is it your testimony to the jury today

2    that you didn't consider anything of the sentencing aspects

3    prior to your debriefing, absolutely none?

4    A     None.  That's my testimony.  I was not concerned

5    about the sentencing.

6    Q     And that you know nothing about the consequences of

7    your sentencing with regards to credits and how much time

8    you're actually going to serve?

9    A     Right now, no, that is true.

10   Q     Okay, but you do know you have a parole date; that's

11   all you can tell us?

12   A     I do know I have a parole date.  I know I did not get

13   a life sentence.

14   Q     Well, you know you're not going to serve all those

15   fifty years; don't you?

16   A     That I don't know because I don't understand how the

17   laws work.

18   Q     Okay.

19   A     You keep on asking me how the sentencing goes.  You

20   probably know it better than I do.

21   Q     That's fine.  Mr. Healy -- well, isn't it true, Mr.

22   Healy, that when you contacted the District Attorney's

23   Office, let's say in November, late November, 1997, before

24   your sentencing --

25   A     I believe it was early in November.  I don't believe

26   it was late.

27   Q     Okay, in any event -- let's say it's early in

28   November.  You knew quite a bit about the Littrell/Marsh

1    incident; did you not?

2    A    I knew what I've testified here to.

3    Q    But you knew some details; didn't you?

4    A    I know the details that I've been involved in, what

5    I've testified to, yeah.

6    Q    Well --

7    A    I don't know the extent of your question.  I don't

8    know what you're -- heading towards.  Yeah, I knew some

9    things.  I knew why he was killed; I know who ordered the

10    murder; I know who killed him.  I mean, I know all that.  I

11    know how he got the message that killed the dude.

12    Q    Well, Mr. Healy, prisoners are allowed to have

13    newspapers; aren't they?

14    A    Yes, they are.

15    Q    Allowed to have the local paper, The Triplicate;

16    aren't they?

17    A    Yes, they are.

18    Q    They're able to watch television on occasion?

19    A    Yes, they are.

20    Q    And, in fact, this case was reported in the local

21    paper and was on the news; wasn't it?

22    A    I believe so.

23    Q    And did you ever read any of that?

24    A    You know what?  I -- I don't think I ever seen it on

25    TV.  I don't even think I heard it on the radio, but I

26    believe it was in the newspaper.

27                    (Counsel conferring briefly.)

28                    MR. CLANTON:  I would like this marked as Defendant's

944

1    Exhibit next in order.

2                THE CLERK:  That will be double "R."

3                THE COURT:  Exhibit double R, a newspaper.

4                               (Defendant's Exhibit RR, a
                                newspaper article, was
5                               marked for identification.)

6                MR. FALLMAN:  There's no objection to this.

7                THE COURT:  All right.  Want that received in

8    evidence?

9                MR. CLANTON:  Yes, your Honor.

10               THE COURT:  All right, double "R" is received in

11   evidence.

12                              (Defendant's Exhibit RR was
                                received in evidence.)
13

14               MR. CLANTON:  May I approach the witness, your Honor?

15   Q      Mr. Healy, let me show you what's been marked

16   Defendant's double R.  Would you tell me whether you see any

17   article about the Grizzle/Littrell/Marsh --

18   A      Yes, it's down here at the bottom on the right -- on

19   the left-hand side.

20   Q      And would you read that to yourself, please?

21   A      Okay.

22   Q      That's -- and could you --

23   A      It discusses -- well, it mentions all three, the

24   defendant, Littrell and Marsh.

25   Q      And --

26   A      And it talks about some of the particulars, alcohol

27   and -- Marsh had a drug alcohol level of .10 I think it was.

28   And they both been charged.

1    Q    What's the date on that newspaper, Mr. -- Mr. Healy?

2    A    Wednesday, September 17th, 1997.

3    Q    Okay.  That's -- if I may.  So that's more than two

4    months before you make this debriefing effort; isn't that

5    correct?

6    A    That's correct.

7    Q    Now, your sentencing was on December 19th, 1997;

8    isn't that correct?

9    A    I think so, yeah.  But it was scheduled earlier and

10   they postponed it.

11   Q    Okay.  And at that sentencing, did this man here, Mr.

12   Fallman, ask that your three strikes be stricken?

13   A    No.

14   Q    He didn't?

15   A    No.

16   Q    You were present at that sentencing hearing; isn't

17   that correct?

18   A    Yes, I was.

19   Q    If I were to give you a copy of the transcript, would

20   that refresh your memory what took place there?

21   A    Yeah, I think it probably would because -- at that

22   time I was talking to my -- my lawyer, Paul Gallegos.

23               (Counsel conferring briefly.)

24           MR. FALLMAN:  Your Honor, I wouldn't have a problem

25   with this in its entire context.  The objection would be --

26           THE COURT:  Well, let's -- let's -- a speaking

27   objection, let's come up to the bench.

28   /   /   /

1          (The following proceedings
           were held at bench outside
2          the presence of the jury.)

3      THE COURT:  What is --

4      MR. FALLMAN:  Your Honor, what -- what he's got is

5  Judge Petersen making a statement that on recommendation of

6  the D.A. the three strikes will be stricken.  I don't

7  remember exactly without looking at all the pages here

8  but -- I mean, I don't have a problem as long as the entire

9  sentencing thing -- were to be given to the jury.  This one

10  page is hearsay which I think -- misstates what happened.  I

11  think what happened is that the judge struck one of the

12  strikes and -- and to ask him, "Did he strike the three

13  strikes," it sounds as if he struck all of the strikes and

14  that's not what happened.  I think he struck one strike and

15  that's how he got a 50-year sentence but -- is that right?

16      MR. CLANTON:  No, I don't agree.

17      MR. FALLMAN:  Well, then this is why we need the

18  entire transcript because I can't remember and he doesn't --

19      MR. CLANTON:  What I'm after here, your Honor, is

20  just simply that in fact Mr. Fallman -- unless he wants to

21  stipulate to that, that Mr. Fallman argued to that court

22  that in fact the strikes should be stricken.  He did.

23      MR. FALLMAN:  I would like to read exactly how it's

24  worded.

25      THE COURT:  Well, did you do that or not?

26      MR. FALLMAN:  I can't remember exactly how I said it.

27      MR. CLANTON:  Well, give --

28      MR. FALLMAN:  I would like to read the rest of this.

1    MR. CLANTON:  Give him the opportunity to read the

2    rest of his transcript then he can make that decision but I

3    can guarantee you that he did.

4    MR. FALLMAN:  It's possible but I need to read it.

5    THE COURT:  Well, do we need this witness to discuss

6    that if that's a prerecorded proceedings anyway?

7    MR. CLANTON:  Well, I do think it's important that I

8    discuss that with this witness because, in my opinion, my

9    theory, it's a motive for him to come up here and lie.

10    THE COURT:  Well, if -- if the witness is -- is shown

11    this and he remembers the colloquy then you can just --

12    MR. CLANTON:  Okay.

13    THE COURT:  Then you're better off to raise this and

14    you can do it.  If -- and if -- you want to come back later

15    with the full transcript to prove that it's all a

16    misunderstanding or something, maybe that has some

17    relevance, although it's really -- in this context it's

18    really the witness's understanding of it rather than what

19    really happened that matters because that's what we're doing

20    with his testimony.

21    MR. CLANTON:  Well, I was going to have him look at

22    that and see if he recalls.

23    MR. FALLMAN:  Well, I don't think that's fair because

24    I think, number one, the judge's statement is ambiguous.

25    Number two, it's hearsay as to what I would have said, and

26    if we can read the ten pages before it we'll know exactly

27    what I said.

28    THE COURT:  Well, what really matters, though, is --

948

1    is not what happened but what Healy believed happened.

2    That's what influences his testimony.  If he believes

3    something happened and something else really happened but it

4    didn't influence his testimony it doesn't matter.  If he had

5    a completely wrong impression but it influenced his

6    testimony then it matters.

7          So -- I'm going to allow Mr. Clanton to go ahead and

8    show him this and see -- see what his reaction to it is.

9          MR. CLANTON:  Thank you.

10         MR. FALLMAN:  All right.

11                              (The proceedings then
                                resumed in open court in the
12                              presence of the jury.)

13   Q     BY MR. CLANTON:  Mr. Healy, I'm going to show you a

14   transcript of your sentencing proceedings and see if this

15   refreshes your memory, okay?

16   A     All right.

17   Q     The underlined portions.

18   A     Yes, that's what it says.

19   Q     Okay.  Does that refresh your memory?

20   A     Yes, it does.

21   Q     So in fact Mr. Fallman requested that your strikes be

22   stricken; didn't he?

23   A     Yes, it does.

24   Q     And in fact they were stricken; weren't they?

25   A     Yes, they was.

26   Q     Was that a relief to you?

27   A     Sometimes I have second thoughts about it.  Like I

28   told you earlier, it's like I think I ought to get out

949

1   sooner if I had 25 to life.

2   Q    Well, Mr. Healy, again, you've been in prison fifteen

3   years.  Consider yourself institutionalized?

4   A    Yes, I do.

5   Q    So, I mean, you pretty much know the ins and outs of

6   prison life; is that correct?

7   A    No, it means I'm pretty comfortable; I'm not really

8   concerned about getting out.  Institutionalized doesn't mean

9   I know all the policies and procedures.  I have an

10  understanding of them.  I'm not going to sit here and tell

11  you I don't.  But as far as whether or not that makes me

12  feel better, no.

13  Q    Well, Mr. Healy, you testified on direct that 25 to

14  life, all those new rules in fact had become a real

15  deterrent for some of your friends, correct?

16       THE COURT:  Deterrent what?  Say that again.

17  Q    BY MR. CLANTON:  Three strikes law, you specifically

18  mentioned the three strikes law, that that had become a real

19  concern for some of your friends; isn't that correct?

20  A    No.

21  Q    You didn't say that?

22  A    I don't believe so.

23  Q    Okay.  Well, had it?

24  A    I don't think so.  Nobody -- you got to understand,

25  nobody's concerned about three strikes in the A.B.  Nobody

26  cares about that.  That's -- you got to understand, time is

27  irrelevant when you're involved in the gang.  The gang is

28  number one.  You are number six or seven on the list.

1    Q    Well, Mr. Healy, did you tell Mr. Fallman, "Don't

2    argue this strike, my strikes"?  Did you tell him that?

3    A    On his recommendation I did that.  You talking about

4    on the video?

5    Q    No, I'm asking you at your trial -- or excuse me,

6    strike that.  At your sentencing hearing where Mr. Fallman's

7    arguing to have your strikes struck, were you telling him,

8    "No, don't, I'm not concerned about that"?  Did you tell him

9    that?

10    A    No.  And again, that's because at that point it was

11    like -- I didn't want the life sentence but if -- now that I

12    don't have the life sentence I think I probably would have

13    been better off with it because I would have been out

14    sooner.

15        Now, him -- I'd never discussed with him personally

16    me and him like, "Okay, can you help me out here," and he

17    said, "Okay, well, what are you gonna do for me?"  That's

18    never taken place.

19    Q    Well --

20    A    I know you would like that to have taken place but it

21    never did.

22    Q    Mr. Healy, you and Mr. Fallman were at your

23    sentencing hearing together; weren't you?

24    A    Yeah, I was.  He was.  The Probation Officer was,

25    whatever his name was.

26    Q    And he went to bat for you; didn't he?

27    A    Do you got the whole transcripts there?  Because if

28    you have the transcript -- see, I don't ever recall him

1    getting up and talking and saying -- arguing a position --

2    because it was my understanding prior to that when we had

3    postponed the former sentencing date he had said, "I'm not

4    gonna argue this but I won't object -- won't object to it

5    neither."

6         So -- that's what I'm telling you on -- when you

7    asked me that question earlier, that's what I was

8    regarding -- I didn't think he was ever gonna argue it.

9    Q      But in fact the strikes got stricken; isn't that

10   correct?

11   A      Yes, they got stricken.

12   Q      And -- and then -- in fact, Mr. Healy, that was --

13   that flew in the face of your criminal history; didn't it?

14   A      What do you mean?

15        MR. FALLMAN:  Objection, your Honor.  That's a vague

16   question.  I don't understand.

17        THE COURT:  Rephrase the question.

18        MR. CLANTON:  Well, I'll rephrase it.

19   Q      Mr. Healy, you'd been convicted of attempting to kill

20   a prison guard; hadn't you?

21   A      Yes, I have.

22   Q      And you tried to do that with a spear; didn't you?

23   A      Yes, I did.

24        MR. FALLMAN:  Objection.  He, under _Castro_, is not

25   allowed to go behind the facts.  He can only go to the

26   conviction itself.

27        MR. CLANTON:  Well, I would --

28        THE COURT:  Well, that's when it's being used for

952

1    impeachment as a -- as a felony conviction under -- under

2    788.  The objection's overruled.

3    Q    BY MR. CLANTON:  You tried to kill a prison guard

4    with a spear.

5    A    Yes, I did.

6    Q    And you've slashed the throats of inmates; haven't

7    you?

8    A    Yes.

9    Q    And you've stabbed inmates; haven't you?

10    A    Yes.

11    Q    And you've beaten inmates with your hands; haven't

12    you?

13    A    Yes.

14    Q    And -- in fact, you've taken weapons right into

15    court; haven't you?

16    A    Yes.

17    Q    In fact, you stabbed somebody right at counsel table,

18    a table just like this; didn't you?

19    A    Yes.

20    Q    And did you and Eddie Burnett get a guy killed in

21    1990?

22    A    Yes.

23    Q    So you're involved in all of this heinous violent

24    crime.

25    A    Yes.

26    Q    And yet this man assisted you in getting your strikes

27    struck.

28         MR. FALLMAN:  Your Honor, without the entire

953

1    transcript, that is -- not a fair question.  I would move

2    to -- if I can find that transcript I'd like to move that

3    whole transcript in.

4         THE COURT:  Well, are you able to answer that

5    question without seeing that transcript?

6         THE WITNESS:  No, I can't, your Honor.

7    Q    BY MR. CLANTON:  Mr. Healy --

8         THE COURT:  I'm going to sustain the objection then.

9    Q    BY MR. CLANTON:  Mr. Healy, that -- is just a portion

10   of your criminal history, right?

11   A    What you just outlined here?

12   Q    Yes.

13   A    Yeah.  I got some other things.  I mean -- do you

14   want me to name them?  I can name them for you.

15   Q    Go ahead.

16        MR. FALLMAN:  Well, your Honor, before that happens

17   I'm going to interpose -- the People versus Wheeler,

18   subsequent spin on People versus Castro unless he's going to

19   put on a prima facie case as to these --

20        THE COURT:  Overruled.  He can testify to it.

21   Q    BY MR. CLANTON:  Will you tell the jury the bounds of

22   your criminal history as you know it?

23   A    Well, I beat up a guard in Y.A.  In '84.  Went to

24   prison for that.  I've stabbed about four or five different

25   inmates.  Been involved in orchestrating hits and murders.

26   I've murdered.  I've tried to stab the guard -- I stabbed a

27   guard.  Numerous weapon possessions, about five or six of

28   them.  Knives.  Spear tips.  Numerous D.A. referrals for

1    beating up cops with my hands.  And I believe that's about

2    it.  That pretty much outlines my history as an adult.

3    Q    Well, given your understanding of the three -- three

4    strikes law, you feel that you're the kind of guy that three

5    strikes was made for?

6         MR. FALLMAN:  Objection.  That's a legal conclusion.

7    He's already said he doesn't understand the three strikes

8    law.

9         THE COURT:  Rephrase the question.

10    Q    BY MR. CLANTON:  Did you fear three strikes because

11    you had that kind of background and you knew you were dead

12    on three strikes?

13    A    No, I did not fear three strikes.

14    Q    Okay.

15    A    And I'll tell you why.  When I stabbed that cop in

16    his neck I only had a couple years left.  If I was that

17    concerned about time I would have just -- ate my mush and

18    hushed, went on home and said, "Oh, well, let's get out of

19    the prison."  Time is not an issue with me, never has been.

20         It is now, yeah.  I would like to be out one day.  I

21    got to serve my time and I'll serve my time.  That's part of

22    the whole deal.  I'm serving my time.

23         As far as before that I did not care about time.  I

24    started out with four months, counsel.  Four-month

25    violation.  Been down ten years and got fifty years.  Time

26    is not an issue with me.

27    Q    Well --

28    A    And prior to the fifty years I had thirty years to

1    do.

2    Q        Well, do you recall making a statement to the

3    probation officer in your case?

4    A        I -- vaguely, yes.

5    Q        Do you --

6    A        I remember talking to him over the phone.

7    Q        Do you remember what was said?  And that statement

8    was going to be directed to the judge; isn't that correct?

9    Is that what he told you?

10   A        Yes.  Yes, it was.

11   Q        And do you recall in that statement whether you

12   discussed about not ever coming back to prison?

13   A        Again, this was subsequent to me debriefing, making

14   up my mind to disassociate myself from the Aryan

15   Brotherhood.  At that point I was going through a lot of

16   emotional trips inside my head.  I was still second-guessing

17   if I was doing what I was supposed to be doing.  Time was an

18   issue then.  I was thinking, "Yeah, I would like to be out

19   one day," but that's subsequent to me debriefing.

20   Q        Well, so -- time was an issue for you then.

21   A        Afterwards.

22   Q        You mean -- no.  At the time you wrote or gave that

23   statement to your probation officer, time was an issue for

24   you.

25   A        Oh, yeah, then it was starting to become an issue.

26   Yeah, I would like to get out one day.

27   Q        And now that you testify in front of juries it's not

28   an issue anymore?

1   A      No, I have not said that.  I told you right from the

2   gate about now that I'm debriefing I'm disassociating from

3   the Aryan Brotherhood.  I hope to one day be out.  I would

4   like to see my daughter again.  I would like to see my

5   nephew again.  I got family members out there.  I would like

6   to be with my family again.  I am now an individual.  I am

7   no longer part of the collective gang business.

8   Q      Okay.  Well, Mr. Healy, if time was an issue at the

9   time you talked to the probation officer, and time is an

10  issue now, because -- as you said to this jury, you want

11  out, time's always been an issue for you then; isn't that

12  correct?

13  A      No, that's not true.  A little carries a long way.  I

14  just told you before I debriefed it wasn't an issue, so how

15  could you say always?

16  Q      In any event, what you're saying, Mr. Healy, then if

17  I understand you correctly is that you weren't going to tell

18  Mr. Fallman to be quiet at your sentencing hearing when it

19  came to three strikes, right?

20  A      Would anybody?

21  Q      Well --

22  A      You tell me.  If any -- you find me one convict

23  that's going to say, "Oh, no, leave me in prison.  I want to

24  stay in here."

25  Q      Okay, so that's exactly what you were bargaining for;

26  wasn't it?

27  A      No.

28  Q      You wanted -- Mr. Healy, please just let me finish my

957

1    question.

2    A    Okay, I apologize.

3    Q    It's hard for the reporter -- so in fact, isn't it

4    true, Mr. Healy, that you had it in your mind that if you

5    got struck out you weren't ever hitting the streets so you

6    sold out.

7         MR. FALLMAN:  Wait, I --

8         THE WITNESS:  Not true.  Not true, absolutely.  Not

9    true.

10   Q    BY MR. CLANTON:  Did you ever decide, Mr. Healy, that

11   you knew a few things that you'd been able to pick up here

12   and there and that you knew you were going down on three

13   strikes so you contacted the District Attorney?

14   A    Not true.

15   Q    Well --

16   A    Never a motivating factor.

17   Q    So -- and so -- it's just a coincidence that you made

18   that decision between the time you were convicted and the

19   time that you were sentenced.

20   A    It is a coincidence because I'll tell you right now,

21   as I told you, the motivating factor was being deceived by

22   the Aryan Brotherhood.

23   Q    Would you say that that's a big coincidence, Mr.

24   Healy?

25   A    What's that?

26   Q    You see that as a big coincidence?

27   A    Well, no, it's a coincidence.  You're focusing it --

28   you're making it a serious coincidence but I don't think it

958

1    is and I think the evidence shows that my motivating -- my

2    motivating factor for coming forward was as I've said.

3    Ruffo.  I killed Ruffo.  I felt bad behind killing Ruffo

4    when I found out they had lied about it, it was done over a

5    personal thing.

6    Q    Well, isn't it true, Mr. Healy, the only

7    circumstances that changed after your conviction was the

8    fact that now you were facing three strikes?

9    A    Say that again?

10   Q    Isn't it true, Mr. Healy, that the only circumstances

11   that changed for you as a person after your conviction was

12   the fact that now you were facing three strikes?

13   A    Only thing that changed?

14   Q    Yes.

15   A    No, a lot of things changed.  I've changed my whole

16   perspective on life.  Everything's changed.

17   Q    Well, you didn't -- you weren't facing three strikes

18   prior to October 2nd, 1997; were you?

19   A    You said everything changed.  Now, "everything," that

20   carries a long way.  Again, I mean, you're asking me

21   everything.  Everything didn't change.

22   Q    Well, let's make it more simple then, Mr. Healy.  The

23   date you were convicted you started facing three strikes;

24   isn't that correct?

25   A    That is correct.

26   Q    Okay.

27   A    I think I was facing three strikes prior to that

28   because we had discussions of -- pre -- pretrial discussions

1    regarding three strikes.  So I think I probably could have

2    took the stand and done it prior to that.

3    Q    The fact is, the minute you got that conviction for

4    voluntary manslaughter you knew that you were going to

5    potentially be sentenced to a three strikes 25-to-life term,

6    correct?

7    A    Yes.

8    Q    Okay.

9    A    That's true but not a motivating factor, me turning

10   State's evidence on your client.

11   Q    So is it your testimony, Mr. Healy, that you

12   debriefed out of the kindness of your heart?  It had nothing

13   to do with the fact that you were going to prison for life?

14       MR. FALLMAN:  Your Honor, that misstates his

15   testimony.

16       THE COURT:  Objection's overruled.

17       THE WITNESS:  Could you repeat the question, please?

18   Q    BY MR. CLANTON:  Isn't it true, Mr. Healy, that you

19   decided to -- begin your career testifying in trials like

20   this in order to not go to trial -- -- or go to prison for

21   life; isn't that true?

22       MR. FALLMAN:  Objection to the form of the question.

23   Assumes that he's making a career out of testifying.

24   That's -- that's --

25       THE COURT:  Overruled.  You may answer.

26       THE WITNESS:  Well, again, you're on -- you've asked

27   me this question I think now about thirty times and -- I

28   mean -- different ways, though, and I keep telling you,

960

1    look, it's not a motivating factor.  Time has nothing to
2    do -- I could see if I got out of prison then you would have
3    a serious argument right now.  You could say, "Look, hey,
4    Mr. Healy, you're on the streets right now; aren't you?"
5    And then you could sit back and go, "Yeah, that guy got some
6    serious action."  I'm not on the streets.  I'm in prison.
7    I'm in a security housing unit still.  I will remain in
8    prison until the year two thousand whenever, a long way
9    away.  So there -- there's no deal.  There's nothing.

10   Q      Well, Mr. Healy --

11   A      I'm un -- I'm unloading my conscience is what I'm
12   doing here.  I've been involved in a lot of evil stuff in my
13   day and I feel bad behind it.  It's not easy for me to come
14   up here in front of all these people and talk about all this
15   but I do it, and I'm doing it because -- you know what I
16   think?  I'm giving back to society now, that's all I want to
17   do, help law enforcement and that's it.  I don't care about
18   these gang members.  I don't care about all the time.  I
19   don't care about none of that.  That don't make a difference
20   to me no more.

21   Q      Well, Mr. Healy, prior to November of '97 you were in
22   the SHU at Pelican Bay State Prison, right?

23   A      Yes, I was.

24   Q      You were -- on single-cell status; isn't that
25   correct?

26   A      When are you talking about?

27   Q      Prior to --

28   A      I mean, I've had numerous cellies up there but I've

961

1    been on single-cell status as well.

2    Q    Okay, say in the period of time of --

3    A    Subsequent to Ruffo's murder?

4    Q    Yes.

5    A    Yes, I was single-celled.

6    Q    So you're single-celled, you're in the SHU, and by

7    your own admission life in the SHU is miserable, right?

8    A    Yes.

9         MR. FALLMAN:  Asked and answered.

10        THE COURT:  Well, the answer will stand.  Go ahead.

11    Q    BY MR. CLANTON:  And after November of '97 those

12    circumstances changed; didn't they?

13    A    What circumstances?

14    Q    The fact that you were in the SHU.  The fact --

15    A    I've been in the SHU.

16    Q    -- you were in Pelican Bay.

17    A    I've been in Pelican Bay in '97.

18    Q    You're not in Pelican Bay right now; are you?

19    A    No, but I'm still in a security housing unit.  You

20    know what?  I'm probably in a more security setting now than

21    I was in Pelican Bay.  I don't leave my cell without cops

22    all around me, shackles on my feet, the whole nine yards.

23        MR. CLANTON:  Your Honor, I'd ask that we approach on

24    the record, please.

25        THE COURT:  All right.

26                              (The following proceedings
                                were held at bench outside
27                              the presence of the jury.)

28        MR. CLANTON:  Your Honor, I was prepared to abide by

1    the agreement with Mr. Fallman and the Court that I would
2    not go into the status of Mr. Healy's current incarceration,
3    but because he is volunteering testifying in a way that
4    describes his incarceration as -- as being Draconian and
5    akin to what's going on at Pelican Bay State Prison, I think
6    I would have the right to go into that and discover whether
7    that's true or not.
8        THE COURT:  Well, essentially you brought it on
9    yourself; it's not that he's volunteering it.  So far as
10   what prison he is now housed in, where -- where they have
11   placed him for his safety, I'm not going to allow you to
12   find out what prison it is.  His testimony is he's in a
13   secure housing unit.  He had testified to that much earlier
14   in your cross-examination the same thing and -- and -- I
15   don't know if you -- if you're trying to show that that's
16   not true and he's not, otherwise I don't know why you -- why
17   you delved into this deeper because -- because if you don't
18   think he is in a security housing unit, I don't know.
19   But -- but -- but if you -- but at this point it appears to
20   me that -- well, and the other aspect of it is given his
21   history, I would be amazed if he were not.  He's obviously
22   an extremely dangerous man by his own admission and
23   obviously any prison is going to keep him in as much
24   security as they can so it's not plausible that he isn't, so
25   why are we going through this drill here?
26       MR. CLANTON:  Well, the reason, your Honor, is I --
27   suspect that his circumstances are considerably less harsh
28   than they were at Pelican Bay State Prison.  He's trying to

1    indicate, "Well, that's not true."  I -- I have not looked

2    into that because I felt that the Court would rightfully

3    terminate my exploration of that area, but I think that I

4    have a right to engage in discovery on that issue and find

5    out what exactly are his circumstances.

6         Mr. Healy is a very clever man.  He is a practiced

7    and artful --

8         THE COURT:  Uh-huh.

9         MR. CLANTON:  -- witness, and I think he's been very

10   well groomed for today and I think if he's going to get into

11   these types of responses that I would have the right to --

12   to look into that.

13        THE COURT:  Well, his answer was quite responsive to

14   your question.  And you -- you have -- you have developed

15   this situation we now find ourselves in.

16        MR. CLANTON:  Uh-huh.

17        THE COURT:  And so -- as I say, it is not plausible

18   that he is not in any security housing unit.  Any

19   responsible correctional official would put him in one given

20   his history.  And so -- I -- I take it that he is.  And so

21   there's nothing really useful to be gained from delving into

22   just where it might be.

23        MR. CLANTON:  Well, it wasn't so much where it is but

24   the circumstances of his actual incarceration.  Is --

25        THE COURT:  Well --

26        MR. CLANTON:  Is he shackled day and night such as he

27   says, that sort of thing, and I would do that not through

28   this questioning process at this point but -- at -- ask for

964

1    discovery in that particular area and maybe have him brought

2    back later today.

3        MR. FALLMAN:  That would defeat the whole purpose of

4    him being in the protection program.  We would object to

5    that and --

6        THE COURT:  He's clearly under some tight security

7    and should be.  And -- and whether -- you know, he has one

8    hour of shackles on his left wrist or not on any given day I

9    think is really unnecessary.

10       MR. CLANTON:  All right.

11       THE COURT:  So I'm going to --

12       MR. CLANTON:  That's fine.

13       THE COURT:  -- sustain the ruling and sustain the

14   objection.

15                              (The proceedings then
                                 resumed in open court in the
16                              presence of the jury.)

17   Q    BY MR. CLANTON:  Mr. Healy, did you know Mr. Marsh?

18   Aaron Marsh?

19   A    Yes, I believe he -- like I said before, if it's

20   Youngster that was in Old Folsom, that's the one, and I know

21   him, yeah.

22   Q    Okay.

23   A    But I hadn't seen him since that time.

24   Q    Okay, so you knew him back in Folsom?

25   A    I believe so, if it's the same guy.

26   Q    And you knew him?

27   A    Yes, I believe so.

28   Q    Did you ever see Mr. Marsh intoxicated?

1    A    I'd say yeah, there was a lot of people that used to

2    drink back then.  They had a lot of good -- they was making

3    moonshine back then so --

4    Q    Do you recall whether he was belligerent when he

5    drank?

6    A    I -- belligerent?  No, I wouldn't say he was

7    belligerent.  He wouldn't -- wouldn't be able to be

8    belligerent at that time.

9    Q    Was he loud?

10   A    I mean, yeah.  Like I said before, his tongue got a

11   little loose.  He wasn't overly loud, probably no more than

12   you when you get drunk or anybody else in the courtroom when

13   they start drinking.

14   Q    Well, were you aware of any people that Mr. Marsh had

15   killed?

16   A    Of the -- the incident or -- the people that he

17   killed?

18   Q    People that Mr. Marsh had killed.

19   A    I'm familiar with him being involved in murders.  Or

20   a murder with an A.B. member named Tank.  That's -- about as

21   far as I know.  I don't know who it was personally.  I know

22   it was a Hell's Angel.  And that's it.  But I don't know

23   none of the specifics regarding the case.

24   Q    Did you -- are you aware of Mr. Marsh slashing the

25   throat of a cellmate?  Of his?

26   A    Oh, yeah.  Yeah, I'm not gonna tell you Marsh was

27   nonviolent.  I mean, yeah, he's -- he's gotten busy in the

28   past.  I mean, I'd be a fool to tell you that he wasn't.  He

966

```
 1    was A.B., he's gonna be violent.

 2    Q     So --

 3    A     It's our nature.

 4    Q     So in fact you're aware of an incident where Mr.

 5    Marsh slashed the throat of his own cellmate?

 6          MR. FALLMAN:  Asked and answered.

 7          THE COURT:  You may answer.

 8          THE WITNESS:  Banducci.  Yeah, I know him, yeah.

 9    Q     BY MR. CLANTON:  Okay.  Thank you.  Just out of

10    curiosity, Mr. Healy, if there is a cell fight --

11    A     Uh-huh.

12    Q     -- and nobody dies but just -- some small injuries,

13    is it likely or customary for that injured party to call out

14    to the guards and say, "I've been struck by my cellmate"?

15    A     No.

16    Q     Why would that not take place?

17    A     Because you'd be a stool pigeon.  That would be a

18    coward.  You'd be -- you know, wouldn't be right.  You would

19    be a rat.

20    Q     So you wouldn't expect somebody to do that, right?

21    A     No.

22    Q     Okay.  Thank you.  Mr. Healy, again out of curiosity,

23    you recently received any money as a result of a civil

24    settlement?

25    A     Recently?  No.  About a year and a half ago or

26    something now.

27    Q     Okay.

28    A     Two years ago.
```

967

1    Q    How much did you receive?

2    A    About three thousand dollars.

3    Q    Three thousand dollars?

4    A    Yeah, three thousand.

5    Q    Okay.  Thank you.  Have you ever told a fellow

6    inmate, Mr. Healy, that you created the stories you've told

7    during your debriefing in order to gain the trust of law

8    enforcement so that you might escape someday?

9    A    No.

10   Q    Never said that to anybody?

11   A    Never told that to no one, no.

12   Q    Okay.  Well, you're currently working with federal

13   authorities; isn't that correct?

14        MR. FALLMAN:  Objection.

15        THE COURT:  You can answer "yes" or "no."

16        THE WITNESS:  Yes.

17   Q    BY MR. CLANTON:  And can you tell this jury whether

18   there's been any discussions about whether you might someday

19   be housed out of the State of California?  Outside the

20   State?

21        MR. FALLMAN:  Objection.  For his security.

22        THE COURT:  Again you can answer "yes" or "no."

23        THE WITNESS:  Yes.

24   Q    BY MR. CLANTON:  Okay.  Thank you.  So it would be a

25   long way from the SHU to someplace outside of California;

26   wouldn't it, Mr. Healy?

27        MR. FALLMAN:  Objection.  Calls for speculation.

28        THE COURT:  Sustained.

968

1    Q    BY MR. CLANTON:  Mr. Healy, do you consider yourself

2    a good manipulator?

3    A    I would say I used to be.

4    Q    Okay.  Didn't you -- or -- wouldn't you consider it

5    one of your many virtues?

6    A    No.

7    Q    Well --

8    A    I wouldn't even call myself a virtuous person in

9    terms of that, not when I was active in the Aryan

10   Brotherhood.  I was a hateful person.  All those dudes are

11   hateful, bitter.  It's -- no.

12   Q    Have you ever described your ability to manipulate as

13   one of the positive aspects of your personality?

14   A    I'm not going to say I've never manipulated myself

15   into a situation where I would get something.  No, I'm not

16   going to tell you that because I have done that.  But as far

17   as me mastering the art of manipulation, no, I've never done

18   that.  No, because I've never really been one that's too

19   friendly with cops.

20   Q    So you wouldn't manipulate this jury at all; would

21   you?

22   A    No, I'm telling this jury the utmost truth.  All day

23   that's all I've been telling is the utmost truth.

24        MR. CLANTON:  Thank you, Mr. Healy.

25        I have no further questions, your Honor.

26        THE COURT:  Redirect?

27                    REDIRECT EXAMINATION

28   Q    BY MR. FALLMAN:  The -- the $3000, tell the jury what

1    you -- what happened for those $3000.      .

2    A      Well, a problem -- it's mostly all gone now.  I sent

3    probably about sixteen or seventeen hundred of it to my

4    mother and -- this past Christmas.  My mother spent it on

5    the kids, my nephew for Christmas.  I've helped my parents

6    out.  My parents aren't rich.  I helped them out.  They

7    could use it on whatever they wanted.

8          I had a couple hundred dollars left on my books, my

9    account, my books and I've spend that on literature.  And

10   I've got I think about $200 left.  Oh, and I also paid

11   restitution, excuse me.  When I got convicted I paid -- they

12   took some money for restitution.

13   Q      Restitution for your victims?

14   A      Yeah.  Yeah, I still owe some.

15          MR. FALLMAN:  (Nodding.)  No further questions, your

16   Honor.

17          THE COURT:  Mr. Clanton, anything further?

18          MR. CLANTON:  Nothing further, your Honor.

19          THE COURT:  All right, at this time, ladies and

20   gentlemen, we're going to break for lunch.  We'll come back

21   at 1:00 o'clock.

22          While you're on your break, remember the admonition.

23   Do not discuss the case or form any conclusions about it.

24          One o'clock.  Court is recessed.

25             (Whereupon the noon recess was taken.)

26          THE COURT:  All right.  For the record we have

27   present all members of the jury, both attorneys and the

28   defendant.