COLEMAN & BALOGH LLP
BENJAMIN L. COLEMAN
California State Bar No. 187609
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone No. (619) 794-0420
Facsimile No. (619) 652-9964

COLEMAN & BALOGH LLP
ETHAN A. BALOGH
California State Bar No. 172224
255 Kansas Street, Suite 340
San Francisco, California 94103
Telephone No. (415) 565-9600
Facsimile No. (415) 565-9601

Attorneys for Petitioner Eliot Scott Grizzle

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIOT SCOTT GRIZZLE,<br><br>Petitioner,<br><br>v.<br><br>ROBERT HOREL,<br><br>Respondent. | Case No. C 07-4845 SI<br><br>**EXHIBITS A-O TO STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**VOLUME 3** |

Exhibit H:   Post-trial proceedings held on April 21, 1999

Exhibit I:   Post-trial proceedings held on June 16, 1999

Exhibit J:   Exhibits from Clerk's Transcript

Exhibit K:   Opinion of the court of appeals

Exhibit L:   *People v. Clark*, No. C042795, 2004 WL 2326373 (Oct. 15, 2004)

Exhibit M:   Testimony of Fallman in *People v. Clark*, No. 99FO9138

Exhibit N:   Video of January 19, 1999 Clark interview

Exhibit O:   Orders In State Habeas Corpus Proceedings

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF DEL NORTE

---oOo---

**FILED**

APR 2 7 1999

SUPERIOR COURT OF CALIFORNIA
COUNTY OF DEL NORTE

THE PEOPLE OF THE STATE OF CALIFORNIA,         )
                                               )
                                    Plaintiff, )
              vs.                              )   No. 97-268-X
                                               )
ELLIOTT SCOTT GRIZZLE, (H-10106),              )
                                               )
                                    Defendant. )

---oOo---

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>ON MOTION TO COMPEL/MOTION FOR CONTINUANCE/MOTION</u>

<u>FOR NEW TRIAL/CONTINUANCE OF JUDGMENT AND SENTENCING</u>

Had in the Superior Court of the State of California in and for the County of Del Norte, beginning at 9:12 O'Clock, A.M., Wednesday, April 21, 1999.  Before the:

Honorable ROBERT W. WEIR, Judge thereof

---oOo---

Reported by:  Lorraine Kaye O'Hara, CSR No. 5637, RPR



## APPEARANCES

For the People:
    ROBERT J. DROSSEL
    District Attorney
    County of Del Norte
    County Courthouse
    Crescent City, California  95531
    By:  JAMES FALLMAN, Dep. D.A.

For the Department of Corrections:
    BILL LOCKYER
    Attorney General
    State of California
    50 Fremont Street, Suite 300
    San Francisco, California  94105
    By:  JAMES J. PETZKE
    Deputy Attorney General

For the Defendant:
    RUSSELL J. CLANTON
    Attorney at Law
    725 H Street, Suite D
    Arcata, California  95521

---oOo---

on the jury's decision in this case and we need to get to the bottom of that, and I think that the discovery issues that -- that the Court is well aware that we've complained about are the focus of the information sought by way of this particular request.

There are many people that Mr. Clark has spoken to. There's -- especially with regards to his having been threatened by a guard at the prison after his testimony at the Littrell case where there were a number of inmates that he had contact with, one of which ostensibly was Mr. Grizzle. I believe that there were discovery errors, discovery misconduct taking place with regards to all of the contacts that spun out of that particular event and I think ultimately resulted in Mr. Clark coming onto the stand with defense -- with a pile of discovery they've never had and then getting into another whole area. I think that if we could have had the opportunity to cross-examine Mr. Clark entirely in those areas and had the opportunity to review that information, we would have been able to impeach him even on the issue of this retaliation that he claimed.

And I believe that by talking to inmates that were close to Mr. Clark in the past that we -- it's very likely that we're -- especially with regards to the genesis of his rehabilitation, should we call it, that -- for his appearance at the Grizzle case is that contact with the guard, the threat and his contact with a number of inmates, all of which is reflected in some of the discovery we received at the time that Mr. Clark testified. So all of

1 gained from Mr. Grizzle's trial, we took a logistical view
2 of Mr. Rhodes' involvement and had not reached the
3 conclusion that in fact there was another process underfoot.
4 That's why Mr. Rhodes' testimony, although it does exist,
5 is -- is -- is directed only at logistical questions.
6     MR. FALLMAN: But that was a joint preliminary
7 hearing before bifurcation on Aranda/Bruton principles and I
8 think counsel had full opportunity to examine this -- this
9 individual. I think it's a lot of waste of money and a
10 fishing expedition to bring this man from halfway across the
11 country, I suspect for nothing.
12     THE COURT: All right, Item No. 8 will be denied. It
13 does not appear that there is a sufficient showing to grant
14 that one.
15     Item No. 9. Housing history of Inmate Frederick
16 Clark dated from 1-1-97 to present including names and
17 present locations of prior cellmates.
18     MR. PETZKE: Similar to your having denied No. 2, we
19 would request that you deny No. 9. It's seeking the same
20 kind of information and all cellmates for this particular
21 inmate.
22     THE COURT: Why do you need this housing information
23 on Clark and his cellmates?
24     MR. CLANTON: Well, your Honor, I think the Court
25 understands my position with regards to Mr. Clark. There
26 have been in chambers discussions. We've had discussions on
27 the record regarding Mr. Clark.
28     THE COURT: Well, for the record --

```
 1              MR. CLANTON:  Right.
 2              THE COURT:  -- tell me your theory why you need this.
 3              MR. CLANTON:  Well, your Honor, Mr. Clark has
 4    provided a variety of statements regarding his contacts with
 5    my clients, the nature of those contacts.  He has a number
 6    of motives that have been drawn out from him himself in
 7    statements.  He is a person who has very little compunction
 8    about making statements.  He does that all the time and I
 9    think it's -- it's -- extremely possible that he has
10    discussed his involvement on any of the number of levels
11    that he is involved in the Littrell/Grizzle matter with
12    cellmates; that it's typical -- it's a typical form of
13    investigation that the defense will engage in in a matter
14    arising out of a prison environment because statements are
15    made.
16              And because Mr. Clark claims to have had contacts
17    with my client that ultimately resulted in our being
18    sandbagged here at trial with discovery at the very point
19    that Mr. Clark took the stand and then beyond that
20    information that was not even contained in the discovery we
21    were given at the time Mr. Clark took the stand which
22    ultimately formed the basis for Mr. Fallman's closing, his
23    rebuttal, he invested a lot of time into a lot of
24    statements -- into that particular area statements of Mr.
25    Clark, that we're interested in finding out about his
26    contact with Mr. Grizzle regarding the retaliation against
27    Mr. Healy's daughter or potential retaliation.  That's an
28    area that we feel very strongly had a very material effect
```

those people we're interested in talking to.

Why did he go out and seek declarations from a number of inmates? And who were his cellmates, what did he talk about, what was his plan, knowing that he was going to parole soon, knowing that he was seeking out-of-state parole as the benefit of whatever bargain he might be able to manipulate Mr. Fallman into. Those -- are very relevant, and I think though the Court may not share our belief that Mr. Clark had an impact on this jury to the degree that we do, I would just make the point that a jury is a group of people who comes in here very seldom, maybe once or twice in a lifetime. We're here every day. And we are somewhat hardened by the types of comments and by the natures of some testimonies elicited by inmates and we have perhaps even particular viewpoints about that, but a jury's a whole 'nother group of people without those experiences, and I think had -- if Mr. Clark had been cross-examined effectively on this issue of retaliation that he claimed Mr. Grizzle had discussed with him that the result in this case may have been different.

THE COURT: All right, so this is impeachment information about Clark that you're seeking; is that right?

MR. CLANTON: I think it's -- it's related to our claim that there was prosecutorial misconducted based on 1054 violations.

THE COURT: So it's not even to impeach Clark; it's to impeach the Prosecutor for not providing discovery?

MR. CLANTON: Well, I think -- with all due respect,

1  your Honor, that's -- that's --
2      THE COURT: Well, I'm trying to understand what
3  you're saying.
4      MR. CLANTON: What I'm saying is obviously any
5  information that we would receive that would indicate
6  anything different from what Mr. Clark testified to would be
7  impeachment, so --
8      THE COURT: All right, so you're looking for a new
9  trial.
10     MR. CLANTON: Would be granted.
11     THE COURT: Yeah.
12     MR. CLANTON: Also we made our claim that there were
13 1054 violations by the District Attorney, and ultimately
14 with -- our objection being overruled by the Court there
15 would be judicial misconduct on that level by advising
16 incorrectly in the area of law with regards to the 1054.
17 Had those objections been sustained, had there been
18 sanctions of 654 given to the Prosecutor, had we been given
19 that information and therefore had the time to review it and
20 effectively investigate and therefore cross-examine Mr.
21 Clark, the -- the result in this case may have been
22 different. But we were barred from that by the 1054
23 violations by the Prosecutor and by the Court's decision not
24 to impose the sanctions we requested and basically put in
25 the position of cross-examining Mr. Clark, one, without
26 information about the retaliation. Two, with the pile of
27 discovery we'd just received, basically reading it and
28 cross-examining Mr. Clark at the same time.

1    MR. FALLMAN: Your Honor, that -- that's a bunch of
2    baloney. First of all, he got all the discovery that we
3    had. There was a memo of an Officer Jim Rogers. Jim Rogers
4    was subpoenaed up here. He was available. They could have
5    done whatever they wanted to do in camera with Jim Rogers if
6    there's anything further behind the -- discovery which I
7    had -- which I handed to him which would have led them to
8    Jim Rogers. If he didn't go in camera with that that's not
9    my problem; that's his problem.
10        And as far as impeachment of Clark is concerned,
11   that's fully cumulative. Clark got on the stand and
12   admitted that he was a self-admitted rapist. It was --
13   or -- or statutory rapist. He -- he admitted that he
14   committed perjury at the other trial. He comes in here and
15   does an about-face. He says there was a relationship; that
16   he was a black man who had been paid by this white supremist
17   gang to come in and broadside the Prosecution which he says
18   that -- and he did successfully do and he -- he comes up
19   with -- he tells us that in his cell he has something in the
20   writing of the defendant which will prove the almost
21   unbelievable thing that there could be a relationship
22   between a white supremist Aryan Brotherhood member and a
23   black man. Officer McKinney and Officer -- Special Agent
24   Dan Smith go out to the prison, go in his cell and, low and
25   behold, there it was.
26        And I don't remember it as well as I -- but -- the
27   day that it happened you were here and we put it on the
28   record and whatever was said, that is -- that's -- my best

recollection of it. I don't quite remember it as well now as I did then but that's my recollection. It's in the record.

      MR. CLANTON: And that's specifically our point, your Honor. This information that's given to us the minute Mr. Clark sits down to testify is information that we feel the District Attorney or C.D.C. had in their possession prior to that time. Because we did have a letter from Mr. Clark that was included in that stack of discovery that indicated on Monday, "You're not going to get my substantial cooperation," in quotation marks, "without an answer to these questions."

      Now, our point is is that the District Attorney obviously had some contact with Mr. Clark prior to the date of trial because I would suspect, I don't think it takes a rocket scientist to feel that Monday is the date of the start of the trial of Mr. Grizzle. That's what he's referencing in this letter. Now, that letter is to the District Attorney or to C.D.C. prior to the trial. And they have that information. So it's our view that they knew about that information beforehand because that's how Mr. Clark communicates to him, that he wasn't even going to testify unless in fact they responded to his questions. And what they do is introduce a statement by my client on the day that Mr. Clark testifies, a handwritten statement, and I would find it hard to believe that given the nature and the depth of the -- of conversations they obviously have with Mr. Clark prior to the Monday start of that trial which Mr.

1  Clark references to that they didn't discuss this
2  information that ultimately, as far as the Prosecution was
3  concerned, was very important, it showed this link was
4  forged.
5      THE COURT:  All right, Item No. 9 is denied.  It
6  appears that what is sought here is either impeachment
7  information about Clark or, even more collateral, evidence
8  to -- to support complaints about discovery concerning
9  impeachment information about Clark.  But ultimately Clark
10 was as impeached as any witness can ever be.  He was a
11 self-admitted perjurer.  He had his prior inconsistent
12 testimony under oath available to the defense to use to
13 admit into evidence against him and his testimony was about
14 as impeached as any witness's testimony can ever be.
15 Finding any more impeachment about Clark would have been
16 merely cumulative and it does not appear that -- that there
17 is any basis other than just -- than a pure fishing
18 expedition to grant Item No. 9 so 9 is denied.
19     Item No. 10.  Housing logs for Inmate Douglas
20 Ridinger from 1-96 to 1-98 including the names and current
21 location of prior cellmates.
22     Okay, why do you want this?
23     MR. CLANTON:  Well, your Honor, in listening to Mr.
24 Ridinger's testimony at trial, getting the information that
25 we did about Mr. Rubidoux, it -- became -- I think a very
26 rational thought and a logical thought that Mr. Ridinger
27 might as well be an informant for C.D.C. in that the manner
28 in which he comes into the pod where Mr. Littrell and Mr.