IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF DEL NORTE

---oOo---

**FILED**

JUL 2 1 1999

SUPERIOR COURT OF CALIFORNIA
COUNTY OF DEL NORTE

THE PEOPLE OF THE STATE OF CALIFORNIA,  )
                                       Plaintiff,  )
        vs.  )   No. 97-268-X

ELLIOTT SCOTT GRIZZLE, (H-10106),  )

                                Defendant.  )

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

ON MOTION FOR NEW TRIAL/SENTENCING

Had in the Superior Court of the State of California in and for the County of Del Norte, beginning at 9:04 O'Clock, A.M., Wednesday, June 16, 1999. Before the:

Honorable ROBERT W. WEIR, Judge thereof

---oOo---

APPEARANCES

For the People:           ROBERT J. DROSSEL
                        District Attorney
                        County of Del Norte
                        County Courthouse
                        Crescent City, California  95531
                        By:  JAMES FALLMAN
                        Deputy District Attorney

For the Defendant:       RUSSELL J. CLANTON
                        Attorney at Law
                        791 8th Street, Suite R
                        Arcata, California  95521

Reported by:  Lorraine Kaye O'Hara, CSR No. 5637, RPR

COPY

<u>WITNESS INDEX</u>

| <u>FOR THE PEOPLE</u> | <u>D</u> | <u>C</u> | <u>RD</u> | <u>RC</u> |
|---|---|---|---|---|
| REYNOLDS, JUDY | | | | |
| By Mr. Fallman | 79 | | | |
| By Mr. Clanton | | 82 | | |
| CRUSE, MELISSA | | | | |
| By Mr. Fallman | 102 | | 106 | |
| By Mr. Clanton | | 105 | | 106 |

---oOo---

## WITNESS INDEX CONTINUING

| FOR THE DEFENDANT | D | C | RD | RC |
|---|---|---|---|---|
| **WILLIS, DIANA** | | | | |
| By Mr. Clanton | 12 | | | |
| By Mr. Fallman | | | | |
| **REPPOND, STEVE** | | | | |
| By Mr. Clanton | 18 | | | |
| By Mr. Fallman | | | | |
| **MAVRIS, GEORGE** | | | | |
| By Mr. Clanton | 35 | | 38 | |
| By Mr. Fallman | | 37 | | 40 |
| **MOLINA, CARLOS** | | | | |
| By Mr. Clanton | 43 | | 55 | |
| By Mr. Fallman | | 51 | | |
| **CLOUD, ROBERT** | | | | |
| By Mr. Clanton | 65 | | | |
| By Mr. Fallman | | | | |
| **COLLINS, GEORGE** | | | | |
| By Mr. Clanton | 73 | | | |
| By Mr. Fallman | | 78 | | |
| **SMITH, DANIEL L.** | | | | |
| By Mr. Clanton | 84 | | | |
| By Mr. Fallman | | | | |
| **RUBIDOUX, VERNON** | | | | |
| By Mr. Clanton | 112 | | 121 | |
| By Mr. Fallman | | 120 | | |

---oOo---

<u>EXHIBITS</u>

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | ID | IE |
|---|---|---|---|
| A | A copy of logbook | 24 | 24 |
| B | A transcript | 34 | |
| C | A notice of attorney visit | 38 | 40 |

---oOo---

1

---oOo---

THE COURT:  All right, the People of the State of California versus Elliott Grizzle, Case No. 97-268-X.  We are present in court with the defendant, defense counsel Mr. Clanton and the District Attorney.  We are before the Court on the defendant's motion for new trial, and then depending on the outcome of that, either setting it for a new trial or proceeding to sentencing.

Are we ready to proceed?

MR. FALLMAN:  Yes, your Honor.

MR. CLANTON:  Well, your Honor, I -- I do not believe that we are at this moment.  As the Court's aware, there is an additional witness that we requested and the Court signed a transport order on, Mr. Molina.  According to C.D.C. he is en route and the Court indicated I would have the opportunity to speak with Mr. Molina prior to the beginning of this proceeding this morning.

THE COURT:  Well, I thought that was before -- before putting him up on the stand.  There are other witnesses we could take care of, right?

MR. CLANTON:  That's correct.  However, there is another event that took place last evening, your Honor, and that the Attorney General's Office, vis-a-vis James Petzke, faxed to me at 6:30 last evening a copy of a transcript of a meeting that he had with Mr. Clark on January 5th, 1999 I believe it was, and I'm in the process of getting the trial transcript portions which were just faxed to me --

2

1       THE COURT:  Uh-huh.

2       MR. CLANTON:  -- that relate to that transcript, and

3   inasmuch as I'd requested that transcript sometime earlier,

4   and given the fact that it just got to us -- just got here

5   last night and I just received the trial transcripts by fax

6   to my office, I need to have the opportunity to review those

7   just briefly and I would ask the Court for that time.

8       I need to put on the record as well, your Honor,

9   given these comments as well as some comments that were

10  delivered through a telephone conference between Mr.

11  Fallman, the Court and myself, I believe it was on Monday

12  morning that I had requested a continuance in order to talk

13  to Mr. Molina.  That was information that we had received

14  only on June 11th of this year -- of this month and that we

15  attempted to see Mr. Molina with the -- with the assistance

16  of Dan Smith from the Internal Affairs Office of C.D.C.

17  who's present here this morning.  He intervened for us and

18  we were in fact granted the opportunity to talk to Mr.

19  Molina on Monday; however, two flights that we had available

20  to us in order to make that were canceled out of the

21  McKinleyville airport.  We were not able to talk to Mr.

22  Molina and that is when I contacted the Court on a telephone

23  conference requesting a continuance.  The Court indicated it

24  would not grant that continuance.  That was off the record.

25  I want to make sure that that's on the record, and if

26  there's any discrepancies, certainly counsel and the Court

27  can --

28      THE COURT:  Well, I did indicate I'd give you a

1    again, I think that that is a -- an issue which needs to be

2    taken into account by the Court in granting our motion for

3    new trial.

4        Your Honor, if I have -- may have just a moment.

5            (A brief pause in the proceedings.)

6        THE COURT:  Actually this might be a good time for a

7    break.  We'll recess for ten minutes.

8        MR. CLANTON:  That's fine, your Honor.  Thank you.

9            (A brief recess was taken.)

10        THE COURT:  We're again in session with both parties

11    and defendant.  You may continue.

12        MR. CLANTON:  Your Honor, I initiated my interview

13    with Mr. Molina.  I believe we've got maybe another ten

14    minutes.  If I could have that time I think I could finish.

15        THE COURT:  Well, you'll have plenty -- I'd rather --

16    I'd rather forge ahead right now.  You'll have plenty of

17    time to speak with him during the extended lunch break we'll

18    be taking, so if we could get some of these other witnesses

19    out of the way that would be a great help, I think.

20        MR. CLANTON:  Well --

21        THE COURT:  So let's forge ahead.

22        MR. CLANTON:  I'd like to have this --

23            (Counsel conferring briefly.)

24        MR. CLANTON:  I would like to have this marked for

25    identification, please.

26        THE COURT:  What's --

27        MR. CLANTON:  This is a transcript from the Attorney

28    General's Office.

1    THE COURT:  It hasn't previously been marked in any

2    other proceedings?

3    MR. CLANTON:  No.

4    THE COURT:  So that will be Defendant's B for this

5    motion.

6                                    (Defendant's Exhibit B, a
                                     transcript, was marked for
7                                    identification.)

8    MR. CLANTON:  Your Honor, my next argument involves

9    the testimony of Frederick Clark at Mr. Grizzle's trial.

10   And as I indicated to the Court earlier, that I received a

11   document faxed to my home office last evening from Attorney

12   General James Petzke, a 16 -- excuse me, 12-page document of

13   a transcript of an interview that he had with Mr. Frederick

14   Clark on January 5th, 1999.  That is the document, your

15   Honor, that I indicated I provided to my client this

16   morning.  He needs to review that.  And in fact, I had

17   requested a time to look at the trial transcript with

18   regards to that transcript.

19   If the Court wants me to go ahead I would do that at

20   this time, but I would prior to doing that make that request

21   for some additional time to reconcile those two documents

22   because I received the trial transcript portions relating to

23   that transcript this morning.

24   THE COURT:  Well, if you prefer to defer that issue

25   till later in the presentation so you can do that over the

26   break, that would be -- that would be fine with me.

27   MR. CLANTON:  Well -- I would call -- I -- I would do

28   that, your Honor.  At this time I would call George Mavris

1    that information.

2         The Court gave me the opportunity this morning

3    briefly to interview Mr. Molina.  This is information that I

4    think is highly relevant.  I think that it's -- it's an

5    obligation on the defense part to request the continuance at

6    this point so that we could in fact investigate further the

7    information provided by Mr. Molina when -- and that

8    information tied to the other information we have and the

9    Court is well aware I think makes it a reasonable request.

10        THE COURT:  Well, aside from that have you concluded

11   your presentation on the motion?

12        MR. CLANTON:  No, I do have additional information,

13   your Honor.

14        THE COURT:  All right, let's defer that issue until

15   we've heard the rest of what you have to offer.

16        MR. CLANTON:  Okay.

17        THE COURT:  I have about eight or ten minutes before

18   we're going to have to break for lunch because I have

19   another matter I'm going to have to take care of.

20        MR. CLANTON:  Lastly, your Honor, it is a matter --

21   the Court is -- has heard extensive commentary on -- for the

22   life of the post-trial portion of this case, certainly at a

23   very pertinent point during the trial itself.  The Court

24   will recall and Mr. Fallman called an inmate at Pelican Bay

25   State Prison by the name of Frederick Clark to the stand

26   during the trial.  And Mr. Clark proceeded -- well, strike

27   that.

28        Just prior to Mr. Clark taking the stand I was handed

58

1    a rather large packet of discovery relating to Mr. Clark.  I

2    objected at that point and in my brief I think that I have

3    clearly stated my reasons for why a motion for new trial

4    should be granted based on the delivery of that information

5    at the time when Mr. Clark took the stand.  So I won't treat

6    that issue at length.  I think that the cites I've provided

7    in -- in the brief and the argument and prior argument this

8    court has heard doesn't need to be repeated.  However -- and

9    I would rest on -- on those cites and those comments and the

10   brief.

11        However, after Mr. Clark took the stand and continued

12   to testify over the objection of the defense which is

13   treated in this motion, Mr. Clark proceeded to testify about

14   an incident that was not contained in the information I

15   received prior to his sitting down to testify and related to

16   an allegation that Mr. Grizzle was involved in an Aryan

17   Brotherhood plot to injure or -- if not outright murder a

18   young girl, a young girl that is purportedly the daughter of

19   Brian Healy, the star witness for the People.

20        Now, I objected at that time when Mr. Clark began to

21   testify in that area because not only had I not heard that

22   prior to that, he was not contained in any of the discovery

23   that I have.  I treat the reasons this -- the cites in my

24   motion as to why that is -- was inappropriate and should

25   ultimately result in a motion for new trial.

26        But what has occurred since I filed this motion is as

27   the Court is well aware, during a phone conference between

28   the Court, Mr. Fallman and myself, I had received

59

1    information from James Rogers who is an Internal Affairs

2    officer with the California Department of Corrections that

3    in fact a transcript existed of an interview that he

4    conducted with Mr. Clark on January 5th, 1999.  Prior to

5    trial.  Now, I'd never seen that transcript.  I was

6    interested in what was involved in that and in the

7    conversation in chambers Mr. Fallman indicated that he would

8    prevail upon Mr. Rogers to see that I got a copy of that

9    transcript.

10        Mr. James Petzke, the Attorney General's Office was

11   subsequently contacted I suspect by Mr. Rogers, was asked to

12   review that transcript, redact it if necessary and forward

13   it to the defense attorney, myself.  I did in fact, your

14   Honor, receive a copy of that transcript at approximately

15   6:00 o'clock last evening.  It is a document that is 12

16   pages long and it is in fact an interview which took place

17   between Mr. Rogers and Mr. Clark on January 5th, 1999.

18        And in that transcript, your Honor, which has now

19   been admitted into evidence, I believe it's Defendant

20   Exhibit B at this point --

21        THE COURT:  Well, I have held off on a ruling on that

22   because I -- just before this last witness took the stand

23   because I don't know if you want -- if you're wanting me to

24   read this entire thing or if you have some part of it that's

25   relevant that you want to point me to.

26        MR. CLANTON:  Well --

27        THE COURT:  I mean, what's the point of going through

28   a long rehash if we're only looking at one or two sentences

1    that might --

2        MR. CLANTON:  Well --

3        THE COURT:  -- be important.

4        MR. CLANTON:  The problem of this transcript, your

5    Honor, if I may very -- just very briefly is that there are

6    portions that are relevant to this proceeding that appear

7    haphazardly throughout the -- throughout the transcript.

8        If I may have a copy of the transcript I can focus

9    the Court's on a particular area.

10        THE COURT:  All right, maybe the thing to do would be

11   if you were to hit it with a yellow highlighter or something

12   like that because, I mean -- I can imagine myself sitting

13   down and reading -- reading twelve pages to get two, three

14   lines that you might consider are important.

15        MR. CLANTON:  That's fine, your Honor.  In fact, I --

16   I have highlighted it.

17        THE CLERK:  Your Honor, while he's looking through

18   that --

19        (The Court conferring briefly with the clerk.)

20        MR. CLANTON:  And I believe counsel has a copy of

21   this at this point.

22        MR. FALLMAN:  Yes.

23        MR. CLANTON:  Okay.  This would be on page eleven,

24   your Honor, at the top of the page.

25        THE COURT:  All right, so what you want me to focus

26   on is the two lines there on the top of page eleven that you

27   have underlined?

28        MR. CLANTON:  Yes.  Yes.  I think that is the focus

1    of my comments at this point, your Honor.·

2            THE COURT:  All right, that Mr. Rogers asks Clark,

3    he's -- Rogers says, "You said that the A.B. were offering

4    $1,500 dollars for the address of Shannon Nichols."

5    That's -- the whoever -- the transcriber put down the word

6    "phonetically," question mark.  And then Clark says, "Yeah,

7    that's" -- "Brian Healy's daughter or stepdaughter or

8    something like that."

9            Okay, that's what you want me to know about?

10           MR. CLANTON:  Yes.  Yes.

11           THE COURT:  All right.  Shall we just -- treat --

12   rather than admitting the whole 12 pages, just take it that

13   that was an excerpt of that interview?

14           MR. FALLMAN:  That would be good, and if we do that

15   could we also have a court order that all copies be given

16   back, that this be sealed and that the copies that counsel

17   have be returned to S.S.U. Agent Smith, and I'll get my --

18           THE COURT:  Rather than sealing it, why keep it in

19   the court file at all where somebody could perhaps get their

20   hands on it?  Why don't we just make note that that was an

21   excerpt of the interview, what I just read into the record?

22           MR. FALLMAN:  (Nodding.)

23           THE COURT:  That way --

24           MR. FALLMAN:  Please let's do it the way you're

25   saying.

26           MR. CLANTON:  For appellate purposes I would ask that

27   that be sealed.  For appellate purposes there are other

28   entries in there that may --

62

1    THE COURT:  Well, why don't you tell me what those

2    are and I'll read those into the record too, because I'm

3    sure the Appellate Court isn't going to be pleased at all to

4    have to wade through a 12-page transcript to see two or

5    three lines and we ought to give them a break, too.

6    MR. CLANTON:  I'm sorry, your Honor, it doesn't

7    amount to more than two or three lines.

8    THE COURT:  Well, however many it is, tell me the

9    part instead of going through this giant exercise, instead

10   of dumping this in my lap and saying, "Comb through it with

11   a fine-tooth comb."

12   MR. CLANTON:  Well, your Honor, for the record I

13   would indicate that may in fact be what has happened to the

14   Court, this was dumped on the Court, but it was dumped on

15   the defense last evening.

16   THE COURT:  I'm not faulting you for that.  I'm just

17   suggesting perhaps a shortcut so the record will be clean

18   for the Court of Appeals and -- and see if that is --

19   MR. CLANTON:  Your Honor, there's a portion on page

20   ten as well, middle portion of the page where there is a

21   discussion of individuals coming to Mr. Clark's cell with a

22   video camera and watching him tear up paperwork.

23   THE COURT:  All right.  So I'll read that into the

24   record so -- is there more or is that it?

25   MR. CLANTON:  There's -- on page seven at the bottom

26   of the page there is an indication that -- further

27   allegations that a former attorney for Mr. Grizzle had in

28   fact sent money to Mr. Clark's sister in payment for Mr.

1    Clark's testimony at trial.  And --

2         THE COURT:  Are these things conflicted with Clark's

3    testimony?

4         MR. CLANTON:  That particular item did not, your

5    Honor; that was part of a -- of a memo.  But what's

6    important here, I believe that that information's contained

7    in another memo that we never received and wherein there's

8    additional information.  There's reference to a memo here by

9    Mr. Rogers.  He's reading off a memo that he -- or a report

10   from somewhere that preexisted this transcript that contains

11   information relating to Mr. Clark and a relationship to Mr.

12   Grizzle that we were never provided with.  And --

13        THE COURT:  Well, let's do this.  I have to -- I have

14   to break now.  It's 11:20.  As I indicated, I have this

15   other matter that I just can't -- can't get around.  I need

16   to take care of it so we're going to break for lunch.  What

17   I would suggest is that you -- you underline or highlight or

18   whatever the -- the excerpts from that interview that you

19   want read into the record.

20        I'm just going to assume there won't be any objection

21   by the District Attorney if you're satisfied that this is an

22   accurate transcript of that conversation.

23        MR. FALLMAN:  Right.

24        THE COURT:  All right, and so -- when we come back

25   from lunch, we'll -- we'll take care of that.  I -- there's

26   one other matter that has cropped up so we're going to be

27   reconvening at 1:05.  I have something that's going to take

28   about five minutes at 1:00 o'clock.

1          MR. FALLMAN:  Your Honor?

2          THE COURT:  And we'll be able to take care of it that

3     way.

4          MR. FALLMAN:  The only thing I'm worried about is the

5     way this has come -- from -- on the facts, I look at this

6     and I see security things that could cause people to get

7     hurt and that's why I'm asking that the copy that counsel

8     has that Mr. Grizzle has access to be given back and that

9     counsel read in the parts that are not gonna get people

10    hurt.  That -- there's no problem with that; we can fashion

11    a remedy.  I just don't want the actual -- the physical

12    document, any copies of it with Mr. Grizzle or the Aryan

13    Brotherhood.

14         If you -- if you look at it carefully you'll see the

15    reasons for that.  It talks about other crimes and --

16         THE COURT:  All right.  Well, do not disseminate that

17    to the defendant until we get back from lunch and we'll talk

18    about that further.

19         MR. CLANTON:  Well, I would indicate just for the

20    record and to be straight with the Court that I provided a

21    copy to Mr. Grizzle earlier today.

22         THE COURT:  Oh, well, cat's out of the bag then.

23         MR. CLANTON:  And he did read it in its entirety.

24         MR. FALLMAN:  Well, we --

25         THE COURT:  So we'll see you at 1:05 this afternoon.

26         MR. CLANTON:  Thank you.

27         (Whereupon the noon recess was taken.)

28         MR. CLANTON:  Your Honor, may we approach just for a

1    moment?  Off the record.

2        (Both counsel at bench for off-the-record discussion.)

3        THE COURT:  All right, the People of the State of

4    California versus Elliott Grizzle.  We're present in court

5    with both attorneys and the defendant.

6        Mr. Clanton, you may proceed.

7        MR. CLANTON:  Yes, your Honor.  As I -- I spoke with

8    counsel earlier that I had a witness who became free who has

9    some additional information on an earlier argument regarding

10   the July 26th alleged encounter between Mr. Healy and Mr.

11   Grizzle, and I would call at this time Bob Cloud.

12                        ROBERT CLOUD,

13   called as a witness by the defendant, after having been duly

14   sworn to tell the truth, the whole truth and nothing but the

15   truth, was examined and testified as follows:

16       THE CLERK:  Be seated and state your name, please.

17       THE WITNESS:  Robert Cloud, C-l-o-u-d.

18                    DIRECT EXAMINATION

19   Q    BY MR. CLANTON:  Mr. Cloud, what is your profession?

20   A    I'm currently a private investigator.

21   Q    And are you often employed by defense attorneys in

22   cases arising out of Pelican Bay State Prison?

23   A    Fairly frequently, yes.  (Nodding.)

24   Q    And in July of 1997 were you so employed in any case?

25   A    Yes.

26   Q    And were you employed by Paul Gallegos?

27   A    Yes.

28   Q    And did that case involve a Mr. Healy?

1    MR. CLANTON:  I --

2    THE COURT:  Anything further?

3    MR. CLANTON:  I have nothing further, your Honor.

4    THE COURT:  All right, may the witness be excused?

5    MR. CLANTON:  Yes, I have nothing further.

6    THE COURT:  All right, thank you.  You're excused.

7    Your next witness.

8              (Counsel conferring briefly.)

9    MR. FALLMAN:  Your Honor, if we may call Judy.

10   THE COURT:  Yes, bring your witness.

11                    JUDY REYNOLDS,

12   called as a witness by the People, after having been duly

13   sworn to tell the truth, the whole truth and nothing but the

14   truth, was examined and testified as follows:

15       THE CLERK:  Have a seat.  In the witness box.  State

16   your name.

17       THE WITNESS:  My name is Judy Reynolds.

18                  DIRECT EXAMINATION

19   Q    BY MR. FALLMAN:  Judy, I mean -- I'm sorry, Mrs.

20   Reynolds.

21   A    Uh-huh.

22   Q    Would you tell us your title and where you work?

23   A    I'm a Legal Clerk III at the District Attorney's

24   Office.

25   Q    Okay, how long you work for the D.A.'s Office?

26   A    Eleven years.

27   Q    All right.  And during -- the -- the Grizzle case,

28   was it your duty to log discovery as it was given out to the

80

1    defense?

2    A    Yes, some of the time.  At first it was Lorie

3    Wing's -- (Nodding.)

4    Q    Oh, okay.

5    A    Job.

6    Q    Okay, you replaced Lorie Wing at that job?

7    A    Yes, she --

8    Q    All right, so for part of the Grizzle case at least,

9    you were the official custodian of the records of -- the

10   discovery process for the D.A. to the defense; is that

11   correct?

12   A    Correct.

13   Q    All right, and as such did you maintain a log to the

14   best of your ability?

15   A    (Nodding.)

16   Q    Of the discovery that was given to Mr. Clanton or to

17   his investigators in the Grizzle case?

18   A    Yes.

19   Q    And tell the judge what methods you use to maintain a

20   log of discovery.

21   A    When the discovery is submitted to the D.A.'s Office

22   it comes to me and I log it in by computer onto a disk what

23   it is, how many pages, if it's a report or how many videos

24   or cassettes.  What that cassettes contains or the video

25   contains, the date of it if I have it, the officer if I have

26   the officer's name and I put the date that I give it to them

27   or into the Clerk's Office.  And sign it.

28   Q    All right, in this case did you maintain a log of

1    whatever discovery you may have given to Mr. Clanton or to

2    his office or to his investigators concerning an Inmate

3    Clark?

4    A    Yes.

5    Q    And what, if anything, did you give to Mr. Clanton?

6    A    I have a list here of what I did.

7    Q    Is that in your computers that you just described?

8    A    Yes.

9    Q    Okay.

10   A    Regarding Clark, "One video.  Inmate Clark, E No.

11   73520."  There's -- an interview was -- "to Clanton on

12   January 21, '99," by me, and I have in parenthesis, "Handed

13   to him."

14   Q    So you -- you marked on there that you hand that --

15   handed that to Mr. Clanton?

16   A    Yeah, I show how we submit discovery to the defense

17   attorney.

18   Q    Okay.

19   A    Either handed or through the Clerk's Office or one of

20   his investigators -- investigators comes in to get it.

21   (Nodding.)

22   Q    Okay, and any other discovery that you -- that you

23   were personally responsible for about Mr. Clark?

24   A    Frederick Clark?  Interview at Pelican Bay State

25   Prison by Smith was to Clanton on January 29th via clerk's

26   receptacle.

27   Q    Would that have been paper -- paperwork?

28   A    Three pages.

1    Q       Okay, and anything else?

2    A       Not that I see.  That's all I have for Clark.

3    Q       Okay.  And before the video was there also a -- a

4    short memo that you gave?  I think it's listed in your

5    transcript, just one entry above the video?

6    A       Oh, I'm sorry, yes, "One memo regarding telephone

7    conversation, Clark, handed to Clanton via D.A.'s Office."

8    Q       All right, so two paper memos, one -- one of

9    apparently one page, one of three pages and a video?

10   A       Uh-huh.

11   Q       And the video was given on January 20th, '99?

12   A       The video is to Clanton on January 21st.

13   Q       Twenty-first?

14   A       Nineteen ninety-nine.

15           MR. FALLMAN:  No further questions.

16                       CROSS-EXAMINATION

17   Q       BY MR. CLANTON:  Good afternoon.

18   A       Good afternoon.

19   Q       I guess my first question would be do you have

20   personal recollection of actual transfer of that tape to my

21   person?

22   A       Huh-uh.  (Shaking head.)  No.

23   Q       Okay.  And is it policy to perhaps receive the

24   discovery and have made the log prior to having delivered

25   the -- the discovery on occasion?

26   A       If, for instance, the handed one, if -- if you called

27   me and said, "I'm going to be in there to pick it up," I

28   would have done it that way.  (Nodding.)  But I can't tell

1    you that.

2    Q    Well --

3    A    That that's how it happened.

4    Q    Okay.

5    A    I could have logged it in after I handed it to you.

6    Q    Okay.

7    A    I just can't recall.

8    Q    Or it could have been logged in prior to?

9    A    It could have.  (Nodding.)

10    Q    And is it possible -- as -- as I suspect you're

11    aware, that I have respect for your professionalism and your

12    courtesy --

13    A    Thank you.

14    Q    -- in the District Attorney's Office here, but is it

15    possible that this entry could have been made and a mistake

16    had been made?  In fact, I did not receive that tape?  Is

17    that a possibility?

18    A    That's possible but I don't think so.

19    Q    Okay, but you don't have any memory of --

20    A    I don't know.

21    Q    -- actually -- delivering it to --

22    A    There are lots of videos and other tapes that I do.

23         MR. CLANTON:  Okay, nothing further, your Honor.

24         MR. FALLMAN:  No questions.

25         THE COURT:  You may step down.  Thank you.

26         Next witness.

27         MR. CLANTON:  I would call Dan Smith to the stand,

28    your Honor.

1                      DANIEL L. SMITH,

2      called as a witness by the defendant, after having been duly

3      sworn to tell the truth, the whole truth and nothing but the

4      truth, was examined and testified as follows:

5              THE CLERK:  Would you state your name, please?

6              THE WITNESS:  Daniel, middle initial L., Smith.

7                      DIRECT EXAMINATION

8      Q      BY MR. CLANTON:  Good afternoon.  Agent Smith is it?

9      A      Yes, sir.

10     Q      Okay.  Agent Smith, I wanted to ask you a few

11     questions regarding Vernon Rubidoux.  Specifically what is

12     your capacity with C.D.C. currently?

13     A      I'm a special agent in the Special Service Unit,

14     Department of Corrections.

15     Q      And how long have you occupied that position?

16     A      Since November of 1988.

17     Q      Okay.  And from 1988 to the present, did you ever

18     come into contact with Vernon Rubidoux, an inmate in the

19     California Department of Corrections?

20     A      I think the only time that I remember contact with

21     Inmate Rubidoux was during the Inmate Grizzle trial.

22     Q      Okay.  Do you recall the date of your first contact

23     with Mr. Rubidoux?

24     A      No, I don't.

25     Q      Do you recall the nature of your contact with Mr.

26     Rubidoux?

27     A      I think it might have been in -- accompanying Deputy

28     District Attorney Jim Fallman into one of the holding areas

1    to interview Mr. Rubidoux, I'm not sure. When I had my

2    first contact or any, I never made any records or notes

3    regarding that.

4    Q      Okay. Did you ever discuss Mr. Rubidoux with other

5    agencies within Department of Corrections?

6    A      I'm not sure what you mean in terms of "other

7    agencies."

8    Q      Did you ever -- I'm sorry. Did you ever discuss Mr.

9    Rubidoux with Captain Dillard of Pelican Bay State Prison,

10   the gang coordinator?

11   A      I don't think so.

12   Q      Did you ever discuss Mr. Rubidoux with Sergeant

13   McKinney?

14   A      I think more than -- more than likely Sergeant

15   McKinney might have brought him up in terms of conversation

16   to me.

17   Q      And do you recall what that conversation was about?

18   A      Other than I think that Rubidoux was a witness, as he

19   was the main investigator for the case for Mr. Fallman.

20   Q      Did he ever discuss Mr. Rubidoux as an informant?

21   A      You know, he may have but I'm not sure.

22   Q      Specifically, Agent Smith, was Mr. Rubidoux ever

23   known to you as an informant who was going to be used as

24   a -- information-gathering plan in the Littrell and/or

25   Grizzle case?

26   A      Not in -- not in that framework.

27   Q      Did you ever discuss with anybody any plan that

28   anybody may have had to do that?

1    A       No, sir.  I don't recall anything like that and my

2    only recollection of Rubidoux was that he was going to be a

3    witness for the Prosecution in the Grizzle case.

4    Q       And how did you learn that?

5    A       Working on the Grizzle case with Sergeant McKinney

6    and Mr. Fallman.

7    Q       And did Sergeant McKinney relate to you how Mr.

8    Rubidoux became part of all that?

9    A       I think somewhere during the course of his

10   investigation Sergeant McKinney came upon Mr. Rubidoux and

11   developed some information from him.

12   Q       Do you know what date that was?

13   A       No, sir.

14   Q       And you know what information that was initially?

15   A       No.  I don't have any direct recollection of what his

16   information was as -- Mr. Rubidoux had no interest to me in

17   terms of I had other people that I was dealing with that

18   were more important to me than Mr. Rubidoux.

19   Q       Do you know the first contact of any investigation

20   you had with Mr. Rubidoux with regard to these cases?

21   A       I don't have any recollection of any specific dates

22   of contact by anybody in terms of investigation by this

23   department to Rubidoux.

24   Q       Well, since the time of the conclusion of the Grizzle

25   trial, have you discussed with Sergeant McKinney or any

26   other individuals Mr. Rubidoux's role in that case?

27   A       I've had discussions with the District Attorney

28   regarding Mr. Rubidoux since the conclusion of the trial.

1    Q    And in what regard?

2    A    I think it was more of transporting Mr. Rubidoux back

3    to wherever it was he was brought up from.  I think he was

4    brought up and returned to the Substance Abuse Treatment

5    Facility at Corcoran.  For the testimony he gave in the

6    Grizzle trial, and then when he was finished we transported

7    him back down there, being our department transported him

8    back to S.A.T.F.

9    Q    Do you know, Agent Smith, who or what agency would be

10   responsible for coordinating the use of informants at

11   Pelican State Prison?

12   A    I don't know if there's any one agency specifically

13   charged with that duty.

14   Q    Well, let me ask a more pointed question.  Is there a

15   unwritten position or unwritten plan for the use of

16   informants at Pelican Bay State Prison?

17   A    I have no knowledge of anything like that.

18   Q    So your testimony is here today you have no knowledge

19   of Mr. Rubidoux being selected as an informant particularly

20   for the Grizzle case or the Littrell case?

21   A    Selected in terms of --

22   Q    In terms of any particular plan to be put into force

23   to use him as an informant.

24   A    No, sir, I've -- that's -- I don't have any

25   recollection of anything like that.

26   Q    Well, let me change gears here, Agent Smith.  From

27   January 5th to February 19th of this year, did you ever

28   learn of any claims by an inmate by the name of Frederick

1    Clark to -- or regarding an alleged assault or plan of an

2    assault on a child of Mr. Healy's?

3    A    I'm not sure of the exact dates and it may be within

4    that time frame you're quoting but I'm not sure at all.

5    When I was made aware of Inmate Clark was I think through a

6    short memorandum that came from -- an Internal Affairs

7    investigator, Jim Rogers, behind an investigation he had

8    done wherein he had interviewed Inmate Clark and there was

9    just a very brief disclosure of information that Clark had

10   some information regarding the case.  And subsequently

11   myself and District Attorney Fallman here interviewed Inmate

12   Clark.

13   Q    And were you ever made aware, Agent Smith, of the

14   existence of a transcript of the meeting on January 5th

15   between Mr. Clark and Jim Rogers?

16   A    I was unaware of that transcript until I saw it just

17   this morning on the table here in this room.  I didn't know

18   there was a transcription of that.

19   Q    Well, you saw -- you saw a memo from Jim Rogers dated

20   January 13th that indicated Mr. Clark had given information

21   to Mr. Rogers regarding gang activity; isn't that correct?

22   A    I would -- I would have to say yes.  I'm not sure of

23   the memo or the date of it, yeah, that he had given some

24   information to Agent Rogers.

25   Q    Okay.  Now, it would be in your job description to

26   follow up on that; wouldn't it?

27   A    We did interview Inmate Clark.

28   Q    Okay.  And as a result of your receipt of that memo,

1    that January 13 memo from Mr. Rogers, did you ever contact

2    Mr. Rogers?

3    A    Yes, I did.

4    Q    And did he tell you about that transcript he had?

5    A    No, he said he didn't have a transcript at all at the

6    time.  What he had was an ongoing Internal Affairs

7    investigation that was not closed and therefore the

8    particulars of the information in that investigation other

9    than the specific information he released we weren't gonna

10   have access to.

11   Q    Well, on January 13th you were assisting Mr. Fallman

12   in preparing the Grizzle case for trial; weren't you?

13   A    I believe so.

14   Q    And Mr. Rogers knew that; isn't that correct?

15   A    He may have.

16       MR. FALLMAN:  Objection, that calls for speculation

17   about what Rogers may or may not have known.

18       THE COURT:  Well, if you know you may answer.

19       THE WITNESS:  I -- I would only guess that he knew

20   that we were doing something with the case.

21   Q    BY MR. CLANTON:  Well, you --

22   A    Yes.

23   Q    I'm sorry.  You've read that transcript; haven't you?

24   A    Yeah, I breezed through it I think once or twice.

25   Q    And there is on page eleven of that transcript near

26   the top of the page an exchange between Mr. Rogers and Mr.

27   Clark wherein Mr. Clark confirms at least his allegation of

28   an alleged payment of $1500 for information regarding Mr.

1    Healy's daughter; isn't that correct?

2    A      I'm not sure -- if you don't have two objectives in

3    that thing.  He confirms that a payment was made or that

4    there was discussion of a payment?

5    Q      Just confirms that he had that knowledge or -- or

6    created that knowledge or -- or mentioned that fact.  Mr. --

7    A      You're talking --

8    Q      That allegation.

9           MR. FALLMAN:  Your Honor, that transcript I guess

10   speaks for itself.  It's speculative to ask him about it.

11   He wasn't there.

12          THE COURT:  Well -- maybe it's quicker than reading

13   the whole transcript if he just asks one question about it.

14          Do you -- do you know the answer or --

15          THE WITNESS:  I'd like to look at the transcript,

16   your Honor, if I could.

17          THE COURT:  All right.

18          MR. CLANTON:  If I may approach, your Honor.

19          THE COURT:  All right.

20          MR. CLANTON:  This is --

21          THE COURT:  What are we trying to prove, anyway?

22   That -- that Rogers did or did not know about the -- this

23   case or what -- what's -- where are we going with this?

24          MR. CLANTON:  Well, your Honor, in my brief one of my

25   principal arguments --

26          THE COURT:  Uh-huh.

27          MR. CLANTON:  -- proposing that new trial is

28   appropriate --

1          THE COURT:  Uh-huh.

2          MR. CLANTON:  -- under the circumstances is that in

3    fact prior to trial that the District Attorney and/or

4    agencies under his employ had information that in fact Mr.

5    Clark had made these allegations.  Now, those allegations,

6    I --

7          THE COURT:  Well, I think -- I think what you're

8    saying is that Rogers knew about this case and therefore is

9    charged with knowing about the discovery demand; he had this

10   information and therefore should have handed it over.  I

11   mean, is that where we're going with it in a nutshell?

12         MR. CLANTON:  That Rogers had the information as of

13   January 5th.

14         THE COURT:  Yeah.

15         MR. CLANTON:  He is in -- Mr. -- Rogers knows that

16   Agent Smith and Mr. Fallman are preparing a trial --

17         THE COURT:  Uh-huh.

18         MR. CLANTON:  -- against Mr. Grizzle.

19         THE COURT:  Uh-huh.

20         MR. CLANTON:  That in fact this transcript existed;

21   that in fact Agent Smith would have received that

22   information or other operatives of Mr. Fallman; Mr. Fallman

23   had that information; and if the Court will recall at trial

24   when Mr. Clark sat down and he began to testify about this

25   alleged plan to -- as he --

26         THE COURT:  Yeah.

27         MR. CLANTON:  -- indicated, murder --

28         THE COURT:  But how does -- how does the question did

1    Rogers know help you move the ball closer to the goal line?

2        MR. CLANTON:   Then in fact if he knew that they were

3    preparing that trial?

4        THE COURT:   Yes.   Then what?

5        MR. CLANTON:   If in fact he would have assisted and

6    given that information that he had available, that would

7    have been very relevant, very material from their

8    perspective from a --

9        THE COURT:   Maybe.   Why don't you just ask him did he

10   give that information to him.

11   Q    BY MR. CLANTON:   Well -- did you receive that

12   information from him?

13   A    What I received was in essence that little one-page

14   memo.   And then I asked him, well -- I called Mr. -- Agent

15   Rogers, I asked him about the information and there was --

16   concerning his interview of Inmate Clark relative to the

17   information regarding the Grizzle case.

18   Q    And did he discuss with you Mr. Clark's comment that

19   you've read in this transcript about an alleged attempt on

20   the life of Mr. Healy's daughter?

21   A    I don't know if that came up at all during our

22   conversation and -- you know, I think the first we heard of

23   it was when we interviewed Clark ourselves.

24   Q    So do you recall the date of that interview?

25   A    Not off the top of my head, no, sir.

26   Q    Was it before trial?

27   A    I -- I don't know what date your trial actually

28   started and I don't know the date that I interviewed Inmate

1    Clark.

2    Q    Well, so -- your testimony is that you first learned

3    about this comment of Clark at your -- at the time of the

4    interview of Mr. Clark?

5    A    I think so.  But I'm not positive.

6         MR. FALLMAN:  Your Honor?

7         THE WITNESS:  I --

8         MR. FALLMAN:  I'm not trying to -- this is not an

9    objection.  I'll stop if you want but I think we can solve

10   the problem.  There was an interview.  It was in January.

11   It's the one referred to by Judy Reynolds in her log.  The

12   date of the interview will be said at the front of the tape.

13   It's the only interview and it will answer all of counsel's

14   questions.

15        MR. CLANTON:  I will -- with regards to the tape,

16   your Honor, I will under penalty of perjury declare on the

17   record that I never received a copy of this tape.

18        THE COURT:  Well -- if the clerk logged it out to

19   you, you say you didn't get it, I -- I don't know.  What --

20   what are you -- what are you attempting to prove?  That

21   they --

22        MR. CLANTON:  They --

23        THE COURT:  -- falsified a log --

24        MR. CLANTON:  No.

25        THE COURT:  -- and said she gave it to you and didn't

26   or --

27        MR. CLANTON:  No.

28        THE COURT:  -- she gave it to you but it got lost in

1    some other things that were given to you? What?

2            MR. CLANTON:  No.

3            THE COURT:  Where are we going with this?

4            MR. CLANTON:  With regards to the receipt or lack of

5    receipt of this tape, I will simply state to the Court I was

6    never handed the tape, it was never handed to me by a clerk,

7    and I suspect -- knowing this particular clerk, that she is

8    very responsible, I suspect it is a clerical error.  That

9    that log -- if she had the tape that she made the log.  It

10   was never transferred to me.  I in fact never received it.

11           THE COURT:  Well, here's the thing on this discovery

12   piece of it, and maybe -- I don't know, I'm very reluctant

13   to say anything.  I'm more inclined to just sit back and say

14   nothing and -- let it all go by then just make a ruling, but

15   maybe in the interests of shortening this thing down, it

16   strikes me that the discovery piece of this problem,

17   whether -- whether there was a failure to make discovery or

18   not is of no consequence anymore unless you can show that

19   she -- had you had the discovery you could have specifically

20   done some -- not just, "It would be nice to have it, I would

21   have liked to have had it to cross-examine," but that if you

22   had cross-examined with the benefit of this that something

23   big would have turned up and show me what that is.

24           I mean, you've had the stuff now for a long time

25   so -- by now you've had as much time as you would have had

26   if you'd had it before trial in the first place, and if

27   something big wasn't going to turn up, just the fact that

28   you didn't have it for cross-examination is kind of no harm,

1    no foul, so what.  What is -- what is the smoking pistol

2    that we -- that you now know was going to turn up if you'd

3    been able to cross-examine Clark with this stuff?

4        MR. CLANTON:  Well, first, your Honor, our position

5    is -- as we stated in our brief is that there was a 1054

6    violation at the time Mr. Clark's --

7        THE COURT:  But that doesn't matter unless it some in

8    some fashion prejudices you.

9        MR. CLANTON:  Well --

10       THE COURT:  So I'm asking you now what is the

11   prejudice.

12       MR. CLANTON:  Well, first we were not able to

13   properly impeach Mr. Clark.

14       THE COURT:  Okay, now you've had the time to have dug

15   out everything you would have dug out, what would you have

16   impeached him with?

17       MR. CLANTON:  Well, your Honor, what I would have

18   impeached him with is the fact that was there -- first of

19   all, I still don't know this date whether this fact Mr.

20   Healy has a daughter and that was -- foisted on us literally

21   at trial.

22       THE COURT:  Okay, but you've had all -- you've had

23   plenty of time, you've had months now to find out, so if you

24   haven't found out by now it wouldn't have mattered if they

25   had made this discovery six months before trial because six

26   months have gone by and you still haven't found out so I

27   don't count that.

28       MR. CLANTON:  Okay.  Whether in fact there ever had

been this contact that Mr. Clark claimed.· We were able to

show that in fact that information that he proposed to --

that there was a plan to eliminate Mr. Healy's daughter, if

we were able to show -- had that information, were able to

do the proper investigation to show that he was never in a

position, one, to even get that information.

THE COURT:  Okay, but here's my point.  You've now --

I mean, ever since the trial, which was what, six months

ago?

MR. CLANTON:  February.

THE COURT:  You've known about Clark's allegation

they're out to get Healy's daughter so you've had plenty of

time to investigate that.  Now, if you have turned something

up that you didn't have at trial that you would have turned

up and had at trial to blast him with on the witness stand

then maybe you're getting somewhere.  But if you've had all

this time, you still haven't turned this up, then I now know

that having had that information wouldn't have helped you.

So which it is?  Do you have the -- do you have the

big clue that would have -- that would have shot Clark out

of the saddle or not?  Because if you don't this is just a

wasted exercise.

MR. CLANTON:  Well, your Honor, I think it's -- it's

important to note that we were not aware of all of the

relationships that Mr. Clark had at the time that created

those -- those relationships.

THE COURT:  Okay, but now you've got all that stuff,

I mean, where's the -- where's the smoking gun that you

1   would have been able to confront Clark with?  If it's not

2   there, it doesn't make any difference.  That -- that maybe

3   they dropped the ball and didn't give you the discovery they

4   should have given, I don't know, I'm not deciding that, but

5   I am saying that even if it were true it wouldn't have

6   helped you.  So -- so you got to show me what you would have

7   done with this information that would have won the case for

8   you.

9        MR. CLANTON:  Well, I think, your Honor, that if we

10  would have had that information we would have been able to

11  provide an argument to the Court that -- or to provide

12  testimony that would in have in fact undercut Mr. Clark's

13  assertions.

14       THE COURT:  That's what I'm asking you to tell me.

15  What testimony?

16       MR. CLANTON:  Well --

17       THE COURT:  What testimony have you now been able to

18  turn up had -- that you would have been able to present at

19  trial if you'd had this information sooner?  What testimony?

20       MR. CLANTON:  Well, part of the problem, your Honor,

21  is that -- the very transcript that contains the information

22  that we would have needed to pursue, that we got last night

23  at 6:10 p.m. because that's when I received the

24  transcript --

25       THE COURT:  Uh-huh.

26       MR. CLANTON:  -- of Mr. Rogers' interview which

27  contains the information that tells us exactly what was

28  transpiring with Mr. Clark.  And -- and as this court will

1    recall, there were numerous occasions when we were here

2    arguing to try and get that very same information.  And also

3    I have a copy of the trial transcript at page --

4        THE COURT:  All right.  Well, you've had a chance to

5    look at that over lunchtime.  I mean -- now -- I mean,

6    where's -- where's the hot trail that we're onto now, now

7    you've seen it, now you've had time to read it?  I mean, it

8    sounds to me --

9        MR. CLANTON:  Could I have just a moment?

10       THE COURT:  -- like we're just -- we're just playing

11   this kind of -- this game of gotcha.  "You dropped the ball

12   on discovery," but that doesn't matter.  Sure, you've --

13   maybe you -- maybe you've got them, they don't make -- maybe

14   they didn't give you some discovery they should have, but if

15   we go back and find out that if you had had it in the first

16   place it wouldn't have helped you, I don't care and I'm not

17   going to grant you a new trial on account of that.

18       MR. CLANTON:  Okay.

19       THE COURT:  Unless you can show me what you were

20   going to do with that information that would have changed

21   the outcome of this trial.

22       MR. CLANTON:  Well, your Honor, I think that one of

23   the principal areas that we would have been able to explore

24   is that we would have been able to show that in fact Mr.

25   Clark had perjured himself.  If we'd had that information

26   that he was engaging in a perjurious act, that in fact we've

27   learned that Agent -- excuse me, that Mr. Rogers had in fact

28   requested of Mr. Fallman and the Attorney General's Office

1    represented here by Mr. Petzke that he be charged with

2    perjury and we learned that after trial.  And had we had

3    that information I would have been able to put Mr. Rogers up

4    here, I would have been able to ask Mr. Fallman himself

5    about that, I would have been able to call Mr. Petzke and

6    asked him whether in fact they had been -- whether Mr.

7    Rogers had in fact asked them to charge Mr. Clark with

8    perjury.

9         Now, Mr. Clark -- excuse me, Mr. Rogers in his latest

10   memo after the last discovery hearing that we had in this

11   court put at the foot of that that he had asked both Mr.

12   Fallman and Mr. Petzke to charge Mr. Clark with perjury and

13   they declined to do that.  Now, if we had had that

14   information at the time of trial it would have been

15   extremely helpful.  I think that a jury hearing that an

16   operative, a high ranking official in -- in C.D.C. had asked

17   both of the agencies that are promoting this testimony to

18   charge him with perjury, I think that would have had a

19   significant impact on this jury.

20        THE COURT:  But -- Clark doesn't have to be charged

21   with perjury.  He admitted right out in front of the jury

22   that he committed perjury.  He testified that he had

23   committed perjury, remember, and confessed to it so --

24        MR. CLANTON:  That's true with other matters, but

25   what happened with all of these informants, your Honor, and

26   I appreciate --

27        THE COURT:  Okay, I don't want to take up more time.

28   What I'm going to do is I've kind of shot my bolt, I think,

1    you know, what might help you and what is wasting your time

2    so I'm going to -- I'm going to shut up and let you go

3    ahead.

4         MR. CLANTON:  Well, I appreciate the Court's candor,

5    your Honor.  I just -- I believe that the Court's position

6    for some time has been that all of the informants in this

7    case were admitted perjurers for the most part and were

8    effectively impeached, but I would respectfully disagree

9    with the Court because of the result in this trial and the

10   lack of physical evidence that would support -- that would

11   support --

12        THE COURT:  All right.

13        MR. CLANTON:  -- their testimony.  Now --

14        THE COURT:  I think I get it -- get -- I get it.

15   Let's go ahead with the witness.

16   Q    BY MR. CLANTON:  So you first became aware of that

17   information at the time of your interview with Mr. Clark?

18   A    To the best of my recollection.  (Nodding.)  Yes.

19   Q    And did you -- and Mr. Fallman was present at that

20   time; isn't that correct?

21   A    Yes, sir.

22   Q    And in fact, Mr. Rogers at some time told you that he

23   had severe doubts about Mr. Clark's credibility; didn't he?

24   A    I think so but he said his investigation was still

25   ongoing.

26   Q    Did he ever tell you that he had asked Mr. Fallman to

27   charge Mr. Clark with perjury?

28   A    I don't think he said that.  I don't think he ever --

1    because -- he hadn't closed his investigation yet.

2    Q    Are you aware at any time from the beginning of the

3    trial of Mr. Grizzle to date that Mr. Rogers had asked both

4    the Attorney General's Office and Mr. Fallman to charge him

5    with perjury?

6    A    I don't think he ever said anything about charging

7    Clark with perjury.  I think he may have said something to

8    me he thought -- at times he didn't believe Clark was

9    truthful.  So I don't know where the nexus is charging him

10   with perjury.

11   Q    You've seen the latest declaration from Mr. Rogers;

12   did you not?  Mr. Fallman shared that with you?

13   A    No.  I don't think I read it.

14        MR. CLANTON:  I have nothing further, your Honor.

15        MR. FALLMAN:  Your Honor, no questions.

16        THE COURT:  All right, you may step down.

17        Next witness.

18          (Counsel conferring with the defendant.)

19        MR. CLANTON:  Your Honor, that would conclude my

20   arguments.  I do have concluding remarks but that would be

21   the end of my argument.

22        THE COURT:  All right.  Mr. Fallman?

23        MR. FALLMAN:  I have one witness, very brief.

24        THE COURT:  All right.

25        MR. FALLMAN:  Officer Cruse.  Step up, raise your

26   right hand.

27        THE CLERK:  Would you raise your right hand, please?

28   /   /   /

1    I'm going to deny the motion for continuance.  It appears

2    that if there were anything it would simply be cumulative of

3    Mr. Molina and we don't know really that there would be --

4    from this individual apparently known as No Brain, that

5    there -- that there's nothing -- there's no indication that

6    there's a need to delay this matter further while we --

7    while we try to track that person down who apparently was

8    receiving virtually the same communications that Mr. Molina

9    was hearing.  And so there's nothing to indicate that he

10   could offer anything new so that motion is denied.

11        Then as to the issue of the motion itself for new

12   trial, does either party have anything further -- well,

13   first of all, any further evidence to add on that?  On

14   that -- that issue?

15        MR. CLANTON:  No further evidence, your Honor.

16        THE COURT:  Mr. Fallman.

17        MR. FALLMAN:  Your Honor, I'm not going -- well, I'm

18   wondering if I should -- I have a tape.  The offer of proof

19   would be that counsel -- we've heard from the secretary

20   about the procedure about whether he received it or not.

21   This tape clearly shows that the evidence was given to him

22   about Clark and -- and Clark's statements about Healy's

23   daughter, and I think if you recall the bench conference the

24   focus there was not that testimony.  It was the new

25   document.  The thing he was arguing about was new

26   evidence -- at the time of trial was the documentary

27   evidence signed by Healy that the guy back in the cell said

28   if we went out to his cell we'd find a letter from Healy in

1   the cell.  That was the surprise stuff, not the Healy

2   daughter thing that was on the tape, and he's had that since

3   January of -- but it -- just so that's not a loose end,

4   seriously, if he seriously contests that maybe I ought to

5   put this tape into evidence.

6       THE COURT:  Well -- I guess to what purpose.

7   There's -- there's no dispute I don't think from either one

8   of you about what's on the tape.  The only question is

9   whether -- did he get it, right?

10      MR. FALLMAN:  Well, that -- but --

11      THE COURT:  So there's no point --

12      MR. FALLMAN:  But the bottom line is this tape, if

13  the Court --

14      THE COURT:  Well, I mean, you're talking about

15  stopping this hearing, getting the tape player out,

16  playing -- how long is this tape?

17      MR. SMITH:  Just a half hour.

18      THE COURT:  For me to watch this tape.

19      MR. FALLMAN:  Probably -- probably 45 minutes to an

20  hour.

21      THE COURT:  Forty-five minutes long to find out

22  what's on it when you both agree what's on it, you've both

23  seen it, and I don't think you're arguing about what's on

24  it, right?

25      MR. CLANTON:  I have never seen this tape, your

26  Honor.

27      THE COURT:  Never seen it.

28      MR. CLANTON:  Your Honor, I'm not asking you to view

1  this tape.  I would take Mr. Fallman's representation about

2  what's on this tape.  I've never -- I've never seen it.  I

3  would -- I would take issue with the fact that at the time

4  of the trial, the bench conference, that my only objection

5  was to the new evidence that was -- that was given to me at

6  the time that Mr. Clark's identified.

7  THE COURT:  Well, wait a minute.  When did your claim

8  first come up that this tape was in existence but you'd

9  never seen it and from then why haven't you gotten to see it

10 if he's got the thing right there in his hand?

11 MR. CLANTON:  Well, I learned of this tape, your

12 Honor, at the time of the filing of Mr. Fallman's motion and

13 saw the letter from the --

14 THE COURT:  When was that?

15 MR. CLANTON:  -- evidence clerk.  What I --

16 THE COURT:  How long ago was that?  Weeks?

17 MR. CLANTON:  It was late last week when I received

18 his opposition.

19 THE COURT:  Have you done anything to try to get it

20 from him and take a look at the thing?

21 MR. CLANTON:  Well, frankly, no, your Honor.  I would

22 take his representation.

23 THE COURT:  All right, all right.

24 MR. CLANTON:  But I did interview Diana Willis with

25 regards to it and I would just note, your Honor, that on

26 page 77 of the trial transcript, lines 15 through 28, one of

27 the -- one of the problems that I was trying to convince the

28 Court that was the basis for my request for -- for either a

131

1    continuance at the time of Mr. Clark's appearance on the

2    stand or sanctions or whatever or something from the Court

3    in order for us to address the new issues is immediately

4    after Mr. Clark uttered these words that in fact there was

5    this --

6            THE COURT:  Uh-huh.

7            MR. CLANTON:  -- agency's allegation that there was

8    an attempt on Mr. Healy's daughter.  In other words, I

9    made -- I made it clear on the record that I had knew

10   nothing about that.  In fact, my recollection, Mr. Fallman

11   himself indicated that that was something that was new to

12   him, but on that page of that transcript, I make it very

13   clear that I have not heard that before and that we were put

14   in a scrambling position to come up and try and -- and --

15   and deal with what I considered a major problem that had

16   surfaced.

17           THE COURT:  All right.

18           MR. CLANTON:  So the idea that I knew about that --

19   that transcript is -- is --

20           THE COURT:  Well, if you're both agreed -- whether

21   you've seen it or not, you're both agreed what's on that

22   tape, tell me what's on it that would be relevant rather

23   than sit here for 45 minutes and watch it.

24           MR. FALLMAN:  What's on it is the same as this

25   transcript that came in from the Attorney General; that

26   basically that he -- that Clark was alleging that the --

27   these A.B.'s were paying -- paying him money to get the name

28   of -- of the daughter of -- of Healy.  And trying -- I mean,

1    to try to get her -- not her name but her location.

2        THE COURT:  All right, and you agree that's what's on

3    the tape?

4        MR. CLANTON:  That's what Officer Willis has

5    indicated is on the tape.  I would accept counsel's

6    representation --

7        THE COURT:  All right.

8        MR. CLANTON:  -- and Officer Willis's.

9        THE COURT:  We'll just treat that as an agreed fact

10   then so we don't have to spend 45 minutes looking at the

11   thing.

12       MR. FALLMAN:  Okay.

13       THE COURT:  All right, so then -- if -- if we -- if

14   we bypass that problem then, Mr. Fallman, you -- you can --

15       MR. FALLMAN:  I have no further evidence, just a

16   little bit of argument or --

17       THE COURT:  All right.  Well, since it's -- the

18   moving party, we'll go back to the moving party first for --

19   for final summation.

20       MR. CLANTON:  Your Honor, the position of defense

21   with regards to this case is fairly clear.  I -- I have

22   argued this many times before this court that there is no

23   physical evidence to implicate my client in this case.  The

24   People relied upon informants.  What we have attempted to

25   do, did our best before trial to try to get the information

26   that was necessary in order to properly defend Mr. Grizzle.

27   We were frustrated on many levels and I think that events at

28   trial were such that they were tied to our -- our

1      Mr. Mavris isn't there at 10:00 o'clock but Mr.

2   Rubidoux is kept there.  That -- I think speaks volumes.

3   And that's a takeoff point for all of this.

4      I think that the Court should look at this and be

5   able to determine that in fact there was a Messiah

6   violation.  I think that it's clear that Mr. Rubidoux put

7   himself in the position of acquiring this information, put

8   himself or with the aid of -- and with the aid of C.D.C. put

9   himself in contact with Mr. Littrell and Mr. Grizzle.  That

10  was done deliberately.  And the fact of -- what proves that

11  is that Mr. Mavris was never there in the morning, didn't

12  make that appointment, but Mr. Rubidoux is.  So who put him

13  there?  Mr. Rubidoux cannot call up and ask to be taken to

14  attorney visiting.  He's taken there by officers.  And now

15  he can tell the story.

16      So I think the Court has everything that it needs in

17  order to make the determination that a Messiah violation

18  took place.

19      Lastly, your Honor, the business with Mr. Clark.

20  When Mr. Clark came and testified here on the -- at the

21  moment he sat down I was handed a packet of material.  I

22  requested that the Court provide me just a continuance so I

23  could review that.  The Court denied that.  I asked for the

24  sanctions under 1054 which I felt were appropriate.  The

25  Court denied that.  The direct examination took place and

26  the damage is done.  Because I could not cross-examine Mr.

27  Clark whatsoever on any of those issues that he brought up.

28      As -- as I was cross -- as I was reading these

1    documents I'm cross-examining him and a lot of that had to

2    do with his request for out-of-state parole.  And his entire

3    bargain with the District Attorney.  I was put in a position

4    to scramble under those circumstances and I think that was

5    very unfair to Mr. Grizzle.  I was not able to do what I

6    would call an effective cross-examination because I'm

7    literally reading and cross-examining at the same time.  I

8    think that if we would have had an opportunity for a break

9    in proceedings to review those materials I would have done a

10   better job of cross-examining Mr. Clark and ultimately the

11   result would have been different.

12        Additionally, your Honor, what came up aside from

13   just -- the information that I'd just received from Mr.

14   Fallman was this allegation that my client somehow was

15   involved in a plot to kill Mr. Healy's daughter.  Now, I

16   understand from the Court's earlier discussions about its

17   view of the import of that exchange or that portion of our

18   argument with regards to a new trial.  However, my point is,

19   your Honor, and I -- and as I represented to the Court

20   earlier, I did not receive that tape.  I can state that for

21   the record.  Never did receive that and the record of the

22   trial transcript supports that because what I am doing at

23   the bench is telling the Court this is information that's

24   not even contained in this that I have.  I have never heard

25   that and that's what the trial transcript says.  And I asked

26   for the opportunity to look into that matter in order for me

27   to try and undo some of the damage that Mr. Clark in my mind

28   had just done to my client.

1        I felt that it was a -- a blow amid ships right then

2    and there.  I had absolutely no way of countering that

3    testimony.  I think it was very damaging testimony when you

4    have somebody who's talking about a child murder and that

5    relates back, your Honor, to some of my other arguments in

6    this case which were that the Court allowed Mr. Fallman to

7    get into a lot of other areas about the Aryan Brotherhood

8    that implicated my client in other uncharged crimes.

9        And I think the case law which I'm not going to

10    recite now, it's all in my brief and so I -- on the record

11    want to make sure that my arguments are tied to the case law

12    which I've cited there, I think the Court erred at that

13    point by allowing Mr. Fallman basically to provide a seminar

14    on the Aryan Brotherhood and implicate my client in any

15    number of events and associations that he was never able to

16    sustain by any testimony by any member of California

17    Department of Corrections.  It was all hyperbole offered

18    through informants that I was not for the most part able to

19    sufficiently cross-examine because of the lack of

20    information that was discovered to us.

21        And I think when you look at this trial as a whole

22    collectively there are a number of very clear problems that

23    in and of themselves are sufficient for a grant of motion

24    for new trial but I think that the Court, and I would hope

25    that the Court would have a sense that there was perhaps too

26    much enthusiasm on behalf of the Department of Corrections

27    to sustain a conviction in Mr. Grizzle's case.  And that in

28    fact corners were cut.  Corners were cut that we've

1  the other things of the Polly Klaas case were kept -- that
2  could have been prejudicial came up.
3      Molina turns out to have not done -- I think what the
4  defense was trying to show.  They -- the offer of proof was
5  that he was gonna prove that Rubidoux lied at Corcoran or
6  Delano, wherever it was, and his statement was, number one,
7  "I don't like Rubidoux because I'm Hispanic and he was
8  making fun of my Cinco de Mayo cell breaks."  Number two, "I
9  didn't say that I heard him lie."  So -- I think that fails,
10  the argument as to him.
11      There's -- one other thing I wanted to mention,
12  trouble is I can't remember -- oh.  I think the evidence at
13  trial, the things in evidence were -- were overwhelming
14  evidence of guilt with -- with plenty of potential
15  impeachment to which the -- the showings here would just be
16  cumulative, wouldn't change anything.  I think that the
17  motion for new trial should be denied.
18          (Mr. Fallman conferring with Mr. Smith.)
19      MR. FALLMAN:  I think I'll stop there, your Honor.
20      THE COURT:  All right, we'll recess ten minutes then
21  I'll hear the last argument by the defendant.  Ten minutes.
22          (A brief recess was taken.)
23      THE COURT:  We have both attorneys and the defendant
24  present.
25      Your rebuttal argument, Mr. Clanton?
26      MR. CLANTON:  I'm going to be brief, your Honor.  I
27  think that all the issues for the most part have had a --
28  have been aired today.  I would just point out that one of

1    the most troubling aspects for me in this case in the way we

2    put our motion for new trial today together is the issue of

3    Mr. Clark, and I still have a few remaining comments there.

4    I think that the Court has a particular perspective on that

5    that's very clear and I appreciate the candor of the Court

6    earlier today, but I must -- on behalf of Mr. Grizzle make

7    some statements with regards to that issue.

8        And that is we persisted for some time in attempting

9    to get the information relevant to Mr. Clark.  We learned of

10   Mr. Clark's change of heart just prior to trial, changing

11   his testimony 180 degrees from what it was out of Mr.

12   Littrell.  At that point we really began intensely -- our

13   pursuit of information with regards to Mr. Clark and I

14   believe this court can recall on several occasions in this

15   very room that we debated the existence of information with

16   regard to Mr. Clark and we were rebuffed on many occasions

17   in the pursuit of that information that would have

18   ultimately made what happened at trial somewhat less of an

19   error.  It became an error of a scale that requires that

20   this court grant Mr. Grizzle a new trial.

21       There were admissions I think by the People that in

22   fact they have not -- or even talked to Mr. Clark.  I think

23   that time's borne out that in fact Mr. Clark was not only

24   talked to but interviewed and taped by the People.  There

25   were comments by Mr. Rogers of Internal Affairs that there

26   was just a reference to gang activity.  We learned later

27   post trial that there's an entire transcript dating back to

28   January 5th of Mr. Clark's assertions that ultimately I

1    feel, and I know Mr. Grizzle feels, persuaded this jury that

2    the Aryan Brotherhood was an absolute vengeful organization

3    that could contemplate the death of a young child, and the

4    inappropriate linkage of Mr. Grizzle to that organization

5    ultimately resulted in a prejudice again that should

6    motivate this court to grant a new trial.

7         There was a significant effort by the defense to

8    learn everything about Mr. Clark and I think that there was

9    a great deal of energy put to shielding us from that

10   information, and our continued complaints I think have been

11   put before this court as having merit today by -- by the

12   existence of this transcript, by the existence of this tape,

13   and when the Court reflects back on assertions that in fact

14   certain contacts were not made, you have to look at the

15   credibility of those and look at the position that the

16   defense was put in, not only at trial but at this juncture

17   of the motion for new trial.  Once Mr. Clark testified

18   without our ability to even begin to cross-examine on those

19   issues the damage was done.

20        I understand the Court's perception is "well, what

21   was there to gain, what did we learn."  My point is, your

22   Honor, that there was quite a bit that could have been

23   learned and dealt with if we had had the opportunity to

24   confront Mr. Clark with the fact that Mr. Rogers had urged

25   both the Attorney General and Mr. Fallman to charge him with

26   perjury, that the jury would have known that.  I think that

27   would have made a lot of difference.  If we had known that

28   in fact this transcript existed or this tape existed we

1     would have -- we would have been able to prepare

2     cross-examination that would have persuaded this jury, I

3     believe, to look differently at Mr. Clark.

4          The fact of the matter is in this case that the

5     People attempted to rehabilitate all of these informants and

6     I believe that to some degree because of the lack of

7     information, because of the -- the manner in which we were

8     rebuffed in a number of our discovery requests and

9     arguments, that we were disarmed in our ability to take that

10    persuasive quality away from the People's arguments.

11    Ultimately it's resulted in conviction for Mr. Grizzle.

12    That can be remedied by the Court looking closely at the law

13    and not the emotions that have been operative, I think, to

14    some degree in this case.

15         I think the Court is frustrated and fatigued by a

16    number of the issues in this case and the way that we have

17    been put in the position of pursuing them that have in fact

18    swallowed up very valuable court time, but I don't think

19    there's any more valuable time than the time of a person who

20    is wrongly incarcerated and that's exactly what would happen

21    to Mr. Grizzle and I think that that certainly should shift

22    the perspective of merit to what this investigation and our

23    defense has attempted to do which is to try and get the

24    truth out.

25         I think that the Court has glimpsed from time to time

26    what we have proposed actually took place in this whole

27    affair.  There was a great deal of law that we've used to

28    support that perspective.  I urge the Court to closely look

152

1    at the precedents that we have put into our briefs and

2    separate itself from the frustrations that the Court may

3    have in the manner in which this case has proceeded.

4          I would rest with that.

5          THE COURT:  All right, submit the matter then?

6          MR. FALLMAN:  Yes, your Honor.

7          THE COURT:  Both sides?

8          MR. CLANTON:  Submit it, your Honor.

9          THE COURT:  All right, first I'll address the issue

10   of the -- the supplemental points and authorities that were

11   filed yesterday to do with the defendant's neck tattoos, and

12   it's I think hornbook law that it is not a -- it is not

13   self-incrimination or is not compelling a person to testify

14   to require them to display some part of their body starting

15   with their face in an identification, for example.  For

16   whatever -- whatever rights may be implicated, the Fifth

17   Amendment is not implicated by that.  It's -- in this

18   situation, it was certainly relevant evidence which would

19   have had a tendency to bolster Ridinger's testimony that was

20   how he got started in his conversation with the defendant in

21   the first place, and secondly, the tattoos, which I don't

22   know that they've ever really been fully described for the

23   record, but they are tattoos running around the front

24   portion of the defendant's neck.  I would say that they

25   probably are about one half the circumference of his neck,

26   they are probably an inch to an inch and a half in height

27   and so therefore they're probably six or eight inches in

28   length starting on the left side with a very prominent