

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

**FILED**

Court of Appeal First App Dist

MAR - 2 2001

RON D. BARROW, CLERK

By _____
                    DEPUTY

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | A087504 |
|     v. | (Del Norte County |
| ELIOT SCOTT GRIZZLE, | Super. Ct. No. 97-268-X) |
|     Defendant and Appellant. | |

A jury convicted Eliot Scott Grizzle of murdering (count 1; Pen. Code, § 187, unspecified section references are to that code) and conspiring to murder (count 2; § 182) Aaron Marsh, and the trial court sustained special allegations of two prison-term priors (§ 667.5, subd. (b)) plus two serious-felony strike priors (§§ 667, subd. (a), 667, subds. (b)-(i), 1170.12 & 1192.7). Sentenced to an aggregate unstayed term of 37 years to life, Grizzle appeals raising numerous claims of error regarding the murder and conspiracy and the denial of post-trial motions. We affirm the judgment in its entirety.

## BACKGROUND

The victim and alleged participants in the crimes were inmates of Pelican Bay State Prison (Pelican Bay), a "level 4" high security prison in Del Norte County, and the murder occurred in the security housing unit (SHU), a lockdown area developed by the Department of Corrections (CDC) to segregate especially violent or disruptive inmates from the general prison population, often due to membership in prison gangs. SHU inmates are housed in "pods" consisting of two tiers of four cells each, two men to a cell.

Marsh was murdered in pod D-4. The People's theory was that this was ordered by a governing committee or council of the Aryan Brotherhood (AB) and motivated by gang aspirations and loyalty. Marsh was strangled to death on July 25, 1997, by cellmate Gary J. Littrell, after being given an alcoholic brew called "pruno" that was made and

laced with other drugs (indomethacin and methocarbamol) for the occasion by Grizzle, in his own cell. The brew was then delivered to the Marsh/Littrell cell by inmate Michael Contreras. An amended information (hereafter the information) jointly charged Grizzle and Littrell with the murder and conspiracy and alleged four overt acts in furtherance of the conspiracy: (1) that Grizzle dissolved drugs in the pruno to render Marsh drunk and vulnerable, (2) that he had Contreras deliver the mixture to Marsh, (3) that Littrell got Marsh drunk and disabled, and (4) that Littrell strangled him with a "garrote rope" while Marsh was too drunk to defend himself.

Littrell's case was severed and tried first. A jury acquitted him of the conspiracy and found him guilty of the murder, but in the second degree. Some jury misconduct evidently came to light, and he ultimately accepted a plea offer of voluntary manslaughter and attempted murder. Grizzle rejected a similar offer here (voluntary manslaughter with a low term) on the eve of his own trial and proceeded before a jury. Littrell testified for the People, under his plea agreement, but admitted little beyond having strangled Marsh, assertedly in self-defense. But several other SHU inmates testified, including Contreras (who admitted taking the spiked pruno to the cell at Grizzle's request), Brian Healy and Vernon Rubidoux (who heard admissions of guilt), Frederick Clark (who had testified for the defense at Littrell's trial but now said Grizzle had solicited him to lie and, afterward, to locate Healy's young daughter for a retaliatory killing), and Douglas Ridinger (who said he was solicited by the AB to kill Marsh himself, but refused). These witnesses also related the structure and features of the AB and their own and others' gang connections.

Their testimony cumulatively showed that the AB is a white supremacist gang of great power within the prison system. It employs symbols drawn from Nazi (swastikas and SS lightning runes) and Celtic or Irish (shamrocks, the color green) sources. A badge of membership is the shamrock tattoo. The gang tolerates no disrespect or betrayal. An inmate who has been marked by the committee to be "whacked" (murdered) is "put into the shamrock hat." A common means of killing is strangulation (the Leprechaun's hold or "taking [one's] wind"), and the marked inmate may be lured into sharing a cell with an older member to accomplish this. Nazi Low Riders (tattoo "NLR") and Skinheads are

2

lesser white supremacist gangs that feed into the AB. Attaining AB membership ("getting your rock") requires having a brother "raise his hand" to recommend you, a two-year period of probation, being "schooled" by a brother on gang history, rules, skills, etc., and then, to become a brother yourself, having a second brother raise his hand for you. The AB is able to communicate between prisons and has "gone to the streets" to retaliate against witnesses and other turncoats by killing family members.

At the time of trial, AB's six-member governing "committee" at Pelican Bay consisted of Robert Griffin ("Blinky"), Richard Terflinger ("Rick" or "Ricky T"), John Stinson, Bobby Crane ("New York"), James Pendleton ("JP") and Dave Chance, all of whom were housed in the SHU.

Marsh was murdered on July 25, 1997. Around 4:00 p.m., Littrell calmly told a control booth officer that his "cellie" had fallen and struck his head and "don't look too good." Another officer entered the cell and found Marsh unresponsive. A medical team tried to resuscitate him but pronounced him dead. There were no obvious signs of a fight, but a doctor estimated that Marsh had been dead for several hours. Marsh had apparent shoe prints on his body and marks on his upper chest and throat consistent with tennis shoes. An autopsy showed death by strangulation plus blunt-force trauma to the neck consistent with stomping. Ligature marks on the neck were made with a small diameter cord something like a shoelace (not a larger diameter skip rope found near the body), and a tennis shoe print on Marsh's back was consistent with him having been held face down on the ground while being strangled from above with a garrote. Scratches and overlaid ligature marks showed that he had tried to grasp the ligature.

Marsh's blood-alcohol level was .11 (probably .15 earlier), and his urine showed .15. His stomach contained small flecks consistent with partly dissolved tablets, and tests on his blood, urine, stomach and intestines revealed indomethacin, an anti-inflammatory drug, and methocarbamol, a muscle relaxant that would have contributed to impairment. Littrell had been prescribed a high-range dose of methocarbamol due to a bad back.

Littrell's account was at odds with much of the evidence. He claimed not to be a member of AB or know what it was (despite sporting swastika and "white power" tattoos

and having a card in his cell with clovers and "Great White Warrior" on it). He said that he and Marsh (not Grizzle, his former cellmate) concocted the pruno and began drinking it around 10 o'clock that morning. Marsh had taken methocarbamol pills of his own, also for a bad back, and become belligerent and then quiet. (They had fought physically two days earlier.) As Littrell spoke to someone at the door, Marsh came up behind him and tried to hit him and throw a rope around his neck. (Rope burns on the back of Littrell's neck could have been caused by this, or could have been self-inflicted.) Littrell grabbed the rope away and garroted Marsh until he passed out. It was a thin, shoestring-like rope, and Littrell flushed it down the toilet so Marsh could not use it again. When Marsh tried to get up, Littrell grabbed a jump rope (the one found) and "finished it." He reported the incident after Marsh had not moved for an hour.

Ridinger, in prison for carjacking and gun possession, testified that he occupied the cell next to Littrell and Marsh on the upper tier, and that their cell was directly above the one occupied by Grizzle (known to him as "Rascal") on the tier below. Inmates can communicate with cells to the sides and above and below through air vents. On that July 25th, Ridinger smelled pruno coming from both cells and had smelled it emanating from Grizzle's cell for several days. Himself a member of the NLR, one step below the AB in the prison gang hierarchy, Ridinger assumed from Grizzle's "NLR" neck tattoo (shown to the jury) that Grizzle was NLR and first introduced himself as his NLR "homeboy." Grizzle took offense, saying, "I'm not Nazi Lowrider anymore; I'm a Brother." Knowing Grizzle's cellmate Littrell to be AB, Ridinger said lightly, "Well, you graduated." When Ridinger moved to their pod, he brought a message from John Harper ("Turtle") and Marsh in D-6 that they each needed a "celly" and wanted Grizzle and Littrell moved over there. Grizzle told Ridinger that Marsh was "in trouble," and Littrell told him he wanted Marsh moved into D-4 since Marsh was "in the hat" for not "pulling his weight." Grizzle said Marsh "needed to be taken care of." Ridinger, hoping to impress them and have them "raise their hand" for him to "move up" to the AB, volunteered to "whack" Marsh, but the next day, when Ridinger told them his plan to "stab [Marsh] a few times," Grizzle said "that's not gonna work." He explained: "A.B. don't deal like that. We're gonna do

something to somebody, we're gonna kill him." Ridinger had not understood this and wrote them a note (kite) declining. Grizzle wrote back: "[Y]ou didn't know what you were getting yourself into anyways," and "Gary's gonna go ahead and do it . . . ." Littrell filed a CDC form 602 requesting a shared cell with Marsh, and Marsh also made the request. He was moved into Littrell's cell just six days before he was murdered.

On the day of the killing, Ridinger saw Contreras slip an envelope under the door of Littrell and Marsh's cell door and assumed it contained pruno. He heard thanks given for it, smelled it, and heard someone say it tasted "kind of funny." The day after, Grizzle warned him that attorneys for Littrell would probably be contacting him and told him to say he heard Marsh and Littrell fight (he had not) a few days before Marsh died and that Marsh had hit Littrell with a TV remote control. Ridinger knew he was in the hat "[b]ig time" for testifying against the AB and had received immunity, time off his sentence and protective housing, in return for his testimony.

Contreras ("Wino") was a "tier tender" for D-4 on that July 25th. On the way to the control booth that morning to use his asthma inhaler, he saw Grizzle squatting on his cell floor by some newspaper, 30 to 60 green capsules (like those found in Littrell's cell), a coffee cup and a milk carton. There was a smell of pruno, and Grizzle was opening the capsules, pouring them into the cup, and tossing the empty capsules into his toilet. On the way back, Contreras asked if he "had the right recipe for the pruno"; Grizzle nodded and said "yeah." As Contreras later passed by after exercise on the yard, Grizzle asked him to stop by. Contreras did, after a shower, and Grizzle slid a manila envelope under the door and asked him to take it to Littrell. Contreras did, noticing that it felt soft as if containing liquid, and he figured it was spiked pruno and that Marsh was in trouble.

Contreras left his cell again after 1:30 p.m. to do his tier-tender cleaning chores and asked Littrell if he needed disinfectant. As Littrell declined, Contreras saw Marsh lying on the floor and Littrell say, "Get up, Wood." Marsh tried to roll himself up but fell back down, as if drunk. Contreras continued his chore rounds and was asked by Grizzle what Marsh and Littrell were doing. When he said Marsh looked "messed up," Grizzle said, "Yeah, I got the perfect recipe now." After the chores, Littrell had Contreras take a

book and TV adapter to Grizzle. He did and, while outside Grizzle's cell, heard thumps come from the upper tier and heard Littrell say to Grizzle, through the vents, "There's no other way." Still later, from his own cell, Contreras heard another thump, like a stomp. Maybe "a couple minutes" later, he heard Littrell call out for the control officer.

Contreras, later realizing he was suspected as an accomplice, cooperated and was offered immunity and protective custody for his testimony. Paroled and reimprisoned for a dirty test and a seizure of methamphetamine at his house, he faced the three strikes law (with priors for aggravated assault, other assaults and discharging a gun) but anticipated a favorable recommendation. His testimony left him in danger from "ex-associates" in the Northern Structure and Nuestra Familia (Northern Mexican prison gangs) and the AB.

Healy (known as "Deadeye" because of his glass left eye) had become an AB associate in 1985 and a full member in 1993. He dropped out in 1997, feeling betrayed to learn he had murdered a good friend, Ruffo, under the mistaken belief that it had been ordered by the AB committee. He was prosecuted for Ruffo's murder but, by using AB training to employ manual strangulation and falsely claim self-defense, won a jury verdict of manslaughter. He identified all six AB committee members and testified that Grizzle and Littrell were AB members.

While still a member in early 1997 and responsible for relaying AB "business" to other brothers, Healy received a code message from AB committee member Terflinger that Marsh was "in the hat" and "had to go" (be killed) for not killing another inmate as ordered. Healy then told Grizzle while they were both in holding cells at the Del Norte County Courthouse on March 13. (Their presence there on that date was stipulated.) Healy said, partly in sign language, that Marsh had to die, and Grizzle replied orally that he would "take care of it," "[i]f he got the opportunity."

On July 26, the day after Marsh was killed, the two met again in holding cells, this time in the SHU visiting area. Through the perforated doors of their "kitty-corner" cells, Healy yelled, "Hey, Rascal," and identified himself as Deadeye. Healy asked, "Who did it, you?" and Grizzle said, "No, it was Gary." When Healy asked how, Grizzle made a crossing or "strangling" motion, as if "with a rope or something."

Healy conceded that at his own trial, to protect his interests while an AB member, he had lied and carried a handcuff key in hopes of an opportunity to escape. He said he was telling the truth now. He had committed "heinous violent crime," beaten and stabbed inmates, and took a weapon to court once and stabbed somebody "right at counsel table." He had been in prison for 15 years and had about 50 years left to serve, despite the judge in the Ruffo matter having struck one of his strike priors. Prison time had "never been an issue" for him, and his decision to cooperate and "debrief" about the AB had nothing to do with expectations regarding his sentence.

Rubidoux ("Smiley") did not know Grizzle until May 25, 1998, 10 months after the killing. He knew Littrell, however, and struck up a conversation with him when all three were in the SHU attorney-visit holding area that day. After first "clowning" with Littrell, Rubidoux remarked, within earshot of Grizzle, "[L]ook what you went and did now." Littrell answered: "Yeah, I did that, done that, want that, took that. I took that punk's wind"; "Yeah, he didn't have no rock coming"—*rock* meaning shamrock. Littrell said Marsh had been "giving out too many free passes to those that had bought big green hats" and not putting in "work when he's on the line out here." Rubidoux understood this to mean he had been letting people go who were "in the hat." Rubidoux and Grizzle introduced themselves when Grizzle left to go to a visiting booth.

The conversation resumed after Grizzle and Littrell had met with their attorneys and returned to the holding cells. Rubidoux told Littrell, "[Y]ou do good because Aaron [Marsh] wasn't no slouch," and Grizzle chimed in, "Well, he wasn't feeling nothing after we put a mickey in his drink." Grizzle snickered and added: "Yeah, he always wanted me to make him a bomb, and I made him that bomb all right." He and Littrell laughed (a *bomb* means "the best") and then spoke about "a buster from Modesto" named "Wino," who had just paroled. (This was Contreras; *buster* is a derogatory term for a Northern Mexican.) Two "shooters" were out to "whack" Wino, and Littrell and Grizzle talked about their trial strategies—what they would do if this buster testified seeing them put the hold on Marsh or put pills in the "wine." They were also going to make Marsh out to be "a violent drunk, a bad guy."

Rubidoux admitted a violent past that included assaults on police and guards, and inmate stabbings. He had been a "rat" now since 1996 and had a "priority contract" out on him. He was seeking protective custody and a favorable recommendation.

Inmate Frederick Clark testified for the defense at Littrell's trial. He testified for the prosecution here, saying he lied at Littrell's trial because Grizzle offered him $500. One idea was that Clark, a Black man, would have credibility to "broadside the prosecuting attorney" in a case involving inmates who were supposedly white supremacists. Clark was known for being able to find people "on the street," and after Littrell's trial, Grizzle asked him to find Healy's daughter. She was eight or nine years old and living with a foster parent, and the AB "was going to retaliate against Deadeye" by "taking her out." Haunted by the recurring thought of "Polly Klaas," however, Clark declined to do it and went to the authorities. He was promised immunity for his prior perjury and help in getting into the state witness protection plan. He had moved his family out-of-state and was hoping for an out-of-state parole.

Grizzle did not testify.

## DISCUSSION

### I. *Shackling*

Grizzle was tried in restraints, seated chained at the waist and ankles to a heavy "security chair" that was "scooted" under counsel table, his left hand linked by handcuffs to the waist chain. This left his right hand free above the table for writing and the like. The court ordered these measures at a pretrial hearing on the matter and found at the start of trial that the restraints were not visible to jurors and did not appear to interfere with Grizzle's ability to cooperate with counsel. The court ordered a cloth screen placed around the front of the counsel table to block juror views and promised to have jurors brought in and out of the courtroom so as to minimize the possibility of their seeing the restraints. At defense counsel's suggestion, a cloak was draped across the back of the security chair to further disguise it. Evidently agreeing that the restraints were not visible, defense counsel declined the court's offer to instruct jurors to disregard them. (Cf. *People v. Medina* (1995) 11 Cal.4th 694, 732 [instruction not needed if restraints are not

visible]; *People v. Livaditis* (1992) 2 Cal.4th 759, 774 [same].)  At pretrial proceedings, Grizzle also had a "black box" over the hand-cuffs that prevented access to the keyholes, but this was not used in proceedings before the jury.

Grizzle claims prejudicial error, noting that the court found no disruptive behavior by him in pretrial proceedings and had allowed codefendant Littrell, in the separate trial, to have both hands free and only his ankles bound to the security chair. He claims due process, fair trial and equal protection violations; we find no such error and no prejudice.

"'[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a *manifest need for such restraints*. [Citation.]' [Citations.] Such a "'[m]anifest need" arises only upon a showing of unruliness, an announced intention to escape, or "[e]vidence of any noncon-forming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .'"" (*People v. Hill* (1998) 17 Cal.4th 800, 841; see also § 688.)  A decision to place a defendant in physical restraints will not be overturned on appeal unless there is a showing of a manifest abuse of discretion. (*People v. Hill, supra*, 17 Cal.4th at p. 841.)

Grizzle engaged in no disruptive behavior in court.  However, restraints need not be based on conduct at the time of trial. (*People v. Livaditis, supra*, 2 Cal.4th at p. 774.) They may be based on "'violence or nonconforming conduct' while in custody" (*People v. Hawkins* (1995) 10 Cal.4th 920, 944), including prison fights (*ibid.*), and while current charges and criminal histories are not enough *alone* to justify restraints, they are factors to consider (*ibid.*; *Duckett v. Godinez* (9th Cir. 1995) 67 F.3d 734, 748-749).

The People presented two Pelican Bay witnesses—a court liaison officer who testified about security and had reviewed Grizzle's confidential file (C-file), and the associate warden who testified about security and prison gangs.  They spoke incidentally of SHU segregation of dangerous inmates (Cal. Code Regs., tit. 15, § 3341.5, subd. (c)), committee classification ("validation") of inmates as gang *members* or gang *associates* (*id.*, § 3378, subd. (c)), an internal form "812-B" (misnamed "128-B" in testimony) used for those purposes (*id.*, subd. (a)), and an interview process of "debriefing" used when a

inmate became a "dropout" (ceased gang affiliation) (*id.*, §§ 3378, subd. (c)(5), 3378.1) and was to be reintegrated into the general prison population (*id.*, § 3378.1). Grizzle presented defense counsel from Littrell's trial, who criticized use of the black box.

Grizzle had initially been committed for discharging a firearm and had been in SHU segregation since 1995. Pelican Bay is a level IV prison, the highest in the state, where inmates needed 52 classifying "points" to be placed; Grizzle had 316. His SHU segregation had made assaults more difficult in recent years, but he had many disciplinary offenses and many earlier violent offenses. The more serious ones were a 1994 felony conviction for assault with a deadly weapon on an inmate (§ 4501), a 1997 felony conviction for manufacturing a weapon (§ 4502), a fistfight in 1991, three more in 1993 (two fights and a stabbing), two 1992 possessions of weapons or other contraband (razor blades, sharpened needles), two more in 1993 (metal clips, staples, radio parts), four in 1994 (metal spear tip in underwear fly, metal piece in shoe, bracket, telephone bracket), two in 1996 (seven pieces of metal—two sharpened to a point—metal clip, match heads), and one in 1997 (metal pen clip).

Aggravating those concerns were the nature of this trial and the AB involvement. Grizzle was classified as an AB associate, and Littrell, a known member, had testified that Grizzle was an actual member. Both witnesses concurred in Littrell's assessment. An AB "dropout" was considered a "rat" or informant and would be killed at the first opportunity. Any inmate who testified would be placed in "the hat," with "a priority hit" placed on him, and several inmates had testified in Littrell's trial. It was likely that hits were out now for Contreras, Healy, Rubidoux and Ridinger. Those witnesses would now be in the courtroom again, on one side or the other. Debriefings had revealed that AB members were taught to make handcuff keys and carry them. They were often made of plastic to elude discovery with a metal detector; and members used court appearances as opportunities for escape and assault. One inmate had come to court with a key up his nostril. Grizzle had a demonstrated propensity for gaining metal and other contraband that could be used for weapons or keys. Rubidoux had testified at Littrell's trial that he overheard Littrell and Grizzle express a "great desire" to have Contreras harmed.

The court ruled to have the restraints at trial except for the black box.  The court would also state later, at the start of trial, that it was aware from earlier showings on this subject that there had been an apparent attempt to breach security during Littrell's trial; someone had been caught "making a diagram of the layout of the courthouse."  Also, an AB inmate in a Santa Rosa trial had tried to breach security.  Citing the court's comments at that later time, Grizzle culls "four factors" for the shackling decision and calls them inadequate reasons.  His own authority, however, holds that a court need not articulate all reasons on the record; it is enough that the full record reflects adequate justification.  (*Duckett v. Godinez, supra*, 67 F.3d at p. 749, fn. 7.)  We find that the record does furnish adequate justification.  As the People observe, our Supreme Court has held less compelling evidence sufficient to justify shackling with leg irons.  (*People v. Sheldon* (1989) 48 Cal.3d 935, 945-946 [five assaults on inmates, handcuff key found on confederate, and defendant faced a life sentence and, confidential informant said, might have access to such a key].)  No abuse of discretion appears in the implied finding of manifest need.

Grizzle decries the ruling as based on "rumor and innuendo," by which he means "'opinion' testimony" about his AB connection, and "unsubstantiated rumor" regarding the diagram made of the courtroom by others.  He also notes that the court denied his mid-hearing request for discovery of any reports regarding AB manufacture of handcuff keys—evidently to learn the names of AB inmates who had been taught to make handcuff keys.  The court denied the discovery for reason that it would not go to guilt or innocence and that "the identity of those people would not itself affect the outcome of this motion, either."  Grizzle does not identify specific objections or rulings for most of the evidence he now disputes, and he fails to brief the problem of confidentiality inherent in his claim that the files should have been opened to him (Cal. Code Regs., tit. 15, § 3378, subd. (a)).  Also, the court's statement that the requested discovery would not "affect the outcome of this motion" (ignored by Grizzle) shows that any error in that regard was not prejudicial.

Grizzle says the court failed to explore less restrictive alternatives (*People v. Medina, supra*, 11 Cal.4th at p. 731; *Spain v. Rushen* (9th Cir. 1989) 883 F.2d 712, 721), but the record shows that his counsel argued vigorously for alternatives.  This is not a

11

case of summary denial without a hearing or adequate record. (E.g., *Duckett v. Godinez, supra,* 67 F.3d at pp. 748-749.) The court implicitly explored alternatives and, except for eliminating the "black box," rejected them. Nor does Grizzle show a violation of equal protection, which he bases on the fact that his codefendant had both arms free (and won partial acquittals). Putting aside the dubious notion that dissimilar treatment of similarly situated *groups* (*People v. Andrews* (1989) 49 Cal.3d 200, 223) can be establish by a two-person comparison, his problem is that the restraints in Littrell's case were ordered by a different judge and based on stipulated evidence plus agreement by the prosecutor, not on a contested evidentiary hearing as Grizzle had.

Nor does anything show that the restraints were visible. (*People v. Majors* (1998) 18 Cal.4th 385, 406 [no prejudice where record failed to establish that any juror actually saw physical restraints]; *People v. Coddington* (2000) 23 Cal.4th 529, 651 [same]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [same].) Indeed, our high court's most recent precedents may foreshadow a trend toward making visibility not just a factor in assessing prejudice, but a test for whether some restraints require a manifest need or are committed to the court's discretion. (See discussions in *People v. Ayala* (2000) 23 Cal.4th 225, 252-253, and *People v. Jenkins* (2000) 22 Cal.4th 900, 995-996.) A pending case involving the use of a non-visible stun belt may shed light on this (*People v. Mar* (S086611) review granted June 2, 2000), but the point for now is that nothing shows that any juror actually saw the restraints. Grizzle's view that jurors "could not fail to notice" them, especially when he used just one hand to expose the "NLR" tattoo on his neck, is speculation. The record must *clearly* show that restraints were seen (*People v. Tuilaepa, supra,* 4 Cal.4th at p. 584; *People v. Medina, supra,* 11 Cal.4th at p. 732 [we cannot "assume from a silent record" that restraints were viewed]), and this record clearly shows only the contrary.

Similarly unsupported are Grizzle's suggestions of pain-impaired mental state or ability to communicate with counsel. (See generally *People v. Hill, supra,* 17 Cal.4th at p. 846.) Grizzle did complain in pretrial proceedings about actual or potential discomfort —mainly from having to wear the cigarette-pack-sized "black box" over the handcuffs. But the trial court found at one point that the cuffs appeared "to be comfortable," at least

for short pretrial hearings, and said later that Grizzle's "claims of discomfort seem greatly overstated." At two other points, the court personally examined Grizzle's wrists without changing its rulings. In reviewing a court's assessment of claimed pain or disruption, we are required to defer to findings, including veracity. (*Spain v. Rushen, supra*, 853 F.2d at pp. 718-719.) Moreover, the "black box" was *not* worn at any time before the jury, and the record shows no complaints of impairment once the presentation of evidence began. Nor was any claimed in the motion for new trial. Further, there is no indication that the restraints would (or ultimately did) affect Grizzle's decision whether to testify. (*People v. Cox* (1991) 53 Cal.3d 618, 652.) No manifest abuse of discretion is shown.

## II. *Sufficiency of Conspiracy Evidence*

Grizzle insists there is insufficient evidence to support conspiracy or, since the conspiracy tied him to the murder, the murder as well. We find ample support.

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.) It is not necessary that the defendant be present and personally participate with his co-conspirators in all or in any of the overt acts. (*Id.* at p. 417.) The agreement or unlawful design "may be proved by circumstantial evidence without the necessity of showing that the conspirators met and actually agreed to commit the offense which was the object of the conspiracy." (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20.) While mere association does not prove conspiracy, common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy. The circumstances from which a conspiratorial agreement may be inferred include the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators. (*Id.* at pp. 20-21.)

The parties seem to agree on our substantial-evidence standard of review except that Grizzle cites intermediate federal court authority that when an innocent and a guilty

inference each exist, "the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one" (*U.S. v. Vasquez-Chan* (9th Cir. 1992) 978 F.2d 546, 549). We accept this only to the extent consistent with our state high court's views, which bind us (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455). That court stresses that while it is the *jury*'s duty to acquit where conflicting inferences exist, we are bound on appeal to uphold any supported guilt finding even though we may find the circumstances reasonably reconciled with a contrary finding. (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793; *People v. Perez* (1992) 2 Cal.4th 1117, 1124; *People v. Towler* (1982) 31 Cal.3d 105, 118.) As the jury was instructed, accomplice testimony must be corroborated by evidence from other sources (CALJIC Nos. 3.11, 3.12 & 3.13). But "[t]he testimony of an accomplice is sufficient to establish the fact or existence of a conspiracy (the corpus delicti); his or her testimony needs corroboration only as to the defendant's connection with it. [Citations.] And it is settled that only slight corroborative evidence is necessary to connect a defendant with the alleged conspiracy." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 312.) It is sufficient if it *tends to connect* the defendant with the commission; it need not establish every element. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1206.)

Grizzle erroneously assumes we cannot consider any testimony from Littrell because Littrell, in his own trial, was acquitted of the conspiracy charge. We will address this more fully in rejecting a claim that Littrell's acquittal was collateral estoppel in this trial; it is enough to say here that no estoppel arose because the evidence at the two trials differed materially. (See part XII, *post*.) We therefore do consider Littrell's testimony.

An initial problem is deciding whose testimony must be corroborated. We need corroboration only for those witnesses the jury determined to be accomplices (*People v. Williams* (1997) 16 Cal.4th 635, 680, fn. 18); but the defense here decided for tactical reasons to leave this unresolved in the instructions (part XIVB, *post*); and the jury made no express findings. Grizzle posits for this purpose that, besides Littrell, "only Contreras or Healy could plausibly be considered" coconspirators. We accept that assessment for sake of argument. Certainly those three witnesses' combined testimony was "sufficient

to establish the fact or existence of a conspiracy," thus requiring corroboration "only as to [Grizzle's] connection with it." (*People v. Cooks, supra,* 141 Cal.App.3d at p. 312.)

Since we need only *slight* corroboration that *tends to connect* the defendant with the commission (*People v. Bunyard, supra,* 45 Cal.3d at p. 1206), we do not exhaust all possible corroboration. Enough exists from two sources—Grizzle's "NLR" tattoo and the testimony by Clark that Grizzle paid him to lie at Littrell's trial and then asked him to find Healy's daughter to "tak[e] her out" in retaliation for Healy's turncoat testimony. The tattoo physically linked Grizzle to the Nazi Low Riders, corroborating that he was involved in the murder to move into or solidify his standing in the AB gang. There was testimony from Rubidoux that he saw the tattoo when they first met, in May 1998, which was *after* the murder, but this did not necessarily mean Grizzle did not have the tattoo at the time of the murder. Moreover, Clark's testimony provided strong circumstantial inferences of Grizzle's guilt in that he had procured false testimony (CALJIC No. 2.04) in order to undercut Healy, a key potential witness against him, and then tried to intimidate Healy between Littrell's and his own trials. Just as a defendant's flight after a crime constitutes an implied admission that corroborates an accomplice (*People v. Zapien* (1993) 4 Cal.4th 929, 983; *People v. Williams, supra,* 16 Cal.4th at p. 680), so must a defendant's post-crime procurement of false testimony and attempts to intimidate a witness.

This evidence was independent of any accomplice's testimony. The tattoo spoke for itself when Grizzle exposed it in court, and Grizzle points to no evidence that Clark was part of the AB conspiracy. In fact, Clark explained that one reason he was chosen to discredit Healy at Littrell's trial was that he was a Black man and thus would have credibility in supporting someone (Littrell) whom the prosecution claimed was a member of a white supremacist group. Sufficient evidence supports the murder conspiracy conviction.

### III. *Gang-Related Evidence*

The defense moved *in limine* to exclude, as substantially more prejudicial than probative (Evid. Code, §352), "any evidence . . . concerning or relating to the Aryan Brotherhood." He conceded its relevance but urged a danger of undue prejudice and that "[m]urder and conspiracy to commit murder can be proved without any reference to the

Aryan Brotherhood." The court denied the motion as overly broad, and the defense made renewed objections during the presentation of some of the evidence at trial, but without success. Grizzle now claims abuse of discretion and denial of his state and federal rights to due process and a fair trial, also complaining of error in admitting testimony about witnesses' fear of reprisal and his having sought out Healy's daughter for a retaliatory killing after Healy testified in Littrell's trial.

We will approach the problem in three parts, all of which share these principles: Evidence is relevant if it has a tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action (Evid. Code, § 210)—i.e., if it tends logically, naturally, and by reasonable inference to establish material facts such as identity, intent, motive (*People v. Champion* (1995) 9 Cal.4th 879, 922; see Evid. Code, § 1101, subd. (b)), or the credibility of a witness or hearsay declarant (*People v. Green* (1980) 27 Cal.3d 1, 19). "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) In making that decision, a trial court "'need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so . . . .'" (*Id.* at fn. 6, overruling all contrary precedent.) "A trial court's ruling on admissibility *implies* whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary." (*People v. Williams* (1997) 16 Cal.4th 153, 196, italics added.)

The admission of gang evidence—typically a defendant's affiliation—creates a risk that jurors will improperly infer guilt from criminal disposition (Evid. Code, § 1101, subd. (a)) and, even where relevant, may have a highly inflammatory impact and should be carefully scrutinized. (*People v. Williams, supra,* 16 Cal.4th at p. 193.) But "in a gang-related case," as here, "gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect." (*Ibid.*; Evid.

Code, § 1101, subd. (b).) "[N]othing bars evidence of gang affiliation that is directly relevant to a material issue." (*People v. Tuilaepa*, *supra*, 4 Cal.4th at p. 588.) This is also true of gang social structure, religion, and criminal activities—where relevant to motivation or the nature of a conspiracy. (*People v. Frausto* (1982) 135 Cal.App.3d 129, 140-141, citing *People v. Manson* (1976) 61 Cal.App.3d 102, 131, 155-156.)

The *prejudice* identified in Evidence Code section 352 refers to evidence that uniquely tends to evoke an emotional bias against defendant as an individual and that has very little effect on the issues. *Prejudicial* is not synonymous with *damaging* (*People v. Coddington*, *supra*, 23 Cal.4th at p. 588), meaning the prejudice that naturally flows from relevant, highly probative evidence (*People v. Padilla* (1995) 11 Cal.4th 891, 925).

**A. In limine ruling.** While Grizzle's appellate briefing complains of "irrelevant" gang-related evidence, his *in limine* motion correctly conceded that such evidence would be relevant. The trial court aptly called it "the heart of the D.A.'s theory of motive" and, if capable of some trimming "around the edges," impossible to exclude. The prosecutor confirmed that the killing was part of a conspiracy by the AB council to have a cellmate "strangle" another who was not doing what he was supposed to do. The court noted that gang tattoos would circumstantially prove membership or association, that gang "indicia" would be used to prove membership by Littrell, and that it would be necessary to "tie" or "link" Grizzle to the organization as well. It said that while the evidence might "at some point" become "irrelevant," the prohibitions the defense sought appeared overbroad. Defense counsel said, "Well, I guess I'll deal with it on a blow-by-blow basis . . . ."

No abuse of discretion or due process error appears. In a case where a defendant's in limine motion was to exclude the name "Aryan Brotherhood" as connoting "Nazism and other racist ideologies," our high court held: "[E]vidence showed that defendant's membership in the AB was central to the prosecution's case, under which all of the charged offenses originated with a conspiracy by the AB leadership to murder the father of a defecting member. [Citation.] The defense, on the other hand, appeared to dispute the AB's very existence, defendant's membership, and the AB's character as a gang rather than a mere social club. To litigate the existence and character of an organization

without naming it would have been a practical impossibility and might have caused the jury to speculate about why the name was being withheld. Also, voir dire provided an effective means to remove any jurors who might be so prejudicially influenced that they could not fairly try the case." (*People v. Price* (1991) 1 Cal.4th 324, 397-398; *People v. Champion, supra*, 9 Cal.4th at pp. 922-923 [no abuse in admitting gang membership to connect defendants to a car and another gang-member participant in a murder].) Here, too, the gang-related evidence had great probative value, for it forged a crucial link between Grizzle and the actual killer, Littrell, and explained why Grizzle would participate in this otherwise senseless murder. The court had voir dire to ferret out biased jurors, could use limiting instructions to guide their use of the evidence, and surely appreciated that Pelican Bay was a prominent institution in the community from which the jurors were drawn. As noted in a change-of-venue context for trial in another in-prison offense at Pelican Bay: "One might assume that Del Norte County residents would tend to be more familiar with the operation and occupants of the prison, but greater familiarity with a generally unpopular group does not always result in greater bias; sometimes the effect is just the opposite." (*People v. Venegas* (1994) 25 Cal.App.4th 1731, 1738.)

Nor does abuse of discretion appear in the court's decision to confront the issue later, as the evidence was presented. Generally, an *in limine* ruling is not binding on the court anyway and requires further objections as the evidence arises in the full context of the trial. (*People v. Morris* (1991) 53 Cal.3d 152, 188-190; *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.) The court here grilled defense counsel repeatedly but could not elicit a well-enough defined and limited body of evidence to allow a meaningful pretrial exclusionary ruling. The defense request for exclusion of *all* gang-related evidence was, as the court noted in understatement, "overly broad."

Having failed to secure an exclusionary ruling *in limine*, Grizzle complains of two instances where, as he puts it, the prosecutor "argued" that AB was a "totally racist" or "Nazi-like" gang and that Grizzle was "hiding" an NLR neck tattoo that connoted such ideas. Also, this was opening statement, not argument, and the defense interposed no objection in any event.

**B. AB evidence generally.** Most of the evidence Grizzle challenges as substantially more prejudicial than probative (Evid. Code, § 352) and violative of his constitutional rights need not be examined, for he forfeited his claims by failing to make timely and specific objections on those grounds below (*id.*, § 353). "The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." (*People v. Morris, supra,* 53 Cal.3d at pp. 187-188.) "Evidence Code section 353 does not exalt form over substance. No particular form of objection or motion is required; it is sufficient that the presentation contain a request to exclude specific evidence on the specific legal ground urged on appeal." (*Id.* at p. 188.) Claims of undue prejudice under Evidence Code section 352, for example, are *not* preserved by objections on grounds of *relevance* (*id.* at p. 205; *People v. Champion, supra,* 9 Cal.4th at p. 918; *People v. Smith* (1984) 151 Cal.App.3d 89, 97) or *leading* or *suggestive* questions (*People v. Ghent* (1987) 43 Cal.3d 739, 766). Constitutional claims like due process must also be raised in the trial court to preserve them. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1240, fn. 2.)

Thus issues regarding the following matters are forfeited: Grizzle showing his neck tattoo to the jury (no ground stated for objection); death threats as recounted by Contreras (no objection); Rubidoux's testimony that Littrell was an AB "main man," with Grizzle his "foot soldier" (late objections "nonresponsive," "relevance" and "narrative"); his testimony that AB members worshiped Odin, not God, and would not swear an oath on the Bible ("lack of foundation"); Healy's claim of being inspired to join AB because of "their sophistication, their ability to run a prison, their racial loyalties toward the white race, their viciousness, [and] how they took no disrespect" ("relevance"); his testimony that AB focused on "just basically murder," "just killing each other in prison," after historical involvement in "protection, extortion, drug trafficking, things of that nature" (no contemporaneous objection, just an earlier one for "relevance"); his testimony that

the NLR and the Skinheads were "feeder" gangs into the AB—what he considered an "ongoing . . . criminal conspiracy"—and that Littrell and Grizzle were AB members ("speculation," "lack of foundation"); Healy's AB "training" on "[h]ow to beat a murder, get it from a first degree murder to a manslaughter" and how he used that training successfully in his own murder trial ("relevance"); his AB training about befriending and deceiving cellmates in order to "get" them (same or no objection); his Nazi and white-power tattoos and AB members' affinity for books by Friedrich Nietzsche ("relevance"); CDC Special Agent Smith's testimony of statewide experience with the AB, the development of SHU's for that reason, and having witnessed an in-prison AB neck stabbing (continuing objection based on "relevance" and discovery); Captain Dillard's testimony that the AB is much more powerful than the Italian Mafia in the California prison system, with its power extending to the streets ("relevance," "vague," "speculation," lack of foundation for opinion); and Healy's testimony that the AB requires one to "make [his] bones," meaning kill or stab someone to be a member, and will kill its own members for retribution ("speculation," "vague").

The only claims of undue prejudice we find preserved are for: (1) Littrell reading from a racist book with an anti-Semitic inscription, found in his and victim Marsh's cell ("more prejudicial than probative"); (2) admission of that book and other AB indicia from the cell ("not relevant and also a 352 objection"); (3) Healy's testimony that the AB, when after someone in protective custody, has been known to track down and kill family members ("[t]hree fifty-two"); and (4) Healy's revelation that Curtis Price was one AB member now on death row for killing the family of someone who had testified against the AB (arguably covered by the same "[t]hree fifty-two" objection).

No abuse of discretion is shown. As the court observed in overruling the objection to the book (partially inscribed "[n]ever allow yourself to show weakness to the Jews"): "if it can be shown that the two alleged conspirators [Grizzle and Littrell] were members of the same criminal gang, that has a reasonable tendency to show that they did conspire together"; and there had been testimony that white supremacist belief was "one of the principles of the Aryan Brotherhood." The evidence was highly probative because, with-

out that connection, the prosecution had little or no motive for the killing. Grizzle notes that the book and other items were found in Littrell's cell, not his own, but the point was to show a common gang affiliation not just between the conspirators, but with the victim, who the People theorized was lured into sharing Littrell's cell and targeted for retaliation for not following AB orders. The book inscription was not unduly inflammatory in the context of the overall evidence. Nor has Grizzle shown the other "indicia" to be so. The court aptly noted, upon overruling his objection to admitting the physical evidence, that AB membership was "the common thread" of the whole conspiracy.

Items (3) and (4) showed the AB's ability to retaliate, even against people held in protective custody. This was highly probative, for the prosecutor had to lay a foundation that several inmate-witnesses' claimed fears of reprisals from the AB (or other gangs) was creditable (see part IIIC, *post*). The evidence, moreover, does not appear unduly prejudicial, especially considering the abundant gang-related evidence that came in without any objection about undue prejudice.

Grizzle complains, without much pertinent analysis, that much of the gang-related evidence was simply irrelevant, but we disagree. The evidence had a tendency to prove issues like motive, witness bias (part IIIC, *post*), and planning. Given that threshold level of relevance, Grizzle's recourse was to argue that the evidence was too inflammatory, or cumulative. But this required objections invoking Evidence Code section 352, and we have already upheld the rulings on all of the evidence properly objected to on that basis.

Absolutely without merit is Grizzle's claim that introducing gang-related books and ideology constituted an irrelevant admission of his "abstract beliefs" in derogation of his First Amendment rights (*Dawson v. Delaware* (1992) 502 U.S. 159, 165-167 [error to admit Aryan Brotherhood evidence unrelated to murder or penalty factors]) or without required special caution (cf. *People v. Hovey* (1988) 44 Cal.3d 543, 575-576 [no abuse to admit pornographic magazine, found in defendant's bedroom, to rebut defense image in penalty phase]). First, the evidence here was not found in his possession, and thus any connection to his personal beliefs was indirect. Second, AB beliefs were not irrelevant. They were vital to the prosecution's theory of motive and planning tied to gang loyalty

and membership. (Cf. *People v. Plasencia* (1985) 168 Cal.App.3d 546, 552-553.)  Third, we are cited to no place in the record where the defense raised any First Amendment or related concerns by objection or even argument.

    **C.  Threats and reprisals.**  We have just alluded to the testimony of witnesses fearing AB reprisals.  Grizzle claims several instances of that testimony—particularly from inmates Ridinger, Rubidoux, Contreras, Clark and Healy—as irrelevant and unduly prejudicial in that the reported threats were not shown to have come from him personally and thus could not be fairly rebutted.[1]

    We find this claim mostly forfeited, for in only one of the cited portions of the trial transcript did Grizzle object based on relevance or undue prejudice.  (Evid. Code, § 353, subd. (a); *People v. Williams, supra*, 16 Cal.4th at p. 208 [waiver from failure to object to testimony regarding fear of testifying].)  That one instance was toward the end of Healy's testimony, where defense counsel had just established a "standing objection" to "mention or discussion of the Aryan Brotherhood"; this came after defense counsel protested that the AB evidence had become a "heaping of prejudicial material" and was "not relevant."  Assuming for sake of argument that this preserved the question of undue prejudice (Evid. Code, § 352) as well as relevance, we find no abuse of discretion on either ground.

    """"Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible.  [Citations.]  Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible.  [Citation.]  It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be

---

[1] Ridinger said he feared for his life and was in trouble "[b]ig time" for testifying against the AB.  Contreras had received death threats, relayed through his brother, because of this case.  Rubidoux said he had "a priority contract on me now," that "[t]hey want to kill me" and that he was seeking protective custody.  Clark said his life was in jeopardy, it was "obvious I'm going to be retaliated against as a result of coming here today," and that he had taken steps to move his family out of state and was seeking safe housing and witness protection.  Healy said he was "up for murder" ("on the list," "in the hat") because of his testimony against the AB.

admissible.""" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450.) Thus the testimony about threats and fear of reprisals was clearly relevant.

It was also highly probative, for Evidence Code section 352 purposes, both as to Healy's credibility (*People v. Sanchez, supra,* 58 Cal.App.4th at p. 1450) and as to the prosecution's theory that Marsh was murdered pursuant to an AB conspiracy—much like the retaliatory action that Healy said he feared. This was vital evidence not substantially outweighed by a risk of undue prejudice: it was not cumulative to some comparable evidence of Healy's fear and credibility (see generally *People v. Carter* (1957) 48 Cal.2d 737, 748-749); it consumed very little time to present; and it was no more inflammatory than much of the evidence that had already been admitted *without* any undue-prejudice objection. The precedent Grizzle cites to claim a fair-trial denial (*Dudley v. Duckworth* (7th Cir. 1988) 854 F.2d 967) has twice been distinguished by our high court as involving a lack of admonition about unattributed threats and a prosecutor's attempt to get them before the jury by pretext (*People v. Williams, supra,* 16 Cal.4th at p. 212, discussing *People v. Wharton* (1991) 53 Cal.3d 522, 566, fn. 9, and *People v. Mason* (1991) 52 Cal.3d 909, 947, fn. 17). No pretext appears here, where the threat evidence was relevant and highly probative, and this jury was instructed to use other-crimes evidence for motive or plan, not character or disposition (CALJIC No. 2.50), and not at all unless they were "satisfied that the defendant committed such other crime[s]" (CALJIC No. 2.50,1). No abuse of discretion appears.

The last item Grizzle attacks is the testimony by Clark that Grizzle approached him after Littrell's trial, showed him transcripts of Healy's testimony, and asked him to locate Healy's (Deadeye's) young daughter to "tak[e] her out" in retaliation. Again, however, there was no pertinent and timely objection to this testimony, just an objection to "leading the witness . . . ." Much later and out of the jury's presence, defense counsel did object to the entire line of inquiry on grounds we might construe as raising Evidence Code section 352, but the questioning had already moved on to other matters. The claim is accordingly forfeited. But even if it were preserved, it would have no merit. This was not an unattributed threat, but one solidly attributed to Grizzle. It was also relevant as an

evident attempt to dissuade a witness (Healy) from testifying in Grizzle's own upcoming trial. (Evid. Code, § 413.)  Grizzle's reliance on tests for using uncharged acts to prove plan, motive, intent or identity (*People v. Ewoldt* (1994) 7 Cal.4th 380) is misplaced; this evidence of an evident effort to suppress evidence was independently relevant and admissible to show a consciousness of guilt (*People v. Williams, supra*, 16 Cal.4th at pp. 200-201; Evid. Code, § 413).  Also, this evidence was relevant to the jury's assessment of Clark's credibility, for he explained that it was the prospect of hurting a child—an image of "Polly Klaas"—that ultimately drove him to turn state's evidence.  We find no abuse of discretion in the court's view that Clark's unelaborated Polly Klaas reference had not "inflamed" the jury, a view the court repeated later in ruling on the motion for new trial.

### IV. *Mistrial*

Grizzle claims the court denied him due process and a fair trial by "failing to declare a mistrial" on two bases:  first, improper testimony from prosecution witnesses; second, jury tampering.  We find no such error.

**A. Improper testimony.**  Grizzle calls the following testimony inadmissible as containing opinion on ultimate issues or legal questions and as implying a sham defense: Rubidoux's aside that Littrell "killed a drunk dude" and that Grizzle had "helped him"; Rubidoux's courtroom comment that Grizzle "looks smug over there"; Healy's testimony that, as an AB member, you are "obligated to perjure yourself"; Clark's interjection that "[t]here's no such thing as conspiracy to commit a second degree murder"; Healy's view that the AB is an "ongoing criminal conspiracy"; and his explanation that manslaughter carried a penalty of 5 or 7 years, as opposed to 17 or 25 years to life for murder.

There is no need to reach the admissibility issues, for they are forfeited by defense failure to raise any pertinent objections or motion for mistrial below.  Grizzle urges that "'waiver' . . . cannot be dispositive because it fails to consider the independent obligation of the trial court . . . to control the proceedings and to determine the admissibility of evidence to further the interest of justice."  However, his sole cited authority has nothing to do with that concept (§ 1130 [court duty to appoint prosecutor when none attends]), and he ignores binding precedent.  His essential complaint being that "the prosecutor elicited"

this testimony, the answer is settled and often repeated: "[A] trial court has no sua sponte duty to control prosecutorial misconduct . . . ." (*People v. Carrera* (1989) 49 Cal.3d 291, 321; *People v. Adcox* (1988) 47 Cal.3d 207, 261; *People v. Poggi* (1988) 45 Cal.3d 306, 335-336; *People v. Miranda* (1987) 44 Cal.3d 57, 108, fn. 30.)  While Grizzle is correct to note that, misconduct aside, "a witness's volunteered statement can also provide the basis for a finding of incurable prejudice" justifying the grant of a motion for mistrial (*People v. Wharton, supra*, 53 Cal.3d at p. 565), no mistrial motion was made.  Failure to seek a mistrial waives the issue.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1100-1101.)

    **B. Jury taint.**  Grizzle did seek mistrial on the other ground he presents.  The motion was denied, and our review standard is abuse of discretion.  "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]"  (*People v. Wharton, supra*, 53 Cal.3d at p. 565.)

    At the end of the second day of trial, Juror 5 reported to the court a contact concerning the trial.  He worked at Pelican Bay teaching classes for inmates, and on the previous day, while at work during the noon recess to cancel a college tour, was told by a library-clerk inmate named Chu, "Well, I hear you are Juror No. 5."  When asked, "Where did you hear that?" Chu replied, "Oh, word gets around."  There was no further conversation, and the juror could not figure out how the inmate had found out.  The court inquired whether this would affect Juror 5's decision, and he said it would not.  On further questioning by defense counsel, the juror revealed that, while getting a cup of coffee, he had told this to Juror 12, a woman who worked at the college he was to tour.  He was "sure" ("I didn't make a secret out of it") that three or four other people had overheard it.

    After Juror 5 left, the court and parties discussed what to do, and defense counsel, citing concern that jurors were "tainted" and would now be intimidated by the prospect of the AB targeting them, ultimately requested a mistrial.  The court denied the motion "on the record we have now," reasoning that nothing had gone to "the merits of the case" or "would be particularly prejudicial," but the court did invite defense counsel to question

the other jurors in the morning. It stressed that the motion was denied "on the record we have now," adding: "If you want to build a bigger record go ahead . . . and I will allow it. If you do not want to that's where the motion stands at this point."

The first thing in the morning, Juror 5 approached the court with second thoughts. Having thought about it overnight, he still felt he could be a fair juror but, given his work at the prison, felt it "would influence" "the nature of my classroom" or his "relationship with inmates" should there be a guilty verdict. He wanted to be excused, and so he was, with the concurrence of both counsel. First, however, defense counsel inquired further and learned from Juror 5 that he had mentioned the incident only generally and that one juror (identity not recalled) had said something about getting a call years ago from some state institution and having her phone number changed. Juror 5 said concern about reaction from inmates in the unit was, while "minor," probably "an element" in his decision, but that he had not heard any other juror express apprehension.

Defense counsel never renewed his motion for mistrial but did ask to individually voir dire the other jurors. The court obliged, apprising each juror individually (including alternates) that Juror 5 had been excused and asking what each one knew about the circumstances. Each said he or she had heard—from Juror 5 or others—that Juror 5 worked or taught at the prison and had learned that some inmate knew he was a juror (or Juror 5) on the panel. Each said this would not affect his or her decision in the case, and most were examined personally by defense counsel. None except Juror 12 recalled Juror 5 expressing any particular feelings about this (although Juror 11 surmised that Juror 5 could be "a little uneasy" in the knowledge); Juror 12, the woman to whom Juror 5 had spoken directly, said only that Juror 5 had been "surprised" at the inmate's knowledge. Each juror was admonished not to discuss this any further with the others and to report it to the court or bailiff if it did come up. Two of the jurors (6 and 10) said they felt concern for Juror 5's "safety" or his being "in danger." The thought had "occurred to" Juror 10 personally, but neither one in the end felt apprehension for themselves.

An alternate (Juror 13) was seated in place of the excused Juror 5, and the People called their first witness. As noted, defense counsel never renewed the mistrial motion.

The People argue that failure to renew the motion forfeited the jury-taint issue. We agree. It clearly appears that the court's initial ruling, made after examining only Juror 5, was made provisionally on that basis and would be reconsidered should defense counsel decided to conduct further voir dire of the rest of the panel. Also, the court had no way to anticipate, at that time, further revelations Juror 5 would bring to the court's attention on the following morning (Feb. 10). Grizzle's appellate attack rests on the full state of the record as presented that morning, and his failure to seek a ruling on that state of the evidence is a clear waiver. (Cf. *People v. Bolin* (1998) 18 Cal.4th 297, 312 [after tentative denial of change of venue, defense counsel proceeded through voir dire without further objection]; *People v. Fudge, supra,* 7 Cal.4th at pp. 1100-1101 [silence by defense counsel after clarification of instruction upon mid-deliberations juror dismissal].) Grizzle calls it "inconceivable that counsel intended to withdraw the motion" after Juror 5 told of "the extent of the prejudicial impact" and the other jurors "acknowledged the implicit threat to their safety inherent in being a juror in an [AB] trial." But it *is* conceivable. Any misgivings counsel had when Juror 5 revealed the incident the previous day could easily have been dispelled when, after that juror was excused and the others were examined, it developed that juror "taint" was not nearly as bad as counsel had first feared.

Had the issue been preserved and a ruling secured, we could not find an abuse of discretion on the record as finally made. The test is whether the defendant's "chances of receiving a fair trial have been irreparably damaged" (*People v. Ayala, supra,* 23 Cal.4th at p. 283), and the judge reflected later at trial, "[E]very member of the jury including the alternate[s] were questioned about that. And I'm satisfied that . . . they said it would not bother them. And what they indicated they had heard was not of the nature of things that would tend to bother them. It was not . . . threatening in its nature." Taking this as the judge's reasoning earlier as well, it is sound. Jurors said they knew Juror 5 worked at the prison, had learned that at least one inmate knew he was on the jury, and felt conflicted about his duties as a teacher should he serve on a jury that convicted an inmate. No threat was revealed, and to the extent that jurors *intuited* a threat to Juror 5's safety, there is no showing that any of them worked at the prison or felt similarly threatened. All of them

claimed they could function as fair jurors after the incident. The court would have been within its broad discretion (*People v. Wharton, supra*, 53 Cal.3d at p. 565) had it so ruled.

## V. *Prosecutor Misconduct*

Grizzle claims prosecutor misconduct of due process dimension in the eliciting of assertedly improper testimony about the AB and instances in closing argument where the prosecutor remarked about Littrell's trial and acquittals, suggested the existence of facts not in evidence, asked jurors to "see what we can do about this group" (AB), assertedly alluded to informant testimony not in evidence, urged guilt by association, and likened informant witnesses to characters from the Bible. We have no occasion to review any of this on the merits, for all of the claims are waived.

In the absence of a timely objection and request for admonishment at trial, claims of prosecutorial misconduct are not reviewable, the exception being where an admonition would not have cured any harm. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215; *People v. Coddington, supra*, 23 Cal.4th at p. 651.) We have perused the record in the places Grizzle cites and find no objections based on misconduct (or any other ground). Grizzle does not specifically argue that admonitions would not have cured any harm. If by his closing brief reference to prejudice "equivalent . . . to that requiring reversal in *People v. Hill* [*supra*] 17 Cal.4th [at pp. ]836-837" he means to suggest that his failure to object should be excused altogether as futile in light of pervasive misconduct, the suggestion fails. The misconduct in *Hill* was extreme and relentless ("a constant barrage"), and counsel there did object on numerous occasions, only to be overruled. (*Id.* at p. 821.)

All of Grizzle's misconduct claims are waived, including due process claims. (*People v. Bell* (1989) 49 Cal.3d 502, 534-535 & fn. 17.)

## VI. *Late Discovery Requests*

A week before trial, the defense moved to compel discovery of inmate witnesses' prison records that had previously been sought informally but not produced. An attached list had "no" written next to items apparently refused discovery by CDC. At a hearing three days later (Feb. 4, 1999), CDC consented to release some items from Clark's files that the court had identified as discoverable after an in camera review. CDC also agreed

to release other matters but declined, for confidentiality reasons, to release others. Much discussion ensued on the merits of reviewing the confidential files of Healy, Contreras, Ridinger and Rubidoux for what defense counsel hoped would show other motives or gang pressures for those witnesses to have "debriefed" and turned state's evidence. Much of this same material had been examined by a different judge in the discovery for Littrell's trial, and an estimate by Officer Willis was that it could take a continuance of up to three or four weeks for CDC to examine all of the potential material. It was now Thursday; trial was set to start the following Monday; and the court in the end announced itself "still up in the air as to whether this stuff really is discoverable or not or whether there's really enough here even to go for a -- an in camera review" and whether it would be fruitful. The court noted the "extremely sensitive nature" of the material and that inmates could be "instantly killed" or have contracts put out on them if their debriefing statements become known. The court adjourned, urging the parties to seek a resolution.

The next day, the court remarked, on reflection, that any need for these materials should have been clear "from very early on," that discovery would now require a continuance, and that there were no declarations to show the materiality of the materials *or* the need for a continuance. The whole matter, the court felt, had been "dropped at the last minute" in "kind of a half-baked condition." Considerable discussion ensued about the merits of the discovery, but the court kept coming back to the lack of declarations or evidence to support the effort. When defense counsel finally gave an offer of proof and the court asked whether the prosecutor would accept this, the prosecutor asked for "some actual proof." None was given, and the prosecutor objected, after further discussion on the merits, that there had been "nothing but argument"—no "evidence . . . of the type . . . that needs to be shown." The court entertained more argument and made comments on the merits from time to time but noted again the lack of "declarations or admissible evidence" to support the motion. The court indulged still more argument but queried what "witness or declaration" the defense had and ended by stressing, "the requirement is you make a showing before we go delving into these files, and the showing ha[s]n't been made . . . ." Discovery (beyond that now agreed to by CDC) was denied.

Despite this record of failure to make a showing, Grizzle argues at length that the court committed egregious error *on the merits*. He seizes on things the court said, repeats his trial counsel's arguments and, confronted by a respondent's brief that pointedly notes the lack of proof below, insists the court "failed to carry out [its] constitutionally required duty of reviewing the desired material in camera to determine whether it contained material and exculpatory information . . . ." He insists that once his counsel had "outlined" plausible theories for impeachment, the court had to undertake the review, and he faults the court further for not placing the materials under seal for review in this court. He claims violations of his constitutional rights to due process, confrontation, compulsory process and fair trial. His arguments are unsupported.

Pretrial discovery is controlled exclusively by statutes (§§ 1054-1054.8) that acknowledge additional discovery "as mandated by the Constitution of the United States" (§ 1054, subd. (e)). (*People v. Tillis* (1998) 18 Cal.4th 284, 294.) A defendant is generally entitled to discovery of information that will assist in his defense or be useful for impeachment, but a motion for discovery "must describe the information sought with some specificity and provide a plausible justification for disclosure" (*People v. Jenkins, supra,* 22 Cal.4th at p. 953), which the motion here utterly failed to do. "It is incumbent on the defendant to make a prima facie showing for disclosure before an in camera hearing is appropriate." (*People v. Oppel* (1990) 222 Cal.App.3d 1146, 1152.) As justification, a declaration by defense counsel related only that the requested material would be "helpful to the defense in preparing for the cross-examination of and impeachment of witnesses," in "assessing [their] credibility" and in "corroborating" defense witnesses. Those conclusionary words were insufficient to merit an in camera hearing (*People v. Luttenberger* (1990) 50 Cal.3d 1, 22), and "defense counsel's oral assertions during argument . . . were not made under oath, and thus also do not constitute evidence" (*Oppel, supra,* at p. 1153). Representations by counsel are sometimes held adequate proof if not objected to or contradicted (*People v. Bolin, supra,* 18 Cal.4th at p. 312; *People v. Medina, supra,* 11 Cal.4th at p. 731), but the prosecutor here objected to the oral presentation and insisted on competent proof. The confidential portions of the inmate files were, without dispute here

or below, confidential for security concerns (*In re Olson* (1974) 37 Cal.App.3d 783, 787-788), as were any indications of membership in prison gangs (*Procunier v. Superior Court* (1973) 35 Cal.App.3d 211, 212-213), and the assertion of privilege (Evid. Code, § 1040) was not overcome with evidence of justification.

Discovery was properly denied for lack of a competent showing of justification, and it follows that the decision not to examine the records in camera (Evid. Code, § 915, subd. (b); *In re Muszalski* (1975) 52 Cal.App.3d 475, 482 [ruling reviewed for abuse of discretion]) was not error. It further follows, since the court properly declined to examine the records, that there was no need to seal them for our appellate review.

Grizzle's constitutional claims fail similarly. Due process generally requires the state to give the accused all material exculpatory evidence in its possession, "even where the evidence is otherwise subject to a state privacy privilege" (*People v. Webb* (1993) 6 Cal.4th 494, 518), but Grizzle's failure to competently show plausible justification dooms those issues as well and leaves us without an adequate record to show error.

## VII. *Jury View and Juror Disclosure*

Citing tension between testimony by Healy and Sergeant McKinney on the one hand, and defense investigator Fuller on the other, about whether Healy could have seen Grizzle and gestures through gaps or perforations in the cells in the visiting area, defense counsel sought a jury view of the area (§ 1119) at the close of the evidence. The court denied the request, deeming it "not reasonably feasible" to transport the jury into a "high security area" of the facility, "past the sign that says the Department of Corrections has a no hostage policy," and that the defense could "prove it in some other fashion . . . ." The court noted the ample existing testimony (photographs and diagrams, too, we note) and offered to reopen if the defense desired.

"The standard of review for a trial court's decision to grant or deny a request for a jury view is abuse of discretion. [Citation.] When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of

testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view." (*People v. Price, supra*, 1 Cal.4th at p. 422.)  Grizzle concedes he had other potential means of testing Healy's testimony on this point but insists he was "entitled to have the <u>best</u> evidence presented"—meaning a jury view.  He cites no authority for this novel notion, and we know of none.  No abuse of discretion is shown.

In another jury-related contention briefed under the same heading, Grizzle contends he was erroneously denied post-trial disclosure of the jurors' names, addresses and phone numbers (Code Civ. Proc., § 237), his goal being to support the new trial motion (*id.*, § 206, subd. (g)).  The court first pondered an oral motion raised by defense counsel at the trial of the priors.  When it became clear that counsel was not giving facts and was insisting on being granted juror information without showing good cause ("I don't think that I am in a position of having to show cause why that should be decided"), the court said it needed briefing and granted counsel time to file it, advising:  " . . . I'm open to be convinced.  But I want you to convince me you're entitled to that on no showing.  If you are entitled you'll get it, of course."  Counsel filed a formal petition for the information, with a supporting declaration, about a week later.  The People say nothing in the record shows the defense ever raising the issue again or pressing for a ruling, and they urge that this constituted a waiver of the petition. (Cf. *People v. Bolin, supra*, 18 Cal.4th at p. 312 [no action following tentative denial of motion for change of venue].)  We need not decide, for even if the issue is preserved, the petition lacked merit on the showing made.

Grizzle cited no authority below, and cites none here, that he was entitled to the disclosure without showing good cause as required by subdivision (b) of Code of Civil Procedure section 237, which also required a showing by "declaration."  Thus his declaration had to contain "a sufficient showing to support a reasonable belief jury misconduct occurred, [that] diligent efforts were made to contact the jurors through other means, and that further investigation was necessary to provide the court with adequate information to rule on a motion for new trial." (*People v. Wilson* (1996) 43 Cal.App.4th 839, 850, citing *People v. Rhodes* (1989) 212 Cal.App.3d 541, 553-554; accord *People v. Jones* (1998) 17 Cal.4th 279, 317 [case tried before current section's effective date].)

Other requirements aside, this declaration failed to support a reasonable belief that jury misconduct occurred. Counsel declared: "During the trial, while interviewing witness Joey Hayes in the holding room just prior to his testimony, I could hear through the closed door members of the jury talking in the deliberation room directly across the hall. I believe that they could hear me as well, and possibly other conversations that took place there between other witnesses and counsel or assistants. I need to find out what the jurors heard while on breaks . . . ." All of this was sheer speculation (*People v. Wison, supra*, 43 Cal.App.4th at p. 852), and counsel did not reveal *anything* he or anyone else might have said to poison the jury. Also pure speculation was counsel's request "to know what, if anything, was said during deliberations with respect to the contacts that [Juror 5] had outside the courtroom." We have examined the record regarding that dismissed juror and have agreed with the trial court's conclusion, in ruling on the motion for new trial, that the information that juror imparted to the others was not "threatening in its nature." (See part IVB, *ante*.) Counsel's view that the information may have *become* threatening as jurors learned of AB retaliation during the trial was utter surmise.

The other instances of potential jury "misconduct" were also baseless. Counsel wanted to know "whether any experimentation took place in the jury room with respect to the marks on Gary Littrell's neck which he testified were made by victim Marsh during the fight which Marsh initiated," but he had no idea whether jurors discussed this at all, much less conducted "experimentation." Citing various biblical references made by the prosecutor in closing argument, counsel declared, "I want to know whether any member of the jury read from a Bible or quoted from it during deliberation," but he revealed no basis to reasonably believe they did this. Finally, he was apparently just fishing in asking "to know what the jury discussed with respect to the testimony by witness Clark which I objected to concerning an alleged [AB] plot to kill the daughter of witness Brian Healy."

Nothing in the declaration constituted a prima facie showing warranting a hearing.

### VIII. *Newly Discovered Evidence*

Grizzle sought a new trial on several grounds. He raises two here, claiming the court violated his state and federal constitutional rights to due process and a fair trial.

(§ 1181, subd. 8.) We find no error in the denial. The determination of a motion for new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears, and in determining whether there has been a proper exercise of that discretion, each case is judged from its own factual background. (*People v. Turner* (1994) 8 Cal.4th 137, 212.) In ruling on such a motion trial based on newly discovered evidence, the court considers whether: (1) the evidence, and not merely its materiality, is newly discovered; (2) the evidence is not merely cumulative; (3) it is such as to render a different result probable on a retrial; (4) the party could not with reasonable diligence have discovered and produced it at trial; and (5) these facts be shown by the best evidence of which the case admits. (*Id.* at p. 212.)

**Missing log.** The motion partly concerned SHU visiting area logs for dates surrounding the July 25th, 1997, murder. These had been sought by the defense, and control booth and floor officer logs were produced before trial. However, two books were not found and produced until afterward, and the defense claimed that this newly discovered evidence warranted a new trial because it impeached Healy's account of Grizzle having made admissions on the day after the murder, at the holding cells. Healy had testified that the encounter occurred when, having just finished a non-attorney visit and awaiting transport from a holding cell, he saw Grizzle arrive for a visit and be placed into a cell more or less across from him. The defense introduced one log (Exh. SS) to show that this occurred on the 26th and that there had not necessarily been an overlap but, rather, a dovetailing of visits. Healy's was logged as from 11:00 a.m. to 1:00 p.m. and Grizzle's as from 1:00 to 3:00 p.m. The late-produced log for the same day differed somewhat, showing Healy leaving from his visit at 1:00 p.m. but Grizzle not arriving for his own until 1:30 p.m.—creating a half hour gap.

We acknowledge the People's contentions that the log was not discoverable under the statutes, that recent precedent suggesting they might be obtained indirectly through a third-party subpoena (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1315-1320) is legally and factually flawed, and that this issue was jurisdictional and thus not waived by the prosecutor's (or CDC's) failure to object on this basis below. We do

not pass on those questions. The court assumed it had jurisdiction and denied discovery on the merits. If we assume the logs *were* discoverable, no abuse of discretion or denial of due process appears in denying a new trial based on their late disclosure.

First, while Grizzle criticizes a lack of "explanation" for the log's late production and elsewhere complains of "due process" and state and federal "fair trial" deprivations, we do not understand him to seriously claim any deliberate suppression of this evidence. He presents no constitutional analysis or case citations (*People v. Gionis, supra,* 9 Cal.4th at p. 1214, fn. 11) and ignores the court's findings below that nothing suggested "any conscious or intentional suppression of evidence within the meaning of the *Trombetta* decision" (*California v. Trombetta* (1984) 467 U.S. 479, 488-489; *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [bad faith required]; *People v. Webb, supra,* 6 Cal.4th at p. 519 [same]) and that hearing testimony from prison officers Diana Willis and Steve Reppond was "true." The court found, consistent with their testimony: "[T]hey didn't know where these things were; they finally dredged them out and provided them."

The question, then, is whether the missing log would render a different result probable on retrial. The court held it would not, accepting hearing testimony that these log books "are apparently inexact records," that "transport or escort officers are moving prisoners about the prison all day long apparently here and there to visiting, to the in-firmary or wherever," and that "in the course of their duties they oftentimes have to make entries to the logbooks that are not made precisely contemporaneously with the action that the entry records." This was indeed the import of testimony by Melissa Cruse, an experienced SHU visiting area officer, and thus the court could view the half-hour dis-crepancy as not necessarily undercutting Healy's testimony. We presume the court also bore in mind that the log used at trial had shown *no* gap and that the entries in both logs were rounded off to the nearest hour or half hour, thus confirming that they were truly imprecise. The court further reasoned that, to the extent the missing log might impeach Healy's general credibility, it was "essentially cumulative" to other impeachment and that jurors had been able to judge his demeanor for themselves. Those observations are well supported. Jurors believed Healy despite his conceded history of violent offenses, AB

membership, receipt of immunity for testimony and, most remarkably, a premeditated AB-ordered strangling of his own cellmate, which brought a first-degree-murder charge that he managed to "beat" down to voluntary manslaughter by using his AB training. No manifest abuse of discretion is shown in the denial of a new trial.

**B.** *Massiah* **violation.** Grizzle urged that at the May 12th encounter, Rubidoux was "deliberately set up by the prison officials in the hope of eliciting information," after Grizzle had counsel, violating *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*). The argument was rejected, and Grizzle claims error.

"The Sixth Amendment forbids the state from deliberately eliciting incriminating statements from the defendant in the absence of counsel. [Citations.] This constitutional guarantee precludes the government from taking any action to prevent an individual from invoking the right to counsel in any postindictment confrontations between suspect and state. [Citation.] Such a 'knowing exploitation by the State of an opportunity to confront the accused without counsel' [citation] renders any incriminating statements inadmissible as evidence against the defendant at trial." (*People v. Frye* (1998) 18 Cal.4th 894, 991-992.) "In determining the merits of a *Massiah* claim, the essential inquiry is whether the government intentionally created a situation likely to induce the accused to make incriminating statements without the assistance of counsel." (*Id.* at p. 993.) To prevail on a claim involving, as here, the use of an informant, "the defendant must show (1) that the informant acted as a government agent at the behest of the police in accordance with a preexisting agreement and with the expectation of receiving a benefit or advantage, and (2) that the informant deliberately elicited incriminating statements." (*Ibid.*)

Grizzle claimed that Rubidoux had acted as a "confidential informant" for CDC, supporting this with only the assertion that Rubidoux's trial counsel George Mavris had not "confirmed" "the proffered reason" for Rubidoux's presence (meaning to visit with counsel), and promising to adduce more testimony at the hearing.

Those facts were apparently not offered as *newly discovered.* Grizzle certainly knew before trial that Rubidoux would be a prosecution witness and obviously knew about the May 12th interaction. Grizzle cited Rubidoux's knowledge of Marsh's death

by then and ultimately going to the district attorney to tell of the encounter, but Grizzle knew those facts before trial. The trial court found, on the merits, "nothing to indicate" that Rubidoux was working for the state when he had the encounter. At best, the court felt, he may have been "hoping" to "find things," but on his own at that point. That ruling is supported and establishes no probability of a different result on retrial.

Grizzle relies on hearing testimony from one inmate who said he overheard Rubidoux discussing debriefing and being an informant (before May 12th). However, it is not enough that Rubidoux may have considered informing or felt it might gain him an advantage, for there was no evidence that anyone solicited him to do so before he sought out the district attorney after May 12. Even "a general policy of encouraging inmates to provide useful information does not transform them into government agents; some specific action 'designed deliberately to elicit incriminating remarks' is required." (*People v. Williams* (1988) 44 Cal.3d 1127, 1141.) Also, it is not enough that Rubidoux did inform later. (*Id.* at pp. 1140-1141 [not enough that, days later, inmate entered an agreement to inform].) This is not a case where the court could find an agreement, by a preponderance of the evidence, from some preexisting informant relationship between the inmate and the authorities (see *In re Neely* (1993) 6 Cal.4th 901, 916-917). Grizzle stresses evidence (1) that Rubidoux was brought to the area in the late morning for a visit, whereas his counsel did not arrive until early afternoon, and (2) that there was (according to a defense witness at the hearing who claimed experience with visits there) a seeming policy of bringing inmates in one at a time to avoid having them "interface" with one another. We hold this insufficient to show an agreement to act as agent-informer. Also, testimony from defense witnesses Rubidoux and his trial counsel, Mavris, countered any such conclusion at the hearing. Rubidoux denied being or telling others that he was an "informant." Rather, he explained, he was "known as" an informant after he testified at Littrell's trial; he decided to inform on the advice of Mavris, after telling the attorney at a meeting a day later what he had discovered. He had not gone to CDC investigators or the district attorney before then. On the timing of his May 12th presence in the visiting area, Rubidoux explained that "they" brought him in that morning expecting him to meet with Mavris but learned

37

from Mavris, in a phone call, that he would not be there until later. Mavris did not remember a phone call but did recall having the meeting around 1:00 p.m. that day, after lunch, which was also what the prison records showed. No abuse of discretion is shown.

Grizzle argues that, "[i]n light of this newly discovered evidence," the court erred in denying his post-trial discovery request for the identities of all cellmates of Rubidoux over the previous year and the out-of-state address for a retired Pelican Bay guard who had been Rubidoux's escort officer on May 12th. Again putting aside the unbriefed question of how "newly discovered" this evidence was, the argument blurs the fact that the discovery request was made at a hearing two months *before* the hearing on the motion for new trial, where some of this information came to "light." The denial was thus not made on that added showing, and we see no renewal of the request at the latter hearing. In any event, Grizzle fails to show abuse of discretion. This was *post*-trial discovery for which he cites no authority (see generally *People v. Tillis, supra,* 18 Cal.4th at p. 294; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1256-1257), and he undertakes no analysis of what showing he did make to the court when it ruled. This is especially critical since, as the prosecutor, CDC and the court all observed, revelation of these matters raised security concerns. Grizzle thus waives the claim through inadequate briefing. (*People v. Gionis, supra,* 9 Cal.4th at p. 1214, fn. 11.) The trial court also commented that these sources of information could have been discovered before trial. Likewise forfeited for inadequate briefing is Grizzle's claim of error in denying him discovery of Clark's cellmates, from whom he hoped to find impeachment testimony to fuel his new trial motion. To the extent Grizzle means to complain of failure to conduct in camera reviews of any of these materials, his claim is similarly forfeited for inadequate briefing.

## IX. *Foundation for Testimony*

Grizzle attacks the testimony of prison guard Barker, regarding the visiting room log, as admitted without an adequate foundation to interpret the log (Evid. Code, §§ 702, 720). Grizzle objected to Barker's qualifications, and the court, after hearing voir dire and argument, ruled, "The jury can give whatever weight they deem appropriate to the testimony, but I find he has enough knowledge to give testimony." "The trial court's

determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.] "'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.'" [Citation.]" (*People v. Bolin, supra,* 18 Cal.4th at pp. 321-322.)

Barker had been a correctional officer since 1988 and had worked with visiting at Pelican Bay since 1994. The logbook for the May 12th incident came from "the back of SHU visiting," and another logbook was kept at the front of the area. Barker conceded he was "not real familiar with the back of the SHU visiting" but felt he was able to "figure [the records] out." He had worked in the front part of the area for four years and had worked one time in the rear, as a "back podium officer," for two hours of a shift. He conceded lacking experience as a back podium officer, but the court correctly observed that the issue was not his experience in that position, but "whether he understands these records" and was qualified to explain them. Barker explained that his own duties and log records principally involved working with the attorneys while the back podium officers' duties concerned escort crews, room assignments for inmates, and security concerns with the inmates. He did work "in contact" with the back podium officers, however, and had interpreted their records four months earlier, in the same court.

No manifest abuse of discretion is shown in the court's ruling that the testimony was admissible, with the degree of Barker's knowledge going more to its weight (*People v. Bolin, supra,* 18 Cal.4th at p. 322). He had worked in the same general area for years, had brief experience with the back podium position and records and was able to articulate differences in the types of entries made there. Ultimately, the jury had those records (and attorney-visit records) in evidence to view for themselves in light of Barker's testimony. (Cf. *People v. Hays* (1983) 147 Cal.App.3d 534, 543.)

## X. *Degree of Murder Conspiracy*

The jury's count 2 verdict was for "Conspiracy to commit Murder" but did not specify first or second degree, and Grizzle urges that this failure means we are required to reduce the offense to second degree under the compulsion of section 1157, which states

that "[w]henever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury . . . must find the degree of the crime" and, if it does not fix the degree, the crime is "deemed to be of the lesser degree."

However, precedent from our Supreme Court holds, in effect, that conspiracy to commit murder is *not*, in the words of section 1157, "a crime which is distinguished into degrees." Rather, "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder," and "all murder conspiracies are punishable in the same manner as murder in the first degree . . . ." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237-1238 (*Cortez*).) Conspiracy to murder being "a unitary offense," there is no "requirement for the jury to determine the 'degree' of the underlying target offense of murder, and thus no need for specific instruction on premeditation and deliberation respecting the conspiracy count." A "jury's finding of the dual specific intent required for conviction of conspiracy to murder"—i.e., "'an intent to agree or conspire, and a further intent to commit the target crime'" (*id.* at p. 1229)—"necessarily establishes that the target offense of murder was premeditated and deliberated" (*id.* at p. 1238).

Grizzle calls *Cortez* "flawed in any number of respects," alluding to due process concerns (citing *Kleve v. Hill* (9th Cir. 1999) 185 F.3d 1009, 1014-1017, dis. opn. by Nelson, J., decrying affirmance of a pre-*Cortez* conviction for second degree conspiracy to murder) and "dissenting" opinions by Justices Mosk and Kennard in *Cortez*. Actually, he is mistaken on the latter point since Justice Mosk *concurred* in *Cortez*, having won over the majority to his dissenting views from an earlier case. (*Cortez, supra,* 18 Cal.4th at pp. 1240-1241, conc. opn. by Mosk, J.) Still, the dispositive point is that we are bound to follow *Cortez* (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455), and so we do. No error or need for modification appears.

## XI. *Degree of Murder*

The murder charged in count 1, on the other hand, *was* a crime "distinguished into degrees" (§ 1157), yet the verdict, again, did not specify the degree. Grizzle claims error, but his problem here is that his counsel chose, for strategic reasons, not to pursue second degree murder and to offer the jury an all-or-nothing choice of murder in the first degree.

If there was error (*People v. Bradford* (1997) 15 Cal.4th 1229, 1345 [if evidence supports it, instruction on second degree murder is proper notwithstanding a defendant's objection that it is inconsistent with his theory of the case]), it was invited.  Hence, Grizzle cannot now complain of it or, it follows, avail himself of a statutory reduction to second degree.

"'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest.  If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' [Citation.]  For the doctrine to apply, 'it must be clear from the record that defense counsel made an express objection to the relevant instructions.  In addition, because important rights of the accused are at stake, it also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' [Citation.]  However, '[t]he existence of some conceivable tactical purpose will not support a finding that defense counsel invited an error in instructions.  The record must reflect that counsel had a deliberate tactical purpose.'" (*People v. Bunyard, supra*, 45 Cal.3d at p. 1234.)

Defense objection to lesser offenses on count 1 and a deliberate tactical purpose each clearly appear.  After the instructions were settled, the court clarified for the record that "we are treating the murder count as being a straight up-or-down decision by the jury as being murder in the first degree or no crime at all."  This was explained as based partly on the *Cortez* decision (part X, *ante*) that conspiracy to murder is necessarily first degree.  "[B]ut secondly," the court said to defense counsel Russell Clanton, "you do not wish to place the jury in the position of possibly reaching a compromise verdict and that therefore the murder count is either first degree murder or not guilty.  [¶]  Is that—that's your position, Mr. Clanton?"  Clanton confirmed, "That's our position, Your Honor."  Such deliberate reliance on an all-or-nothing strategy has repeatedly been held invited error for not requesting second degree murder instructions. (*People v. Bunyard, supra*, 45 Cal.3d at pp. 1234-1236; *People v. Cooper* (1991) 53 Cal.3d 771, 827; *People v. Duncan* (1991) 53 Cal.3d 955, 968-970.)  And a further tactical consideration appears.  The prosecutor asked for clarification whether defense counsel was also taking into account that Grizzle, a third-strike defendant, would receive a term of 25 years to life, the same as first degree

murder, regardless of the type of homicide, and Clanton replied, upon prompting by the court: "It is a tactical decision. That's the record I would make." Any error was invited.

Grizzle does not dispute that conclusion as to instructions on lessers but argues that there was no invited error for purposes of the procedural defect of failing to specify the degree. We disagree. Grizzle himself observes that CALJIC No. 8.70, directing the jury to determine the degree of murder, was "[c]onspicuously omitted" in this case. But it presumably *would* have been given had defense counsel not decided for tactical reasons to forego instructions on second degree murder. One invitation of error apparently begot the other and, in any event, Grizzle cannot dodge the invited error doctrine by reframing the issue as procedural error under section 1157.

## XII. *Acquittal of Coconspirator*

Grizzle and Littrell were jointly charged in the murder and murder conspiracy counts but were tried separately. The prosecution had wanted to introduce incriminating statements by Grizzle, but all parties ultimately stipulated in writing that the "use of said statements in defendant LITTRELL's trial would violate[] his due process rights and deny him a fair trial." This was based on *Aranda/Bruton* concerns. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123; *In re Jose M.* (1994) 21 Cal.App.4th 1470, 1479 [*Aranda* abrogated by Cal. Const., art. I, § 28, subd. (d), to the extent it requires suppression beyond *Bruton*].) The parties thus further stipulated that "a severance of the defendants' trials [was] required," and the court ordered separate trials based on that stipulation. Grizzle waived time while Littrell went to trial first. The results for Littrell were jury verdicts acquitting him of conspiracy and first degree murder but convicting him of second degree murder. Our record is vague, but some basis for new trial evidently arose (a problem with "the jury"), and Littrell pled guilty to attempted murder and voluntary manslaughter in order to avoid a retrial.

Touting that development as warranting collateral estoppel against the People, Grizzle moved to dismiss both counts as to himself. He reasoned that the jury had found no agreement between himself and Littrell and no premeditation upon which to premise first degree murder, leaving only a homicide he had not perpetrated or anticipated. The

motion was opposed and denied, the trial court finding the matter "not fully litigated" given differences in the evidence to be presented at Grizzle's trial. Grizzle then sought writ of mandate or prohibition from this court. We denied his petition without opinion (A085193) but noted from that pretrial vantagepoint that he was charged with conspiring with Littrell "or with another person" and that one of the alleged overt acts was that he had caused *Contreras* to deliver drug laden alcohol to the victim.

Grizzle renews his arguments postconviction on appeal, urging that the jury that acquitted Littrell of conspiracy and premeditated murder did so on the same evidence presented in this trial and thus that the People should be estopped. His argument fails.

"The general rule is that acquittal of one codefendant normally will not require acquittal of another." (*People v. Howard* (1988) 44 Cal.3d 375, 412, fn. omitted.) "'It is clear that in cases where there are multiple defendants, or in multiple cases arising out of the same offense, the mere fact standing alone that verdicts are, or appear to be, inconsistent, does not give rise to collateral estoppel. Specific issues may be decided differently in different cases. [Citation.] Likewise, a judgment acquitting one defendant does not generally bar subsequent criminal liability of a codefendant. . . .'" (*Id.* at p. 412, fn. 13.) Grizzle relies on a rare exception illustrated by two California cases applying collateral estoppel, each coincidentally as to convicted accomplices or conspirators whose cohorts had been acquitted in earlier trials. (*People v. Taylor* (1974) 12 Cal.3d 686 (*Taylor*) [getaway driver in murder]; *People v. Superior Court (Jackson)* (1975) 44 Cal.App.3d 494 (*Jackson*) [conspiracy to rob].) This authority notes that a criminal conspiracy requires *by definition* the concurrence of at least two parties and holds that "[w]here all of the alleged participants in a conspiracy are tried together, it is a logical and legal imperative that the jury cannot return a verdict of guilty against only one defendant." (*Jackson*, *supra*, 44 Cal.App.3d at p. 498.) However, this so-called "consistency rule" has had limited application where the alleged cohorts are tried separately. (*Id.* at pp. 498-500.)

Shortly after oral argument in this case, our Supreme Court revisited that authority and disapproved the consistency rule in a case where coconspirators were tried in a single trial by separate juries. (*People v. Palmer* (2001) 24 Cal.4th 856 (*Palmer*).) Anticipating

that Grizzle may claim *Palmer* should not apply retroactively to his case, we will analyze his claim according to pre-*Palmer* law and, thus, avoid having to consider the breadth of *Palmer*'s holding. (See also *People v. McCoy* (S087893) [in joint trial, aider and abettor convicted of greater offense than codefendant], review granted July 12, 2000.)

Collateral estoppel requires three criteria—(1) identical issues, (2) a prior final judgment on the merits and (3) party or privity status for the People (*Taylor, supra,* 12 Cal.3d at pp. 691-692)—plus a fact-sensitive assessment of underlying policy goals to (1) promote judicial economy, (2) prevent inconsistent verdicts that undermine the integrity of the judicial process and (3) prevent harassment through vexatious multiple trials (*id.* at p. 695). (Accord *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341-351 [no estoppel where prior proceeding was to revoke probation].) The key consideration is the second, judicial integrity, for "few things [are] more likely to undermine faith in the system than permitting a person to be punished for another's acts when the actor has been previously exonerated from any responsibility for those identical acts." (*People v. Howard, supra,* 44 Cal.3d at p. 412.) Guiding that analysis is a reluctance to apply the doctrine since it often entails uncertainty about whether issues resolved in a prior trial were truly identical. Also, its application is nonmutual (binding the People only), and, in the quest for consistency, we risk multiplying an erroneous prior acquittal. (*Taylor, supra,* 12 Cal.3d at p. 696) or an idiosyncratic resort to leniency or compromise by the first jury (*People v. Nunez* (1986) 183 Cal.App.3d 214, 223-224; *People v. Wilkins* (1994) 26 Cal.App.4th 1089, 1093-1094; *Standefer v. United States* (1980) 447 U.S. 10, 22-25.)

We do not discuss all of those factors, for it appears dispositive that the evidence presented at Littrell's and Grizzle's trials differed significantly. Accordingly, we cannot say that the issues were necessarily identical or that the integrity of the judicial process is undermined by the seemingly inconsistent results. "When," as here, "the convicted conspirator is tried separately from his acquitted alleged coconspirators, and the record does not indicate that the evidence introduced in all trials was identical, application of the doctrine of collateral estoppel is unwarranted." (*People v. Nunez, supra,* 183 Cal.App.3d at p. 225.) Grizzle's casual assertion that the records from the two trials "are identical" is

unsupported by any reference to the record in Littrell's trial. In fact, it does not appear that the trial court had that record before it when it ruled. Grizzle's motion had assumed that transcripts would be prepared, but his counsel conceded at the hearing that they were "not completed" and instead presented brief testimony by Littrell's trial counsel recalling some statements from two of the witnesses, Rubidoux and Ridinger. If transcripts were eventually prepared, they have not been transmitted to us as exhibits on the motion. We must hold, then, that Grizzle fails to show that "the evidence introduced in [the two] trials was identical . . . ." (*Ibid.*)

Further, it is plain from our *own* record that the evidence was not identical. First, it was stipulated below that Littrell required a separate trial because incriminating statements made by Grizzle would be admitted in Grizzle's trial but could not be admitted in Littrell's, due to *Aranda/Bruton* concerns. The People ask us to hold that the stipulation works a judicial estoppel against Grizzle arguing now that evidence was the same in both trials (see generally *People v. Watts* (1999) 76 Cal.App.4th 1250, 1261-1264), but we do not have to go that far. It is enough to note that while Grizzle seemingly called Littrell's trial counsel at the hearing to prove that some incriminating statements in fact did come into evidence, the attorney's testimony is vague and inconclusive, especially without any trial transcripts to consult for context. It is well settled that collateral estoppel is unfair to apply against the People where, due to rules of evidence and exclusion, some evidence was admissible in one defendant's trial but not the other's. (*People v. Wilkins, supra*, 26 Cal.App.4th at p. 1094-1095 [trials had been severed due to such problems].)

There is also a second source of difference, one overlooked by the parties. Clark testified in both trials but explained in this trial, under promises of immunity and inclusion in the state's witness protection program, that he had *lied* at Littrell's trial. He had testified for the defense and been offered $500 by Grizzle to discredit prosecution witness Healy. He had been "brought in to broadside the prosecution a little bit," and did so. At Grizzle's trial, by contrast, he testified for the People and recanted his prior testimony. Clearly, this about-face from discrediting to corroborating Healy was a significant difference that could account for the different jury results.

We hold, based on evidentiary differences, that no collateral estoppel arose under pre-*Palmer* law. We do not reach an alternative theory, hinted at in our summary denial of relief pretrial, that conspirators beyond Grizzle and Littrell remained unacquitted.

### XIII. *Unanimity for Overt Act*

The four alleged overt acts were that (1) Grizzle dissolved drugs in the pruno to render Marsh drunk and vulnerable, (2) Grizzle had Contreras deliver the mixture to Marsh, (3) Littrell got Marsh drunk and disabled, and (4) Littrell strangled Marsh after he was too drunk to defend himself. Jurors were instructed that they had to find, beyond an unlawful agreement and specific intent, "at least one of the overt acts alleged" (CALJIC No. 6.10), but were not instructed that they had to agree unanimously on any one overt act. Grizzle claims there was a sua sponte duty to so instruct and that failure to do so deprived him of his due process right to a unanimous finding on that "element" of the conspiracy conviction.

The Supreme Court has so far declined to resolve this issue (*People v. Jackson* (1996) 13 Cal.4th 1164, 1227, fn. 15 [upholding use of unanimity for special findings but taking "no position on the question whether a defendant *is entitled* to a unanimity instruction in a conspiracy trial"]) but, again, appears poised to do so in a pending case (*People v. Russo* (S088368) [lack of unanimity as to overt act held error but harmless], review granted July 26, 2000). For now, we align ourselves with the prevailing view that a unanimity instruction is not needed. Those decisions reason that an overt act, while needed to mark the end of an inchoate conspiracy and the start of a completed crime for purposes of avoiding criminal liability, is not so much an "element" as a theory or detail of proof as to which jurors may take different paths. Those decisions note that it is the agreement, not the overt act, that is ultimately punished and that the act is not even something that must be intrinsically criminal or personally done by the defendant. (*People v. Jones* (1986) 180 Cal.App.3d 509, 515-517; *People v. Cribas* (1991) 231 Cal.App.3d 596, 611-612; *People v. Godinez* (1993) 17 Cal.App.4th 1363, 1367; *People v. Von Villas* (1992) 11 Cal.App.4th 175, 233-235; see also *People v. Jenkins, supra,* 22 Cal.4th at pp. 1024-1025 [unanimity instruction not needed for factors establishing aiding and

abetting, for they are not included as elements of murder].) Two contrary decisions have taken a more rigid view of an overt act as an element (*People v. Brown* (1991) 226 Cal.App.3d 1361, 1369 [not in the context of unanimity]) or assumed unanimity error only to find it harmless (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 611-615).

Moreover, any arguable error is harmless on this record. Overt act 4 was that "Littrell strangled victim Marsh with a garrote rope while Marsh was too drunk from drugs and alcohol to defend himself." Littrell, the only one in the cell with Marsh, conceded strangling him twice. The medical/forensic evidence was that strangling was a cause of death and that Marsh had a blood alcohol level of .11 and a urine level of .15. The alcohol level alone would have impaired his ability to drive, and the indomethacin and methocarbamol in his system would have had a synergistic effect with the alcohol, increasing impairment and coordination problems (ataxia) and lessening his ability to feel pain. There were no signs of a fight having occurred, and Contreras heard Littrell say, "Get up, Wood," and saw an exhausted-looking Marsh try to "roll himself up" off the floor and then flop back down as if unable to do it. The only contrary evidence came from Littrell, who said Marsh had become belligerent from drinking and attacked him from behind, trying to choke him with a rope. While this arguably showed Marsh not so drunk that he could not defend himself, the jury was instructed on self-defense (CALJIC Nos. 5.12, 5.15, 5.52 & 5.53) and rejected that theory. It follows that they rejected Littrell's testimony on that point. Thus, given the otherwise undisputed evidence, it is inconceivable that they did not agree unanimously that overt act 4 occurred. Any error was harmless. (Cf. *People v. Godinez, supra,* 17 Cal.App.4th at p. 1367; cf. *People v. Ramirez, supra,* 189 Cal.App.3d at pp. 614-615.)

### XIV. *Conspirator Instructions*

Under a single heading, Grizzle claims cumulative prejudice from the giving of one conspirator instruction and the failure to give another. We find no error.

**A. Unjoined perpetrators.** The court gave standard instruction CALJIC No. 2.11.5, which directed that while there had been evidence indicating that a person other than defendant may have been involved in the crimes, there could be many reasons why

that person was not tried and, "[t]herefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether they have been or will be prosecuted . . . ." Grizzle, relying on authority cautioning that this instruction should not be used when the other person is a witness for either side (*People v. Marks* (1988) 45 Cal.3d 1335, 1346-1347), claims lack of due process and a fair trial because jurors could have felt barred from considering that "at least three" testifying "actual or potential accomplices" had an incentive to testify favorably to the prosecution.

         cl      r two reasons. First, the predicate for finding error in giving
......... .. is th       prosecuted participant in the crime has testified. That predi-
cate is          . . . where the jury was told that [a testifying witness] had been charged
and                  "      ople v. Rankin (1992) 9 Cal.App.4th 430, 437.) When that
occurs, jurors clearly derstand that the instruction applies only to nontestifying partici-
pants, and there is no error. (*Ibid.*) Littrell testified that he had been charged in this same case, was tried and found guilty by a jury of second degree murder and, after a mistrial, pled guilty to voluntary manslaughter to avoid a retrial. Contreras, the next most obvious unjoined perpetrator, testified that he had been considered a part of the murder, had been interviewed as such, was offered immunity and protective custody for his truthful testimony, and now expected recommendations of leniency from the district attorney's office in pending proceedings to revoke probation. Thus while ultimately not prosecuted for this killing/conspiracy, Contreras left no room for jurors to speculate why—he told them.

      Second, our high court has adopted similar reasoning. "'The purpose of the . . . instruction is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators. [Citation.] When the instruction is given with the full panoply of witness credibility and accomplice instructions, . . . [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or

bias in assessing the credibility of prosecution witnesses. [Citation.] . . . .'" (*People v. Cain* (1995) 10 Cal.4th 1, 35, quoting *People v. Price, supra*, 1 Cal.4th at p. 446; accord *People v. Carrera, supra*, 49 Cal.3d at p. 313; cf. *People v. Williams, supra*, 16 Cal.4th at pp. 226-227, finding, in light of other instructions, no prejudice from any error.)  That is the case here.  Instructions on witness credibility (CALJIC No. 2.20) and the need to corroborate accomplice testimony (CALJIC Nos. 3.10, 3.11, 3.12 & 3.13) were given, and jurors were further told that Ridinger, Contreras, Rubidoux and Clark were in-custody informants whose testimony "should be viewed with caution and close scrutiny," including "the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness" (CALJIC No. 3.20).  Finally, no argument suggested that jurors could not consider favorable treatment in evaluating the testimony of witnesses. (*People v. Carrera, supra*, 49 Cal.3d at p. 313, fn. 11.)

Error is not shown from giving the unjoined-perpetrators instruction.

**B. Accomplice testimony.**  While the court did instruct on the need to corroborate accomplice testimony (CALJIC No. 3.11) and on what corroboration is sufficient (CALJIC No. 3.12; § 1111), it did not give CALJIC No. 3.18, which at the time would have advised jurors to view incriminating accomplice testimony with *care and caution* (not *distrust*, as formerly worded) (*People v. Guiuan* (1998) 18 Cal.4th 558, 569).

Grizzle claims denials of due process and a fair trial, but he is foreclosed by the invited error doctrine.  In clarifying the parties' positions on instructions, the court noted potential accomplice status for Littrell, Contreras, Healy and Ridinger, but said: "[A]s I understand it, the defendant does not wish to have instructions given concerning accomplices as a matter of law [CALJIC No. 3.16] because that has a tendency to -- or that at least implies to the jury that indeed there was a conspiracy which -- which is the key point that you deny."  Defense counsel confirmed, "That's correct, Your Honor," and confirmed again when the court added: "And rather than confuse the jurors about who is or who is not an accomplice as a matter of law you simply prefer not to have a statement that anyone is an accomplice as a matter of law . . . ?"  The court later stated: "There is also the instruction CALJIC 3.18, that the testimony of an accomplice is to be viewed

with distrust [*sic*], and as I've indicated before, this instruction could apply perhaps to Healy, Ridinger, and Contreras but also, of course, could apply to Mr. Littrell. And because you rely on Littrell's testimony, you prefer that this instruction not be given because even if -- even if we attempted to limit it to the others, that there's a danger that it might cause the jury to mistrust Littrell's testimony[,] which you do not want[,] and therefore you prefer not to have 3.18 given." Counsel replied, "That's an accurate statement of our position, Your Honor." Counsel's objection was express and clearly based on tactical considerations. The defense ultimately obtained CALJIC No. 3.20, which secured a "caution and close scrutiny" admonition as to all of the potential conspirator witnesses (*except* Littrell) and did so based not on disputed accomplice status, but on their undisputed status as "in-custody informants." (See also § 1127a.)

Any error was invited. Alternatively, there was no error because CALJIC No. 3.20 ("caution and close scrutiny") furnished a cautionary admonition substantially the same as CALJIC No. 3.18 ("care and caution").

**DISPOSITION**

The judgment is affirmed.

_____
Lambden, J.

We concur:


_____
Haerle, Acting P. J.


_____
Ruvolo, J.

50

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 2



THE PEOPLE,
Plaintiff and Respondent,
v.
ELLIOTT SCOTT GRIZZLE,
Defendant and Appellant.

A087504
Del Norte County No. 97268X

FILED
Court of Appeal First App Dist

APR - 2 2001

RON D. BARROW, CLERK

By _____
                    DEPUTY

BY THE COURT:

The petition for rehearing is denied.

Date:  APR - 2 2001          KLINE, P.J.          P.J.

oruu

Court of Appeal, First Appellate District, Division Two - No. A087504
**S096644**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

ELIOT SCOTT GRIZZLE, Defendant and Appellant.

SUPREME COURT
**FILED**

JUN 1 3 2001

Frederick K. Ohlrich Clerk

DEPUTY

Petition for review DENIED.

GEORGE

Chief Justice