Westlaw.



Only the Westlaw citation is currently available.
California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

Court of Appeal, Third District, California.
The PEOPLE, Plaintiff and Respondent,
v.
**Frederick** O. **CLARK**, Defendant and Appellant.
**No. C042795.**
**(Super.Ct.No. 99F09138).**

Oct. 15, 2004.

Office of the State Attorney General, Angelo S. Edralin, Sacramento, CA, for Plaintiff and Respondent.
Cara DeVito, West Hills, CA, for Defendant and Appellant.
SIMS, J.

*1 A jury convicted defendant **Frederick** O. **Clark** of first-degree murder with the special circumstances that the crime occurred during the commission of robbery and burglary (count one; Pen.Code, §§ 187, subd. (a), 190.2, subd. (a)(17)) [FN1] ; residential robbery (count two; §§ 211, 213, subd. (a)(1)(A)); and first-degree burglary (count three; §§ 459, 462, subd. (a)). The jury found as to all counts that defendant was personally armed with a knife. (§ 12022, subd. (b).) [FN2] In the subsequent penalty phase, the jury returned a sentencing verdict of life in prison without the possibility of parole. The trial court thereafter imposed that sentence on count one with a consecutive one-year enhancement for the weapon use, imposing the upper term on counts two and three but staying sentence on those counts pursuant to section 654.

FN1. Undesignated statutory references are to the Penal Code.

FN2. Tio Sessoms and Adam Wilson were charged as codefendants. Wilson pled guilty to second-degree murder. Sessoms was tried separately and convicted of first-degree felony murder and special-circumstance murder.

Defendant claims prejudice from governmental misconduct before trial and prosecutorial misconduct during trial. He also claims sentencing error under *Blakely v. Washington* (2004) 542 U.S. ---, ---- [159 L.Ed.2d 403, 413-414] (*Blakely* ). We shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant's contentions do not require us to discuss the trial evidence in depth. Therefore we present that evidence as briefly as possible.

In October 1999, Edward Sherriff, the victim, was a 68-year-old pastor in the Universal Fellowship of Metropolitan Community Churches (MCC). Sherriff operated the Samaritan Center, a free food outlet and outreach center for the poor, in the Oak Park neighborhood of Sacramento. He lived in a mobile home park in south Sacramento, next door to a fellow MCC minister named Chadwick Pifer. Sherriff used Black male parolees as volunteer workers at the Samaritan Center, and some stayed in his home from time to time.

Defendant, who is Black, was released from prison on parole in June 1999. He volunteered at the Samaritan Center and met Sherriff. According to defendant, Sherriff soon revealed that he was gay.

At the Samaritan Center defendant also met Leola Hickman, who cooked there, and her daughter Sandra. Sandra had a 16-year-old son, Joseph

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Singleton, and several younger children. Singleton also volunteered at the Center and knew Sherriff.

Hickman and Singleton were aware Sherriff was sexually interested in Black men, but did not believe this included minors; he had told Hickman he preferred adults. Both testified that Sherriff had not made advances toward Singleton. FN3 Hickman denied ever telling defendant to beat up Sherriff to keep him away from her grandchildren.

FN3. Singleton once overheard Sherriff saying he habitually watched pornography on weekends and another time overheard him commenting on penis sizes.
Hickman admitted Sherriff had a sexual interest in Black parolees and expressed such an interest in defendant when defendant began coming to the Samaritan Center. Hickman also admitted she knew Sherriff "kept a lot of money around" and was always showing it off. However, she denied having told an investigator that Sherriff "put sexual pressure on [B]lack parolees" or that she believed Sherriff and defendant had a sexual relationship.
A defense investigator testified that Hickman had made some of the statements she now denied. He also testified that Hickman had said she was concerned about Sherriff's involvement with Singleton.

Defendant and Sandra Singleton, who was terminally ill with AIDS, married in mid-1999. Defendant moved into the home on Rancho Adobe Way shared by Hickman, Sandra, Hickman's other daughters, and Sandra's children.

On the evening of October 20, 1999, Joseph Singleton saw defendant at the family home. Sometime after 7:00 p.m., Tio Sessoms and Adam Wilson came to the house. Defendant, Sessoms, and Wilson eventually left in a yellow Ford LTD.

*2 Sherriff's neighbor Chadwick Pifer and Pifer's fiancée, Darlene, left their home around 7:00 that evening and returned around 10:00 p.m. Before leaving, Darlene called Sherriff to tell him she would not be able to deliver pastries to the Samaritan Center the next morning as she often did. He did not answer, so she left a message.

After Pifer and Darlene returned, Pifer saw a sensor light come on outside his back door. Opening the door, he saw a Black man walking near the carport, breathing hard and sweating heavily. The man claimed he had been visiting Sherriff and would do the Samaritan Center pastry run in the morning.

The man got into Sherriff's truck and backed it out. Darlene checked to see whether Sherriff's Lincoln was still in its space. She told Pifer she had just seen the curtains in Sherriff's trailer open and shut quickly. She knew Sherriff never shut his curtains. Pifer, who knew Sherriff did not drive at night because of night blindness, saw the Lincoln pulling out. Both vehicles drove out of the mobile home park.

After Pifer got a busy signal at Sherriff's residence, 911 was called. The police knocked on Sherriff's front door and got no reply, then entered through the unlocked sliding glass door. An officer saw that a door straight across from the sliding door was wide open, as if someone had left in a hurry. There were no signs of forced entry.

In the master bedroom, the officer saw a dresser pulled away from the wall and a mattress against it. A White male dressed in a sleeping garment was lying on the floor on the other side of the bed. He had fresh cuts and blood on his upper left arm and shoulder; one wrist was tied down with a shoe lace. He was not moving or breathing. Summoned to the scene, fire department personnel determined the man was dead.

Items were stacked up in the middle of Sherriff's living room, including speakers, a videocassette player, a CD case, CD's, and a television. Drawers had been pulled out, suggesting the place was ransacked.

An autopsy disclosed that Sherriff had 24 stab wounds. Several of the wounds took substantial force to inflict and would have quickly caused death.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Late in the evening of October 20, 1999, Joseph Singleton saw defendant and Tio Sessoms at home in the master bedroom; paper money and coins were on the bed. The next morning Singleton heard on the news that Sherriff had been killed and his white truck was missing. Singleton saw the truck parked around the corner. Defendant had Singleton call the police from a pay phone to report the truck's location and to name one Ainslee, who had once stayed with Sherriff, as a suspect. Defendant then wiped off the phone with a rag.

Leah Bradley, who was defendant's sister-in-law, Joseph Singleton's aunt, and Adam Wilson's girlfriend, lived at the Rancho Adobe Way residence. Around 9:00 or 10:00 p.m. on October 20, 1999, Bradley saw a white truck and a Lincoln pull up near the residence. Defendant got out of the driver's side of the truck; a man Bradley knew as Tio got out of the driver's side of the Lincoln, while a third man whom Bradley claimed not to recognize got out of the passenger side. Defendant took something from the back of the truck, then began talking to Tio; the Lincoln left.

*3 After Bradley went inside, defendant had her count a lot of change for him, then asked her to get rid of two jewelry boxes and their contents. He told her he and Adam Wilson had killed Sherriff. He also threatened to hurt her if she told her mother and ordered her to tell anyone who asked that he had been home all night.

Leola Hickman testified that when she returned home on the morning of October 21, 1999, she saw Sherriff's truck parked near the house and asked her grandson Joseph to report it to the police. Hickman also testified that while defendant lived at her home he was unemployed and his only income was a general assistance check, but after Sherriff's death defendant had money and bought things for the family.

After discovering evidence linking defendant and Tio Sessoms to the crimes, the police obtained a videotaped statement from defendant on November 15, 1999. The jury viewed and listened to the videotape while following along with a transcript.

In the statement defendant admitted killing and stealing from Sherriff. Defendant claimed he went to Sherriff's place at Hickman's instigation to " smack his ass up" for making sexual advances to Joseph Singleton and to get money Sherriff owed Hickman for her work at the Samaritan Center. (Hickman testified Sherriff did not owe her money.)

According to defendant, he took Singleton, Wilson, and Sessoms with him in the yellow LTD; Sessoms carried a sawed-off shotgun. After buzzing unsuccessfully for admittance at the mobile home park's security gate, they jumped the fence to enter the park. Defendant knocked on Sherriff's front door. Sherriff let them in through the sliding glass door.

Once inside, defendant announced his purpose to Sherriff. Defendant had not planned to steal from him, but defendant's companions started to do so and defendant decided they might as well help themselves while they were there. Saying they could not just leave Sherriff there, Wilson started trying to strangle him, while Sessoms got a cord to tie Sherriff up and tried to smother him with a pillow. [FN4] At that point, the woman from next door called and left a message.

FN4. The pathologist found no evidence of strangulation, but some evidence of attempted smothering.

According to defendant, the perpetrators decided to take Sherriff's vehicles, thinking he was dead. Going outside to get them, defendant encountered the couple from next door. Back inside, the perpetrators found Sherriff still alive. Wilson grabbed the shotgun, but defendant dissuaded him from using it. Instead, defendant repeatedly stabbed Sherriff with a knife from the kitchen.

The perpetrators loaded the Lincoln with Sherriff's possessions and departed; Sessoms drove the Lincoln, Wilson drove the truck, and defendant drove the LTD they came in with Singleton as a passenger. They took a substantial amount of cash and property from Sherriff's home back to defendant's house. Defendant and Singleton

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disposed of the murder weapon and had defendant's wife burn their bloody clothes. Defendant had Leah Bradley count the stolen change and told her to dispose of stolen property. Wilson and Sessoms drove away in the Lincoln, but defendant had to leave the truck parked near the house because Wilson had thrown the keys away; therefore he had Singleton make the anonymous phone tip to the police.

*4 Defendant testified on his own behalf, telling a story consistent with his videotaped statement (except that he now named only Sessoms and Wilson as his accomplices). Defendant also presented evidence purporting to prove that Sherriff had a sexual interest in underage Black males generally and in Singleton particularly.

DISCUSSION

I

While in Sacramento County Jail awaiting trial, defendant engaged in a romantic relationship with his then attorney, Assistant Public Defender Karol Martin Repkow. The Sacramento County Sheriff's Department, which runs the jail, became suspicious of Repkow for various reasons and so informed the public defender's office. The Public Defender removed Repkow as counsel; however, she continued to contact defendant on her own initiative and against the Public Defender's orders. A couple of months later, the public defender's office withdrew from the case. The Sheriff's Department began surveillance of Repkow and defendant and made its findings known to the Public Defender, who terminated Repkow several months after his office had withdrawn from the case.

Much later, defendant's new attorney moved to dismiss the case, alleging that the actions of the Sheriff and the Public Defender had created irreparable prejudice. After holding numerous in camera hearings, the trial court found defendant had not suffered prejudice because (1) Repkow and the public defender's office no longer represented him by the time the Sheriff's Department began its surveillance, and (2) defendant had not shown any surveillance of his present defense team.

Defendant contends the trial court should have granted his motion to dismiss because the Sheriff's surveillance (1) deprived him of his rights to counsel, due process, and a fair trial (U.S. Const., 6th & 14th Amends.), and (2) constituted " outrageous governmental conduct" violating those rights under both the state and federal Constitutions. We disagree.

**Facts**

The trial court appointed the public defender's office to represent defendant on November 16, 1999. The office assigned Repkow to the case. She was defendant's sole counsel until June 23, 2000, when Assistant Public Defender John Perkins was associated in as lead attorney. Repkow remained in the case as second counsel until on or around November 16, 2000, when the Public Defender instructed her to cease contact with defendant.

On January 9, 2001, the public defender's office asked to withdraw because of an unspecified conflict. The trial court reassigned the case to the indigent defense panel. As of January 31, 2001, Mark Millard was defendant's lead attorney.

*The motion to dismiss*

On April 29, 2002, Millard filed a motion to dismiss (or to strike the special circumstances). The grounds included "[t]he denial of, failure to provide and interference with the [d]efendant's right to, and representation by, counsel under the Constitution of the United States, Amendment VI and the Constitution of California, Article I, § 15" and " [o]utrageous, illegal and unethical conduct by the government in violation of ... Due Process and other constitutional, statutory and common law rights of the [d]efendant." FN5

FN5. Defendant also claimed a violation of his constitutional right to a speedy trial. He

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

does not renew this contention on appeal.

***5** In support of the motion, Millard declared as follows:

When defendant was confined in Sacramento County Jail in November 1999, the jail staff already disliked him due to his conduct during a prior confinement there and his reported subsequent conduct in prison. Defendant soon started to receive "major" disciplinary writeups. The defense "kn[e]w " deputies had committed misconduct in at least some of the incidents at issue.

Sometime before November 2000, jail staff became suspicious about the relationship between defendant and his attorney. The Sheriff's Department contacted the public defender's office about the matter. The two offices then jointly investigated defendant and the attorney. This included monitoring and taping telephone conversations between defendant and one or more of his attorneys and other defense team members. It was not clear when this began and when (or whether) it ended, but defendant was aware of it by the late fall of 2000. Neither agency had disclosed the records of the investigation to defendant's present defense team.

After receiving the case, the public defender's office had thoroughly investigated it, among other things conducting several interviews with defendant's wife. However, in late October or early November 2000, the Public Defender ordered all work on defendant's case suspended. From then until sometime in January 2001, defendant "was essentially unrepresented."

Defendant's lack of representation prejudiced him in various ways both during and after this period.

First, defendant remained in custody for months while the date of trial remained unset.

Second, further events occurred that could be used against defendant in the penalty phase. For example, in early March 2001 deputies beat defendant and forcibly sodomized him with a " baton," then claimed they had found the "baton" in his cell.

Third, the defense had lost contact with witnesses, including some who could give evidence as to the victim's character and conduct which would corroborate defendant's claimed motive for his actions.

Fourth, defendant lost the testimony of his wife. Her illness had grown so much worse by February 2001 that she could no longer speak to the defense. She died in May without having given evidence in any admissible form. However, her earlier interviews had shown that she was probably defendant's star witness: she would have corroborated his claimed motive and would also have been his most sympathetic witness at the penalty phase.

When the public defender's office declared a conflict and requested permission to withdraw in January 2001, it explained nothing to defendant or the trial court. Defendant had no opportunity to waive any possible conflict.

Millard had reason to believe that the public defender's office possessed tapes of conversations between defendant and Repkow, but had refused to provide them to him in April 2001 despite his written request. Some may have been made after the office withdrew from the case, but while it still had a duty to preserve the confidentiality of communications with defendant and to protect his rights.

***6** Documents furnished by the prosecution in discovery, including a printout containing a data entry from the Sheriff's Department, amounted to "a documented admission that the police have been eavesdropping on [defendant] when he communicates with his attorneys ." The printout showed that the eavesdropping encompassed defendant's current defense team.[FN6]

FN6. A copy of a "Sheriff's Department Inmate Incident Report" attached to the declaration stated that a deputy recorded conversations between defendant and his attorney at a specified telephone number

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on March 6, 2001, and that the previous day another deputy read letters written by defendant to his attorney. The defense stated that the telephone number actually belonged to a defense investigator.

Based on all of the above, the defense requested an evidentiary hearing.

*Litigation of the motion to dismiss*

On May 29, 2002, the prosecutor opposed the motion.

Defendant filed subpoenas duces tecum directed to the Public Defender and the Sheriff. Both moved to quash the subpoenas.

On June 21, 2002, the trial court heard argument on defendant's motion to dismiss and the Public Defender's motion to quash. On June 28, 2002, the court denied defendant's motion and granted the Public Defender's motion.

On July 16, 2002, defendant requested reconsideration. Defendant asserted the trial court could not properly decide his motion until it had reviewed all relevant materials from the Sheriff's Department, the public defender's office, and the district attorney's office in camera. Defendant attached a copy of the Sheriff's motion to quash, which stated in part:

"Prior to defendant's present counsel being appointed, while defendant was still represented by the public defender's office, it came to the Sheriff['s] Department's attention that defendant was having a romantic relationship with his public defender, Karol Repkow. Pursuant to that relationship Mr. [*sic* ] Repkow would bring items into the facility and give them to defendant which were considered contraband. Although several of these allegations could not ultimately be proven, there was the general belief that she was supplying defendant with information on other criminal defendants housed in the main jail, to enhance his status and facilitate his civil lawsuit against the department. Regardless of its origin, this information was used by defendant to intimidate and threaten other inmates into acting as witnesses to false claims of abuse. This resulted in additional criminal charges against defendant. There were also instances where Repkow engaged in illicit communications in violation of [ ] section 4570 with defendant while she placed herself in a strategic position outside the jail and communicated via gestures.[FN7] There were numerous hours of telephone calls made from defendant to Repkow's residence, and numerous letters of a sexual and romantic nature were exchanged between the two.

FN7. Section 4570 provides: "Every person who, without the permission of the .. . officer in charge of any ... jail ..., communicates with any prisoner or person detained therein, or brings therein or takes therefrom any letter, writing, literature, or reading matter to or from any prisoner or person confined therein, is guilty of a misdemeanor."

"Because of the extreme security risk posed by defendant by his relationship with Repkow, to maintain institutional security, and investigate the possibility of criminal charges against the defendant or Repkow, an investigation was commenced on the nature and extent of both the propriety of the relationship between the two, [and] the nature and extent of her misdeeds within the facility. Ultimately, certain facts of the investigation were shared with the Public Defender as they related to Repkow's conduct, and measures were taken to mitigate her access to the jail."

*7 On July 17, 2002, the prosecutor opposed defendant's request for reconsideration. He reiterated that he had not received any privileged information stemming from the investigation.

After argument on the request for reconsideration and on the Sheriff's motion to quash, on July 22, 2002 (the day jury trial commenced), the trial court ordered the Sheriff to provide materials for the court's in camera review. On July 26, 2002, the court specified the items to be provided:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"1. All conversations [ ], or portions of conversations [ ], regardless of how maintained (paper, audiotape, computer) between Defendant Clark and any of his counsel during such time as counsel represented Defendant Clark.

"As used in this order, 'conversations' or 'portions of conversations' is deemed to mean 'conversation and/or communication, whether oral or written.'

"With regard to defense counsel, the beginning date for such representation is 11/16/99 and the ending date is 1/9/01.

"This item shall be deemed to include conversations involving any attorney employed by the Sacramento County Public Defender.

"2. All conversations, or portions of conversation, regardless of how maintained (paper, audiotape, computer) between Defendant Clark and any of his non-Public[-]Defender attorneys ... during such time as those counsel represented Defendant Clark.

"With regard to these defense counsel, the beginning date for such representation is 1/9/01 and the representation is ongoing.

"3. The conversations, or portions of conversations referenced in items # 1 and # 2, above, shall also encompass all agents of counsel conversing or attempting to converse with Defendant Clark.

"4. Any conversations, or portions of conversations between Defendant Clark and the Office of the Public Defender of Sacramento County during the time of representation by the Office of the Public Defender (11/16/99 through 1/9/01) regardless of how maintained.

"5. Notes, memoranda, logs or records of any kind relating to such conversations and/or as to the chain of custody or distribution of such tapes/transcripts-the goal of the Court being to determine who has been afforded the opportunity to listen to or read about these conversations.

"6. In the event summaries were prepared concerning any conversations or portions of conversations referenced above, even if neither a recording nor a transcript of the conversation or portion of conversation was ever prepared, such summaries shall be deemed within the parameters of this order."

On July 31, 2002, the trial court ordered the District Attorney, the Public Defender, and the Sheriff to preserve all items covered by the July 26 order. The court simultaneously rescinded its prior order granting the Public Defender's motion to quash and ordered the Public Defender to appear in camera with whatever relevant evidence it had preserved.

*In camera proceedings*

On August 5, 2002, the Sheriff produced materials for the trial court's in camera review, and the court conducted an in camera hearing with the Sheriff. The Sheriff also submitted a declaration by Deputy Matthew Curtis, a jail housing officer during the relevant period. Curtis declared:

***8** "The Jail became aware of improper conduct on the part of Clark's former attorney, Karol Repkow. She was alleged to have brought in contraband for Clark, including liquor, cigarettes, pornography, [and] other materials. I was aware that Ms. Repkow's representation of Clark ended in early January [2001]. Because of the extreme security risk that Clark posed, I monitored and recorded many of his telephone calls to Ms. Repkow. With regard to these calls, I can make the following statements:

"1. That to my knowledge, I was the only one recording telephone calls between Clark and Ms. Repkow.

"2. Every telephone call I recorded was between Ms. Repkow and Clark, with the exception of only one. The one was between Clark and an unidentified woman made on or about March 6, 2001. In the conversation, Clark complained of abuse at the jail. At no time did the conversation trigger anything in my mind which would indicate that it was a legal call.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"3. To my knowledge, the tape from the above incident was given to Sergeant Jon Zwolinski and I did not get it back, notwithstanding what it says in the information report from that incident. I do not have the tape, did not make any copies of the tape, and never shared any portion of the tape with anyone from either the District Attorney's Office or the Public Defender's Office. I did, however, have conversations with the District Attorney's office regarding the nature of Clark['s] and Ms. Repkow's relationship, but limited my discussions to specific and general threats Clark had made against deputies and the jail.

"4. If I determined that a telephone call that Clark was attempting was a legal call, I would not record it, or immediately cease recording if I had already started.

"5. I deliberately did *not* record numerous phone calls by Clark which I determined to be legal in nature.

"6. I did not record *any* telephone conversations between Clark and Ms. Repkow prior to January 9, 2001.

"7. I did not record *any* telephone conversations between Clark and any other attorney or other legal representative after January 9, 2001, with the possible exception detailed in Item # 2, above."

Also on August 5, 2002, the defense attorneys and the Public Defender appeared separately in camera before the trial court. The defense attorneys asked the court to order that the Sheriff and/or the Public Defender produce any recordings of telephone conversations between defendant and Repkow. They alleged that recordings could have been made not only as described in the Curtis declaration, but by an automatic system.

The Public Defender in camera produced documentation that his office conflicted out of the case on January 9, 2001, and Repkow resigned from the office on April 6, 2001. The Public Defender also gave the trial court four CD's, containing over 60 hours of telephone conversations recorded at the jail (including 40 calls to the office and 23 to Repkow's home), that the Sheriff had provided to his office-all dated after January 9, 2001.

*9 The Public Defender testified in camera that his office learned of the Sheriff's concerns about Repkow in November 2000. After the Sheriff began to investigate, Repkow's co-counsel John Perkins expressed his own concerns about her conduct. Around November 16, 2000, the Public Defender ordered Repkow to cease representing or contacting defendant. Perkins remained as defendant's counsel until the public defender's office withdrew, and a supervisor in the office also stayed on top of the case; defendant was never unrepresented or abandoned by counsel.

Once the Public Defender learned that Repkow had not only behaved improperly with defendant but had continued to contact him after being ordered to stop, he decided to terminate her and worked with her union to negotiate her resignation. The public defender's office had no contacts with the district attorney's office about this matter. The Public Defender did not know whether the Sheriff had opened or read defendant's legal mail.

*The trial court's orders*

On August 16, 2002, the trial court issued an order granting the Public Defender's motion to quash because the materials the office had provided did not support defendant's motion to dismiss.

After inspecting further materials produced by the Sheriff in camera, the trial court issued an order on September 20, 2002, granting the Sheriff's motion to quash. The court found:

"[T]here is no evidence that the Sheriff's Department recorded or listened to conversations between defendant and his counsel during the time that they represented him. The identity of the person with whom [defendant] was speaking in the telephone call referenced on [Exhibit D to the defense motion to dismiss] is not definitively resolved by the declarations and the tape of that call cannot be located. However, the Court is satisfied, based on the declarations submitted by the Sheriff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Department, that the call did not pertain to this case and that no part of this conversation was disclosed to the District Attorney.

"As reported by [Sheriff's counsel] in open court, telephone calls between defendant and Karol Repkow were taped, but only after she no longer represented him in this case. And there is no evidence that the content of these tapes was disclosed by the Sheriff's Department to the [d]istrict [a]ttorney's office.

"The court further finds that there is no evidence that the Sheriff's Department actually read mail between defendant and his attorneys at the time when they represented him.

"[¶] ... [¶]

"In sum, the information acquired by the Court in camera generally confirms the representations of [Sheriff's counsel] in open court and in the motion to quash:

"1) While Ms. Repkow was defendant's attorney, the Sheriff's Department suspected that Ms. Repkow was engaging in improper conduct at the jail.

"2) There was no taping of calls between defendant Clark and Ms. Repkow until after the Public Defender withdrew from the case.

***10** "3) There was no taping of calls between defendant and his other attorneys with the possible exception of the call identified on [Exhibit D to the defense motion to dismiss].

"4) The recordings provided to the [p]ublic [d]efender's office were calls recorded after January 9, 2001.

"5) No mail between defendant Clark and Ms. Repkow was read until after the Public Defender withdrew from the case.

"6) No mail between defendant Clark and his other attorneys was read.

"7) There are no documents, tapes, recordings, or other information responsive to the Court's order directed to the Sheriff's Department.

"The Sheriff's Department previously provided the Court with records, tapes, and a CD pertaining to defendant Clark. The Court has reviewed the records and listened to a significant portion of the tapes and CD. None of the records, tapes or the CD pertain in any way to conversations between defendant and his attorneys at the time he was represented by those attorneys. Nor are any of them relevant in any way to defendant's case or defendant's claims of misconduct by the Sheriff, the Public Defender, or the prosecution, or alleged prejudice to defendant's rights."

The trial court permitted defendant to "renew" his motion to dismiss. However, defendant did not do so.

**Analysis**

*No Sixth Amendment or Fourteenth Amendment violation*

Defendant does not dispute the trial court's factual findings in a clearly framed and properly headed argument. Defendant asserts, however, that the facts show a violation of his Sixth Amendment right to counsel and his Fourteenth Amendment rights to due process and a fair trial, requiring "[d]ismissal of this action" as "an appropriate sanction"; he also asserts these violations prejudiced him at trial. We disagree. We find no violation of defendant's constitutional rights, and therefore do not reach the question of prejudice.

The Sixth Amendment of the United States Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy ... the Assistance of Counsel for his defense."

The Fourteenth Amendment of the United States Constitution provides in part that no state shall "... deprive any person of life, liberty, or property, without due process of law...."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant asserts the taping of his conversations with Repkow created a breach of attorney-client confidentiality and the work-product privilege, thus infringing his Sixth and Fourteenth Amendment rights, at four separate phases of his pretrial case: (1) November 29, 1999, to November 16, 2000, when Repkow was defendant's counsel or co-counsel. (2) November 16, 2000, to January 9, 2001, when the public defender's office was still representing defendant and Repkow was still an Assistant Public Defender, though no longer assigned to the case. (3) January 9, 2001, when the public defender's office withdrew, to April 6, 2001, when Repkow resigned from that office. (4) After April 6, 2001, when Repkow remained an active criminal defense attorney in Sacramento County and received a court appointment in another high-profile homicide case. Defendant is wrong.

*While Repkow was still assigned to the case*

***11** Defendant asserts his rights were first violated " while the A[ssistant] P[ublic] D[efender] was still his attorney of record." (Capitalization omitted.) This assertion misstates the law. When the public defender's office handles a case, the Public Defender, not any individual deputy, is attorney of record. (*People v. Sapp* (2003) 31 Cal.4th 240, 256 .) If it were otherwise, a defendant could veto the Public Defender's decision to substitute one assigned deputy for another. In fact, the defendant may not do so. (*Id.* at p. 256; *Drumgo v. Superior Court* (1973) 8 Cal.3d 930, 934; *People v. Stroble* (1951) 36 Cal.2d 615, 629.) Thus a defendant's right to counsel is not violated merely because a deputy is investigated for malfeasance or even removed from the case, so long as the Public Defender remains attorney of record and continues conscientiously to represent the defendant. (See *People v. Velasquez* (1987) 192 Cal.App.3d 319, 329.) Here, according to his uncontroverted testimony, the Public Defender did that.

Defendant is also mistaken about the facts. Although he does not openly challenge the trial court's finding that no taping of his conversations with Repkow occurred until after January 9, 2001, when the Public Defender withdrew from the case, he asserts: "[F]or some time before mid-November 2000, the Sheriff's Department had been eavesdropping on [defendant's] and [Repkow]'s confidential communications." The record does not support him.

Defendant cites testimony that a deputy sheriff first told the Public Defender of the Sheriff's Department's "suspicions" in mid-November 2000. FN8 But that testimony, given by the Public Defender, does not show what triggered those " suspicions" or what the jail deputies had done by then to investigate them. In fact, the Sheriff's counsel represented to the trial court in camera that Repkow had been detected bringing contraband into the jail to other inmates before she began to represent defendant, and Deputy Curtis declared that Repkow was alleged to have also brought contraband in to defendant. The deputies could have observed this conduct without eavesdropping on confidential communications.

FN8. The Public Defender used the word " concerns," not "suspicions."

In defendant's reply brief, he cites other passages in the record for the first time to show that the Public Defender received tapes of conversations from the Sheriff as of November 2000. Assuming defendant may cite these passages for the first time in his reply brief to support an argument not clearly articulated in the opening brief-namely, that the trial court's findings of fact on this issue were in error (Cal. Rules of Court, rule 14(a)(1)(B); *Neighbours v.. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 3)-we reject defendant's reading of the record.

The Public Defender initially said he thought the Sheriff "may have" furnished one or more tapes in November 2000, when they first met to discuss the Repkow situation. But he later testified that the earliest recorded conversation he had was dated January 21, 2001, and denied that he had been provided any earlier tapes. In the final passage defendant cites, the Public Defender first showed some confusion about the dates of meetings with the Sheriff's Department, but then corrected himself to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

say that a meeting in which the Department agreed to furnish tapes occurred on March 15, 2001. The trial court, after hearing and weighing all of this testimony along with the showing made by the defense and the Sheriff, concluded the Public Defender did not receive tapes made while Repkow was still involved in the case. Defendant has shown no error in this finding.

***12** Defendant finally asserts baldly in his reply brief that if the Public Defender had not received tapes as of November 2000, he had no reason to remove Repkow from the case at that time, to direct that work on defendant's case stop, or to withdraw from the case. Defendant is wrong. We may infer that the Public Defender questioned Repkow about the allegations he had heard (not only from the Sheriff, but from Repkow's co-counsel John Perkins) and was not satisfied with her answers; if so, that was sufficient reason to remove her. Defendant's allegation that all work stopped on his case is unfounded: the Public Defender's contrary testimony was uncontroverted by any evidence. Finally, the Public Defender could reasonably have decided his office should withdraw out of an abundance of caution, given his inability to determine exactly how much damage Repkow's imprudent conduct might have caused.

Defendant also asserts that the Public Defender "was told the [Sheriff's] Department had intercepted [defendant]'s privileged attorney-client mail" during this time period. Defendant misreads this testimony also. The Public Defender did not state therein that the alleged interception of mail took place before mid-November 2000 or that he had been so informed; he gave no dates whatever. (He also did not state that the allegations were proven true.) FN9

FN9. In his reply brief defendant cites the following statement in the Sheriff's declaration in support of its motion to quash as proof that the Sheriff read defendant's legal mail while Repkow was still his counsel: "[N]umerous letters of a sexual and romantic nature were exchanged between the two." As this statement gives no dates, it fails to substantiate defendant's claim that the Sheriff read any mail between defendant and Repkow before she was removed from the case.

In short, defendant fails to show that the trial court erred when it found no evidence of taping or other intrusive activity by the Sheriff's Department while Repkow was still assigned to the case. Thus his claims of violation of the attorney-client privilege and the work-product privilege at this stage also fail.

*After Repkow was removed from the case*

Despite defendant's initial breakdown of the issue into four "stages," he lumps the remaining three "stages" into one: "after [Repkow] was removed from [the] case." Defendant asserts that even then Repkow "remained an attorney he consulted about his defense." (Capitalization omitted.) Therefore, according to defendant, the attorney-client privilege and the work-product privilege still applied to his conversations with Repkow. This argument rests on the fallacy we have already identified: defendant's incorrect belief that Repkow had some authority to represent him independent of her assignment by the Public Defender. Because she did not, she was not defendant's attorney after she was removed from the case, and any conversations they had from then on were not protected by attorney-client privilege or work-product privilege.

"Under [Evidence Code] section 954, a client holds a privilege to prevent the disclosure of confidential communications between client and lawyer. As pertinent here, a 'client' includes a person who 'consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him *in his professional capacity* ( [Evid.Code,] § 951), while 'confidential communications' include 'information transmitted between a client and *his or her lawyer in the course of that relationship* and in confidence' ( [Evid.Code,] § 952)." FN10 (*People v. Gionis* (1995) 9 Cal.4th 1196, 1207; italics added.)

FN10. In defendant's reply brief, he asserts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

correctly that Evidence Code section 954, which defines the attorney-client privilege, does not specify that the privilege applies only where there is a "professional relationship." However, this assertion ignores Evidence Code sections 951 and 952.

***13** "The attorney-client privilege is based on grounds of public policy and is in furtherance of the proper and orderly functioning of our judicial system, which necessarily depends on the confidential relationship between the attorney and the client. [Citation.] ... [B]y encouraging complete disclosures, the attorney-client privilege enables the attorney to provide *suitable legal representation.* [Citation.]" (*People v. Gionis, supra,* 9 Cal.4th 1196, 1207; italics added.)

In short, the attorney-client privilege depends on the premise that the "client" is consulting the attorney in the course of representation, or at least with the prospect of obtaining representation if needed. Here, however, defendant was represented by the Public Defender or by other counsel for indigent defendants at all times. Once removed from the case, Repkow could not play any licit part in representing defendant so long as he remained indigent. If she had "consulted" with him "about his defense" after being removed from the case and while he was represented by counsel of record, she would have acted in a manner totally inconsistent with the purpose of the attorney-client privilege: to further "the proper and orderly functioning of our judicial system, which necessarily depends on the confidential relationship between the attorney and the client." (*People v. Gionis, supra,* 9 Cal.4th 1196, 1207.) To go behind the trial court's and counsel's back in this way would have subverted the functioning of the judicial system and undermined the relationship between defendant and his counsel.

We note, however, that defendant fails to prove Repkow engaged in illicit conduct of this kind. He asserts, citing one passage in the record, that the tapes of his conversations with Repkow after her removal from the case included "discussions of [defendant]'s preparation for trial and [Repkow]'s suggestions for his defense at trial." But the passage defendant cites is not evidence. It comes from the argument of defendant's co-counsel in camera, not from sworn testimony. Co-counsel was apparently restating the contents of a declaration submitted to the trial court, but defendant does not cite to the declaration. Thus defendant has failed to show that co-counsel claimed to make these statements of his own knowledge. If not based on personal knowledge, co-counsel's statements were not competent evidence. (Evid.Code, §§ 140, 702; see *Bostic v. Love* (1860) 16 Cal. 69, 73 [attorney's pleadings]; *Goodwin v. Hammond* (1859) 13 Cal. 168, 169 [same]; *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1025-1026 [declarations on summary judgment]; *Schaefer v. Manufacturers Bank* (1980) 104 Cal.App.3d 70, 76 [attorney's declarations].) Therefore defendant's claim that Repkow purported to act as his counsel after her removal from the case is unsupported.

The work-product privilege also does not cover anything Repkow said or did after she was removed from the case. (As explained above, defendant has not shown that any communications between himself and Repkow were taped before that time.) The purpose of this privilege is to "(1) preserve the rights of attorneys *to prepare cases for trial* with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases; and (2) to prevent attorneys from taking undue advantage of *their adversary's* industry and efforts." (Code.Civ.Proc., § 2018, subd .(a); italics added.) Once off the defense team, Repkow was not preparing defendant's case for trial and was not an adversary of the prosecution.

***14** Furthermore, unlike the attorney-client privilege, which is held by the client (Evid.Code, § 953), the work-product privilege is held by the attorney. (*Lasky, Haas, Cohler & Munter v. Superior Court* (1985) 172 Cal.App.3d 264, 279; but see *Metro-Goldwyn-Mayer, Inc. v. Superior Court* (1994) 25 Cal.App.4th 242, 246-249.) Thus, even if the work-product privilege might apply, defendant would lack standing to raise it.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Conclusion*

Defendant cannot show that any surveillance occurred while Repkow was assigned to his case or that Repkow was still his attorney after the Public Defender removed her from the case. Therefore, the authorities he relies on, which all find or presume the violation of an actual attorney-client relationship, are inapposite. (See *Black v. United States* (1966) 385 U.S. 26 [17 L.Ed.2d 26]; *People v. Gionis, supra,* 9 Cal.4th 1196; *In re Jordan* (1974) 12 Cal.3d 575; *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252; *People v. Garewal* (1985) 173 Cal.App.3d 285; *In re Navarro* (1979) 93 Cal.App.3d 325.)

Defendant has failed to show any violation of his rights under the Sixth and Fourteenth Amendments of the United States Constitution. Accordingly, we need not consider his argument for prejudice.

*No "[o]utrageous [g]overnmental [c]onduct"*

Defendant also contends that the facts discussed above constitute outrageous governmental conduct requiring reversal. We disagree. Even assuming the federal doctrine of outrageous governmental conduct as a ground for dismissal or reversal is recognized in California law (see *United States v. Russell* (1973) 411 U.S. 423, 431-432 [36 L.Ed.2d 366, 373]; *Provigo Corp. v. Alcohol Beverage Control Appeals Board* (1994) 7 Cal.4th 561, 570), the trial court's findings of fact, which defendant has not shown to be erroneous in any way, satisfy us that no outrageous governmental conduct occurred here.

II

In addition to the conduct discussed above, defendant contends the Sheriff was guilty of "an overall pattern of oppression and harassment" before and during defendant's trial, also constituting outrageous governmental conduct, which deprived him of his due process rights and independently requires reversal. Specifically, defendant asserts that before trial, jail deputies repeatedly gave him disciplinary "write-ups" because they disliked him; forcibly sodomized him with a foreign object (see part I above); and while a motion concerning this incident was pending, handcuffed him and assaulted him again. Later, according to defendant, the deputies deliberately endangered his life by placing him in direct contact with Sureno gang members, knowing he had once testified against a leader of the Aryan Brotherhood, which assigns "contracts" for assassinations to Surenos; they maliciously placed him in a tiny holding cell without a toilet, forcing him to urinate on the floor; they sought to use dual escorts when moving him to and from the courtroom; they strapped him into a security chair in the courtroom; on one occasion, before bringing him from the holding cell into court, they searched him and the cell; and on another occasion during trial the escort officer "insisted on standing directly behind [defendant], between [defendant] and the jury panel, while assuming a very rigid military bearing, causing the defense to worry that jurors would interpret this as a signal that [defendant] was being dangerous." We conclude this issue is forfeited on direct appeal.

***15** In *People v. Jenkins* (2000) 22 Cal.4th 900 ( *Jenkins* ), our Supreme Court stated: "Defendant contends that numerous adverse conditions of confinement before and during the guilt phase of [his] trial cumulated to impair his ability to assist in his defense and to defend himself in violation of the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 15, of the California Constitution. He asserts that these violations included his right to due process of law, to assist in his own defense, to the effective assistance of counsel, to be present both physically and mentally at all proceedings against him, and ' not to be compelled to stand trial except when able to meaningfully assist his counsel.' He refers to periodic difficulties he experienced in obtaining access to the jail law library, to allegedly disruptive searches of his cell and legal materials, to periods in which he was deprived of appetizing food and kept in solitary confinement as punishment for disciplinary infractions in jail that he claims were not his fault, to transportation schedules that from time to time deprived counsel of the opportunity to confer with him in court after the daily proceedings

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had concluded and that deprived him of adequate sleep and the opportunity to work on his case, to being kept shackled while waiting to appear in court, and to the failure of jail authorities to protect him from the violence of other inmates. He contends that these adverse circumstances were imposed on him with the purpose of 'grinding him down' and that they cumulated to undermine his constitutional rights by so damaging his physical and mental condition that he was unable to assist counsel. He apparently contends that his condition was affected so adversely that he was, in effect, not ' present' at trial." (*Id.* at p. 999 .)

The court then observed: "We question whether the issue properly is before us on direct appeal. Although defendant repeatedly complained to the trial court regarding the conditions of his confinement, and on more than one occasion contended that he was-or soon would be-unable to assist in his defense as a consequence of adverse conditions of confinement, defendant does not assert on appeal that he made a motion for mistrial or other motion in which he asked the trial court to consider and rule on the contention that he asks this court to consider: that as a cumulative matter, adverse conditions of confinement before and during the trial deprived him of rights protected by the Sixth and Fourteenth Amendments...." (*Jenkins, supra,* 22 Cal.4th 900, 999-1000.) Defendant had also given no reason to deviate from "the general rule" that an appellate court will not consider claims which could have been raised in the trial court by an appropriate method but were not. (*Id.* at p. 1000.) [FN11]

FN11. However, the court went on to consider the defendant's arguments on the merits without stating any reason for doing so. (*Jenkins, supra,* 22 Cal.4th 900, 1000-1006.) We might speculate that it did so because *Jenkins* was a capital case, or because the court deemed the issues raised important enough to merit discussion despite the defendant's failure to preserve them for appeal. But whatever the court's reason for reaching the issues, it does not compel us to do likewise.

Here, as in *Jenkins, supra,* 22 Cal.4th 900, defendant fails to show that he made a motion for mistrial based on the alleged deprivation of his constitutional rights, or that he pursued this claim by any other means to the point of obtaining a ruling on it. By his own account, he made only one relevant motion: a pretrial motion for transfer to a contiguous county (§ 4007) following the alleged forcible sodomy incident.[FN12] The judge who heard the motion denied it on the ground that section 4007, which deals with general conditions of confinement, did not apply to defendant's complaint, and that he should seek a writ of habeas corpus instead. Defendant did not do so.[FN13]

FN12. Section 4007 provides in part: " When there is no jail in the county, or when the jail becomes unfit or unsafe for the confinement of prisoners, the judge of the superior court may, by a written order filed with the clerk of the court, designate the jail of a contiguous county for the confinement of any prisoner of his or her county, and may at any time modify or vacate the order."
Defendant asserts he also filed a civil lawsuit over this incident. He does not say what its outcome was, however. In any event, that suit was not before the trial court in this case and is not in the record on appeal.

FN13. Defendant's section 4007 motion contained one paragraph asserting that the conditions of his confinement, as shown by the alleged forcible sodomy and other events, violated due process under the Fourteenth Amendment of the United States Constitution. However, defendant does not explain why, once he was told that he could raise this issue only by a petition for habeas corpus, he did not do so and obtain a ruling on his contention.

***16** Although defendant and his counsel complained orally to the trial court about the other alleged misconduct he describes, defendant never filed any further motion on this subject. Indeed, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trial court expressly or impliedly invited him to make motions as to several specific allegations, yet he did not.

In short, defendant never "asked the trial court to consider and rule on the contention that he asks this court to consider: that as a cumulative matter, adverse conditions of confinement before and during the trial deprived him of rights protected by the Sixth and Fourteenth Amendments." (*Jenkins, supra,* 22 Cal.4th 900, 999-1000.) And, like the defendant in *Jenkins,* defendant offers no reason to deviate from the general rule that contentions not appropriately presented in the trial court are not preserved for appeal. (*Id.* at p. 1000.)

Defendant asserts in his reply brief that after his motion for transfer to a contiguous county was denied without the evidentiary hearing he had requested, any further motion would have been futile. We do not see why. The judge explained that his ruling was based strictly on his interpretation of section 4007 (which defendant does not challenge on appeal) and did not prejudice defendant's right to seek relief by writ. Defendant cannot reasonably argue that it would have been futile to renew his contention by the appropriate procedural vehicle. And he does not even try to explain why it would have been futile to make a new motion during trial asserting that the deputies' misconduct considered as a whole denied him due process.[FN14]

FN14. The judge who denied defendant's section 4007 motion was Judge Marlette. The judge who presided at trial was Judge Cecil.

Because defendant took no measures after the denial of his section 4007 motion to bring the issue he now raises to the trial court's attention by any appropriate means and obtain a ruling on it, the issue is not preserved for appeal. (See *Jenkins, supra,* 22 Cal.4th 900, 999-1000.)

III

Finally, defendant contends he suffered prejudice, including the violation of his Fourteenth Amendment rights to due process and a fair trial, from prosecutorial misconduct in closing argument.[FN15] We agree that misconduct occurred, but find that the trial court's admonition to the prosecutor, the prosecutor's subsequent statement to the jury, and defense counsel's response cured any possible harm. Therefore we reject defendant's claim of prejudice.

FN15. Defendant concedes he did not raise any federal constitutional ground when he moved for a mistrial based on the alleged misconduct, but notes that the trial court granted his request at the start of trial for a continuing order that all defense objections be deemed "federalized." We need not decide whether defendant is correct in claiming that this sufficed to preserve his current Fourteenth Amendment claim.

**Facts**

As previously noted, defendant testified that he went to the victim's home intending not to kill or rob him, but only to beat him for making advances to defendant's stepson. The defense argued to the trial court that the jury could credit this motive (which, if believed, might throw doubt on the alleged robbery and burglary special circumstances) only if it heard evidence that (1) defendant and his siblings were sexually molested or exposed to molestation in childhood, and (2) defendant had learned from his childhood and from prison that the way to deal with people who caused trouble was to beat them. Therefore, the defense sought leave from the trial court to put on evidence about defendant's upbringing and prison experiences in its case-in-chief to show why he was chronically angry and violent, and why he harbored bad feelings in particular about White people and child molesters. The prosecutor objected under Evidence Code section 352. The trial court overruled the objection, but advised the parties not to take up undue time with such evidence.

***17** Defendant thereafter testified at length about his background. As to his upbringing, he testified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that his father brutally beat him and his older brother; his older half-sister became sexually involved with his father; and when he was 11 or 12 he was sexually molested by older females. As to his experiences in confinement, he testified that he came to hate White people when first imprisoned at age 18 in an Idaho facility with almost no other Black inmates; he engaged in a great deal of violent and rebellious behavior in prison; he was diagnosed with mental disorders there and put on psychotropic medications most of the time; he had a high level of anger, especially toward child molesters; he asked the authorities not to release him on parole because he did not think he could control his anger; and after his release he no longer received his medications even though he still needed them. However, he did not put on any corroborating evidence as to his psychological and psychiatric history in his case-in-chief.

In closing argument, the prosecutor said:

"He talks about how awful that [prison] experience was, how traumatic it was....

"[¶] ... [¶]

"What other evidence have you heard about all of this information about [defendant]'s background and how traumatic it was, except from [defendant]? You have no other source for this information. There was no psychiatric or psychological evidence presented to you to support these naked insinuations. *Don't you think that if there were such evidence available, that if this were really the case, that the defense would have presented that evidence? It wasn't presented because it doesn't exist. It's all a smoke screen of deceit and deception to try and fool you, to try to make you feel sorry for [defendant ], to try to turn you away from what he really did. There were no family members brought in, just [defendant ]* .... " (Italics added.)

Defense counsel did not object. After the jury left for lunch, however, counsel moved for mistrial based on the prosecutor's statement.[FN16] Counsel asserted the defense had precisely the kind of evidence the prosecutor said it did not have, and the prosecutor knew it: the defense had given him two experts' reports plus defendant's prison records, which documented his mental health history.

FN16. Defense counsel, Mark D. Millard, asserted that his co-counsel, Jan David Karowsky, had probably failed to object because he was not as familiar with that part of the evidence as Millard, and Millard thought he could not object under the agreed procedural rules because Karowsky would be making the final argument.

The prosecutor said he had merely commented on the defense's failure to call possible witnesses. The trial court pointed out: "Well, you actually did say they weren't called because the information doesn't exist."

The prosecutor argued he had understood the defense to be claiming that defendant's history was " the sole reason" he committed his crimes-i.e., his background and experiences "pushed him over the edge that night"-and the defense had not put on corroborating evidence to support that theory because "that fact doesn't exist." The prosecutor admitted the defense could call family members and psychiatric experts, "[b]ut what I am saying is that they cannot produce any evidence that would show that this is the only reason this happened. And that that is the evidence that doesn't exist."

***18** The trial court said the prosecutor's "choice of words" before the jury was "unfortunate," but " fixable" and not misconduct; however, the court would defer ruling on the motion for mistrial until the prosecutor had finished his closing statement. The court also said: "I think the burden is on [the prosecutor] to dig his way out."

When the jury returned, the prosecutor said the following:

"I would like to go back to a point we were discussing just before we broke for lunch and clarify a point that I made, something that I said. Because none of us involved in this process want to mislead you or confuse you in any way. And I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certainly don't have any intent to confuse you or mislead you in anything that I say."

After quoting his prior statement, the prosecutor went on:

"I'm not saying to you-*I'm not telling you that the defense could not have brought in family members to say what they would say on this issue. Or that they couldn't have brought in psychologists or psychiatrists to give some opinion on this issue.* [ *Defendant* ] *testified about being at the California Medical Facility and being seen by psychiatrists and taking medications. Being given a prescription prior to his release.*

"*But the evidence that can't be produced, the evidence that doesn't exist is the fact that this is the sole reason that caused* [*defendant* ] *to do what he did to Edward Sherriff.* You-the defense told you in its opening statement that they would present this information to you, that you could see [defendant] had this background ... and that on that night of October 20th that all of this sort of came to a head and this is what made [defendant] do what he did.

"A person's background and experience, life experiences certainly have an influence on them [*sic* ]. Some good, some bad. Some can be overcome, sometimes they're not overcome. But each person responds differently.

"The rendition that you have been given from [defendant] is [defendant]'s contentions [*sic* ]. Whether they were as traumatic and influential in his life is a decision you're going to have to make. Based on what you have heard. Perhaps you will find that it did have an influence on him, it did harden his outlook on life, it did make him a violent person. *But it is not the sole reason that he did what he did that night. And that's what I meant when I said that there is no evidence, that that evidence doesn't exist.*

"No one is going to be able to come in and say what this sort of background ... did to [defendant]. People can say what they saw, people can give opinions, but they cannot say yes, this is what caused this. The only person that knows what was in [defendant]'s mind that night is [defendant]. He has given you his account. I'm suggesting to you that his account is very biased and shaded and self-serving.

"As I said, I submit to you that there is no evidence to show that this fact alone, these background experiences that [defendant] has said is what made him kill Edward Sherriff. The defense in its closing argument will surely tell you the opposite. As I said early on, what the attorneys tell you is not evidence. We are advocates for a position. You are the ones that are going to decide this based on all of the evidence that you've heard. What you find credible, what you find not to be credible, what you find to have value, what you find not to have value. So I hope that that clarifies in your mind what I said what I meant to say [*sic* ], if my initial chosen words were not the best I apologize to you." (Italics added.)

***19** After the prosecutor finished his first closing statement, the trial court invited further argument on the mistrial motion. Millard asserted that the prosecutor's "clarification" had not cured the harm from his original remarks. Disagreeing, the trial court denied the motion.

In his closing argument, defense co-counsel Karowsky quoted the prosecutor's original remarks, then stated: "Folks, he knows there's psychiatric reports. He has them, and we have them. And we've got more. He stood here-neither side chose to present them, for whatever reasons, and then there are instructions that talk about them. It wasn't necessary."

**Analysis**

" ' "A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so 'egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Hill* (1998) 17 Cal.4th 800, 819.) A showing of bad faith is not required. (*Id.* at pp. 822-823.)

To show prejudice from prosecutorial statements to the jury amounting to misconduct, a defendant must show a reasonable likelihood that the jury understood or applied the statements in an improper or erroneous manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970.) The reviewing court must consider the statements in the context of the prosecutor's entire argument (*People v. Dennis* (1998) 17 Cal.4th 468, 522) and may not " 'lightly infer' that the jury drew the most damaging rather than the least damaging meaning from [those] statements." (*People v. Frye, supra,* 18 Cal.4th at p. 970.)

If no federal constitutional violation exists, the test for prejudice is whether it is reasonably probable that a result more favorable to the defendant would have occurred absent the misconduct. If federal constitutional error occurred, the state must prove beyond a reasonable doubt that the misconduct did not contribute to the verdict. (*People v. Roybal* (1998) 19 Cal.4th 481, 520.)

The People urge us to find defendant's contention waived because he did not immediately object and request an admonition to the jury and he has not shown why such objection and admonition could not have cured any harm. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1133.) Ordinarily we would agree, but in this case defense counsel offered a plausible explanation both for his own and co-counsel's failure to object immediately, and counsel moved for mistrial very shortly after the alleged misconduct. Therefore we shall give defendant the benefit of the doubt and find the issue preserved for appeal.

On the merits, contrary to the trial court's and the People's view, we think the prosecutor's original statement to the jury was misconduct. The prosecutor told the jury that the defense did not put on evidence to corroborate defendant's story about his "background and how traumatic it was" because such evidence did not exist. When defense counsel asserted it did and the defense had furnished it to the prosecutor, the prosecutor did not deny he had received it or say he had been unaware of it. Instead, he claimed he had meant something other than what his statement to the jury plainly conveyed. This "explanation" conceded that that statement was deceptive on its face.

***20** Furthermore, the statement impugned not only defendant's honesty, but also that of defense counsel. The prosecutor did not merely assert that corroborative evidence did not exist: he asserted that, instead of presenting such evidence, the defense had put up "a smoke screen of deceit and deception to try and fool you." This comment cannot reasonably be read as referring only to defendant, because the prosecutor preceded it by asking rhetorically: "Don't you think that if there were such evidence available ... the defense would have presented this evidence?" To impugn the integrity of defense counsel is prosecutorial misconduct. (*People v. Wash* (1993) 6 Cal.4th 215, 265; *People v. Thompson* (1988) 45 Cal.3d 86, 112 .) [FN17]

FN17. We disagree with defendant, however, so far as he asserts the prosecutor also committed misconduct by appealing to the jurors to decide based on emotion rather than a dispassionate evaluation of the trial evidence. Rightly or wrongly, the prosecutor was urging the jury to evaluate the evidence presented by the defense on this issue.

Defendant cannot show prejudice, however, because the sequence that followed the misconduct cured any harm from it. First, the trial court admonished the prosecutor that his remarks were " unfortunate" and the burden was on him to "dig his way out." Next, the prosecutor explained at length to the jury that he had not meant to deny that the defense could put on family members and expert witnesses to corroborate defendant's account of his background: he had merely meant to argue that nothing in defendant's background, even if corroborated, could explain or justify his crimes. Finally, defense co-counsel told the jury without objection that the defense did indeed have corroborating expert evidence on this issue. In light

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of remarks by both counsel, the jury could not have gone into deliberations either uninformed or misinformed about the true state of affairs. Thus any harm from the prosecutor's original remarks was fully cured.

Although defendant asserts that the misconduct rose to the level of federal constitutional error, he does not even try to show the "pattern of conduct" required under the federal standard. (See *People v. Hill, supra,* 17 Cal.4th 800, 819.) In any event, defendant did not suffer prejudice under any standard. The prosecutor's isolated remark, amended soon after by his followup comments, did not infect the trial with fundamental unfairness. And since any harm done by the misconduct was cured, there is no reasonable probability that defendant would have obtained a more favorable outcome absent the misconduct.

IV

The trial court sentenced defendant on counts two and three, the robbery and burglary counts, to the upper terms of six years, then stayed them pursuant to section 654. The court imposed the upper terms because defendant was on parole at the time of the offenses. Defense counsel did not object.

Applying the Sixth Amendment to the United States Constitution, the United States Supreme Court held in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi* ) that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be tried to a jury and proved beyond a reasonable doubt. (*Id.* at p. 490 [147 L.Ed.2d at p. 455].) Thus, when a sentencing court's authority to impose an enhanced sentence depends upon additional fact findings, there is a right to a jury trial and proof beyond a reasonable doubt on the additional facts. (*Blakely, supra,* 542 U.S. ---, ---- [159 L.Ed .2d 403, 413-414].)

***21** Relying on *Apprendi, supra,* 530 U.S. 466, and *Blakely, supra,* 542 U.S. ----, [159 L.Ed.2d 403], defendant claims the trial court erred in imposing the upper term on counts two and three because the court relied upon facts not submitted to the jury and proved beyond a reasonable doubt, thus depriving him of the constitutional right to a jury trial on facts legally essential to the sentence. Assuming *Apprendi* and *Blakely* apply to sentences stayed under section 654, the contention fails because defendant did not raise the issue in the trial court. (See *United States v. Cotton* (2002) 535 U.S. 625 [152 L.Ed.2d 860] ( *Cotton* ).)

In *Cotton, supra,* 535 U.S. 625, a case decided after its decision in *Apprendi, supra,* 530 U.S. 466, the Supreme Court unanimously held that a defendant's failure to object to *Apprendi* error in the trial court forfeits the right to raise it on appeal if the error did not seriously affect the fairness, integrity, and public reputation of the judicial proceedings, i.e., if a factor relied upon by the trial court in violation of *Apprendi* was uncontroverted at trial and supported by overwhelming evidence. (*Cotton, supra,* 535 U.S. at p. 631 [152 L.Ed.2d at p. 868].)

Such is the case here. Overwhelming evidence presented at trial established that defendant was on parole when he committed the offenses charged in this case: defendant himself testified that he was released on parole in June 1999, only four months before the offenses. Defendant's continuing parole status as of October 1999 was uncontested. Finally, defendant did not raise an *Apprendi, supra,* 530 U.S. 466, objection when that fact was used by the trial court to impose the upper term. Consequently, defendant has forfeited his right to raise an *Apprendi/Blakely* challenge to the upper term. ( *Cotton, supra,* 535 U.S. 625, 631 [152 L.Ed.2d at p. 868]; see *People v. Cruz* (1995) 38 Cal.App.4th 427, 433 [one valid factor is sufficient to expose defendant to the upper term].)

DISPOSITION

The judgment is affirmed.

We concur: SCOTLAND, P.J., and BLEASE, J.
Cal.App. 3 Dist.,2004.
People v. Clark
Not Reported in Cal.Rptr.3d, 2004 WL 2326373 (Cal.App. 3 Dist.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.