1          IN THE SUPERIOR COURT OF CALIFORNIA

2          IN AND FOR THE COUNTY OF SACRAMENTO

3     HONORABLE THOMAS M. CECIL, JUDGE, DEPARTMENT 23

4               ---oOo---

5  THE PEOPLE OF THE STATE OF CALIFORNIA, )

6                         )

        -vs-             )  Number 99F09138

7                         )

8  FREDERICK ONEAL CLARK,        )

9               Defendant. )

10  _____ )

11

12               ---oOo---

13    REPORTER'S TRANSCRIPT OF DAILY PROCEEDINGS

14           TESTIMONY OF

15          **JAMES FALLMAN**

16               ---oOo---

17      FRIDAY, OCTOBER 18, 2002

18               ---oOo---

19          APPEARANCES:

20    For the People:

21        JAN SCULLY, District Attorney for the
           County of Sacramento,
22        State of California,
           By:  FRANK C. MEYER
23           Deputy District Attorney

24    For the Defendant:

25        MARK D. MILLARD, Attorney at Law
           Sacramento, California
26

27               ---oOo---

28      Araceli Plasencia, CSR No. 8687


SACRAMENTO COUNTY OFFICIAL COURT REPORTERS

1                       I   N   D   E   X

2                        ---oOo---

3    FRIDAY, OCTOBER 18, 2002

4    PROCEEDINGS OUT OF THE PRESENCE OF THE JURY RE

5    VIDEO LINK CONDITIONAL EXAMINAITON   ....................3

6    WITNESS FOR THE DEFENDANT:

7                    (Via video link technology)

8    JAMES FALLMAN

9        Direct Examination by Mr. Millard .............4
         Cross-Examination by Mr. Meyer ...............16
10       Redirect Examination by Mr. Millard ..........23
         Recross-examination by Mr. Meyer .............33
11       Further Redirect Examination by Mr. Millard ...35
         Further Recross-Examination by Mr. Meyer ......38

12

13                      ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1              FRIDAY, OCTOBER 18, 2002
 2                   ---oOo---
 3         In the matter of the People of the State of
 4    California vs. FREDERICK ONEAL CLARK, Defendant, Court
 5    Number 99F09138, came on this day before the Honorable
 6    Thomas M. Cecil, Judge of the Superior Court of California,
 7    in and for the County of Sacramento, sitting in
 8    Department 23.
 9         The People were represented by Frank C. Meyer,
10    Deputy District Attorney.
11         The Defendant was not personally present, but was
12    represented by Mark D. Millard, Attorney at Law.
13         The following proceedings were then had via video
14    link:
15                   (NO JURY PRESENT)
16         THE COURT ATTENDANT:  Please come to order.
17    Department 23 is now in session.
18         MR. MILLARD:  Okay.  If we could have the witness
19    sworn, please.
20         THE CLERK:  Mr. Fallman, if you can raise your right
21    hand?
22         You do solemnly swear that the testimony you're
23    about to give in the cause now pending before this court
24    will be the truth, the whole truth and nothing but the
25    truth, so help you God?
26         THE WITNESS:  I do.
27         THE CLERK:  Thank you.
28         Will you please state your name for the record and
```

1    spell it, please?

2            THE WITNESS:  James Fallman, F-A-L-L-M-A-N.

3            THE CLERK:  Thank you.

4                        TESTIMONY OF

5    JAMES FALLMAN, witness called on behalf of the Defendant:

6                    DIRECT EXAMINATION

7    By MARK D. MILLARD, Attorney at Law:

8    Q.      Mr. Fallman, you and I have met on -- by the

9    telephone before.  I'm Mark Millard.

10   A.      Right.

11   Q.      And Mr. Meyer's here with me, and as you know, we're

12   here in a case called People versus Frederick Oneal Clark?

13   A.      Yes, sir.

14   Q.      Okay.  First of all, Mr. Fallman, could you tell us

15   where you're at right now?

16   A.      I'm in Crescent City, California, about 20 miles

17   from the Oregon border, on the ocean.

18   Q.      A very long way from here, correct?

19   A.      Somewhat.

20   Q.      Okay.  And what do you do?

21   A.      I'm a senior deputy district attorney for Del Norte

22   County.

23   Q.      And Del Norte County -- I think that's where you are

24   now.  You're way up on the coast, right?

25   A.      Right.

26   Q.      And we're doing this by kind of a video link up,

27   which I don't know the technical term for it, but in any

28   event, you're up at a certain location.  Where is that?

1    A.    I'm at the Board of Prison Terms room in Pelican Bay

2    State Prison.

3    Q.    Okay.  And we're here in Department 23 of the

4    Sacramento Courthouse.

5          Now, sir, how long have you been with the Del Norte

6    County District Attorney's Office?

7    A.    Since December 31st, 1990.

8    Q.    Okay.  And what do you do there?

9    A.    I prosecute the felonies that are related to Pelican

10   Bay State Prison, and occasionally I'll prosecute a street

11   case, but not too often.

12   Q.    Okay.  When you say prosecute cases involving

13   Pelican Bay State Prison, do these cases mostly involve

14   inmates?

15   A.    Ah, yes.  I have prosecuted several noninmate cases,

16   but most -- well over 99 percent are inmate cases, yes.

17   Q.    And what about the other percent?

18   A.    Those are officer misconduct cases.

19   Q.    In other words, where a correctional gets in

20   trouble?

21   A.    Yes.

22   Q.    Okay.  Now, I'd like to take you back a couple of

23   years and ask if you know a guy by the name of Frederick

24   Oneal Clark?

25   A.    Yes, I do.

26   Q.    And how did you get to know Fred Clark?

27   A.    Well, he perjured himself in a -- one trial that I

28   did against a man named Gary Littrell, and then he came

1    forward and admitted that he had perjured himself in the

2    trial of Gary Littrell and said that he would be willing to

3    tell the truth in the case of the People versus Elliott

4    Scott Grizzle.

5    Q.     Okay.  Who were Littrell and Grizzle?

6    A.     Gary Littrell and Elliott Scott Grizzle are reputed

7    to be members of the so-called Aryan Brotherhood prison

8    gang.

9    Q.     What is that?

10   A.     That is a white supremist Nazi type group of

11   prisoners that very much, in my perspective, run activities

12   for the white race on the A and B yards and in the SHU

13   department -- the SHU means security housing unit -- at

14   Pelican Bay, as well as possibly statewide in the 33

15   prisons and have some affect out of state.

16   Q.     Okay.  Does the Aryan Brotherhood, so far as you

17   know, also have members that are outside prison custody?

18   A.     Yes, they do.

19   Q.     In other words, basically, the Aryan Brotherhood is

20   a prison gang, correct?

21   A.     It's a prison gang with ramifications beyond the

22   prison.

23   Q.     Is it considered a violent gang?

24   A.     Absolutely.

25   Q.     All right.  Now, the first case that you told us

26   about involved Mr. Littrell?

27   A.     Gary Littrell.

28   Q.     Yes.

1        When was that prosecuted?

2    A.    I don't remember the exact year, but it was probably

3    around '97 or '98.

4    Q.    What was the charge?

5    A.    First degree murder, conspiracy to commit murder,

6    and I believe that he was subject to three strikes -- yes,

7    he was.  Three strikes.

8    Q.    Okay.  Without going into the details of the trial,

9    what generally had Mr. Littrell done?

10    A.    Mr. Littrell had strangled his cellmate -- killed

11    his cellmate after his co-conspirator, Mr. Grizzle, had

12    mixed up a concoction of inmate-manufactured alcohol that

13    we colloquially call pruno, intermixed with methylcarbonol

14    and indomethacin which the doctors -- one of which the

15    doctors told me was some sort of a muscle relaxant.  And I

16    don't remember what the pharmacological effects were of the

17    other one.

18        But the bottom line of it was that these two people

19    conspired to get Littrell's cellmate incapacitated on

20    alcohol and medicine, and then Littrell strangled him.

21    Q.    Okay.  Now, pruno is a kind of a prison-manufactured

22    alcohol using a bunch of fruit and, you know, things of

23    that nature, that they sort of let ferment; is that right?

24    A.    Absolutely.

25    Q.    Okay.  After the Littrell case -- when I say the

26    case, I mean the trial -- Mr. Clark approached you in some

27    manner, correct?

28    A.    Not me personally, but I believe that he approached

1    possibly Lieutenant John McKinney.   I'm not sure which
2    one -- it would have had to have been one of the people --
3    prison authorities, and they alerted me to it, that he
4    wanted to talk to us.
5    Q.    And what happened then?
6    A.    We talked to him, and he said that he had had a
7    change of heart and that he would testify truthfully if
8    called to the stand in the second trial of People versus
9    Elliott Scott Grizzle.
10   Q.    Okay.  Actually, Mr. Littrell was convicted anyway,
11   wasn't he?
12   A.    He was convicted of second degree murder, but he was
13   found not guilty of the conspiracy to commit murder.
14   Q.    All right.  Do you remember approximately when it
15   was that Mr. Clark approached someone who got in contact
16   with you regarding his change of heart?
17   A.    The best I can tell you on that, it would have been
18   after -- well after the Littrell case was over and near the
19   beginning of the Grizzle trial, but -- but -- somewhat
20   prior to the beginning of the actual trial, I believe, of
21   Grizzle.  Lieutenant McKinney probably could be more
22   specific.
23         There's also another person who may know the answer
24   to that, and he's in Rancho Cordova, and his name is
25   Special Agent Dan Smith of the special service unit there
26   at the Department of Corrections.
27   Q.    In any event, because of Mr. Clark's contact with
28   people in the prison system, you eventually wound up having

1  a direct discussion with Mr. Clark about what he knew

2  connected with the Grizzle and Littrell case, correct?

3  A.      Yes.  Along with McKinney and -- I think Dan Smith

4  might have been there, but I'm not sure, and a DA intern up

5  here named Kelly Keifer.  I believe she was involved in his

6  statement -- in that statement.

7  Q.      Okay.  Approximately when did that statement take

8  place?

9  A.      I think that I first got a statement with him -- and

10 my memory could be off on this.  I don't have records to

11 look at -- but I believe that that -- that I actually

12 started talking to him at the beginning of trial --

13 somewhere near the beginning of trial.  I could have taken

14 his statement slightly prior to trial.

15      And the normal place that we take those statements

16 is in the room that I'm in right here.

17      And I've seen so many inmates since then I'm not

18 sure -- what I do remember is talking with him in a holding

19 cell at the Del Norte County courthouse, and my best memory

20 is that was right near the beginning of the trial.

21 Q.      And when was the Grizzle trial?

22 A.      Again, that probably would have been in '98.  I'm

23 just guessing.  I don't have those files to give you the

24 exact dates.

25 Q.      You know, I have a document here, and maybe this

26 will help refresh your recollection.

27      And I understand there's some way when we're doing

28 this that we can actually feed it in, but I don't know how

1    to do.  So what I think I'm going to do is --

2    A.    Just tell me what it is.  I might remember it.

3    Q.    Yeah.  What it is, is the verdict form in the

4    Grizzle case.

5    A.    That will do.

6    Q.    Okay.  Actually, if it's okay with Frank Meyer --

7    with Mr. Meyer here, maybe I'll just read it to you.

8          MR. MILLARD:  Is that okay?

9          MR. MEYER:  (Nods head.)

10    Q.    (By Mr. Millard)  Okay.  The verdict form indicates

11    that the verdict of by guilty of one count of murder was

12    returned on February 19, 1999.

13          Does that sound about right?

14    A.    Okay.  '99 is probably what it was then.  I'll go

15    with what that paper says.

16    Q.    All right.  And -- okay.  So the trial then would

17    have been --

18          Was this one of these long trials that maybe started

19    late in '98 and finished in '99, or is this one that --

20    A.    I think this trial took probably two weeks or less.

21    Q.    Okay.

22    A.    Somewhere in the area of two weeks.

23    Q.    All right.  Now, when you contacted Mr. Clark, did

24    he tell you why he had had the change of heart and decided

25    to come forward?

26    A.    Yes, he did.

27    Q.    And what did he say?

28    A.    Um, he said that he had been willing to accept money

1   to perjure himself in the first case of Littrell where his

2   testimony apparently was partially successful in sabotaging

3   my case because they knocked our first -- our attempt to

4   get first degree murder and successfully got it down to a

5   second degree.

6        And I believe based largely on his testimony, or

7   somewhat on his testimony, that they were able to get rid

8   of the conspiracy count.  That was found to be not guilty.

9   That was found not even to exist by the jury.

10       And -- I don't remember the specifics of what he

11   perjured himself as to in the Grizzle case.

12       But to answer your question, when he came forward he

13   says, they now want me to go further.  He says, I have

14   someone -- I have a relative who is either in the

15   Sacramento Sheriffs Department or the Sacramento Police

16   Department.  And I'm not sure which agency he said, but he

17   said I have a relative -- I don't know if that was blood

18   relative or in-law -- who has access to law enforcement

19   computers.

20       And Rascal, which is the nickname for Elliott Scott

21   Grizzle, has now asked me to do more than just perjure

22   myself like I did for his buddy Littrell.  He wants me to

23   have my source who has access to law enforcement computers

24   see if they can find the home address -- or the changed

25   address from DMV records, or however law enforcement would

26   do it using a computer, which I personally am not quite

27   sure how they do that.  He said I want -- Grizzle wanted

28   Clark to have Clark's relative find the -- the relatives of

1   another inmate named Brian Devlin Healy (ph) so that --

2   since Healy had been placed in the federal witness

3   protection because Healy was testifying against both

4   Littrell in case one and Grizzle in case two, that the

5   Aryan Brotherhood wanted to kill Healy, but they couldn't

6   get to him because he was in the federal witness

7   protection -- or he was in the process of

8   going into it.

9        And so what -- instead they knew he had a daughter,

10  and they wanted to find the last known address of the

11  family so that they can put a hit on the daughter.

12       Mr. Clark stated that Scott Grizzle said, we're

13  going to find the daughter, and the cops will find her

14  buried in the ground head down with her legs sticking out

15  of the ground.  And he said to me, I didn't want to be part

16  of any Polly Klaas, and so I'm willing to testify

17  truthfully about this because now they're not just offering

18  me money to lie.  They're offering me money to kill a

19  little girl, and I don't want anything to do with that.

20  Q.      All right.  And that happened somewhere around the

21  start of the Scott Grizzle trial, which would have been in

22  early 1999?

23  A.      I'm assuming that that's -- that's my best memory.

24  You can double check my memory with those two officers, Dan

25  Smith -- and I'll give you his phone number if you want it.

26  Q.      Okay.  Well, we may ask you for that later, but I

27  think since this actually is really recorded testimony --

28  and I believe that there is, if I'm not mistaken, a

1   prohibition against phone numbers and actual addresses.

2   A.    Oh.

3   Q.    I think maybe we should not do that at this time.

4   A.    Okay.  Okay.

5   Q.    Okay.  So Mr. Clark told you all this information

6   that you just told us about?

7   A.    Best of my recollection.  And I think that's how he

8   testified in open court once he took the stand.

9        He did, in fact, take the stand and testify 180

10  degrees different from what he had testified to in the --

11  the Littrell case when he got on the stand against Grizzle.

12  And I think largely because of Clark's testimony that there

13  was a different result.

14       On the morning of trial --

15       MR. MEYER:  I'm going to object to the narrative

16  form of the answer.

17       MR. MILLARD:  Okay.

18  Q.    (By Mr. Millard)  I'm not really sure whether

19  Mr. Meyer's -- what Mr. Meyer just said came through, but

20  in any event, let's just kind of stop for a second and

21  restart.

22  A.    Okay.

23  Q.    Okay.  In any event, Mr. Clark testified in the

24  Scott/Grizzle trial, and eventually that case came to a

25  verdict, and that verdict was --

26  A.    Yes.

27  Q.    -- what?

28  A.    First degree murder, guilty; conspiracy to commit

1    murder, guilty; and three strikes.

2    Q.      Now, am I correct that Mr. Grizzle actually had a

3    parole date coming up, I think, about two years or so down

4    the line from when his trial took place; in other words,

5    this guy was set to get out?

6    A.      He was set to get out.  I don't know if it was

7    precisely two years, but it was a small number of years

8    like that, yes.

9    Q.      All right.  And you wanted to keep him in?

10   A.      Absolutely.

11   Q.      And Mr. Clark helped you do that?

12   A.      And who?

13   Q.      Mr. Clark helped you do that?

14   A.      Yes, he did.

15   Q.      Okay.  And I believe you have an opinion as to the

16   benefit or the value of Mr. Clark's cooperation.  Could you

17   tell us what that is?

18   A.      Yes.

19           Well, I also, I believe, sent a letter to the Board

20   of Prison Terms to the effect of answering the question

21   that you just asked.  And I feel that he did confer benefit

22   on society by finally coming forward, even though he

23   perjured himself in case number one and telling the case

24   (sic) in case number two.

25           And the reason for that benefit is shown by the

26   result:  Case number one, not guilty on the conspiracy to

27   commit murder, and only a second degree murder on the

28   actual strangler, where -- who was in the cell with the

1   victim.  Whereas on case number two, the large difference
2   in the case was Clark's testimony.  I got a first degree
3   murder --
4           MR. MEYER:  I'm going to object.  I'm going to
5   object on the narrative, and the opinion is irrelevant.
6   Q.      (By Mr. Millard)  Well, okay -- why don't we just
7   maybe kind of tie this up this way, Mr. Fallman.
8           Mr. Clark -- as a prosecutor you felt that
9   Mr. Clark's testimony was of benefit to society; is that
10  fair to say?
11  A.      Yes.
12  Q.      Okay.  And at some point did you become aware that
13  there had been a request that Mr. Clark be prosecuted
14  for -- I believe it was a felony battery on a psychologist
15  in Pelican Bay by the name of Dr. Doran?
16  A.      I don't recall that.  That's possible.  I just don't
17  remember now.
18  Q.      Okay.  That wasn't something that -- it wasn't a
19  case that you were asked to review as to whether it should
20  be prosecuted then?
21  A.      I don't remember that case.  It's possible.  I see
22  hundreds of cases.  I'm probably going to review a hundred
23  cases today after we're through here.  I don't remember
24  that one.  I don't remember that doctor's name.
25  Q.      Okay.  All right.
26          Well, since you have so many cases to review, I
27  think at least for now I will conclude at least on this
28  topic and let Mr. Meyer ask further questions that he has.

1    A.    Okay.

2    Q.    Thank you.

3                         CROSS-EXAMINATION

4    By FRANK C. MEYER, Deputy District Attorney:

5    Q.    Good morning, Mr. Fallman.  How are you?

6    A.    Fine, sir.

7    Q.    And you are aware of what Mr. Clark is being

8    prosecuted for in this case?

9    A.    Ah, yes, I believe I am.

10   Q.    And you're aware that he's already been convicted of

11   first degree murder with special circumstances?

12   A.    Yes, yes.

13   Q.    Now, in the -- and I think just to make it simple

14   we'll call it the Littrell trial, which was the first one,

15   and the Grizzle, which was the second one.

16   A.    Right.

17   Q.    So trial one and trial two.

18   A.    Yes, sir.

19   Q.    And you were aware Mr. Clark testified for the

20   defense in the Littrell trial?

21   A.    Yes.

22   Q.    And then he came forward afterwards and spoke to you

23   about wanting to tell the truth, as he says, and testify

24   for you in the Grizzle case; is that right?

25   A.    Or to testify truthfully -- what we thought was

26   truthfully as he explained it to us in the Grizzle case,

27   yes.

28   Q.    All right.  Was there any way you could corroborate

1    what Mr. Clark was telling you?

2    A.    He knew the age of Healy's child, and there was no

3    way that Healy would have told that to him because Healy

4    was an Aryan Brotherhood dropout, a hater of black people.

5    Healy was a white supremist.  There's no way that a white

6    supremist, in my experience with the Aryan Brotherhood up

7    here, is going to tell a black man the name and age of his

8    child, and the man knew that.

9    Q.    Well, if what Mr. Clark --

10    A.    Clark knew that.

11    Q.    If Clark had these connections where he could get

12    this information from another source, he could get it from

13    someone other than Mr. Healy; isn't that right?

14    A.    Well, I suppose, but he had very specific

15    information.

16    Q.    Now, why did you make the deal with Mr. Clark?

17    A.    What deal are you talking about?

18          As far as a deal is concerned, I have a policy.  I

19    will send a letter to the Board of Prison Terms for

20    anybody -- any inmate whom I feel has conferred a benefit

21    on society, and I did in this case follow my normal thing,

22    and I did send a letter for him.

23    Q.    Did Mr. Clark --

24    A.    The way --

25    Q.    Did Mr. Clark receive any kind of benefit for coming

26    forward and testifying in your trial with Grizzle?

27    A.    Um, you know, I don't know what the Board of Prison

28    Terms did in his particular case, but now that you mention

1    the words benefit, I'm thinking of one other thing that we

2    tried to do.  We tried -- we asked for out of state -- to

3    see if we could get him a courtesy parole out of state, and

4    we attempted to do that with the State of Oregon, and that

5    was unsuccessful.

6    Q.    Do you know why that was unsuccessful.

7    A.    Ah --

8          MR. MILLARD:  Excuse me.  Before we go into that,

9    could I ask the foundation be laid as to whether he has

10   personal knowledge as to why he was unsuccessful.

11   Q.    (By Mr. Meyer)  Did you make a request to the State

12   of Oregon for him to be paroled on a courtesy supervision?

13   A.    I did not personally involve myself in the process.

14   What I know about it is hearsay.

15   Q.    But you do know that it was declined?

16   A.    Yes.

17   Q.    And that it was declined because of Mr. Clark's

18   record.  He had a sex offense and where he was going was

19   close to a school?

20         MR. MILLARD:  Objection, objection.  Move to strike

21   that.  Mr. Fallman just said he only has hearsay

22   information, and that's an improper question.

23   Q.    (By Mr. Meyer)  You have no personal knowledge of

24   why Mr. Clark's request to go out of stay was declined?

25   A.    I have only hearsay knowledge of it.

26   Q.    What benefit did the Del Norte County District

27   Attorney Office give Mr. Clark for his testifying?

28   A.    Ah, the only benefit that I can recall, is after he

1    testified I believe I did send the letter to the Board of

2    Prison Terms, and I requested of CDC that they attempt to

3    see if they could get a cooperative courtesy parole out of

4    state in Oregon.

5    Q.    Was there --

6    A.    I encouraged it.

7    Q.    Was there any attempt -- I'm sorry.

8    A.    I encouraged them to see if they could get the

9    parole -- the kind of parole that he wanted.

10   Q.    Was there an attempt to reduce his parole date?

11   A.    I don't recall that part.  I don't recall that.

12   Q.    You didn't prosecute Mr. Clark for perjury, did you?

13   A.    No.

14   Q.    So he received that benefit from you?

15   A.    If you call that a benefit, I suppose you're right.

16   Q.    Well, you could have prosecuted -- you could have --

17   A.    He wasn't -- he was not prosecuted, and we could

18   have.

19   Q.    Did you discuss that with him, that you would not

20   prosecute him on the perjury charge?

21   A.    I don't know that we discussed that.  We might have.

22   I mean, it's -- it's -- a DA is not likely going to

23   prosecute someone for perjury who comes forward voluntarily

24   and then testifies in another case.

25        We may have discussed that, but I don't remember

26   that specifically.  Again, I would defer to Lieutenant John

27   McKinney and I believe Special Agent Dan Smith who would

28   have been present during any such --

1          The other thing is I would ask you to look at the
2    court transcripts, because if that -- if that's there, then
3    it would be in the court transcripts from the trial because
4    we would have said it on the record.
5    Q.     All right.  So did Mr. Clark -- in his discussion
6    with you he requested to be paroled out of state.
7    That's --
8    A.     Yes.
9    Q.     -- that's the only thing he asked for?
10   A.     Well, I don't know if he asked or I offered the
11   letter to the Board of Prison Terms, but he certainly was
12   willing to have me do that, and I told him it was my normal
13   practice to do that.
14         So he was aware that it would be done if I thought
15   he'd confer a benefit.
16   Q.     Well, who was requesting that this be done?
17   A.     I -- I don't know that he specifically requested it.
18   I may have told him that I will do that for him because I
19   do it for any inmate who testifies in a way that I think is
20   beneficial to society.
21   Q.     Well, did you just pick Oregon out of the hat, as to
22   where he'd be?
23   A.     You're asking as to the place?
24   Q.     Yes.
25   A.     You're asking as to the place?
26         I believe that -- now this is hearsay, but I believe
27   that he wanted Oregon because he had a grandmother who
28   lived there.

1   Q.    Mr. Clark didn't tell you himself where he wanted to

2 go?

3   A.    He may have said that, but I don't remember the

4 source of that. That may have come from McKinney to me.

5 It may have come straight from Clark to me. I don't

6 remember.

7   Q.    In your discussion with Mr. Clark about his reason

8 for coming forward, if Mr. Clark had not come forward and

9 provided this information and this had actually taken

10 place, he could have been prosecuted as a co-conspirator if

11 anything had happened to Healy's family; isn't that right?

12   A.    If what had happened?

13   Q.    Well, you said that there was a supposed hit going

14 to be done on somebody in Healy's family.

15   A.    If he were an active participant. Mere knowledge of

16 the crime doesn't make you an accomplice, as you know,

17 counselor --

18   Q.    Well, Mr. Fallman, doesn't getting --

19       MR. MILLARD: Excuse me. Mr. Fallman hadn't

20 finished his question -- answer.

21       MR. MEYER: Well, Mr. Fallman didn't answer the

22 question he was asked.

23       THE WITNESS: I'm trying to answer your question,

24 sir.

25   Q.    (By Mr. Meyer) All right. But the question -- let

26 me ask the question again, Mr. Fallman.

27       The question that -- is that you had indicated that

28 Clark had come forward and said that the Aryan Brotherhood

1  wanted him to use this contact that he had to gain

2  information --

3  A.    Right.

4  Q.    -- about where Healy's family lived?

5  A.    Right.

6  Q.    Okay.

7  A.    Right.

8  Q.    And if Mr. Clark had done that, that's certainly

9  more than knowledge of the conspiracy?

10  A.    Oh, certainly, if he had done that.

11  Q.    Yes.

12  A.    Right.

13  Q.    Okay.

14  A.    If he had done that and relayed it to a member of

15  the Aryan Brotherhood.  Neither of those happened to my

16  knowledge.

17  Q.    To your knowledge, did anything ever happen to

18  Mr. Healy's family?

19  A.    Not to my knowledge.

20  Q.    In your discussion with Mr. Clark, did he indicate

21  to you that he didn't want to get out of prison?

22  A.    I don't recall that.  I know that he did at one

23  point say that he didn't want to parole to Sacramento.

24    So my best memory of that would be that he wanted to

25  get out, but not to parole to Sacramento.  He may have said

26  something like that, but I don't remember that.

27  Q.    And I just want to ask you a question in terms of

28  the sentence Clark was serving.  As far as you know, he was

1    doing a determinate term?

2    A.    I believe so.

3    Q.    And his parole date was coming up?

4    A.    Yes, sir.  I believe so.

5    Q.    And your knowledge as a prosecutor, when an inmate

6    has served their determinate time, the state has to release

7    them?

8    A.    Well, depends if they're MDSO or something.  Not

9    necessarily, but --

10                    (Court reporter interrupted.)

11              THE COURT ATTENDANT:  Hold on.  Mr. Fallman, hold

12    on.  The court reporter didn't get what MDSO was.

13              (Record read back.)

14              MR. MILLARD:  Could I request that we start over

15    with a new question and get the answer again?

16              MR. MEYER:  Okay.  Let's try again.

17    Q.    (By Mr. Meyer)  You didn't have any knowledge that

18    Mr. Clark was MDSO offender?

19    A.    No, I didn't.

20    Q.    And other than that, when a determinate sentence has

21    been fully served the inmate is released; isn't that right?

22    A.    Released on parole, I believe.

23    Q.    Okay.  Thank you, Mr. Fallman.

24    A.    Thank you, sir.

25                    REDIRECT EXAMINATION

26    By MARK D. MILLARD, Attorney at Law:

27    Q.    Mr. Fallman, I have a few more questions just to

28    follow up, if I could?

1    A.    Sure.

2    Q.    Okay.  First of all, as I think Mr. Meyer has

3    established, by the time Mr. Clark testified in the

4    Scott/Grizzle case, he was coming up for parole, and you

5    knew that, didn't you?

6    A.    I knew he had a parole date coming.

7    Q.    Right.

8          And you also know because of your connection with

9    law enforcement that if a person is actually told -- the

10   Department of Corrections people, their staff, their

11   psychologists, their psychiatrists, that he doesn't think

12   he's ready to parole, he has violent tendencies and he's

13   concerned about getting out, there are many ways that

14   potentially an inmate could be kept in; isn't that correct?

15   A.    Ah, that -- I'm not certain of what you're driving

16   at there.

17   Q.    Well, if a person --

18         Actually, I think you and I and maybe Mr. Meyer are

19   kind of old, and we use terms like MDSO.  I think it's

20   actually MDO now, isn't it, mentally disordered offender?

21   A.    Right.

22   Q.    Okay.  And that involves a situation where a person

23   has been in custody, and he has got a parole date coming

24   up, and he's got serious mental problems, and there's a

25   procedure for keeping that kind of a person off the

26   street; isn't that correct?

27   A.    There is a civil commitment procedure, if that's

28   what you're talking about.

1    Q.      Yeah.

2           And the MDO procedures, one civil commitment, way to

3    keep a guy in under civil rules, correct?

4    A.      I believe so.

5    Q.      Okay. And that's not the only way. There's other

6    ways. There's this 5150 method, where a person is a danger

7    to himself or others; isn't that correct?

8    A.      That's possible, I suppose.

9    Q.      Okay.

10   A.      I haven't seen that personally happen, but I think

11   it could.

12   Q.      All right. And if Mr. Clark had told various people

13   in the prison system, such as staff psychiatrists and other

14   staff members, that he didn't think he was supposed to get

15   out, you know from your connection with the California

16   Department of Corrections that they would make records of

17   that; isn't that true?

18   A.      Well, I'm sure if he said something like that they

19   would record it.

20   Q.      Okay. And with regard to Mr. Clark now. One topic

21   that we didn't cover involves his personal situation before

22   he testified, after he was disclosed as a witness -- which

23   I take it you did at some point, didn't you?

24   A.      Say that again.

25   Q.      At some point --

26   A.      We put him on a witness list --

27   Q.      I'm sorry?

28   A.      We put him on a witness list and disclose it to the

1    defense.

2    Q.    That's what I meant.

3        Okay.  So the defense in the Scott/Grizzle case knew

4    at some point before trial that Mr. Clark would be a

5    witness, correct?

6    A.    I believe so.

7    Q.    Okay.  And then they certainly knew it after he

8    testified, correct?

9    A.    Yes -- oh, yes.

10    Q.    Now, at some point did you become aware of

11    information that Mr. Clark was in danger because he was a

12    witness in the Grizzle trial?

13        MR. MEYER:  Well, I'm going to object that that

14    would be hearsay.

15    Q.    (By Mr. Millard)  Okay.  It's not offered for the

16    truth of the matter, and I'll just ask you if you could

17    tell us yes or no.

18        Did you become aware of information that Mr. Clark's

19    life might be in danger from the Aryan Brotherhood?

20    A.    Yes.

21        MR. MEYER:  I'm going to make the same objection.

22    Q.    (By Mr. Millard)  Okay.  Now, without going into the

23    details of what you learned, what I'd like you to do is

24    tell us if you communicated to Mr. Clark concern about

25    Mr. Clark's safety from the Aryan Brotherhood?

26    A.    Um, I don't believe it was I necessarily personally,

27    but I believe it would have been Lieutenant McKinney.

28        MR. MEYER:  Well, then I'm going to object if he

1    didn't personally do it.  He can't testify to what was

2    done.

3    Q.    (By Mr. Millard)  Okay.  Were you personally present

4    when anyone communicated to Mr. Clark that his safety was

5    in danger as a result of his testifying against a member of

6    the Aryan Brotherhood?

7    A.    I believe the subject came up in the holding cell

8    conversation that I've discussed with you earlier at the .

9    Del Norte County jail.  It may have been Mr. Clark --

10        MR. MEYER:  Objection, the question's been answered.

11   Q.    (By Mr. Millard)  Well, okay.  When the subject came

12   up in the holding cell concerning Mr. Clark's safety as a

13   result of this testimony, can you tell us what was said?

14   A.    I don't remember the specifics of it, but I am

15   reasonably certain that it came up.

16   Q.    Okay.  Did you have a conversation with Mr. Clark

17   either by yourself or with one of the other officers

18   concerning efforts to protect Mr. Clark while he was in

19   prison as a result of his testimony against the Aryan

20   Brotherhood?

21   A.    I would have never had any conversation with

22   Mr. Clark just by myself.  I would have always had an

23   officer there.

24        Um, and I -- that kind -- how he would be protected

25   once the people -- the prison is aware that there's a

26   danger is left up to the prison authorities.  It's not up

27   to me.

28   Q.    Did you communicate to any prison authority that you

1    believe Mr. Clark needed protection from the Aryan

2    Brotherhood?

3    A.      Yes.  I talked to McKinney, and he was fully aware

4    of that, and I was aware of that, and Dan Smith I believe

5    was fully aware of that.

6    Q.      And in addition to your communication with the

7    people you just mentioned, did you do anything else to try

8    to insure that Mr. Clark be protected while he was in

9    prison because of threats by the Aryan Brotherhood?

10   A.      I may have put --

11          MR. MEYER:  I'm going to object to the question as

12   asked, if there were threats by the Aryan Brotherhood.

13   That's a fact not in evidence.

14          MR. MILLARD:  Well, I'll rephrase it.

15   Q.      (By Mr. Millard)  You had serious concerns about

16   Mr. Clark's safety from the Aryan Brotherhood; is that

17   correct?

18   A.      Yes.

19   Q.      What did you do as a result of those concerns?

20   A.      I discussed it with people who would have the power

21   in CDC to look into safety concerns for him.  Lieutenant

22   McKinney, who -- and the Special Agent Smith, who were my

23   two chief special agent -- or special investigators on

24   those two trials, on Grizzle and Littrell.  And I may have

25   put --

26          If you have a copy of the letter I wrote to the

27   Board of Prison Terms, it will speak for itself.  I may

28   have addressed something like that, that I had concerns for

```
 1    his safety, in the letter that I addressed to the Board of
 2    Prison Terms because I normally do.
 3    Q.     Now, just going back to this subject of whether
 4    Mr. Clark would have been subject to prosecution for
 5    conspiracy, when he was asked to obtain and provide
 6    information to the Aryan Brotherhood concerning the
 7    daughter of the witness --
 8           Are you with me?
 9    A.     I think so.
10    Q.     Okay.  Now, your understanding is -- strike that.
11    Let me start over.
12           You understand the laws related to conspiracy,
13    correct?
14    A.     Well, I try to.
15    Q.     Okay.  And in response to one of Mr. Meyer's
16    questions, you indicated that merely having knowledge that
17    somebody was trying to commit a crime doesn't make you
18    subject to prosecution for perjury.
19           Could you explain that?
20    A.     Well, in certain --
21           MR. MEYER:  Wait.  Hold on.  Excuse me.
22           Prosecution for conspiracy, not for perjury.
23    Q.     (By Mr. Millard)  Well, Mr. Meyer asked you if when
24    Mr. Clark learned that the Aryan Brotherhood was trying to
25    get information concerning the daughter of the witness so
26    that they could have her killed, I think you very
27    graphically told us that they wanted to get her address and
28    location so that they could kill her and put her in a
```

1    shallow grave upside-down or something like that.

2        You remember responding to Mr. Meyer's questions

3    about that?

4    A.    Yeah, except that I thought his question was about

5    perjury, not conspiracy.  Maybe I'm wrong.

6    Q.    Okay.  Well, I recall that he asked you, you could

7    have prosecuted Mr. Clark for conspiracy as a result of him

8    knowing about what the Aryan Brotherhood was trying to do

9    to the little girl.

10   A.    That's -- that's a complicated question.

11       First of all, normally you need an overt act in

12   furtherance of the conspiracy to prosecute somebody under

13   California Penal Code Section 182, I believe it is.

14   There -- and normally under the US Code, even in the

15   federal system, you normally need an overt act.  But I'm

16   told by US attorneys there are certain federal statutes

17   where you don't need an overt act for certain federal

18   conspiracies.

19       But since I deal with state conspiracies I look for

20   overt acts, and I wouldn't be -- if he didn't do anything

21   to follow through to ask his relative to -- to look for

22   this information or attempt to send it in any way to the

23   Aryan Brotherhood which asked him for it, I probably

24   wouldn't be prosecuting him.

25       If he did any of those things, certainly I would

26   feel he's subject to prosecution for conspiracy, if he did

27   any overt act in furtherance of the conspiracy.

28   Q.    Right.

1          But just because the Aryan Brotherhood came to him

2     and asked him to find that information out doesn't make him

3     guilty of any kind of conspiracy, does it?

4     A.     That -- that looks more like a solicitation of a

5     crime on their part if he doesn't act on it -- on his part.

6     Q.     There's no crime on his part?

7     A.     Right, not yet.

8     Q.     Okay.  I think that covers almost everything.  Could

9     I have just a minute, Mr. Fallman?

10    A.     Sure.

11           (Pause.)

12    Q.     (By Mr. Millard)  There was one other topic that I

13    wanted to ask you about.

14           You indicated earlier that you also prosecute a

15    certain number of cases involving misconduct by CDC

16    officers at Pelican Bay State Prison, correct?

17    A.     I've had some cases, a small number.

18    Q.     Did one of those cases involve a defendant by the

19    name of Gomez?

20           MR. MEYER:  Well, I'm going to --

21           THE WITNESS:  You mean, Garc --

22           MR. MEYER:  Wait.  I'm going to object.

23           What is the relevance of other cases that he's

24    prosecuted that didn't involve Mr. Clark?

25           MR. MILLARD:  Well, this involves another witness

26    that may be a potential witness in this case.  And I think

27    we talked about this, Mr. Meyer.  I'd like to ask him about

28    this.

1          MR. MEYER:  I'm going to object that it's

2    irrelevant.

3    Q.    (By Mr. Millard)  Okay.  Mr. Meyer (sic), there is

4    an objection on the table that the judge may have to rule

5    on if this becomes relevant, but if we could just take a

6    second here.

7          Let me ask this.  Did you become -- did you come

8    into communication with a CDC inmate by the name of Matthew

9    Kramer (ph) several years ago?

10   A.    Yes.

11   Q.    How did you meet Matthew Kramer?

12   A.    It was a part of the investigation of the case of

13   People of the State of California versus Jose Ramon Garcia.

14   Q.    Okay.  And what did Mr. Matthew Kramer have to do

15   with that case?

16   A.    He was a witness in that case.

17   Q.    Okay.  And what was the general nature of the

18   allegation against Mr. Garcia?

19   A.    That he had personally assaulted inmates and

20   conspired with inmates and other officers to set up child

21   molesters to be beaten or have their throats cut.

22   Q.    And Mr. Kramer actually testified in that trial?

23   A.    Yes, he did.

24   Q.    Okay.  There's one other thing.  During the course

25   of your work in connection with prosecuting cases at

26   Pelican Bay, you've come to learn about the practices and

27   activities of the Aryan Brotherhood; is that correct?

28   A.    Yes.

1   Q.     And is the same true that you've come to learn about

2   the standards and the procedures and the practices of the

3   correctional officers?

4   A.     Somewhat.

5   Q.     Yeah.

6          Do you know whether some of the correctional

7   officers that have been guilty of misconduct have had

8   connections with the Aryan Brotherhood?

9   A.     I believe they have.

10  Q.     And could you tell us -- if we're going into any

11  area that's a sensitive area involving an ongoing

12  prosecution or investigation, then just let me know and

13  we'll stop.

14         But putting that aside, could you kind of elaborate

15  or explain your last answer?

16  A.     Ah, I really can't because I'm relying on data which

17  is under a gag order from the federal court, FBI data.  But

18  I can tell you where you can find your answer.

19  Q.     Yes, sir?

20  A.     You can find your answer -- you can find your answer

21  in the trial transcripts in the Northern District Federal

22  Court in San Francisco in the case of United States of

23  America versus Jose Ramon Garcia and Michael Edward Powers.

24  Q.     Mr. Fallman, thank you very much.

25  A.     Thank you.

26                        RECROSS-EXAMINATION

27  By FRANK C. MEYER, Deputy District Attorney:

28  Q.     Mr. Fallman, I just want to clarify here.  I

1    apologize if my question was not clear enough.

2          In terms of Mr. Clark approaching you about

3    testifying for the prosecution in the Grizzle case, isn't

4    it correct that Mr. Clark was concerned that if he did what

5    the AB was asking him to do that he would be part of a

6    conspiracy to commit murder?

7    A.    I think that's fair to say because he said, quote,

8    "I don't want to be part of any Polly Klaas for these

9    guys."

10   Q.    All right.  So my question to you was, if Mr. Clark

11   had done these things that the AB -- he alleges the AB was

12   asking him to do --

13   A.    Right.

14   Q.    -- if he had gotten this information, if he had passed

15   it along --

16   A.    Right.

17   Q.    -- that would have made him a co-conspirator in any

18   crime that was committed?

19   A.    I fully agree on that, if it had gone that far.

20   Q.    That's what I was asking you, and I apologize if it

21   wasn't clear --

22   A.    Got it.

23   Q.    -- to you.

24         Obviously, his just being asked something and coming

25   to you and giving that wouldn't make him, but if he had

26   gone

27   forward with it as he was asked to do --

28   A.    Right.

1    Q.      -- that would have made him a co-conspirator?

2    A.      Oh, I believe so.

3    Q.      Okay.

4            (Pause.)

5    Q.      (By Mr. Meyer)   Thank you, sir.  I have nothing

6    else.

7    A.      Thank you.

8                        FURTHER REDIRECT EXAMINATION

9    By MARK D. MILLARD, Attorney at Law:

10   Q.      Just a question to kind of tie up that last point,

11   Mr. Fallman.

12           There was never any indication that Mr. Clark ever

13   agreed to provide any information to the Aryan Brotherhood

14   when they asked him to find out about the whereabouts or

15   the address of the little girl, was there?

16   A.      No.  I believe there were indications that he had

17   used his source in the Sacramento law enforcement area

18   somehow in the first case, but -- Littrell in some way, and

19   I don't remember exactly what his testimony was, and I

20   haven't reviewed for this -- for my testimony here.  I'd

21   have to go to archives and pull this stuff out, and I just

22   didn't do that.

23           I believe he did do some things in that regard in

24   the first case, but certainly not in the second case.

25   Q.      Well, in the first case was there ever any

26   indication that he had used a source or done anything to

27   endanger anyone outside the prison?

28   A.      I would have to defer to -- to Lieutenant McKinney

1  on that issue because I just don't remember well enough

2  what -- what was said on the first case or the trial

3  transcripts.

4          You could look at those in the first case, the

5  Littrell case, and that would bring out the answer to your

6  question.  I don't remember the answer to that.

7  Q.      Well, if Mr. Clark had done something and provided

8  information or done something else to help the Aryan

9  Brotherhood harm someone outside the prison system, that

10  would have come to your attention, wouldn't it?

11  A.      Well, if you're talking about physical harm, that's

12  one thing.

13          I believe he said that he received $500 to take the

14  stand and perjure himself in the Littrell case because the

15  AB told him since we're white supremacists and we hate

16  blacks, if we hire you to take the stand and lie for us and

17  do whatever it is that they may have asked him to do with

18  the computer with his friend, then they figured a jury

19  would believe it because it would be coming from a black

20  man who the whites -- who Grizzle -- I mean, who Littrell

21  would allegedly hate because he's a member of this white

22  supremist group.

23          And the answer to the question would be that would

24  harm society, just the fact that he perjured himself for

25  these guys.

26          It's certainly not a negative effect on society

27  because we didn't get a conviction for the conspiracy to

28  commit murder, and we got the first degree murder knocked

1    down to a second.

2    Q.     I understand that.  But what I'm really trying to

3    kind of just make sure we have a current understanding on

4    is, there was never any indication that Mr. Clark used his

5    source, whatever that may have been, or did anything that

6    brought about physical harm to anybody outside the prison;

7    isn't that true?

8    A.     Right.  I don't recall that it ever came to physical

9    harm.  I'm not -- I can't go so far as to say some harm of

10   some legal sort was not caused by whatever he was doing in

11   case number one and his contact in the Sacramento law

12   enforcement computer area.  I just don't remember.

13   Q.     Okay.  I understand.

14          And when you say that some legal harm came to the

15   first case because Mr. Littrell was convicted of second

16   degree murder and not first degree murder and he was

17   acquitted on the conspiracy, that means what you're saying

18   is that you didn't get a conviction for the highest crime

19   that had been charged, correct?

20   A.     Right.

21   Q.     Okay.

22   A.     And I think that's directly attributable to the

23   effective perjurious testimony of Mr. Clark --

24   Q.     I understand.  But in terms --

25   A.     -- in that case.

26   Q.     In terms of harm to society that might relate to

27   Mr. Littrell's getting out of prison, based on what the

28   Board of Prison Terms has been doing with parole, there's

1    really no question that Mr. Littrell will never get out,

2    whether it's a second degree murder or a first degree

3    murder; isn't that true?

4        MR. MEYER:  I'm going to object that that's -- I'm

5    going to object that that's  speculation.

6    Q.    (By Mr. Millard)  Okay.  Well, Mr. Littrell's

7    sentence, even on the second degree murder, means that he

8    will never get out of prison unless somebody decides to

9    parole him.  We know that, don't we?

10   A.    That, and he was already doing three strikes life

11   for a conviction out of San Bernardino before this case.

12   So the net effect is he probably will stay in prison

13   anyway.

14   Q.    Okay.  That's all I have.  Thank you.

15                FURTHER RECROSS-EXAMINATION

16   By FRANK C. MEYER, Deputy District Attorney:

17   Q.    Mr. Fallman, just since you brought it up, what

18   specifically did Mr. Clark say in the Littrell trial --

19   what was the perjured testimony that he gave?

20   A.    That's why I would need to read the transcripts.  I

21   can't remember.  I just know it was night and day.  He

22   changed his story between this trial and the one -- the

23   second trial.

24        And the new element in the second trial was the

25   Polly Klaas aspect and the fact that he says he's being

26   asked to do more than just lie, and he's being asked to get

27   information that would cause a little girl to die.

28   Q.    Okay.  And one other thing that you said about

1    Mr. Littrell and Grizzle is that they are purported members

2    of the Aryan Brotherhood?

3    A.    Right.

4    Q.    You use the word purported?

5    A.    Well, after trying them and talking to many, many

6    inmates about them and knowing how the gang works, I

7    believe they are members, but that's my opinion, and they

8    continue to deny that.

9    Q.    Okay.  Thank you.  I have nothing else.

10    A.    Thank you.

11         MR. MILLARD:  Thank you.

12         THE COURT ATTENDANT:  Thank you, Mr. Fallman.

13         THE WITNESS:  Thank you.

14         THE COURT ATTENDANT:  I'll hang up for you.

15         THE WITNESS:  Okay.

16         THE COURT ATTENDANT:  The court reporter wants to

17    know if we're officially off the record.

18         MR. MILLARD:  Yes.

19         MR. MEYER:  Yes.

20              (Proceedings recessed.)

21

22

23

24

25

26

27

28

```
 1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2     STATE OF CALIFORNIA        )
                                  )    ss.
 3     COUNTY OF SACRAMENTO       )

 4
              I, ARACELI PLASENCIA, hereby certify that I am an
 5     Official Certified Shorthand Reporter, and that at the
       times and places shown, I recorded verbatim in shorthand
 6     writing all the proceedings in the following described
       action completely and correctly, to the best of my ability:
 7

 8         Court:     SUPERIOR COURT OF CALIFORNIA,
                      IN AND FOR THE COUNTY OF SACRAMENTO.
 9
           Judge:     HON. THOMAS M. CECIL,
10                    DEPARTMENT NUMBER 23.

11         Case:      THE PEOPLE OF THE STATE OF CALIFORNIA
                      -vs-
12                    FREDERICK ONEAL CLARK, Defendant.

13      Case No.:     99F09138.

14         Date:      FRIDAY, OCTOBER 18, 2002.

15
              I further certify that my said shorthand notes
16     have been transcribed into typewriting, and that the
       foregoing pages 2 through 39 constitute an accurate and
17     complete transcript of all of my shorthand writing for the
       dates and matter specified.
18
              I further certify that I have complied with CCP
19     237(a)(2) in that all personal juror identifying
       information have been redacted, if applicable.
20
       Dated:  Wednesday, May 4, 2005, at Sacramento, California.
21

22

23                          Araceli Plasencia
24                    ARACELI PLASENCIA, CSR No. 8687

25                    ---o0o---   COPY

26

27

28
```

SACRAMENTO COUNTY OFFICIAL COURT REPORTERS    40