1

2

3

4

5            IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    ELIOT SCOTT GRIZZLE,                    No. C 07-4845 SI

9              Petitioner,                   **ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS AND
10     v.                                    GRANTING CERTIFICATE OF
                                             APPEALABILITY**
11   ROBERT HOREL,

12            Respondent.
     _____/

13

14          This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254.  For

15   the reasons set forth below, the petition is DENIED.

16

17                               **BACKGROUND**

18          In February 1999, petitioner Eliot Scott Grizzle, an inmate of Pelican Bay State Prison, was

19   convicted of murder and conspiracy to murder a fellow inmate, Aaron Marsh.  The trial court sustained

20   special allegations of two prison-term priors, plus two serious-felony strike priors, and sentenced

21   petitioner to 37 years to life in prison.  Petitioner appealed.  The California Court of Appeal for the First

22   Appellate District affirmed the judgment.  Pet., Ex. K at 1.  The California Supreme Court denied

23   petitioner's petition for review.  *Id*.  Petitioner filed state habeas petitions, all denied, in the California

24   superior, appellate and supreme courts.  Pet., Ex. O.

25          The California Court of Appeal's opinion affirming the judgment on direct appeal contains a

26   detailed statement of the facts:

27                 The victim and alleged participants in the crimes were inmates of Pelican Bay
            State Prison (Pelican Bay), a "level 4" high security prison in Del Norte County, and the
28          murder occurred in the security housing unit (SHU), a lockdown area developed by the

**United States District Court**
For the Northern District of California

1  Department of Corrections (CDC) to segregate especially violent or disruptive inmates
2  from the general prison population, often due to membership in prison gangs.  SHU
   inmates are housed in "pods" consisting of two tiers of four cells each, two men to a cell.

3      Marsh was murdered in pod D-4.  The People's theory was that this was ordered
4  by a governing committee or council of the Aryan Brotherhood (AB) and motivated by
   gang aspirations and loyalty.  Marsh was strangled to death on July 25, 1997, by
5  cellmate Gary J. Littrell, after being given an alcoholic brew called "pruno" that was
   made and laced with other drugs (indomethacin and methocarbamol) for the occasion by
6  Grizzle, in his own cell.  The brew was then delivered to the Marsh/Littrell cell by
   inmate Michael Contreras.  An amended information (hereafter the information) jointly
7  charged Grizzle and Littrell with the murder and conspiracy and alleged four overt acts
   in furtherance of the conspiracy: (1) that Grizzle dissolved drugs in the pruno to render
8  Marsh drunk and vulnerable, (2) that he had Contreras deliver the mixture to Marsh, (3)
   that Littrell got Marsh drunk and disabled, and (4) that Littrell strangled him with a
9  "garrote rope" while Marsh was too drunk to defend himself.

10     Littrell's case was severed and tried first.  A jury acquitted him of the conspiracy
   and found him guilty of the murder, but in the second degree.  Some jury misconduct
11 evidently came to light, and he ultimately accepted a plea offer of voluntary
   manslaughter and attempted murder.  Grizzle rejected a similar offer here (voluntary
12 manslaughter with a low term) on the eve of his own trial and proceeded before a jury.
   Littrell testified for the People, under his plea agreement, but admitted little beyond
13 having strangled Marsh, assertedly in self-defense.  But several other SHU inmates
   testified, including Contreras who admitted taking the spiked pruno to the cell (at
14 Grizzle's request), Brian Healy and Vernon Rubidoux (who heard admissions of guilt),
   Frederick Clark (who had testified for the defense at Littrell's trial but now said Grizzle
15 had solicited him to lie and, afterward, to locate Healy's young daughter for a retaliatory
   killing), and Douglas Ridinger (who said he was solicited by the AB to kill Marsh
16 himself, but refused).  These witnesses also related the structure and features of the AB
   and their own and others' gang connections.

17     . . .

18

19     Marsh was murdered on July 25, 1997.  Around 4:00 p.m., Littrell calmly told
   a control booth officer that his "cellie" had fallen and struck his head and "don't look too
20 good." Another officer entered the cell and found Marsh unresponsive. A medical team
   tried to resuscitate him but pronounced him dead.  There were no obvious signs of a
21 fight, but a doctor estimated that Marsh had been dead for several hours.  Marsh had
   apparent shoe prints on his body and marks on his upper chest and throat consistent with
22 tennis shoes.  An autopsy showed death by strangulation plus blunt-force trauma to the
   neck consistent with stomping.  Ligature marks on the neck were made with a small
23 diameter cord something like a shoelace (not a larger diameter skip rope found near the
   body), and a tennis shoe print on Marsh's back was consistent with him having been held
24 face down to the ground while being strangled from above with a garrote. Scratches and
   overlaid ligature marks showed that he had tried to grasp the ligature.

25     Marsh's blood-alcohol level was .11 (probably .15 earlier), and his urine showed
26 .15.  His stomach contained small flecks consistent with partly dissolved tablets, and
   tests on his blood, urine, stomach and intestines revealed indomethacin, an
27 anti-inflammatory drug, and methocarbamol, a muscle relaxant that would have
   contributed to impairment.    Littrell had been prescribed a high-range dose of
28 methocarbamol due to a bad back.

2

Littrell's account was at odds with much of the evidence. He claimed not to be a member of AB or know what it was (despite sporting swastika and "white power" tattoos and having a card in his cell with clovers and "Great White Warrior" on it). He said that he and Marsh (not Grizzle, his former cellmate) concocted the pruno and began drinking it around 10 o'clock that morning. Marsh had taken methocarbamol pills of his own, also for a bad back, and become belligerent and then quiet. (They had fought physically two days earlier.) As Littrell spoke to someone at the door, Marsh came up behind him and tried to hit him and throw a rope around his neck. (Rope burns on the back of Littrell's neck could have been caused by this, or could have been self-inflicted.) Littrell grabbed the rope away and garroted Marsh until he passed out. It was a thin, shoestring-like rope, and Littrell flushed it down the toilet so Marsh could not use it again. When Marsh tried to get up, Littrell grabbed a jump rope (the one found) and "finished it." He reported the incident after Marsh had not moved for an hour.

Ridinger, in prison for carjacking and gun possession, testified that he occupied the cell next to Littrell and Marsh on the upper tier, and that their cell was directly above the one occupied by Grizzle (known to him as "Rascal") on the tier below. Inmates can communicate with cells to the sides and above and below through air vents. On that July 25th, Ridinger smelled pruno coming from both cells and had smelled it emanating from Grizzle's cell for several days. Himself a member of the NLR, one step below the AB in the prison gang hierarchy, Ridinger assumed from Grizzle's "NLR" neck tattoo (shown to the jury) that Grizzle was NLR and first introduced himself as his NLR "homeboy." Grizzle took offense, saying, "I'm not Nazi Lowrider anymore; I'm a Brother." Knowing Grizzle's cellmate Littrell to be AB, Ridinger said lightly, "Well, you graduated." When Ridinger moved to their pod, he brought a message from John Harper ("Turtle") and Marsh in D-6 that they each needed a "celly" and wanted Grizzle and Littrell moved over there. Grizzle told Ridinger that Marsh was "in trouble," and Littrell told him he wanted Marsh moved into D-4 since Marsh was "in the hat" for not "pulling his weight." Grizzle said Marsh "needed to be taken care of." Ridinger, hoping to impress them and have them "raise their hand" for him to "move up" to the AB, volunteered to "whack" Marsh, but the next day, when Ridinger told them his plan to "stab [Marsh] a few times," Grizzle said "that's not gonna work." He explained: "A.B. don't deal like that. We're gonna do something to somebody, we're gonna kill him." Ridinger had not understood this and wrote them a note (kite) declining. Grizzle wrote back: "[Y]ou didn't know what you were getting yourself into anyways," and "Gary's gonna go ahead and do it . . . ." Littrell filed a CDC form 602 requesting a shared cell with Marsh, and Marsh also made the request. He was moved into Littrell's cell just six days before he was murdered.

On the day of the killing, Ridinger saw Contreras slip an envelope under the door of Littrell and Marsh's cell door and assumed it contained pruno. He heard thanks given for it, smelled it, and heard someone say it tasted "kind of funny." The day after, Grizzle warned him that attorneys for Littrell would probably be contacting him and told him to say he heard Marsh and Littrell fight (he had not) a few days before Marsh died and that Marsh had hit Littrell with a TV remote control. Ridinger knew he was in the hat "[b]ig time" for testifying against the AB and had received immunity, time off his sentence and protective housing, in return for his testimony.

Contreras ("Wino") was a "tier tender" for D-4 on that July 25th. On the way to the control booth that morning to use his asthma inhaler, he saw Grizzle squatting on his cell floor by some newspaper, 30 to 60 green capsules (like those found in Littrell's cell), a coffee cup and a milk carton. There was a smell of pruno, and Grizzle was opening the capsules, pouring them into the cup, and tossing the empty capsules into his toilet. On the way back, Contreras asked if he "had the right recipe for the pruno"; Grizzle nodded and said "yeah." As Contreras later passed by after exercise on the yard, Grizzle asked

him to stop by.  Contreras did, after a shower, and Grizzle slid a manila envelope under the door and asked him to take it to Littrell.  Contreras did, noticing that it felt soft as if containing liquid, and he figured it was spiked pruno and that Marsh was in trouble.

Contreras left his cell again after 1:30 p.m. to do his tier-tender cleaning chores and asked Littrell if he needed disinfectant.  As Littrell declined, Contreras saw Marsh lying on the floor and Littrell say, "Get up, Wood."  Marsh tried to roll himself up but fell back down, as if drunk.  Contreras continued his chore rounds and was asked by Grizzle what Marsh and Littrell were doing.  When he said Marsh looked "messed up," Grizzle said, "Yeah, I got the perfect recipe now."  After the chores, Littrell had Contreras take a book and TV adapter to Grizzle.  He did and, while outside Grizzle's cell, heard thumps come from the upper tier and heard Littrell say to Grizzle, through the vents, "There's no other way."  Still later, from his own cell, Contreras heard another thump, like a stomp.  Maybe "a couple minutes" later, he heard Littrell call out for the control officer.

Contreras, later realizing he was suspected as an accomplice, cooperated and was offered immunity and protective custody for his testimony.  Paroled and reimprisoned for a dirty test and a seizure of methamphetamine at his house, he faced the three strikes law (with priors for aggravated assault, other assaults and discharging a gun) but anticipated a favorable recommendation.  His testimony left him in danger from "ex-associates" in the Northern Structure and Nuestra Familia (Northern Mexican prison gangs) and the AB.

Healy (known as "Deadeye" because of his glass left eye) had become an AB associate in 1985 and a full member in 1993.  He dropped out in 1997, feeling betrayed to learn he had murdered a good friend, Ruffo, under the mistaken belief that it had been ordered by the AB committee.  He was prosecuted for Ruffo's murder but, by using AB training to employ manual strangulation and falsely claim self-defense, won a jury verdict of manslaughter.  He identified all six AB committee members and testified that Grizzle and Littrell were AB members.

While still a member in early 1997 and responsible for relaying AB "business" to other brothers, Healy received a code message from AB committee member Terflinger that Marsh was "in the hat" and "had to go" (be killed) for not killing another inmate as ordered.  Healy then told Grizzle while they were both in holding cells at the Del Norte County Courthouse on March 13. (Their presence there on that date was stipulated.) Healy said, partly in sign language, that Marsh had to die, and Grizzle replied orally that he would "take care of it," "[i]f he got the opportunity."

On July 26, the day after Marsh was killed, the two met again in holding cells, this time in the SHU visiting area. Through the perforated doors of their "kitty-corner" cells, Healy yelled, "Hey, Rascal," and identified himself as Deadeye. Healy asked, "Who did it, you?" and Grizzle said, "No, it was Gary."  When Healy asked how, Grizzle made a crossing or "strangling" motion, as if "with a rope or something."

Healy conceded that at his own trial, to protect his interests while an AB member, he had lied and carried a handcuff key in hopes of an opportunity to escape. He said he was telling the truth now.  He had committed "heinous violent crime," beaten and stabbed inmates, and took a weapon to court once and stabbed somebody "right at counsel table."  He had been in prison for 15 years and had about 50 years left to serve, despite the judge in the Ruffo matter having struck one of his strike priors. Prison time had "never been an issue" for him, and his decision to cooperate and "debrief" about the AB had nothing to do with expectations regarding his sentence.

Rubidoux ("Smiley") did not know Grizzle until May 25, 1998, 10 months after the killing. He knew Littrell, however, and struck up a conversation with him when all three were in the SHU attorney-visit holding area that day. After first "clowning" with Littrell, Rubidoux remarked, within earshot of Grizzle, "[L]ook what you went and did now." Littrell answered: "Yeah, I did that, done that, want that, took that. I took that punk's wind"; "Yeah, he didn't have no rock coming"— rock meaning shamrock. Littrell said Marsh had been "giving out too many free passes to those that had bought big green hats" and not putting in "work when he's on the line out here." Rubidoux understood this to mean he had been letting people go who were "in the hat." Rubidoux and Grizzle introduced themselves when Grizzle left to go to a visiting booth.

The conversation resumed after Grizzle and Littrell had met with their attorneys and returned to the holding cells. Rubidoux told Littrell, "[Y]ou do good because Aaron [Marsh] wasn't no slouch," and Grizzle chimed in,[1] "Well, he wasn't feeling nothing after we put a mickey in his drink." Grizzle snickered and added: "Yeah, he always wanted me to make him a bomb, and I made him that bomb all right." He and Littrell laughed (a bomb means "the best") and then spoke about "a buster from Modesto" named "Wino," who had just paroled. (This was Contreras; buster is a derogatory term for a Northern Mexican.) Two "shooters" were out to "whack" Wino, and Littrell and Grizzle talked about their trial strategies—what they would do if this buster testified seeing them put the hold on Marsh or put pills in the "wine." They were also going to make Marsh out to be "a violent drunk, a bad guy."

Rubidoux admitted a violent past that included assaults on police and guards, and inmate stabbings. He had been a "rat" now since 1996 and had a "priority contract" out on him. He was seeking protective custody and a favorable recommendation.

Inmate Frederick Clark testified for the defense at Littrell's trial. He testified for the prosecution here, saying he lied at Littrell's trial because Grizzle offered him $500. One idea was that Clark, a Black man, would have credibility to "broadside the prosecuting attorney" in a case involving inmates who were supposedly white supremacists. Clark was known for being able to find people "on the street," and after Littrell's trial, Grizzle asked him to find Healy's daughter. She was eight or nine years old and living with a foster parent, and the AB "was going to retaliate against Deadeye" by "taking her out." Haunted by the recurring thought of "Polly Klaas," however, Clark declined to do it and went to the authorities. He was promised immunity for his prior perjury and help '[sic] in getting into the state witness protection plan. He had moved his family out-of-state and was hoping for an out-of-state parole.

Grizzle did not testify.

Pet., Ex. K at 1-8.

As grounds for federal habeas relief, petitioner alleges that (1) the trial court violated his rights by failing to declare a mistrial due to taint of the jury; (2) the prosecutor knowingly or recklessly presented perjured testimony; (3) trial counsel rendered ineffective assistance by failing to view a videotaped interview of a prosecution witness prior to trial; (4) the prosecutor committed a *Brady*

---

[1] According to the Reporter's Transcript, Rubidoux testified that it was Littrell who said "well, he wasn't feeling nothing after we put a mickey in his drink." Answer, Ex. B, Vol. 3 of 11, RT 550:5-7.

violation by failing to turn over a prison log to the defense; and (5) the trial court violated his rights to due process and a fair trial by ordering that petitioner be tried in shackles and conditions of heavy security. The Del Norte Superior Court's order denying the state habeas petition addressed petitioner's claims that the prosecution knowingly or recklessly presented perjured testimony, and that trial counsel was ineffective. The California Court of Appeal, in denying petitioner's direct appeal, addressed the other claims raised by petitioner in this federal habeas petition.[2] In addressing petitioner's claims, the parties refer to whichever court opinion addressed the claim. The Court does the same.

**STANDARD OF REVIEW**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgement that the relevant

---

[2] As discussed *infra*, petitioner did not fairly present a *Brady* claim to the California Court of Appeal, but arguably presented this claim to the California Supreme Court in the petition for review. The Court addresses which decision is the "last reasoned decision" on this claim in Section VI.

United States District Court
For the Northern District of California

state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

# DISCUSSION

## I.   Jury taint

Petitioner claims that he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights when the trial court failed to declare a mistrial due to taint of the jury.  The California Court of Appeal stated the relevant facts as follows:

> At the end of the second day of trial, Juror 5 reported to the court a contact concerning the trial.  He worked at Pelican Bay State Prison teaching inmates, and on the previous day, while at work during the noon recess to cancel a college tour, was told by a library-clerk inmate named Chu, "Well, I hear you are Juror No. 5."  When asked, "Where did you hear that?"  Chu replied, "Oh, word gets around."  There was no further conversation, and the juror could not figure out how the inmate had found out.  The court inquired whether this would affect Juror 5's decision, and he said it would not.  On further questioning by defense counsel, the juror revealed that, while getting a cup of coffee, he had told this to Juror 12, a woman who worked at the college he was to tour.  He was "sure" ("I didn't make a secret of it") that three or four other people had overheard it.

> After Juror 5 left, the court and parties discussed what to do, and defense counsel, citing concern that jurors were "tainted" and would now be intimidated by the prospect of the AB targeting them, ultimately requested a mistrial.  The court denied the motion "on the record we have now," reasoning that nothing had gone to "the merits of the case" or "would be particularly prejudicial," but the court did invite defense counsel to question the other jurors in the morning.  It stressed that the motion was denied "on the record we have now," adding: "If you want to build a bigger record, go ahead . . . and I will allow it.  If you do not want to that's where the motion stands at this point."

> The first thing in the morning, Juror 5 approached the court with second thoughts.  Having thought about it overnight, he still felt he could be a fair juror, but given his work at Pelican Bay State Prison, Juror 5 felt that remaining on the case "would influence" "the nature of [his] classroom" or his "relationship with inmates" should there be a guilty verdict.  He wanted to be excused, and so he was, with the concurrence of both counsel.  First, however, defense counsel inquired further and learned from Juror 5 that he had mentioned the incident only generally and that one juror (identity not recalled) had said something about getting a call years ago from some state institution and having her phone number changed.  Juror 5 said concern about reaction from inmates in the unit was, while "minor," probably "an element" in his decision, but that he had not heard any  other juror express apprehension.

> Defense counsel never renewed his motion for mistrial but did ask to individually individually  voir  dire  the  other  jurors.  The  court  obliged,  apprising  each  juror

United States District Court
For the Northern District of California

individually (including alternates) that Juror 5 had been excused and asking what each one knew about the circumstances.  Each said he or she had heard – from Juror 5 or others – that Juror 5 worked or taught at the prison and had learned that some inmate knew he was a juror (or Juror 5) on the panel.  Each said this would not affect his or her decision in the case, and most were examined personally by defense counsel.  None except Juror 12 recalled Juror 5 expressing any particular feelings about this (although Juror 11 surmised that Juror 5 could be "a little uneasy" about the situation); Juror 12, the woman to whom Juror 5 had spoken directly, said only that Juror 5 had been "surprised" at the inmate's knowledge.  Each juror was admonished not to discuss this any further with the others and to report it to the court or bailiff if it did come up.  Two of the jurors (6 and 10) said they felt concern for Juror 5's "safety" or his being "in danger."  The thought had "occurred to" Juror 10 personally, but neither one in the end felt apprehension for themselves.

An alternate (Juror 13) was seated in place of the excused Juror 5, and the People called their first witness.  As noted, defense counsel never renewed the mistrial motion.

Pet., Ex. K at 25-26.   On direct review, the California Court of Appeal held that the failure to renew the mistrial motion forfeited the jury-taint issue:

The People argue that failure to renew the motion forfeited the jury-taint issue. We agree.  It clearly appears that the court's initial ruling, made after examining only Juror 5, was made provisionally on that basis and would be reconsidered should defense counsel decide to conduct further voir dire of the rest of the panel.  Also, the court had no way to anticipate, at that time, further revelations Juror 5 would bring to the court's attention on the following morning (Feb. 10).  Grizzle's appellate attack rests on the full state of the record as presented that morning, and his failure to seek a ruling on that state of the evidence is a clear waiver.  (Cf. *People v. Bolin* (1998) 18 Cal.4th 297, 312 [after tentative denial of change of venue, defense counsel proceeded through voir dire without further objection]; *People v. Fudge*, *supra*, 7 Cal.4th at p. 1100-1101 [silence by defense counsel after clarification of instruction upon mid-deliberations juror dismissal].)  Grizzle calls it "inconceivable that counsel intended to withdraw the motion" after Juror 5 told of "the extent of the prejudicial impact" and the other jurors "acknowledged the implicit threat to their safety inherent in being a juror in an [AB] trial."  But it *is* conceivable.  Any misgivings counsel had when Juror 5 revealed the incident the previous day could easily have been dispelled when, after that juror was excused and the others were examined, it developed that juror "taint" was not nearly as bad as counsel had first feared.

*Id*. at 27 (emphasis in original).

The appellate court also stated,

Had the issue been preserved and a ruling secured, we could not find an abuse of discretion on the record as finally made.  The test is whether the defendant's "chances of receiving a fair trial have been irreparably damaged" (*People v. Ayala*, *supra*, 23 Cal. 4th at p. 283), and the judge reflected later at trial, "[E]very member of the jury including the alternate[s] were questioned about that.  And I'm satisfied that . . . they said it would not bother them.  And what they indicated they had heard was not of the nature of things that would tend to bother them.  It was not . . . threatening in its nature." Taking this as the judge's reasoning earlier as well, it is sound.  Jurors said they knew Juror 5 worked at the prison, had learned that at least one inmate knew he was on the jury, and felt conflicted about his duties as a teacher should he serve on a jury that convicted an inmate.  No threat was revealed, and to the extent that jurors *intuited* a

8

United States District Court
For the Northern District of California

1
2
3

threat to Juror 5's safety, there is no showing that any of them worked at the prison or felt similarly threatened. All of them claimed they could function as fair jurors after the incident. The court would have been within its broad discretion (*People v. Wharton*, *supra*, 53 Cal.3d at p. 565) had it so ruled.

*Id*. at 27-28 (emphasis in original).

Respondent contends that petitioner is procedurally barred from raising the jury taint claim under the "adequate and independent state ground" doctrine. Under that doctrine, a federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Respondent argues that the appellate court's adjudication of petitioner's jury taint claim was based on an adequate and independent state ground, namely that the claim was forfeited because defense counsel did not object and/or request a mistrial after Juror 5 was excused and the panel was reconstituted.

Under the adequate and independent state ground doctrine, the state bears the burden of proving the adequacy of a state procedural bar. *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir.), *cert denied*, 540 U.S. 938 (2003). To be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. U.S. Dist. Court*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal citation and quotations omitted). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Where the last reasoned opinion on a claim expressly imposes a procedural bar, it should be presumed that a later decision summarily rejecting the claim did not silently disregard the procedural bar and instead considered the merits. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir.), *cert. denied*, 519 U.S. 1030 (1996). Where the state court decision rests on clearly alternate grounds, one invoking a state procedural bar and the other addressing the merits, the state procedural ground is still sufficiently independent to preclude

**United States District Court**
For the Northern District of California

1   habeas review.  *See Bargas v. Burns*, 179 F.3d 1207, 1214 (9th Cir. 1999); *see also Moran v. McDaniel*,

2   80 F.3d 1261, 1269 (9th Cir. 1996).  Because the California Supreme Court issued a summary denial

3   of this claim, the last "reasoned" decision of the claim by the state courts was by the California Court

4   of Appeal upon direct review.  The Court therefore "looks through" the state supreme court's denial and

5   evaluates the decision of the appeals court.  *Ylst*, 501 U.S. at 804-06; *see also Medley v. Runnels*, 506

6   F.3d 857, 862 (9th Cir. 2007) (en banc); 28 U.S.C. § 2254(d).

7        Petitioner contends that the jury taint claim is not procedurally defaulted because the California

8   Court of Appeal also addressed the merits of the claim.  Petitioner relies on the following footnote in

9   *Barker v. Estelle*, 913 F.2d 1433, 1436 n.3 (9th Cir. 1990):

10        The Attorney General advises us, however, that the Supreme Court has since held

11   that where a state court relies on a procedural default as an alternative holding, even if
      it also reaches the merits, the procedural default generally bars a federal court from

12   considering the claim.  *Harris v. Reed*, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044
      n.10, 103 L. Ed.2d 308 (1989).

13        While the Court in *Harris* certainly noted that an alternative state court holding

14   based on procedural default would preclude federal review of the claim, absent cause and
      prejudice, this statement was made in the context of a broader holding relating to the

15   "*last state court* rendering a judgment in a case." 109 S. Ct. at 1043 (emphasis added).
      "[A] procedural default does not bar consideration of a federal claim on either direct or

16   habeas review unless the last state court rendering a judgment in the case 'clearly and
      expressly' states that its judgment rests on a state procedural bar." *Id*. (quoting *Caldwell*

17   *v. Mississippi*, 472 U.S. 320, 327, 105 S. Ct. 2633, 2638, 86 L. Ed.2d 231 (1985)).

18        Here, although the state trial court alternatively denied Barker's petition based
      on procedural default, the last state court to render judgment in the case was the

19   California Supreme Court. Barker filed an original habeas petition in the California
      Supreme Court, and the court denied the petition without citation or comment. In

20   *Nunnemaker v. Ylst*, 904 F.2d 473 (9th Cir. 1990), we held that "[t]he rationale and plain
      language of *Harris* require that, where . . . a state supreme court does not plainly state

21   in its summary denial of an original habeas petition that its ruling rests on a state
      procedural bar, federal habeas review is not precluded." *Id*. at 476. Therefore, under

22   *Harris* and *Nunnemaker*, we are not precluded from addressing the merits of Barker's
      federal habeas claims.

23   *Barker*, 913 F.2d at 1436 n.3.

24        The problem with petitioner's argument is that the *Barker* footnote relied on the Ninth Circuit's

25   ruling in *Nunnemaker v. Ylst*, 904 F.2d 473 (9th Cir. 1990), which was subsequently overturned by the

26   Supreme Court, *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).  In *Nunnemaker*, the petitioner raised a

27   *Miranda* claim for the first time on direct appeal of his conviction.  The California Court of Appeal

28   affirmed the conviction and rejected the *Miranda* claim based on the state procedural rule that "an

objection based on a *Miranda* violation cannot be raised for the first time on appeal." *Id*. at 799 (quoting California Court of Appeal's decision). The petitioner then filed habeas petitions in the California trial, appellate, and Supreme courts, which were all denied without opinion. *Id*. at 800. The petitioner filed a federal habeas petition, and the district court found that state procedural default barred review of the *Miranda* claim. *Id*. The Ninth Circuit reversed, and held that the California Supreme Court's "silent denial" of the petitioner's habeas petition lifted the procedural bar arising from the decision on direct review. *Nunnemaker*, 904 F.2d at 476. The Supreme Court reversed, holding "where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision on the claim did not silently disregard that bar and consider the merits." *Nunnemaker*, 501 U.S. at 803. Accordingly, this Court presumes that the California Supreme Court's summary denial did not silently disregard the procedural bar, and this Court "looks through" the summary denial to the appellate decision.

Petitioner also contends that the procedural rule applied by the California Court of Appeal was not "adequate" or "independent," and thus that the jury taint claim is not barred. Petitioner contends that there is no authority for the proposition that procedural default can apply where a defendant objects and moves for a mistrial, and the only complaint is that he did not later renew his motion. Petitioner cites *Melendez v. Pliler*, 288 F.3d 1120, 1125-26 (9th Cir. 2002), for the proposition that when an objection is made, even if there are questions as to its timeliness and completeness, procedural default does not apply. In *Melendez*, the defense counsel originally agreed to the introduction of a co-defendant's redacted statement on certain conditions, including that the redacted statement would not refer to the defendant, and that the prosecution's gang expert would not offer testimony that might lead the jury to draw inferences implicating the defendant from the redacted statement. *Id*. at 1125. As the trial unfolded, defense counsel either objected or renewed previous objections every time she perceived a violation of these conditions. *Id*. The first time defense counsel objected, the trial court overruled the objection on the basis that the scope of the redactions had previously been agreed upon; the second time defense counsel objected, the trial court ruled that certain objections were untimely and overruled other objections without explanation. *Id*. at 1123-24. The California Court of Appeal held that the objections were untimely under California's "contemporaneous objection rule," and that the right to raise the claim

United States District Court
For the Northern District of California

1  upon appeal was therefore waived. *Id*. at 1122. The California Supreme Court upheld the decision, and

2  the district court determined the habeas claim to be procedurally defaulted. *Id*.

3       The Ninth Circuit reversed, stating, "[w]e held more than twenty years ago that the rule is

4  consistently applied when a party has failed to make *any* objection to the admission of evidence.

5  However, there are no California cases holding that the rule is applied consistently in situations in which

6  an objection *is* made but the trial court in its discretion declines to consider it on the merits." *Id*. at 1125

7  (internal citation omitted, emphasis in original).  The Ninth Circuit held,

8       Viewed as a whole, the trial record in this case reflects an evolving scenario in which
         defense counsel came to believe that the conditions upon which she had agreed to the use
9        of Rodriguez's statement were not being met.  While reasonable minds might differ as
         to whether counsel asserted her objections at the earliest possible time, there is no
10       question her objections were made at a point when the trial judge realistically could have
         considered them.  More importantly for our purposes, counsel asserted her objections in
11       a sufficiently complete and timely fashion that there is no "clear, consistently applied,
         and well-established" rule of state law that precludes federal review of the merits of
12       these objections.

13  *Id*. at 1126.  The Ninth Circuit noted that "[o]ur reasoning does not apply to circumstances in which no

14  objection is made at all, or in which an objection is so obviously late as to preclude the trial judge from

15  giving it meaningful consideration."  *Id*. at 1126 n.7.

16       Unlike *Melendez* where the defense counsel repeatedly objected and the question was the

17  sufficiency and timeliness of the objections, here defense counsel made one motion for a mistrial, and

18  it was denied based on the state of the record at that time:

19       The motion for mistrial is denied.  At least on the record we have now, it does
         not appear to the Court that this is anything that goes to the merits of the case nor that
20       it would be particularly prejudicial. . . . If you feel that some further inquiry should be
         made of the – of the remaining jurors . . . if you wanted to question the others when they
21       come back in the morning about whether they heard this . . . if that's what you desire I
         will do it. . . . If you do not want to that's where the motion stands at this point.
22

23  Ex. B, Vol. 2 of 11, RT at 415:2-22.  The next morning, upon further consideration, Juror 5 requested

24  to be removed from the jury.  After Juror 5 was dismissed, defense counsel requested to individually

25  voir dire the remaining jurors. Ex. B, Vol. 3 of 11, RT at 425:11-14.  Each juror was then individually

26  questioned by counsel and the court. *Id*. at 425-450.  When the individual voir dire was completed, Juror

27  5 was replaced by Juror 15.  *Id*. at 450:17-23.  The trial court then asked, "Okay.  We're ready to roll

28  then?"  *Id*. at 450:27.  The prosecution responded "Yes, Your Honor," and the record does not indicate

that defense counsel made any comment or objection. *Id*. at 450-451. Thus, after developing the record through individual voir dire of the remaining jurors, defense counsel never objected and/or requested a mistrial on the jury as subsequently reconstituted.

The Court concludes that the California Court of Appeal's adjudication of petitioner's jury taint claim was based on an adequate and independent state ground, namely that defense counsel did not object and/or move for a mistrial as to the jury as subsequently reconstituted. As the appellate court stated, "Grizzle's appellate attack rests on the full state of the record as presented that morning, and his failure to seek a ruling on that state of the evidence is a clear waiver." Answer, Ex. K at 27. The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in holding that claims are procedurally defaulted when there was a complete failure to object at trial. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004); *Jackson v. Giurbino*, 364 F.3d 1002, 1006-07 (9th Cir. 2004); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995); *Featherstone v. Estelle*, 948 F.2d 1497, 1506 (9th Cir. 1991).

In a footnote, petitioner asserts that if this Court determines that procedural default does apply, "then Mr. Grizzle maintains that trial counsel rendered ineffective assistance of counsel by failing to renew his objection, which constitutes cause for the default." Pet. at 8 n.2. Ineffective assistance of counsel may constitute cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 489 (1986). "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution. . . . In other words, ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is *itself* an independent constitutional claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (emphasis in original). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland v. Washington*, 466 U.S. 668, 690 (1984).

The Court finds that petitioner has not shown that counsel's conduct was objectively unreasonable. As noted by the California Court of Appeal, "[a]ny misgivings counsel had when Juror

5 revealed the incident the previous day could easily have been dispelled when, after that juror was excused and the others were examined, it developed that juror 'taint' was not nearly as bad as counsel had first feared.  Pet., Ex. K at 27.  In addition, although the parties do not address the issue of exhaustion, it is not clear that petitioner has exhausted a claim of ineffective assistance of counsel based on counsel's failure to object and/or move for a mistrial after the panel was reconstituted.  In *Edwards*, the Supreme Court held that an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim must itself be presented to the state courts.  *Edwards*, 529 U.S. at 452-53 ("The question raised by the present case is whether *Carrier*'s exhaustion requirement for claims of ineffective assistance asserted as cause is uniquely immune from the procedural-default rule that accompanies the exhaustion requirement in all other contexts—whether, in other words, it suffices that the ineffective-assistance claim was 'presented' to the state courts, even though it was not presented in the manner that state law requires. That is not a hard question. An affirmative answer would render *Carrier*'s exhaustion requirement illusory.").  Here, it appears that petitioner asserted that trial counsel was ineffective based upon his failure to review a videotaped interview of prosecution witness Clark,[3] *see* Pet., Ex. O at 3, 8-12, but there is no discussion in the state habeas order of an ineffective assistance of counsel claim based on the failure to object and/or move for a mistrial based on jury taint, and petitioner has not cited any of his state habeas petitions to show that he raised such a claim in state court. Pet. Ex. O.[4]

Accordingly, the Court finds that petitioner's claim regarding jury taint is procedurally defaulted.

## II.    Perjured testimony

---

[3]  This claim is addressed *infra*.

[4]  The only portion of the record that petitioner cites in support of his argument that ineffective assistance of counsel constitutes cause for the procedural default of the jury taint claim is a declaration submitted by trial counsel in support of the state habeas petition, Pet. Ex. R, in which Mr. Clanton stated that he had read the California Court of Appeal's decision on direct review and was aware that "the Court of Appeal concludes that as to a number of issues at trial, timely and specific objections were not made and that as a result, those issues were deemed forfeited [citing numerous portions of the decision, including the jury taint portion of the decision]."  Pet., Ex. R ¶ 2.  Without specifically identifying any particular objections, Mr. Clanton then stated that "I did not have any strategic reason for failing to assert objections to matters noted by the Court of Appeal as being forfeited . . . ."  *Id.* ¶ 3.

Petitioner claims that he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights when the prosecution knowingly, or at least recklessly and negligently, presented perjured testimony and failed to investigate the testimony's veracity.  Petitioner's claim stems from the testimony of two prosecution witnesses, Clark and Healy.  At petitioner's trial, Healy testified that he had never "even seen that guy," referring to Clark.  Pet., Ex. F, RT 895-896.  Clark, however, testified earlier in the trial that he had known Healy for some time.  *See* Pet., Ex. E, RT 766.  Petitioner contends that this discrepancy "definitively established that at least one of them committed perjury" and that, "[i]n reality, it is clear that both committed perjury."  Pet. at 14:15-16.  Petitioner also asserts that "virtually all" of Clark's testimony was perjury, and that the only point on which he testified truthfully was about his relationship with Healy.  Petitioner argues that the prosecution, specifically prosecutor Fallman, was put on notice prior to the trial that Clark's testimony was not credible because, *inter alia*, after Littrell's trial (at which Clark testified for the defense) and before petitioner's trial, Clark met with a prosecution investigator and told him that he had committed perjury at Littrell's trial.

The Superior Court's decision on collateral review is the last reasoned decision on this claim. The court held,

> "A judgment of conviction based on testimony known by representatives of the state to be perjured deprives the defendant of due process of law and may be attacked by habeas corpus.  In making such an attack, however, Petitioner must establish by a preponderance of the evidence that perjured testimony was adduced at his trial and that representatives of the state knew that it was perjured and that such testimony may have affected the outcome of the trial."  *In re Imbler* (1963) 60 Cal.2d 554, 560 (numerous internal citations omitted but include references to *Mooney v. Holohan*, (1935) 294 U.S. 103, and *Napue v. Illinois*, (1959) 360 U.S. 264, referred to *infra*).  See also Cal. Pen. Code § 1473(b)(2).
>
> Petitioner alleges that virtually all of Clark's testimony at Petitioner's trial was perjured except the testimony that he had known inmate Healy for years.  See Amend. Pet. ¶ 55.  However no direct evidence is presented for the assertion that critical testimony was perjured at Petitioner's trial.  Petitioner points to Clark's prior, contrary testimony in the Littrell trial, his purportedly false allegations about Department of Corrections personnel and his *later* conviction for a grisly murder after his release from prison and after testifying, as evidence of his low character.  But no direct evidence, such as declarations from Petitioner or others, establishes that Clark lied at Petitioner's trial.  The same applies to Healy's testimony.  Petitioner points to a single instance in which Healy's and Clark's testimony varied.  Clark testified he had known Healy for years. R.T. 766.  However Healy testified that to his knowledge he had never seen Clark.  R.T. 896.  Petitioner argues that this contradiction made clear one or both committed perjury and that it therefore became incumbent on the prosecution to notify the court that perjury had occurred and to launch an investigation into the perjury.  Amend Pet. ¶ 56.

. . .

In this case, the only alleged proof (as opposed to assertion) of perjury at Petitioner's trial presented is the discrepancy between the testimony of Healy and Clark about whether they knew each other. While knowing which one was telling the truth might help the trier of fact to make credibility determinations, the discrepancy occurred in the trial and therefore apparently was known to both the judge and the jury. The jury could evaluate the testimony and decide what weight to give it and whether the discrepancy was critical. Without offering proof, Petitioner asserts that Clark testified truthfully on this issue alone and that Healy was lying on this point. It must be noted that this was a collateral point, and not directly critical to whether Petitioner participated in a conspiracy to murder for which there was substantial direct evidence. There is also no proof presented that the District Attorney was aware before Healy's testimony that he would deny knowing Clark; therefore there is no proof that the prosecutors had advance knowledge of any potential discrepancy, let alone perjury.

Contrast these facts with those in [*Commonwealth of* ]*Northern Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001), relied upon by petitioner. In *Bowie*, prosecutors before trial found "concrete documentary evidence suggesting that the prosecution's . . ." witnesses against the defendant ". . . were conspiring to testify falsely against him" (i.e., they intercepted a letter between two witnesses outlining a conspiracy to frame the defendant for a crime the writer had committed). *Id.* at 1111. There, the Ninth Circuit found that failure to investigate the letter was "at least the equivalent of knowingly sitting quietly by . . . while your witness lies on the stand."

In the case at bar, the prosecution was dealing with members of the Aryan Brotherhood prison gang housed at Pelican Bay State Prison's security housing unit (SHU), which houses "the worst of the worst" of California's prison populations. See *Madrid v. Gomez* (1995) 889 F. 2d 1146, 1155. Prison gang members are typically involved in such activities as drug trafficking, extortion, and premeditated assault. *Id.* at 1240. As Healy testified at trial, AB members are obligated to commit perjury when they can get away with it. R.T. 910.

In this case Healy and Clark both admitted in front of the jury prior perjury. However, there was no evidence presented in the petition that suggested the prosecution had actual knowledge, or particular reason to suspect, perjury in this case that needed to be investigated further. The discrepancy was whether the two witnesses knew each other. Due to the secretive nature of prison gangs, the commitment to perjury, and the background of the people who obtain membership in the gang, trials of Aryan Brotherhood members would be almost impossible if only people of good character, free of past violence and lies, were allowed to testify.

Petitioner argues, based on *Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006), and *Bowie*, that he need not show "actual" perjury to prevail in this action. This Court disagrees. Federal and California cases are in agreement in the treatment of *Mooney-Napue* claims. For instance, in *Morris* the Ninth Circuit rejected petitioner's contention that *Bowie* virtually requires reversal whenever perjured testimony has been presented. *Morris*, *supra* at 745. As stated in *Imbler*, *supra*, petitioner must establish that there was perjury, that the prosecution knew of it (or the functional equivalent), and that there was prejudice to the defendant that might affect the outcome of the trial. In *Morris*, the court held that while it found that false testimony had been presented, "there was insufficient evidence to permit a conclusion that correcting the falsehood . . . would have provided support for his claims of actual innocence." The test for prejudice under *Mooney-Napue* is the same as that of materiality in a *Brady v. Maryland* claim. The reviewing court must decide whether petitioner received a trial resulting in a verdict worthy of

16

**United States District Court**
For the Northern District of California

confidence "even with the perjured testimony." *Morris* at 745.

In this case, Petitioner has not established that perjury occurred, with the possible exception as to the collateral issue of whether Clark and Healy knew each other. Failure to investigate that issue by the prosecution after the discrepancy arose during trial was not prejudicial under *Mooney-Napue*, and this Court is not moved to believe Petitioner did not receive a fair trial or that the verdict is not worthy of confidence. There was extensive evidence from the numerous witnesses that petitioner was involved in the conspiracy and murder and that he admitted to the same afterward. [citations omitted].

Pet., Ex. 0 at 4-7 (emphasis in original)..

"A judgment of conviction based on testimony known by representatives of the state to be perjured deprives the defendant of due process of law." *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935). When a conviction is obtained by the use of testimony that the prosecutor knew or should have known was perjured, the conviction is set aside if there is a reasonable likelihood that the judgment of the jury was affected by the testimony. *See United States v. Agurs*, 427 U.S. 97, 103 (1976). This result also occurs if the prosecutor, though not soliciting false evidence, does not correct such evidence when it is presented. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A prosecutor has a duty under the Constitution to correct false evidence if the prosecution knows its witness has lied. *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

Prosecutors, however, will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct and the fairness of the trial was not materially affected. *See United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995), *cert. denied*, 516 U.S. 945 (1995). Petitioner must establish a factual basis for attributing the government's knowledge that the testimony was perjured. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004). Even if conflicts arise in witnesses' testimony, a prosecutor could not have knowingly presented perjured testimony unless they knew whose testimony was false. *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1992). If there is "only an allegation or suspicion that a witness lied . . . we must decide whether the prosecution had a duty to investigate an allegation or suspicion of perjury, separate from its duty to disclose perjury that has definitely taken place." *Morris v. Ylst*, 447 F.3d 735, 743-44 (9th Cir. 2006).

"To prevail on a claim based on *Mooney-Napue*, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was

United States District Court
For the Northern District of California

1    actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886,

2    889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71). "Material" means that there is a reasonable

3    likelihood that the false evidence or testimony could have affected the judgment of the jury. *Morris*,

4    447 F.3d at 743.

5        The Court concludes that the state court's analysis of petitioner's claim was neither contrary to

6    clearly established federal law as determined by the Supreme Court of the United States, nor was it

7    based on an unreasonable determination of the facts. As the Superior Court found, petitioner has not

8    shown that the prosecution knew or should have known that the testimony was actually false, and

9    petitioner did not submit any direct evidence, such as declarations or affidavits, showing that Clark or

10   Healy's testimony at petitioner's trial was false. The Court finds instructive *United States v. Sherlock*,

11   962 F.2d 1349 (9th Cir. 1992). In *Sherlock* the Ninth Circuit held that contradictory prosecution witness

12   statements do not alone prove the prosecutor's knowledge of which statement, if any, is true. The Ninth

13   Circuit held that Sherlock and Casey, who were co-defendants in a rape case, "assert that the prosecutor,

14   by presenting witnesses with contradictory stories, necessarily presented perjured testimony. That

15   argument lacks merit. They fail to allege that the prosecutor knew which story was true or false.

16   Without knowledge of whose testimony was false, he could not have *knowingly* presented perjured

17   testimony. " *Id.* at 1364 (emphasis in original); *see also  Zuno-Arce*, 44 F.3d at 1423 ("Lawyers in

18   criminal cases, for prosecution and defense, sometimes swim in a sea of lies, and must necessarily trust

19   the jury to determine what is true, or whether reasonable doubt remains about what is true."). Here, the

20   credibility of both witnesses had already been seriously undermined by their admissions at trial that they

21   had each committed perjury in the recent past,[5] and the contradiction in the witnesses' testimony about

22   whether they knew each other was presented to the jury. Thus, the jury could evaluate the credibility

23   of both witnesses and decide what weight to give their testimony.

24        Petitioner's claim also fails because he has not shown that the allegedly false testimony was

25   material. As the state court held, whether Healy and Clark knew each other "was a collateral point, and

26   _____

27       [5] Clark admitted that he had, *inter alia*, perjured himself in Littrell's trial, and Healy testified,
     *inter alia*, that he had recently "beaten" a first degree manslaughter charge "down to manslaughter" by

28   using "deceptive" training he had received from the Aryan Brotherhood. Healy's testimony is discussed
     in greater detail *infra*.

not directly critical to whether Petitioner participated in conspiracy to murder for which there was substantial direct evidence." Pet. Ex. O at 5:26-28. Numerous witnesses, aside from Clark and Healy, provided incriminating testimony, including: (1) inmate Michael Contreras, who testified that he saw petitioner making spiked pruno in his cell, and that he took the spiked pruno to Marsh's cell at petitioner's request, Answer Ex. B, Vol. 3 of 11, RT 458:9-470:4; (2) inmate Vernon Rubidoux, who testified that, in a conversation he had with Littrell and petitioner, Littrell told him "well, he [Marsh] wasn't feeling nothing after we [referring to himself and petitioner] put a mickey in his drink," at which point petitioner "kind of laughed, and that's when Rascal [petitioner] said, he goes: 'Yeah, he always wanted me to make him a bomb, and I made him that bomb all right." Answer Ex. B, Vol. 3 of 11, RT 549:4-550:13; and (3) inmate Douglas Ridinger, who testified that petitioner had solicited him to kill Marsh after the Aryan Brotherhood hierarchy ordered the hit, but that he eventually declined; that after he told petitioner he would not kill Marsh, petitioner told him that Littrell would; that on the day of the murder he smelled pruno coming from both Littrell's and petitioner's cells, and he saw Contreras slip an envelope under Littrell and Marsh's cell door; and that the day after the murder, petitioner told him to tell Littrell's attorneys that he had heard Littrell and Marsh fight, which he had not. Answer, Ex. B, Vol. 2 of 11, RT 311:21-322:14, 327:3-328:19. On this record, the Court finds that there is not a reasonable likelihood that the collateral testimony about whether Healy and Clark knew each other could have affected the judgment of the jury.

## III.    Ineffective assistance of counsel

Petitioner claims that his trial counsel was ineffective by failing to watch a videotaped interview of Clark that was produced to his trial counsel before the trial. The Superior Court's decision on collateral review is the last reasoned decision on this claim. According to that decision,

> The ineffective assistance of counsel claim arises from the alleged failure of Petitioner's trial counsel to review a videotaped interview of Clark by the deputy district attorney and the Department of Corrections investigator conducted the month before trial. In a post-trial hearing, defense counsel asserted that he had not been provided the tape and never had the opportunity to review it before trial. Amend. Pet. Ex. I, p. 93. However, transcripts of a pre-trial hearing on discovery issues seemed to include an acknowledgment by counsel that he had received the tape. Amend. Pet. Ex. C, p. 34.

### A.    Timeliness of Claim

19

Generally a petitioner may not raise in habeas corpus proceedings matters that were, or could have been, raised on direct appeal. *In re Waltreus supra*, at 225; *In re Harris* (1993) 5 Cal. 4th 813, 829. Ineffective assistance of counsel is often challenged by habeas corpus because the facts giving rise to that claim are outside the record. See Appeals and Writs in Criminal Cases § 2.175 (C.E.B. 2nd ed.). In the case at bar, the claimed ineffective assistance of counsel in failing to review the videotape is based upon the record. No additional evidence has been presented by Petitioner. When the habeas petition was originally filed in 2002, it included a declaration from trial counsel Russell Clanton as to several issues, including stating he had no tactical reasons for not interposing certain objections at points in the trial referred to in the appellate court decision. However, the declaration was void of any reference to the failure to review the videotape. No explanation is given why Clanton's declaration, or any subsequent declaration submitted with the amended petition, did not address the issue.

However, from the records submitted with the amended petition, it appears Clanton's failure to review the discovery provided by the prosecution constitutes deficient performance of his obligation as trial counsel. See *Williams v. Washington* 59 F.3d 673, 680 (7th Cir. 1995) (court is unable to imagine plausible excuse for a decision not to read discovery materials or excusing the failure). As Petitioner suggests from the evidence it may be that Clanton lost or misplaced the tape. He may have then forgot that he ever received it.

Thus, it appears this is one of those cases where there is "no conceivable tactical reason for counsel's error" and the issue should therefore have been raised in the initial appeal rather than waiting to attack the judgment collaterally by habeas petition. Appeals and Writs in Criminal Cases, *supra* § 1B. 29. See *People v. Mendoza Tello*, (1997) 15 Cal. 4th 264, 266 (ineffective assistance of counsel may be raised on direct appeal when "there simply could be no satisfactory explanation" for counsel's failure to act).

## B.   Merits of Claim

Assuming that Petitioner is not time barred from raising ineffective assistance of counsel in this petition even though he could have raised it on appeal, the merits of the claim must be examined under the applicable law:

"To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." *People v. Lewis* (1990) 50 Cal. 3d 262, 288.

"This and similar statements of the standard have been consistently applied." 5 Witkin, California Criminal Law Criminal Trials § 204 (3d ed.)

In *In re Fields*, (1990) 51 Cal. 3d 1063, the California Supreme Court discussed the showing required to sustain a claim of ineffective representation by reason of incompetent investigation or presentation of evidence at trial. The petitioner may not simply describe what evidence might have been discovered and produced by competent counsel.

"Instead, he must generally produce the evidence so credibility of the

witnesses can be tested by examination . . . in effect the petitioner must show us what the trial would have been like, had he been competently represented, so we can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different." *Id.*, at 1071.

If there is no prejudice (i.e. no finding that it is reasonably probable that a more favorable outcome would have occurred but for counsel's failings) then the petitioner is not entitled to relief even if counsel acted incompetently.

In this case Petitioner's Denial at pages 9 - 10 lists five ways that Petitioner claims he was prejudiced:

First, "the videotape clearly established Clark's relationship with Healy. Had Clanton at least viewed the videotape, he certainly would have recognized Clark or Healy committed perjury . . . regarding their relationship, and he could have argued perjury to the jury and requested appropriate instructions and sanctions." However, Mr. Clanton did not need to view the video tape to discern their testimony at trial was at variance on this issue. It may be that Clanton did not recognize it is particularly important, as discussed above. Healy's testimony on this issue was relatively short and no one made any issue of it at the time. The videotape only discussed Clark's version of his prior relationship to Healy, whose version was not addressed in the tape. However, counsel would not have gained much knowledge on this issue from the videotape, which was cumulative of information trial counsel already had. Clark's assertion that he knew Healy from years before had been detailed in the Littrell trial the year before (Amend. Pet. Ex. B, p. 110-112) and Clanton cross-examined Clark extensively about his prior testimony, so Clanton was surely already aware of it. R.T. 784 *ff*. Having viewed the tape in advance was not likely to have made any difference in this regard. The Court notes that Petitioner did not supply this Court with Clanton's closing argument and this Court does not know what arguments were actually made by Clanton.

Second, "the videotape contained the allegation that Mr. Grizzle attempted to have Healy's daughter killed. Because Clanton did not view the videotape he was surprised by Clark's allegation at trial .. . Clanton could have used the videotape to conduct investigation that would have impeached both Clark and Healy." Petitioner alleges Clanton could also have called attorney Gallegos or Clark's sister to impeach Clark. This argument is conclusory and is not supported by any factual showing that either Clark or Healy lied in this case about anything other than their relationship. As indicated in *Fields*, this is an insufficient "allegation" rather than a production of facts. The trial occurred more than eight years ago and this habeas proceeding began more than five years ago. Petitioner has not submitted evidence as required by *Fields* to show that the outcome would have been any different had trial counsel conducted pre-trial interviews with Gallegos or Clark's sister. Also, the record shows that before trial attorney Clanton had the information Clark provided regarding Gallegos and Clark's sister in the form of the memo from James Rogers. Amend. Pet. J, Ex. C p. 34. Reviewing the tape would have added little in this regard.

Third, "Clanton also could have made . . ." an Evidence Code section 352 objection that any probative value was outweighed by the danger of unfair prejudice. Counsel made such an argument to the court at sidebar. R.T. 777 - 779. The motion to exclude the evidence was denied.

Fourth, Petitioner alleges defense counsel could have "destroyed" the prosecution's "argument that Clark was telling the truth because he must have obtained

the name of Healy's daughter from Mr. Grizzle." After reviewing of the tape, the Court has found nothing in it that supports this argument. The tape set forth Clark's position that he had known Healy; the Court is unaware of any pre-trial information that was available to either party that Healy would testify to the contrary at trial. Counsel pointed out nothing in the transcript, and the Court did not find any attempt by anyone to cross-examine Healy on that statement. As noted, above, defense counsel was well aware before trial that Clark's position was always that he had known Healy for years.

Finally, Petitioner argues, "at the very least, had Clanton viewed the videotape by the time of the post-trial hearing, he could have argued the perjury of Clark and Healy as a ground for a new trial." Again, this Court finds nothing in the tape that could have been used to bolster the argument that Healy or Clark committed perjury beyond their testimony at trial. At trial, Clark's testimony was consistent with the statements on the tape: that he had committed perjury in Littrell's trial, that he did so at the behest of Grizzle, that he had known Healy for years, and that Grizzle and Littrell were considering reprisal at Healy by attacking Healy's step-daughter. Healy testified at trial that he didn't know Clark but that members of the Aryan Brotherhood knew Healy had a daughter and the specifics about her. R.T. 896. Thus defense counsel had already had all this information for months when the Petitioner's post-trial motions were argued and the tape would have added nothing of consequence at this point.

In conclusion, while it appears Petitioner's trial attorney's failure to review the videotape constituted deficient representation, Petitioner has not shown that he suffered constitutional prejudice in that it is not reasonably probable that a more favorable determination would have been reached had defense counsel reviewed the tape before trial.

Pet., Ex. O at 8-12.

The Sixth Amendment right to counsel guarantees effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* A habeas petitioner must establish two things to prevail on a Sixth Amendment ineffectiveness of counsel claim: (1) petitioner must establish that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88; and (2) petitioner must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Respondent does not dispute the Superior Court's conclusion that trial counsel was deficient by failing to review the videotape, and thus the Court turns to the question of prejudice. In order to show prejudice and satisfy the second part of the *Strickland* test, petitioner must demonstrate that counsel's

errors effectively deprived him of a fair trial with a reliable result. *Id.* at 688. Where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695); *compare Plascencia v. Alameda*, 467 F.3d 1190, 1201 (9th Cir. 2006) (holding ineffective assistance claim was not established because "any prejudicial effect was at best minute" from counsel's failure to object to evidence about existence of a drug in murder defendant's system where only killer's identity was in dispute), *with Pirtle v. Morgan*, 313 F.3d 1160, 1170-71, 1174 (9th Cir. 2002) (finding prejudice where counsel failed to request a diminished capacity instruction, which left the jury with no legal context to evaluate expert testimony about effect of chronic drug abuse on petitioner's ability to premeditate).

The Court concludes that the Superior Court's application of *Strickland* was not unreasonable because petitioner has not shown that there is a reasonable probability that, if counsel had watched the videotape, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Petitioner asserts that trial counsel's failure to watch the videotape was prejudicial because "Clanton clearly should have recognized the perjury committed by Clark and Healy from their trial testimony and was incompetent in doing so," and that "even if he had missed the obvious perjury during trial, he certainly would have recognized it if he watched the videotape." Pet. at 33:8-11. However, the Superior Court found that Clark's trial testimony that he knew Healy was consistent with Clark's statements on the videotape that he knew Healy. The court stated, "counsel would not have gained much knowledge on this issue from the videotape, which was cumulative of information trial counsel already had. Clark's assertion that he knew Healy from years before had been detailed in the Littrell trial the year before and Clanton cross-examined Clark extensively about his prior testimony,[6] so Clanton was surely already aware of it." Pet. Ex. O at 10:21-27 (internal citations to record omitted). Petitioner also contends that if counsel had watched the videotape he would have been alerted to Clark's "Polly Klaas" testimony about the plot to kill Healy's daughter, and he would have been alerted to Clark's allegations that Gallegos, petitioner's original attorney, requested that petitioner approach Clark

---

[6] *See* Pet., Ex. J at RT 781:2-804:18.

United States District Court
For the Northern District of California

about providing perjured testimony to discredit Healy in the Littrell trial. Again, however, the Superior Court found that "the record shows that [] trial attorney Clanton had the information Clark provided regarding Gallegos and Clark's sister[7] in the form of the memo from James Rogers. Reviewing the tape would have added little in this regard." *Id.* at 11:15-18 (internal citations to record omitted).

Petitioner asserts that this case is "eerily similar" to *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir 2006). The Court disagrees. In *Reynoso*, the Ninth Circuit found that the petitioner was prejudiced by his trial counsel's failure to investigate and cross-examine the only two eyewitnesses to the murder regarding the fact that the witnesses had come forward to the police three years after the murder and only after being prompted by the promise of a $25,000 reward. The Ninth Circuit "start[ed] from the premise that the case for the prosecution was extremely weak." *Id.* at 1116.[8] The court found that the failure to investigate and cross-examine the two eyewitnesses about the reward money was prejudicial because,

> In closing at trial, the prosecutor emphasized defense counsel's failure to impeach Terrones's credibility, stressed that neither Terrones nor Mendoza demonstrated any bias, and argued forcefully that neither had any reason or motive to lie. She went so far as to state: "They don't have a bias in this case. There's *no* reason for them to come forward and say it's the defendant if it's not the defendant" (emphasis added [by Ninth Circuit]). This last statement demonstrates the substantial impact that establishing the financial motives of the two purported eyewitnesses would have had.

> . . .

> Had defense counsel investigated and questioned Terrones and Mendoza about their expectation of reward money in return for their testimony inculpating Reynoso, she would have been able to provide the jury an explanation of the eyewitnesses' incentive to identify him, regardless of their lack of knowledge, and would have effectively demonstrated witness bias. She would have answered directly the open question that the prosecution's closing argument posed for the jury – what was the witnesses' motive to lie? In the absence of the missing cross-examination, the defendant was unable to provide an answer to this critical question. Given those facts and circumstances, we conclude that, but for counsel's deficient performance, there is a reasonable probability that the outcome of Reynoso's trial would have been different.

---

[7] Clark told investigators that his sister had been paid $500 in exchange for Clark's perjured testimony in the Littrell trial. Pet., Ex. J.

[8] The court noted that there was no physical evidence linking Reynoso to the crime, and that the other two witnesses at trial included a man who was originally a suspect and who recanted his testimony at trial, and another man who was a jailhouse informant who came forward two years after the murder after seeing a broadcast of the reward with a composite of the suspect, and who testified that the reward money motivated him to contact the police. *Id.*

*Id*. at 1117.

The facts of this case are quite different from those in *Reynoso*. Here, as discussed *supra*, the prosecution's case was strong, and there was ample evidence implicating petitioner in the conspiracy to murder Marsh. Further, Clark's trial testimony was consistent with his videotaped interview, and the state court found that the videotaped interview was cumulative of information already available to counsel. Petitioner has not shown how counsel's failure to watch the videotape effectively deprived him of a fair trial with a reliable result.

### IV.   Prosecution's failure to turn over prison log books

Petitioner claims that he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights when the prosecution failed to turn over two prison log books that undermined Healy's testimony. In denying petitioner's appeal on direct review, the California Court of Appeal described the facts as follows:

> [SHU visiting area logs for dates surrounding the July 25th, 1997, murder] had been sought by the defense, and control and floor officer logs were produced before trial. However, two books were not found and produced until afterward, and the defense claimed that this newly discovered evidence warranted a new trial because it impeached Healy's account of Grizzle having made admissions on the day after the murder, at the holding cells.[9] Healy had testified that the encounter occurred when, having just finished a non-attorney visit and awaiting transport from a holding cell, he saw Grizzle arrive for a visit and be placed into a cell more or less across from him. The defense introduced one log (Exh. §) to show that this occurred on the 26th and that there had not necessarily been an overlap but, rather, a dovetailing of visits. Healy's was logged as from 11:00 a.m. to 1:00 p.m. and Grizzle's as from 1:00 to 3:00 p.m. The late-produced log for the same day differed somewhat, showing Healy leaving from his visit at 1:00 p.m. but Grizzle not arriving for his own until 1:30 p.m. – creating a half hour gap.

Pet., Ex. K at 34. Petitioner contends that the late-produced logs establish that the encounter between Grizzle and Healy could not have occurred, and that if the logs had been produced prior to trial, petitioner's trial counsel could have used them to impeach Healy's testimony.

### A.   Exhaustion

---

[9] At trial, Healy testified that he had seen petitioner making strangling motions with his hands in the visiting area holding cell to indicate how Littrell had "taken care" of Marsh. Answer, Ex. B. Vol. 5 of 11, RT 904:5-906:16.

United States District Court
For the Northern District of California

In his habeas petition to this Court, petitioner frames this claim as a *Brady* claim.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").  Petitioner asserts that the last reasoned decision on this claim is that of the California Court of Appeal on direct review, and petitioner contends that the state appellate court "totally misconstrued *Brady*" by applying the wrong standard, namely the "more onerous standard under California statutory law for a new trial based on newly discovered evidence."  Pet. Mem. at 34:21-22, 35:19-20.

Respondent contends that petitioner did not exhaust this claim because petitioner did not "fairly present" a claim of *Brady* error to the state courts.  Instead, when the missing log books were produced after trial pursuant to a subpoena duces tecum, petitioner filed a motion for a new trial, arguing that the "prison officials' bad faith refusal to produce the missing log violated defendant's due process rights," and that "prosecutorial misconduct in not producing the exculpatory evidence is a separate basis for a new trial."  Answer, Ex. A at CT 739, 740.  In the new trial motion, petitioner argued that had the logs been available at trial, he could have used them to impeach Healy's testimony.[10]  The trial court held a hearing on the new trial motion at which the court heard testimony from Pelican Bay officers who testified about the maintenance of the logs as well as the fact that the entries are only "roughly accurate" because they were not always made contemporaneously.  Answer, Ex. B, Vol. 11 of 11, RT 106 (June 16, 1997 hearing transcript).  After the conclusion of witness testimony and argument, the trial court denied the motion for a new trial.  The court found that the maintenance of the log books was "sloppy" and that the nondisclosure was unintentional.  *Id.* at RT 154:17-24.  Based upon the testimony presented, the trial court also found,

> . . . they are apparently inexact records that are kept that -- that the People have shown -- or transport or escort officers are moving prisoners about the prison all day long apparently here and there to visiting, to the infirmary or wherever they're going to take them, and that in the course of their duties they oftentimes have to make entries to the logbooks that are not made precisely contemporaneously with the action that the entry records.

---

[10]  Contrary to respondent's statement in the answer, the motion for a new trial did not cite *Brady*.  *See* Answer Ex. A at CT 705-720 (motion for a new trial), CT 734-749 (amended motion for a new trial).

And so if an entry is off by a few minutes that would not be surprising, and it does not appear to -- and really, the whole import of that is impeachment evidence to try to impeach the testimony of witnesses who claim to have had conversations with the defendant. The jury had an opportunity to -- to assess the credibility of those witnesses. This is simply one -- one further effort to under -- undercut their credibility but -- but those witnesses as convicts and -- and -- and in a couple of cases as admitted perjurers were – were fully impeached, and if the jury upon judging their demeanor chose anyway to believe their testimony I find that further impeachment really would have been essentially cumulative and would not have altered the outcome of the trial.

And so I find first that the unavailability of the log – logbook – logbooks was unintentional, and secondly that it would not have resulted in a different verdict.

*Id*. at 155:1-25.

On direct appeal, petitioner argued that the trial court abused its discretion in denying his motion for a new trial. Answer, Ex. D. Petitioner argued that the trial court erred by ruling that the newly-discovered prison logs were cumulative impeachment of Healy, and that "the objective evidence of the prison log contradicting Healy's version of events certainly would have carried considerable weight with the jury." *Id*. at 74. Neither petitioner's opening nor reply briefs on direct appeal asserted a *Brady* violation with regard to the late-produced logs. Answer, Ex. D & F. Petitioner asserts that his reply brief to the California Court of Appeal on direct review "set forth his *Brady* analysis" by arguing that "the trial court deprived appellant of due process in refusing to grant the new trial based on subsequently discovered evidence of . . . exculpatory matters." Respondent's Ex. F at 12. However, petitioner's reply brief did not cite *Brady*, and did not assert a *Brady* violation.

The California Court of Appeal rejected petitioner's arguments on direct appeal:

Grizzle sought a new trial on several grounds. He raises two here, claiming the court violated his state and federal constitutional rights to due process and a fair trial. . .

. . .

First, while Grizzle criticizes a lack of "explanation" for the log's late production and elsewhere complains of "due process" and state and federal "fair trial" deprivations, we do not understand him to seriously claim any deliberate suppression of this evidence. He presents no constitutional analysis or case citations (*People v. Gionis*, *supra*, 9 Cal. 4th at p. 1214, fn. 11) and ignores the court's findings below that nothing suggested "any conscious or intentional suppression of evidence within the meaning of the *Trombetta* decision" (*California v. Trombetta* (1984) 467 U.S. 479, 488-489; *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [bad faith required]; *People v. Webb*, *supra*, 6 Cal. 4th at p. 519 [same]) and that hearing testimony from prison officers Diana Willis and Steve Reppond was "true." The court found, consistent with their testimony: "[T]hey didn't know where these things were; they finally dredged them out and provided them."

1

2

3

4

5

6

7

8

9

10

    The question, then, is whether the missing log would render a different result probable on retrial. The court held that it would not, accepting hearing testimony that these log books "are apparently inexact records," that "transport or escort officers are moving prisoners about the prison all day long apparently here and there to visiting, to the infirmary or wherever," and that "in the course of their duties they oftentimes have to make entries to the logbooks that are not made precisely contemporaneously with the action that the entry records." This was indeed the import of testimony by Melissa Cruse, an experienced SHU visiting area officer, and thus the court could view the half-hour discrepancy as not necessarily undercutting Healy's testimony. We presume the court also bore in mind that the log used at trial had shown *no* gap and that the entries in both logs were rounded off to the nearest hour or half hour, thus confirming that they were truly imprecise. The court further reasoned that, to the extent the missing log might impeach Healy's general credibility, it was "essentially cumulative" to other impeachment and that jurors had been able to judge his demeanor for themselves. Those observations are well supported. Jurors believed Healy despite his conceded history of violent offenses, AB membership, receipt of immunity for testimony and, most remarkably, a premeditated AB-ordered strangling of his own cellmate, which brought a first-degree-murder charge that he managed to "beat" down to voluntary manslaughter by using his AB training. No manifest abuse of discretion is shown in the denial of a new trial.

11

12

13

14

Answer, Ex. C at 33-36 (emphasis in original). Thus, although petitioner asserts that the California Court of Appeal "misconstrued" *Brady*, in fact the record shows that petitioner did not raise a *Brady* claim in his direct appeal.

15

16

17

    Petitioner's traverse asserts that he presented a *Brady* claim in his petition for review to the California Supreme Court. Petitioner cites the following heading, found at page 12 of his petition for review:

18

19

20

APPELLANT WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF HIS FIFTH SIXTH, AND FOURTEENTH AMENDMENT RIGHTS BY THE TRIAL COURT'S DENIAL OF A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF A *MASSIAH* VIOLATION AND NEW EVIDENCE THAT THE PROSECUTION'S PRINCIPAL WITNESS FABRICATED AN INCRIMINATING EVENT.

21

22

23

24

25

26

27

28

Answer, Ex. E, at 11 (the "fabricated" "incriminating event" in question being Healy's testimony regarding his interaction with petitioner in the Pelican Bay holding cell). The petition for review argued that the Court of Appeal improperly rejected a *Massiah* violation claim -- not the logbook claim -- on the basis that petitioner had not cited supporting authority. Petitioner asserted that under *Brady*, "[a] defendant need not cite authority for his entitlement to exculpatory evidence in the course of proceedings in the trial court, as that is governed by the constitutional dictates of *Brady v. Maryland* and its progeny." *Id*. at 12 (internal citation omitted). Petitioner then turned to his claim based on the logbook, arguing that the Court of Appeal misapprehended the prison log's full impeachment and

exculpatory value. Petitioner also cited *Barkauskas v. Lane*, 878 F.2d 1031, 1033 (7th Cir. 1989), while discussing the prejudicial effect of abundant impeachment evidence. The pages of *Barkauskas* cited by petitioner, in turn, discuss *Brady* principles. See Answer, Ex. E at 13.

The exhaustion-of-state-remedies doctrine reflects a policy of federal-state comity to give the state "an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citations omitted). The state's highest court must be alerted to the fact that the prisoner is asserting claims under the United States Constitution in order to be given the opportunity to correct alleged violations of federal rights. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). Both the legal basis and the factual basis of the claim must be fairly presented. It is not sufficient to raise only the facts supporting the claim; rather, "the constitutional claim . . . inherent in those facts" must be brought to the attention of the state court. *See Picard*, 404 U.S. at 277. With regard to the factual basis for the claim, "the petitioner must only provide the state court with the operative facts, that is 'all of the facts necessary to give application to the constitutional principle upon which [the petitioner] relies.'" *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008) (citations omitted). Although the exhaustion requirement is not jurisdictional and instead is a matter of comity, *see Granberry v. Greer*, 481 U.S. 129, 133-34 (1987), the court generally may not grant relief on an unexhausted claim, *see* 28 U.S.C. § 2254(b)(1).

The Court finds that petitioner's presentation to the California Supreme Court suffices to exhaust the *Brady* claim—but just barely. Although the exhaustion doctrine "requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record," *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988), the exhaustion analysis to some extent focuses less on the quality of the presentation, and more on whether the information is present somewhere in the brief. *See Davis v. Silva*, 511 F.3d at 1011; *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005); *Caswell v. Calderon*, 363 F.3d 832, 838-39 (9th Cir. 2004). Here, petitioner repeatedly raised concerns regarding due process, his right to a fair trial, and his entitlement to exculpatory evidence in various claims before the state courts and, although petitioner may have disguised it well, a *Brady* claim was discernable in the petition for review.

Petitioner's state court filings demonstrate the difficulty of now trying to apply section 2254(d)

to the intermediate state appellate court's decision. Whereas the petition for review barely passed exhaustion muster, the filings in the state court of appeal came nowhere close to alerting the intermediate court that petitioner intended to raise a *Brady* claim based on the late-produced log. Because the claim about the log was not argued as a *Brady* claim to the California Court of Appeal, that court did not analyze it as a *Brady* claim, and this Court does not "look through" the California Supreme Court's unexplained denial of the claim to apply § 2254(d) to the California Court of Appeal's reasoned decision. In short, the California Court of Appeal's decision was not the "last reasoned decision" on the *Brady* claim. Because the California Court of Appeal was not presented clearly with the *Brady* claim the Court turns now to the California Supreme Court's denial of Mr. Grizzle's petition for review.

In denying the petition for review, the California Supreme Court silently rejected petitioner's *Brady* claim. This silent rejection is an unexplained denial to which section 2254(d) applies because, "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). This Court therefore must review the state court's determination that petitioner's *Brady* claim lacked merit, precluding federal habeas relief, by determining "what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786.

## B.    Merits

The government has an obligation to surrender favorable evidence that is "material either to guilt or punishment." *Brady*, 373 U.S. at 87; *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992). Evidence is material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667 at 682 (1985) (plurality opinion)); *Agurs*, 427 U.S. at 111-12; *see also Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). In *Bagley*, the Supreme Court held that a *Brady* violation occurs if it is shown that the favorable evidence could reasonably cast the

United States District Court
For the Northern District of California

1    entire case in such a different light that confidence in the verdict is undermined. *Bagley*, 473 U.S. at

2    682. The Court in *Kyles* subsequently reaffirmed by stating,

> *Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. 419 at 434; *see also Strickler*, 527 U.S. at 281 ("[T]here is never a real '*Brady* violation'

unless the nondisclosure was so serious that there is a reasonable probability that the suppressed

evidence would have produced a different verdict.").

     The Court concludes that the California Supreme Court reasonably could have concluded that

the late disclosure of the log was not material as it did not create a "reasonable probability" that the trial

would have produced a different result had the evidence been timely disclosed. In his petition for

review to the California Supreme Court, petitioner argued that the Court of Appeal erred in not finding

prejudice in the late log disclosure because,

> [w]hile the logs indicating that Healy had left the area before appellant had arrived were not necessarily accurate to the minute, the whole point of them was to show that there was no overlap . . . [t]he jury could have substantially discounted all of Healy's testimony, had it been presented with this evidence that he fabricated one of the most incriminating conversations.

Answer, Ex. E at 12. The record does not support petitioner's argument. The state trial and appellate

courts[11] found that the impeachment value of the log book was questionable based on the testimony that

log books are "inexact records" and that entries to the logbooks "are not made precisely

contemporaneously with the action that the entry records." Answer Ex. B., Vol. 11 of 11, RT 155 (trial

court); Answer Ex. C at 35 (appellate court). Furthermore, the record shows that to the extent the

missing log book would have impeached Healy's credibility, it was "essentially cumulative" to the

extensive impeachment evidence presented to the jury. At the trial, Healy testified, *inter alia*, that (1)

he had been convicted of "attempted murder on a cop, manslaughter, weapon possessions, assault with

a weapons [sic] on prisoners"; (2) he had been an associate, and then a member, of the Aryan

---

[11] Although petitioner did not raise a *Brady* claim to either the trial or appellate courts, both courts, in evaluating whether petitioner was entitled to a new trial based on the late-produced log book, analyzed whether the verdict would have been different if the log book had been entered into evidence at the trial.

**United States District Court**
For the Northern District of California

1  Brotherhood; (3) he had recently been convicted of manslaughter after using training he received from

2  the Aryan Brotherhood on how to "beat a murder, get it from first degree murder to a manslaughter,"

3  and he admitted that he had, in fact, murdered the victim "with premeditation" and "malice

4  aforethought"; and (4) he had received immunity for his testimony   Answer, Ex. B, Vol. 5 of 11, RT

5  867-68, 880, 882-883[12], 888-889.

6  　　　　Finally, even accepting petitioner's arguments about the impeachment value of the log book, the

7  Court concludes that there is not a reasonable probability that, had the log book been disclosed to the

8  defense, the result of the proceeding would have been different.  As discussed *supra*, numerous

9  witnesses, including Contreras, Rubidoux, and Ridinger, provided incriminating testimony implicating

10  petitioner in the conspiracy to murder Marsh.  On this record, the missing log book could not

11  "reasonably be taken to put the whole case in such a different light as to undermine confidence in the

12  verdict." *Whitley*, 514 U.S. at 435 ("One does not show a *Brady* violation by demonstrating that some

13  of the inculpatory evidence should have been excluded, but by showing that the favorable evidence

14  could reasonably be taken to put the whole case in such a different light as to undermine confidence in

15  the verdict.").

16

17  **V.    Use of shackles**

18  　　　　Petitioner claims that he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights

19  when he was tried in shackles.  Petitioner's primary contention in support of this claim is that the trial

20  court incorrectly rejected less restrictive alternatives to shackling.

21  　　　　The Supreme Court has held, "the Fifth and Fourteenth Amendments prohibit the use of physical

22  restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they

23  are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005);

24  *Larson v. Palmateer*, 515 F.3d 1057, 1062 (9th Cir. 2008).  A decision by a court of appeal that the trial

25  judge acted within his discretion under these circumstances is not contrary to, or an unreasonable

26  ───────────────

27  　　[12] Healy testified that he had taught other Aryan Brotherhood members how to "beat" a murder down to manslaughter: "Yes, I sent some – a – different principles on self-defense, case law to brothers. I explained how easy it was to do it, how – you know, deception was key.  You know the brother thinks you're his friend, creep up on him and you can get him.  It's not a problem." *Id.* at RT 883:16-20.

28

application of, Supreme Court law.  *Deck*, 544 U.S. at 629; *Smith v. Harrison*, 388 F. App'x. 673, 675

(9th Cir. 2010); *see also* 28 U.S.C. § 2254(d)(1).   To demonstrate that shackling resulted in a

constitutional violation, "[p]etitioner must demonstrate: (1) that he was 'physically restrained in the

presence of the jury,' (2) that 'the shackling was seen by the jury,' (3) that the 'physical restraint was

not justified by state interests,' and (4) that 'he suffered prejudice as a result.'"  *Cox v. Ayers*, 613 F.3d

883, 890 (9th Cir. 2010) (internal citations omitted).

The California Court of Appeal described the conditions of petitioner's shackling as follows,

> Grizzle was tried in restraints, seated chained at the waist and ankles to a heavy "security chair" that was "scooted" under counsel table, his left hand linked by handcuffs to the waist chain.  This left his right hand free above the table for writing and the like.  The court ordered these measures at a pretrial hearing on the matter and found at the start of trial that the restraints were not visible to jurors and did not appear to interfere with Grizzle's ability to cooperate with counsel.  The court ordered a cloth screen placed around the front of the counsel table to block juror views and promised to have jurors brought in and out of the courtroom so as to minimize the possibility of their seeing the restraints.  At defense counsel's suggestion, a cloak was draped across the back of the security chair to further disguise it.  Evidently agreeing that the restraints were not visible, defense counsel declined the court's offer to instruct jurors to disregard them. [citation omitted].  At pretrial proceedings, Grizzle also had a "black box" over the hand-cuffs that prevented access to the keyholes, but this was not used in proceedings before the jury.

Pet., Ex. K at 8-9.

The Court of Appeal rejected petitioner's claim that shackling violated his constitutional rights,

and found that the record furnished adequate justification for the shackling.  The appellate court noted

that the trial court conducted a hearing in which the court heard testimony from two Pelican Bay

witnesses, a court liaison officer and the associate warden, and took into consideration many factors

before reaching the conclusion that the use of shackles was justified.  The factors the trial court took into

consideration included petitioner's classifying "points" for placement within the state prison system

(inmates needed 52 points to be placed in Pelican Bay; petitioner had 316), the basis for petitioner's

secured housing unit segregation, and petitioner's disciplinary and other violent offenses within Pelican

Bay.  Petitioner's record included,

> a 1994 felony conviction for assault with a deadly weapon on an inmate (§ 4501), a 1997 felony conviction for manufacturing a weapon (§ 4502), a fistfight in 1991, three more in 1993 (two fights and a stabbing), two 1992 possessions of weapons or other contraband (razor blades, sharpened needles), two more in 1993 (metal clips, staples, radio parts), four in 1994 (metal spear tip in underwear fly, metal piece in shoe, bracket, telephone bracket), two in 1996 (seven pieces of metal - two sharpened to a point - metal

1   clip, match heads), and one in 1997 (metal pen clip).

2   *Id*. at 10.

3   The appellate court then stated,

4   Aggravating those concerns were the nature of this trial and the AB involvement.
5   Grizzle was classified as an AB associate, and Littrell, a known member, had testified
    that Grizzle was an actual member. Both witnesses concurred in Littrell's assessment.
6   An AB "dropout" was considered a "rat" or informant and would be killed at the first
    opportunity. Any inmate who testified would be placed in "the hat," with "a priority hit"
7   placed on him, and several inmates had testified in Littrell's trial. It was likely that hits
    were out now for Contreras, Healy, Rubidoux and Ridinger. Those witnesses would now
8   be in the courtroom again, on one side or the other. Debriefings had revealed that AB
    members were taught to make handcuff keys and carry them. They were often made of
9   plastic to elude discovery with a metal detector; and members used court appearances
    as opportunities for escape and assault. One inmate had come to court with a key up his
10  nostril. Grizzle had a demonstrated propensity for gaining metal and other contraband
    that could be used for weapons or keys. Rubidoux had testified at Littrell's trial that he
11  overheard Littrell and Grizzle express a "great desire" to have Contreras harmed.

12  The court ruled to have the restraints at trial except for the black box. The court
    would also state later, at the start of trial, that it was aware from earlier showings on this
13  subject that there had been an apparent attempt to breach security during Littrell's trial;
    someone had been caught "making a diagram of the layout of the courthouse." Also, an
14  AB inmate in a Santa Rosa trial had tried to breach security. . . .

15  *Id*. at 10-11. With regard to the trial court's consideration of less restrictive alternatives, the Court of

16  Appeal held, "the record shows that [petitioner's] counsel argued vigorously for alternatives. This is

17  not a case of summary denial without a hearing or adequate record. The court implicitly explored

18  alternatives and, except for eliminating the 'black box,' rejected them." *Id*. at 11 (internal citations

19  omitted). The appellate court also noted that "[n]or does anything show that the restraints were visible."

20  *Id*. at 12.

21  Petitioner argues that the Court of Appeal erred because "the court of appeals never addressed

22  the ultimate question: was the trial court's rejection of less restrictive alternatives correct?" Pet. at

23  38:9-12. "[T]he general rule is that a court may not order a defendant to be physically restrained unless

24  the court is persuaded by compelling circumstances that some measure is needed to maintain security

25  of the courtroom, and the court must pursue less restrictive alternatives before imposing physical

26  restraints." *United States v. Howard*, 480 F.3d 1005, 1012 (9th Cir. 2007) (internal citations and

27  quotations omitted). Petitioner cites *Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995), in which the Ninth

28  Circuit held that the state trial court committed constitutional error because the court "summarily

United States District Court

For the Northern District of California

1    overruled Duckett's objection to the shackles," "[t]here is no indication in the record that the court

2    considered whether any less restrictive alternatives were available and would be adequate," and "the

3    court's only stated reason for requiring Duckett to appear in shackles during the penalty phase of the

4    case was that he had just been convicted of two counts of murder." *Id*. at 748-49.  The *Duckett* court

5    also stated that "[t]he trial court is not required to state on the record all its reasons for imposing

6    shackles, nor must it conduct an evidentiary hearing on the issue of necessity before ordering the use

7    of physical restraints. . . . However, the basis for the decision to shackle should be apparent from the

8    record." *Id*. at 749 n.7.

9         Here, the record demonstrates that the state trial court had before it ample evidence supporting

10   the use of restraints, and that the trial court implicitly considered less restrictive alternatives.   As

11   detailed by the Court of Appeal, the prosecution presented strong evidence outlining various security

12   concerns stemming from petitioner's personal history, as well as concerns generated by petitioner's

13   potential AB affiliation.  The trial court also considered petitioner's arguments including those based

14   on his incident-free past courtroom conduct, the detrimental effects of restraints, specifically the black

15   box, on petitioner's comfort and ability to communicate with counsel at trial, and overall due process

16   concerns surrounding such a significant use of restraints.  The trial court eliminated the black box for

17   the trial, stating,

18            [T]his court is aware from the testimony we've heard at the hearing . . . of the
              possible danger that's presented, either from this defendant or from other persons who
19            . . . may be coming from outside the courtroom . . .

20            The Court is aware also that during the trial of the of the -- of this defendant's co-
              defendant, that there were -- there apparently was an attempt made to breach the security
21            of the courtroom; that a person was detected making a diagram of the layout of the
              courthouse in -- in that trial.  We're aware that in trial of another individual associated --
22            who is alleged to be associated with the same organization, trial that occurred I believe
              in Santa Rosa or down in that general area, that there were attempts made to breach the
23            security of the trial in that situation.

24            And although the defendant has maintained good behavior in court during the
              hearings he has had in this case, nonetheless, the risk is quite substantial, and although
25            it's regrettable, I believe that the restraints are necessary.  That -- by the defendant
              having his right hand free he is able to take notes, work with -- work with papers that he
26            might have and it does not appear that it's going to unduly prejudice the jury or interfere
              with his ability to cooperate with his attorney in his defense.
27

28   Answer, Ex. B, Vol. 1 of 11, RT 3:16-4:12.  The trial court also personally examined the black box

1   device in reaching its decision on the use of modified restraints.  In light of the extensive briefing, a

2   hearing consisting of compelling testimony, repeated conversations with petitioner and counsel for both

3   sides, a personal review of the black box device, and modifications to the state's proposed security

4   measures, the Court finds that the trial court did not abuse its discretion in rejecting further alternatives.

5        Petitioner's claim also fails because he offers no evidence to show that the shackling was seen

6   by the jury or that he suffered prejudice as a result of the imposed restraints.  Even visible restraints are

7   permitted during trial after "a trial court determination, in the exercise of its discretion, that they are

8   justified by a state interest specific to a particular trial."  *Deck*, 544 U.S. at 629; *Larson*, 515 F.3d at

9   1062.  Additionally, when restraints are not actually seen by the jury during the trial, the Ninth Circuit

10   has held that the shackling was harmless error.  *See Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir.

11   1999) (citation omitted).  Where care is taken to ensure that a defendant's shackling is not visible to the

12   jury in the courtroom, prejudice is not presumed.  *See Rich v. Calderon*, 170 F.3d 1236, 1240 (9th Cir.

13   1999) (no constitutional error where defendant was only shackled with ankle chains during trial and

14   shackles were behind curtain or skirt placed around the defense table to insure that they were not visible

15   to the jury), *amended*, 187 F.3d 1064, 1069 (9th Cir. 1999).  A jury's brief or inadvertent glimpse of a

16   defendant in physical restraints outside of the courtroom has not warranted habeas relief; defendants

17   must demonstrate that they suffered actual prejudice.  *See Rhoden*, 172 F.3d. at 636 (internal citations

18   omitted).

19        Here, the record shows that the trial court took significant steps to conceal petitioner's restraints

20   from the jury.  The trial court held that to "avoid any undue prejudice that may result from the defendant

21   being in physical restraints during the trial I'll make a record that there's going to be a cloth screen . .

22   . this will block the view of the jurors while they're in the jury box . . . and the jurors and prospective

23   jurors will be brought in and out of the courtroom in such a way as to minimize the possibility that the

24   jurors will see that the defendant has physical restraints."  Answer, Ex. B, Vol. 10 of 11, RT 75:27-

25   76:14.  In addition, before the jury entered the courtroom, the trial judge, upon request by defense

26   counsel, instructed that a coat be hung over the back of petitioner's chair to further conceal petitioner's

27   chair from the spectator's area.  In response to counsel's renewed objection to the nature of petitioner's

28   remaining restraints, the trial court again offered to instruct the jury, which petitioner again denied.

Without evidence to suggest that the jury observed the restraints or that petitioner was in any other way prejudiced by the restraints, the Court concludes that the trial court did not commit constitutional error and that the appellate court did not unreasonably apply *Deck* in its review.  Accordingly, petitioner is not entitled to habeas relief on this claim.

**VII.    Certificate of appealability**

Pursuant to Rule 11 of the Rules Governing Habeas Corpus Cases Under Section 2254, the Court has reviewed the record in this case and issues a certificate of appealability on petitioner's claim of jury taint, i.e., petitioner's claim that he was deprived of his Fifth, Sixth and Fourteenth Amendment rights when the trial court failed to declare a mistrial due to taint of the jury.

As to all other issues, a certificate of appealability is denied because petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). That is, he has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**CONCLUSION**

For the foregoing reasons and for good cause shown, the petition for a writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: September 12, 2011

_____
SUSAN ILLSTON
United States District Judge

*United States District Court*
*For the Northern District of California*

37